```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
                               TYLER DIVISION
```

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS
OCT 8 1996
DAVID J. MALAND, CLERK
BY
DEPUTY

UNITED STATES,           )
                         )
          Plaintiff,     )
                         )
Goodrich ISD             )
                         )
          Intervenor     )
                         )
v.                       )      CIVIL ACTION NO. 5281
                         )
                         )
STATE OF TEXAS et al.    )
                         )
          Defendants,    )
                         )
Livingston ISD           )
          Intervenor     )
                         )
_____)

## United State's Post-Hearing Brief

This school desegregation case was initiated by the United States against the State of Texas, including the Texas Education Agency, the State Commissioner of Education and their officers, agents, employees, and successors. On November 24, 1970, this Court entered an Order in this case requiring the defendant parties to re-evaluate all of their activities and practices relating to the desegregation of public elementary and secondary education within the State of Texas. A Modified Order was later entered in 1971, requiring, among other things, defendants to prohibit student transfers and annexations which undermine the defendants responsibility to eliminate segregation "root and branch." Green v. New Kent County, 391 U.S. 430, 437-8 (1968).

The current phase of this case began in 1991, when, pursuant to state law, ninety-one property owners residing in Forest Springs, a subdivision of Polk County, requested a petition for De-Annexation of Territory from the Goodrich Independent School District (GISD) to the Livingston Independent School District (LISD). [State of Texas, Exhibit A, Administrative Record, Volume II, pp 407-432]. The GISD Board voted against the detachment, while the LISD supported annexation. Accordingly, pursuant to state law, the Forest Springs' property owners appealed to the Texas Commissioner of Education and a hearing was held before the Commissioner on January 6, 1992. The Commissioner, against the wishes of the GISD, granted the annexation, resulting in twenty-two students leaving GISD and permanently transferring to the LISD. Of those twenty-two students, twenty were white, resulting in a loss of white student population in the GISD of 11%.[1] [Murray, TR at 36, lines 5-12]. The GISD sought an appeal in Travis County District Court, in accordance with Sec. 19.009 of the Texas Education Code. That court overturned the Commissioner's findings, holding that the detachment would result in dual school systems in contravention of federal law. [Plaintiff-Intervenor Ex. 7-8]. The Court of Appeals for the Third District reversed, and writ was denied by the Texas Supreme

---

[1] For the 1992-1993 school year, GISD enrolled 276 students, of whom 101, or 36.6%, were black; 154, or 55.8%, were white; and 19, or 6.9%, were Hispanic. For the same period, LISD enrolled 3,509 students -- 14.1% were black, 79.5% were Anglo,, and .7% were Hispanic. [Plaintiff-Intervenor Exhibit No. 13 at Table One and Table Four].

2

Court. The GISD eventually brought action in this court claiming that the annexation violated the Modified Court Order of Civil Action 5281 and that the Commissioner's analysis did not satisfy his obligations under this Court's Orders. A hearing was held on August 22, 1996, wherein the GISD and the Forest Springs subdivision, both limited intervenors in this action, presented evidence regarding the proposed annexation of Forest Springs.[2]

I. **THE EVIDENCE SHOWS THAT IN ADDITION TO THE LOSS OF 11% OF THE GISD'S ANGLO STUDENT POPULATION, THE ANNEXATION OF FOREST SPRINGS WOULD PROMOTE FUTURE ANNEXATIONS AND AFFECT THE VIABILITY OF THE GISD TO REMAIN A RACIALLY INTEGRATED SCHOOL DISTRICT.**

At the hearing on August 22, 1996, four witnesses testified regarding the present and future effects of the annexation, the perception that a possible annexation will have in the community, and the failure of the TEA to adequately enforce school district lines.

Dr. Richard W. Murray, Professor of Political Science at the University of Houston and Director of the Center for Public Policy, testified for the GISD. [TR at 31, lines 17-19; Plaintiff-Intervenor Exhibit 13]. At the time of the original annexation, twenty-two students would have been permanently transferred out of the GISD, resulting in an 11% lost of the

---

[2]This Court ordered that any decision would be stayed until the possible annexation of Forest Springs to Goodrich County was administratively approved by the Voting Rights Section of the Department of Justice, pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. Counsel for the GISD has, since the hearing, sought such pre-clearance, and the United States has verified that Section 5 attorneys are presently investigating the detachment for pre-clearance approval.

3

total white student population at the GISD. While any numerical impact, standing alone, may not be used as a per se rule against an annexation, see Order United States v. Texas, in such a small school district as the GISD, an 11% loss of an Anglo population has a substantial impact. [Murray, TR at 48 lines 1-5]. Even the expert for defendant-intervenors, Dr. Michael Say, the Superintendent of Humble Independent School District, remarked the movement of a 11% of an Anglo student population out of his school district would be a "concern[]. . . because that area is part of the total district, and I would be concerned about the impact on balance within my total district." [TR at 150, lines 18-22].

The evidence showed that, when the annexation request was viewed in the context of Polk County as a whole, rather than solely looking at the 22 students in Forest Springs, the likelihood that the GISD would remain a viable and desegregated school district was seriously threatened. [Murray, TR at 52, lines 16-21]. Goodrich has the largest black population, and one of the smaller Anglo populations in Polk County, while Livingston is substantially Anglo. [Murray, TR at 37, lines 18-25]. Since this litigation began, GISD's white resident population has dropped from 60% to 48% Anglo. In all other school districts in Polk County, the Anglo resident population was equally represented in the schools. However, in GISD, the white percentage was much larger in the resident population than in the attendance in the (Goodrich) schools. Thus, the disparity

between white resident population and student enrollment exists in the GISD district only. [Murray, TR at 45-46, lines 24-25, 1-2]. Given the racial make-up of the GISD, coupled with the fact that Anglo students are already leaving the GISD, the detachment and annexation would exacerbate the already existing trend for the GISD to become a heavily minority district in an Anglo County. Id. The GISD is already perceived as the minority school district in the area. [Testimony of Colonel Howard Daniel, resident of the Livingston Independent School District, TR at 125, lines 4-5]. The deannexation of Forest Springs would contribute to that perception. Id.

The evidence also showed that in addition to the 11% change in the Anglo population, other white subdivisions were likely to follow Forest Springs, and seek annexation to contiguous white school districts outside the GISD. Ms. Trisha Klock, a life-long resident of Goodrich County and the administrative assistance and business manager of the GISD, testified on behalf of the GISD regarding the impact of the annexation as well as student transfers and transportation. Because Forest Springs is a nearly all-white subdivision in Goodrich County, the accepted perception is that the annexation request of Forest Springs was racially motivated. [Klock, TR 83, lines 21-22]. Furthermore, and of significant importance, the evidence showed that if Forest Springs were allowed to detach, other Anglo sub-divisions would follow their lead, encouraged by the possibility to leave a school district that has, because of Forest Springs detachment,

become more minority. [Klock, TR at 81, lines 24-25]. Ms. Klock testified that, as a member of an Anglo subdivision, she has been told by other residents that if Forest Springs is permitted to annex, they too will seek detachment. Id. Moreover, if the Forest Springs annexation did annex, the perception that the GISD was solely a minority school district would increase. [Daniel, TR at 125, lines 8-10]. The cumulative effects to these piecemeal annexations, if approved, would be substantial. In short, the reasons to annex offered by Forest Springs are not unique and would be equally applicable to other situations.

The annexation of Forest Springs will also limit the GISD's ability to run a viable and integrated school district. Due to the loss of students because of this annexation and impermissible student transfers, see supra, financial and resource capability is threatened. [Klock, TR at 82, lines 10-14]. In such a small school district, the loss of students over time, with comparative loss of revenue, endangers the ability to offer classes, buy computers and provide extra-curricular activities. Id. As the GISD becomes unable to provide these services, the appeal of other school districts will become greater to parents and their children.

**II. THE COMMISSIONER OF EDUCATION DID NOT ADEQUATELY ANALYZE ESSENTIAL CONSEQUENCES OF THE FOREST SPRINGS ANNEXATION REQUEST AND HAS FAILED TO EFFECTIVELY ENFORCE ASPECTS OF THIS COURT'S ORDERS**

TEA has failed to ensure that the requirements of this Court's Orders are effectively enforced. In 1990, TEA delegated transfer implementation and enforcement to the individual school districts, which are supposed to send a transfer form to the sending district. In the GISD alone, fifty-eight students are attending public schools in other school districts, while only ten have filled out transfer forms. [Klock, TR at 78, lines 9-22 Plaintiff-Intervenor, Ex. 16]. No independent verification of transfers occurs by TEA. Id.

This Court required that TEA effectively enforce zone lines, proscribing excessive transfer and annexations that undermine the desegregation effort in Texas. GISD is not just threatened by the annexation request, but by the perception by parents that zone lines are not enforced and that parents can avoid attending school in the district in which they reside despite the Court's order and the impact on desegregation. In this case, when the transfer of Forest Springs students was denied by the TEA in 1989, eleven of these same students, who now request an annexation, simply went to other school districts. See Response of the Texas Education Agency and the State of Texas to Intervenor's Motion for Preliminary Injunction, at 6.[3]

---

[3]Counsel for the TEA raised an objection to any evidence regarding TEA's policy on transfers being raised at the hearing. [TR at 151-152; lines 24-25, 1-4]. The TEA's policy on
(continued...)

### III. THE DE-ANNEXATION STANDARD IS PROPERLY BEFORE THIS COURT REGARDING THE TEXAS EDUCATION AGENCY'S AND THE COMMISSIONER'S LEGAL OBLIGATIONS IN DETACHMENT CASES

The TEA and the Commissioner are delegated the authority to ensure that the Texas educational system sufficiently and thoroughly eliminates the vestiges of its prior school system in every facet of school operations, including student assignment, faculty, staff, transportation, extra-curricular activities and facilities. Freeman v. Pitts, 112 S.Ct. 1430 (1992). Until a system is declared unitary, federal court supervision of this case continues.

The State of Texas and TEA have, in pre-trial motions and at the hearing, argued that the GISD's claims have been fully and fairly litigated in the Texas state courts and that this present litigation undermines the effective administration of desegregation law established by TEA and the original Court Orders. The Court, in its Order of August 21, 1996, ruled that GISD had "pled facts sufficient to overcome TEA's assertion of collateral estoppel" and denied the motion. Order at 3.

The Defendant parties, however, fail to consider that the Commissioner's findings, assuming arguendo that she found no violation of this Court's Orders, is binding on this Court. Jurisdiction of Civil Action 5281 remains in the federal courts,

---

[3](...continued)
transfers, as does its policy on annexations, however, has important consequence regarding whether the school districts and the State are avoiding their constitutional obligations by allowing parents to freely transfer or annex, regardless of its impact on desegregation.

8

even if the Court Order demanded an extensive apparatus within Texas to enforce the court orders; the desegregation duties are a "duty" on the Texas agencies, while "this court retains jurisdiction of this matter for all purposes, and especially for the purpose of entering any and all further orders which may become necessary to enforce or modify this decree." Modified Order at 23. Thus, even if this court were to find that there is sufficient evidence to show that the Commissioner analyzed the language regarding annexations in 5281, that interpretation, if contrary to federal law, can not stand.[4] This Court retains authority to interpret its orders.

The issue, then, before this court is what standards should be used in interpreting the Modified Orders to ensure that the Commissioner sufficiently and effectively enforces this decree. This question is essential not only because the interpretation of the annexation language in Part B of the Modified Order has never before been before this court, but because the evidence shows that TEA has consistently ruled in favor of detachment and annexation requests. [Plaintiff-Intervenor Exhibit 14]. TEA has never seen a detachment request it did not grant.

---

[4] The United States does not waive its objection to defendant TEA and Forest Spring's claims that this court's review of the Commissioner's findings undermines the effective administration of Civil Action 5281. That claim is entirely without merit. See Plaintiff's Exhibit No. 5, response letter of (Defendants) the TEA and the Forest Springs subdivision ("(w)e reemphasize and reurge that where the sole issue in dispute is whether the Commissioner's decision approving a detachment and annexation violates the Modified Order, the only court that may properly decide that questions is the court that issued the order---. . . the (federal) District Court.")

9

As the United States has urged previously, this case presents an opportunity for this court to set out appropriate factors to be considered to ensure the effective administration of the annexation provisions in the Court's Orders.[5] This court has provided guidance with respect to the requirements of Civil Action 5281, to ensure that TEA carries out its responsibilities in compliance with this Court's orders and in a consistent way. See United States v. State of Texas, Civil Action No. 5281 (September 8, 1980) (Intervention of Mary Hightower).

A formerly segregated school system must effectively remedy the Constitutional violations. A court must determine whether a plan is adequately implemented and actually works in practice. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971). The Supreme Court has repeatedly emphasized that "the measure of any desegregation plan is its effectiveness." Davis v. Board of Sch. Comm'rs, 402 U.S. 33, 37 (1971). The court retains jurisdiction to "insure prompt and faithful compliance with its order . . . ." Lawrence County, 799 F.2d 1031, 1045 (citation omitted); see also Hammon v. Kelley, 830 F. Supp. 11, 13-14 (D.D.C. 1993) (citation omitted) (emphasizing that trial court retains jurisdiction to enforce consent decrees and

---

[5] Evidence adduced at the hearing disclosed that at least ten annexations have been approved by the Commissioner over a nine year period. Since this hearing involved only the Forest Springs annexation, no evidence was presented regarding the impact of these annexations or the standards applied by the Commissioner in approving them. Moreover, it is unclear whether these represent the total annexations for this period of time or only those appeals to the Commissioner.

settlement agreements, in the same manner as orders, and that this jurisdiction includes the power to prevent parties from repudiating their obligations).

In school desegregation cases where changes in school district boundary lines at issue, courts have considered in their inquiries: (1)the percentage change that the annexation will have on racial percentages in the enrollments in the sending and receiving districts, including at particular schools within the sending and receiving districts, United States v. Lowndes County Board of Education, 878 F.2d 1301 (11th Cir. 1989)(inquiry of whether the change in student assignment will result in a 'white haven'); (2)whether the district can remain a viable school district and ensure an adequate quality of education for its students, Lee and United States v. Chambers County Board of Education, Order, April 8, 1994 (submitted to the court and the parties on August 22, 1996) (3)whether the annexation enforces a "reasonable perception has been created in the African-American community in the county that racial considerations were a factor in the decision," Id. at 29; (4)the likelihood that this detachment will result in further annexations and the "eventual occurrence" of dual school systems, Lowndes, at 1306; (5) whether the request for annexation was racially motivated, id. and (6) the desegregation status of the district, that is, whether unitary or not. Consideration of these factors would provide an appropriate framework to review annexations under the Orders. In this case, the evidence, unrefuted by defendants, showed that the

11

annexation would result in a loss of 11% of the Anglo student population, a significant and threatening number [Say, TR 150, lines 13-25]; that other white subdivisions are awaiting Forest Springs detachment in anticipation of doing the same; that the GISD will be unable to provide essential services to its children; that the perception that GISD is the minority enclave in Polk County will be enforced and justified.  The evidence further demonstrated that TEA has not effectively enforced zone lines -- either through transfer requests or annexations.

## CONCLUSION

For the foregoing reasons, the United States urges that this court deny the petition for annexation of the Forest Springs subdivision.  In addition, or in the alternative, the United States suggests that this court require the TEA to consider the standards of federal desegregation law cited above, including

taking into account the cumulative effect of potential annexation requests, in all future annexation cases.

                Respectfully Submitted,

                DEVAL L. PATRICK
                Assistant Attorney General
                Civil Rights Division

                JEREMIAH GLASSMAN
                JULIETTE N. KAYYEM
                Attorneys
                Educational Opportunities
                    Litigation Section
                Civil Rights Division
                U.S. Department of Justice
                Washington, D.C.  20530
                202/514-4092

Certificate of Service

I hereby certify that on this 7th day of October, 1996, I served copies of the foregoing first class mail to counsel of record below:

William C. Bednar, Jr.
Eskew, Muir, & Bednar
98 San Jacinto Blvd., Suite 1400
Austin, Texas 78701

Roger D. Hepworth
Hensell, Fowler & Hepworth
9600 Great Hills Trail, Suite 300-W
Austin, Texas 78759-6303

Mr. Bill Jones
Attorney for Livingston ISD
P.O. Box 1108
Livingston, Texas 77351-3798

Ms. Allison H. Eccles
Attorney General's Office of the State of Texas
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711

*/s/ Juliette Kayyem*
JULIETTE N. KAYYEM
Trial Attorney
Educational Opportunities
    Litigation Section
Civil Rights Division
U.S. Department of Justice
Washington, D.C. 20530
202/514-4092