**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **HEARNE INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| | § | **Civil Action No.  6:71-CV-5281** |
| **Plaintiff-Intervenor,** | § | |
| | § | Before Judge JUSTICE |
| v. | § | |
| | § | |
| **STATE OF TEXAS, ET AL.,** | § | |
| | § | |
| **Defendants,** | § | |

**PLAINTIFF UNITED STATES' MOTIONS FOR SUMMARY JUDGMENT**
**AGAINST DEFENDANTS TEXAS EDUCATION AGENCY**
**AND MUMFORD INDEPENDENT SCHOOL DISTRICT**

TO THE HONORABLE WILLIAM WAYNE JUSTICE, SENIOR U.S. DISTRICT JUDGE:

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule CV-56, Plaintiff United

States of America hereby moves this Court to enter summary judgment in favor of the United

States with respect to each of the United States' claims against the Texas Education Agency

("TEA")  and the Mumford Independent School District ("MISD").  In support thereof, the

United States submits the following.

**STATEMENT OF MATERIAL FACTS**

1.      On April 9, 2004, the United States moved to enforce the Court's August 9, 1973 Order

        (the "Court Order") against TEA to halt funding to the Mumford Independent School

        District ("MISD") for student transfers from neighboring Hearne Independent School

District ("Hearne ISD").  <u>See</u> United States' Motion to Enforce Order Ag. TEA (April 9, 2004).

2.  Specifically, the United States seeks to enjoin TEA from (1) providing MISD with funding for numerous transfers that reduce or impede desegregation in Hearne ISD; (2) providing MISD with funding for 151 specific transfers that MISD misrepresented as qualifying for a hardship exception to the Court Order; and (3) providing MISD with any transportation funding until MISD can show that it has ceased transporting transfer students that reduce desegregation in Hearne ISD.  <u>See</u> <u>id.</u>

3.  Also on April 9, 2004, the United States filed a Motion for Injunctive Relief Against Defendant MISD, alleging that MISD was interfering with the operation of the Court Order.  <u>See</u> United States' Motion for Injunction Against MISD (April 9, 2004)

4.  As claimed therein, and as fully explained below, (1) MISD has interfered with the Court Order and further interference ought to be enjoined under the All Writs Act, 28 U.S.C. § 1651(a); (2) MISD has operated "in active concert or participation" with TEA in violating the Court Order, and the Court Order therefore should be enforced against MISD; and (3) MISD's continued acceptance of transfer students from Hearne ISD has thwarted the Court Order and therefore ought to be enjoined pursuant to the Court's inherent authority. <u>See id.</u>

### The Parties

5.  Defendant Texas Education Agency ("TEA") is an agency of the State of Texas and a defendant in this case.  (MISD's Cross-Claim Ag. TEA, at 2, ¶ 2 (June 21, 2004); TEA's Ans. to MISD's Cross-Claim, at 1, ¶ 2 (July 8, 2004).)

6.      Defendant MISD is a political subdivision of the State of Texas.  (MISD's Ans. to

        Compl. in Interv., at 3, ¶ 13 (Sept. 23, 2003).)

7.      Plaintiff-Intervenor Hearne Independent School District ("Hearne ISD") is a political

        subdivision of the State of Texas.   (Hearne's Compl. in Interv., at 4, ¶ 9 (July 25, 2003).)

8.      The United States of America is the Plaintiff in this case.

## The Court Order

9.      TEA annually provides each school district in Texas with a certain amount of funding for

        each student that the district enrolls, whether the student resides in the district or transfers

        from another district.  Texas Educ. Code §§7.055(b)(35), 42.005, 42.101.

10.     TEA operates subject to a desegregation court order entered in this case in August 9,

        1973.  (Amendments to Modified Order of July 13, 1971 (Aug. 9, 1973) [hereinafter

        Court Order].)

11.     Section A of this Court's August 9, 1973 Order ("the Court Order") pertains to Student

        Transfers and provides:

> Defendants shall not permit, make arrangement for or give support of any kind to
> student transfers, between school districts, when the cumulative effect, in either
> the sending or receiving school or school district, will be to reduce or impede
> desegregation, or to reinforce, renew, or encourage the continuation of acts and
> practices resulting in discriminatory treatment of students on the grounds of race,
> color, or national origin.

(Court Order at 1, ¶ A(1).)

12.     The Court Order requires TEA to review all student transfers and to notify districts of

        transfers that do not appear to comply with the terms of the order.  (Id. at 4, ¶ A(5).)

13.  The Court Order further provides that if a district accepts such transfers, TEA

> shall refuse to transfer the funds, based on the average daily attendance of the
> transfer students involved[,] to the account of the receiving district, and shall,
> thereby, terminate and refuse to grant or continue paying to the offending district a
> percentage of state funds equivalent to the district's entitlement based on the
> average daily attendance of the students transferring in violation of this order.

(Id. at 4, ¶ A(6).)

14.  The Court Order also permits TEA to grant exceptions to these requirements in "hardship

situations," which the Order does not define.  (Id. at 2, ¶ A(2)(c).)

15.  TEA has defined nine different types of "hardship situations" qualifying for the hardship

exception to the Court Order, including, pertinent to the issues in dispute here, situations

concerning childcare needs and a student's health or safety.  (Exh. 1, at 188:14-23 (I

Depo. of Donald Enos (June 2, 2004) [hereinafter Enos I]); Exh. 2, at TEA 336-39 (Depo.

Exh. 27))

### TEA's Monitoring of Transfers

16.  To track inter-district transfers and their effects, TEA requires each district to inform

TEA of each transfer that the district has accepted for the following school year and to

identify the type of hardship exception for which each transfer qualifies, if any.  (Exh. 3,

at 2, ¶¶ 4, 6-8 (Aff. of Sylvia Gonzales (May 18, 2004) [hereinafter SG Aff.])

17.  Before TEA switched to an electronic reporting system in 2002, districts reported transfer

data via a TEA form, identifying each transfer student and type of hardship exception for

which the transfer qualified.  (Id.)

18.  The form included instructions on how to complete the form and an explanation of the

qualifications for each type of hardship exception, and it required the superintendent to

-4-

sign and date the form at the bottom.  (Id., ¶ 6; Exh. 4, at 94:18 to 95:12 (I Depo. of Pete Bienski (Sept. 14, 2004) [hereinafter Bienski I]); Exh. 5, at TEA 1-A to 1-B (Depo. Exh. 62))

19.    In the spring of 2002 TEA implemented a new automated system to track transfers. Under the new automated "Student Transfer System" ("STS"), TEA still requires districts to enter the same information on transfers, but districts now submit the information electronically.  (Exh. 3, at 3, ¶¶ 12-13 (SG Aff.))

20.    Once the district enters the information, the STS system automatically calculates the numerical effect of the transfers on the racial makeup of all districts affected. (Exh. 1, at 186:9-20 (Enos I); Exh. 2, at TEA 334 (Depo. Exh. 27); Exh. 3, at 3, ¶¶ 10-12 (SG Aff.))

21.    To calculate the effect of transfers on a particular district, TEA starts with the district's total enrollment then *subtracts* from that figure all transfers going *into* the district and *adds* to it all transfers *leaving* the district.  (Exh. 1, at 188:5-10 (Enos 1); Exh. 2, at TEA 334 (Depo. Exh. 27))  TEA considers the resulting numbers to be the ethnic counts and percentages of the district if there were no transfers either into or out of the district.  (Exh. 2, at TEA 334 (Depo. Exh. 27))

22.    In the forgoing calculation, however, TEA does not include any transfers that the district has indicated as qualifying for a hardship exception.  (Exh. 1, at 187:7 to 188:4 (Enos I); Exh. 2, at TEA 334 (Depo. Exh. 27))  Yet, Dr. Donald Enos, the Director of the TEA unit responsible for ensuring compliance with the transfer provisions of the Court Order, acknowledges that the calculation would more accurately measure the effect of the

transfers if it included the transfers qualifying for hardship exceptions.  (Exh. 6, at 162,

line 20-23 (II Depo. of Donald Enos (June 10, 2004) [hereinafter Enos II]))

**Effect of Transfers on Hearne ISD**

23.    Hearne ISD, like TEA, operates under a desegregation court order.  See Exh. 7.

24.    Exhibit 8 includes a Declaration and two charts entitled "Effect of Transfers on Hearne

School District."  The first chart (Decl. of Chris Hayes, Exh. A (Nov. 5, 2004)

[hereinafter Hayes Decl.]) accurately presents the numbers of students enrolled in,

transferring into, and transferring out of Hearne ISD for each year since 1996 based on

the information provided by TEA in response to the United States' 1st Set of Interrogs.

(Exh. 8 (Hayes Decl., at ¶¶ 6-7, 10-12)  The chart also accurately shows, under the

column "Resident Population," the numbers of public school students by race who reside

in Hearne ISD regardless of whether they transfer to another district.  (Exh. 8 (Hayes

Decl., ¶ 10).  The "Resident Population" numbers on the report were calculated using the

same calculation that TEA uses to determine the effect of transfers on a particular district,

except that the chart did not exclude any hardship transfers from that calculation.  (Exh. 8

(Hayes Decl., ¶ 10); Stmt. of Mat. Fact 21)

25.    The second chart in Exhibit 8 (Hayes Decl., Exh. B) shows the same information for each

grade level in Hearne ISD.  (Exh. 8 (Hayes Decl., ¶ 11)

26.    During the 2002-03 school year, Hearne ISD enrolled 1280 students, of whom 55.3%

were African-American, 29.5% were Hispanic and 14.5% were white.  (Exh. 8 (Hayes

Decl., Exh. A))

27.   That year, 187 white students transferred out of Hearne ISD compared to 186 white students who actually remained enrolled there.  That is, *more than half of the white public school students residing in Hearne ISD transferred out of the district*.  (Id.)

28.   While 21.6% of the public school students residing in Hearne ISD were white in 2002-03, only 14.5% of Hearne's enrollment after transfers consisted of white students.  (Id.)

29.   Conversely, while only 45.7% of the public school students residing in Hearne ISD were African-American in 2002-03, Hearne ISD's enrollment was 55.3% black after transfers out of the district.  (Id.)

30.   The 2001-02 difference between Hearne's enrollment after transfers and the racial composition of public school students residing in Hearne ISD are greater than those differences in 2002-03.  (Id.)

31.   In 2001-02, the last year that TEA allowed MISD to accept transfers without restriction, 22.1% of the public school students living in Hearne were white while only 13% of Hearne's enrollment after transfers was white.  (Id.)

32.   Conversely, only 45.6% of the public school students residing in Hearne were African-American in 2001-02 while fully 56.7% of Hearne's enrollment after transfers was black. (Id.)

33.   Between 1996-97 and 2002-03, white students' share of Hearne's enrollment dropped from 23.5% to 14.5%.  (Id.)

34.   The transfers affect every grade level at Hearne ISD, including the younger grades.  For example, while 23.8% of public school second graders who resided in Hearne ISD during the 2002-03 school year were white, Hearne ISD's second grade enrollment after transfers

was only 12.5% white--a difference of 11.3%.  (Exh. 8 (Hayes Decl., Exh. B, at 25))  In

Grade 4, 16.8% of Hearne's enrollment that year was white, 9.4% less than the

percentage of white public school fourth graders residing in Hearne ISD.  (Id. at 26)  In

Grade 6, only 9.9% of Hearne's enrollment was  white, while white students comprised

19.5% of white public school sixth graders residing in Hearne ISD.  (Id.)

35.  Mr. James Taylor has been the President of the Board of Trustees for Hearne ISD since

March 2004 and has been a Board member since 1999.  Mr. Taylor's son graduated from

Hearne ISD four years ago and his daughter was a junior in Hearne ISD as of June 2004.

Also as of that time, he had two nieces and three nephews enrolled in Hearne ISD

schools.  (Exh. 9, at ¶¶ 1-3 (Affidavit of James Taylor (June 21, 2004))

36.  Mr. Taylor has lived in Hearne for 17 years, during which time he has interacted

extensively with people in the Hearne community.  He has been a member of the Hearne

booster club for the last four years, and he has participated in a number of volunteer

charity and service organizations.  Many of Mr. Taylor's co-workers are from Hearne,

and he has spoken with them and other co-workers about Hearne ISD on various

occasions.  During these conversations, co-workers from both Hearne and other school

districts have noted that Hearne ISD has become a predominately black school district

because of student transfers leaving the district and that transfers are continuing this

trend.  Based on his conversations with co-workers and Hearne residents and his

familiarity with the Hearne and surrounding communities, Mr. Taylor believes that this is

the general perception of Hearne ISD in the community.  (Id., ¶¶ 4-7.)

**TEA's Continued Funding of Transfers to MISD**

37.   MISD has accepted transfer students in contravention of this Court's Modified Order and its amendments, thereby increasing MISD's student population and its state funding. (TEA's 1st Am. Answer, at 5, ¶ 24 (June 15, 2004).)

38.   From May 2000 to November 2002, Dr. Sylvia Gonzales was the person at TEA primarily responsible for monitoring compliance with the transfer provisions of the Court Order.  (Exh. 3, at 1, ¶ 2 (SG Aff.))

39.   In implementing the automated Student Transfer System ("STS") in the Spring of 2002, TEA decided to allow all transfers who were enrolled in their receiving districts during the 2000-01 school year to remain there with state funding *regardless of those transfers' effects on desegregation at any other district* and regardless of whether the transfers violated the Court Order.  (Exh. 1, at 190:5 to 192:10 (Enos I); Exh. 10, at 86:18 to 87:21 (Gonzales I)).  TEA refers to these 2000-01 transfers as "baseline" transfers.  (Exh. 1, at 189:16-24 (Enos I))

40.   As Dr. Gonzales testified, when TEA found out that the baseline transfers that a district accepted reduced or impeded desegregation in another district, TEA nevertheless allowed those transfers to go to the receiving district.  (Exh. 10, at 127:19 to 128:8 (Gonzales I))

41.   Some months after implementing the STS system in 2002, TEA also decided to allow the *2001-02* class of transfer students to remain at their receiving districts as well, with funding and without regard to whether they reduced or impeded desegregation in any district and violated the Court Order.  (Exh. 1, at 175:21 to 175:14; 190:12 to 192:10 (Enos I); Exh. 10, at 92:7 to 94:5; 105:7-9 (Gonzales I); Exh. 3, at ¶¶ 12-13 (SG Aff.)).

TEA refers to these 2001-02 transfers as "grandfathered" transfers.  (Exh. 1, at 189:25 to 190:4 (Enos I))

42.     In implementing the STS system, TEA further decided to allow districts to accept all transfers who were siblings of a "baseline" transfer student, with funding and without regard to the transfers' effect on desegregation in any other district.  (Exh. 10, at 94:6-18; 101:23 to 102:15 (Gonzales I))

43.      "To put a stop to the incoming of transfers that were not eligible," (Exh. 10, at 105:2-3 (Gonzales I)), however, TEA decided not to allow districts to accept the siblings of "grandfathered" (2001-02) transfer students.  (Id. at 104:18 to 105:6)

44.     As of the 2002-03 school year, MISD enrolled 119 white transfers from Hearne ISD who did not qualify for any hardship exception.  (Exh. 11 (TEA's Response to United States' 1st Set of Interrogs. (Oct. 14, 2004), "Mumford ISD, Transfer Students Enrolled at any Time During the Year, PEIMS Data for Sch. Year 2002-03 [hereinafter TEA's Oct. 14, 2004 Response])

45.     As of 2002-03, TEA continued to fund 93 such transfers who were still enrolled at MISD, of whom at least 82 are either "baseline," "grandfathered" or "sibling" transfers.  (Id. Compare id. with Exh. 12, at 13:19 to 14:6 (Depo. of Ronald McMichael (Sept. 7, 2004)); Exh. 13, at TEA 673-675 (Depo. Exh. 47; list of non-funded transfers); see also Exh. 1, at 186:12-20; 188:14-23 (Enos I); Exh. 2, at TEA 340 (Depo. Exh. 27; showing codes for "baseline," "grandfathered," and "sibling" transfers.)  (TEA is not funding the remaining 26 such transfers.  See Stmt. of Mat. Fact 80-81 [hereinafter SMF].)  TEA will

continue to provide funding for these students as long as they remain enrolled at MISD.

(Exh. 2, at TEA 340 (Depo. Exh. 27))

**<u>MISD's Interference with the Court Order</u>**

46.    MISD first began to accept increasing numbers of transfers in the mid-to-late 1990s.

(Exh. 4, at 9:13 to 10:11; 46:23 to 47:2 (Bienski I))

47.    Of the 422 transfer students leaving Hearne ISD in 2002-03, 310 transferred to MISD,

including 70.5% of the white students transferring out of Hearne (132 of 187).  (Exh. 8

(Hayes Decl., Exh. A); Exh. 14, at TEA 3848-3856 (TEA's Response to United States'

1st Set of Interrogs. (June 29, 2004)))  Sixty-two percent (62%) of MISD's enrollment

consisted of transfers from Hearne ISD.  (<u>Id.</u>)

48.    In 1996-97, white students comprised only 28.1% of MISD's enrollment.  (Exh. 15,at

TEA 3811-3814 (TEA Response to Interrogs.)).  By 2002-03, white students' share of

MISD's enrollment had increased to 46%, a larger share than any other ethnic group.

(Exh. 14, at TEA 3848-3856 (TEA Response to Interrogs.))

49.    According to information provided by MISD, but not yet confirmed by TEA, 59% of

MISD's enrollment in 2003-04 consisted of transfer students from Hearne ISD.  (Exh. 16,

at MISD 504-516 (MISD's Answers to United States' 1st Set of Interrogs. (July 14, 2004)

[hereinafter MISD's Answers to Interrogs.]))

50.    Moreover, MISD sends out information to parents on how new transfer students can

enroll; this information is intended for parents of students who have not yet transferred to

Mumford.  (Exh. 17, at 40:14 to 41:19 (I Depo. of Barbara Brannon (Oct. 14, 2004)

[hereinafter Brannon I]); Exh. 18 (Depo. Exh. 55))

51.    All five of MISD's buses currently run into Hearne ISD.  (Exh. 4, at 150:9-11; 247:21 to 248:7 (Bienski I))

52.    MISD's buses currently transport transfer students from Hearne ISD to MISD, including white transfer students from Hearne.  (Id. at 248:6-7; Exh. 19, at MISD 532-535 (MISD's Answers to Interrogs.))

**Failing to Report Transfers to TEA**

53.    In June 1998, MISD superintendent Pete Bienski reported that MISD had accepted no transfers.  (Exh. 4, at 90:22 to 91:3; 94:18 to 95:7 (Bienski I); Exh. 5, at TEA 1-A (Depo. Exh. 62))

54.    That year, however, MISD had accepted at least 143 transfer students, all from Hearne ISD.  (Exh. 20, at 193:7 to 194:5 (Gonzales II); Exh. 21, at TEA 10-13 (Depo. Exh. 34; listing 143 new transfers, the notation, "133 additions," notwithstanding); Exh. 4, at 114:21-22 (Bienski I))

55.    Bienski knew that he was misleading TEA.  (Exh. 4, at 90:22 to 91:8 (Bienski I))

56.    Bienski discussed MISD's reporting of transfers with TEA (Exh. 4, at 93:19 to 94:16 (Bienski I)), and re-submitted MISD's report in November 1998, this time identifying the 143 transfers.  (Exh. 20, at 193:7 to 194:5 (Gonzales II); Exh. 21, at TEA 10-13 (Depo. Exh. 34))

**Misuse of Hardship Exceptions**

57.    MISD's November 1998 report stated only 57 of the 143 transfers qualified for hardship exceptions.  (Exh. 20, at 193:7 to 194:5 (Gonzales II); Exh. 21, at TEA 10-13 (Depo.

Exh. 34); Exh. 5, at TEA 1-B (Depo. Exh. 62; explaining that code "J" indicates that a

students does not qualify for any hardship exception))

58.    In February 1999, TEA informed MISD that because of the effect of MISD's transfers on

desegregation in Hearne ISD, MISD could not accept any new white transfers *who did not*

*qualify for hardship exceptions* to the Court Order.  (Exh. 10, at 25:13 to 27:2 (Gonzales

I); Exh. 22, at TEA 14-15 (Depo. Exh. 2))

59.    Bienski submitted the transfer form for the 1999-2000 school year and reported that 64 of

89 transfers who previously had not qualified for any hardship exception now *did* qualify

for hardship exceptions.  (Exh. 4, at 111:18-24 (Bienski I); Exh. 23, at TEA 1203-1208

(Depo. Exh. 64))

60.    In addition, Bienski accepted 38 new transfers for the 1999-2000 school year, 34 of

whom Bienski reported as qualifying for a hardship exception.  (Compare Exh. 23, at

TEA 1203-1208 ( Depo. Exh. 64), with Exh. 21, at TEA 10-13 (Depo. Exh. 34))

61.    MISD's next report, submitted in May 2000, stated that all 216 transfers for the 2000-01

year qualified for a hardship exception.  (Exh. 4, at 122:19-12 (Bienski I); Exh. 24, at

TEA 1217-1222 (Depo. Exh. 65); compare Exh. 24 (Depo. Exh. 65) with Exh. 23 (Depo.

Exh. 64))

62.    In sending out the transfer applications for the 2000-01 school year, MISD had notified

transfer students' parents that "[t]o ensure that you child's transfer request is approved,

please check an exemption on the transfer form, if applicable."  (Exh. 4, at 48:5-11

(Bienski I); Exh. 25, at MISD 493 (Depo. Exh. 54))

63.     The notice provided three hardship exemptions to choose from:  childcare reasons, children of MISD employees and safety reasons, which the notice said "can be used by all students."  (Exh. 4, at 48:5-11 (Bienski I); Exh. 25, at MISD 493 (Depo. Exh. 54))

64.     The notice also provided two generic examples of safety reasons:  "Smaller school district offers safer, more stable learning environment;"  "Home district has problems with discipline, resulting in an unsafe learning environment."  (Exh. 4, at 48:5-11 (Bienski I); Exh. 25, at MISD 493 (Depo. Exh. 54))

65.     Although only 22 transfers claimed the health/safety exemption when MISD first reported transfers in 1998 (Exh. 20, at 193:7 to 194:5 (Gonzales II); Exh. 21, at TEA 10-13 (Depo. Exh. 34); Exh. 5, at TEA 1-B (Depo. Exh. 62; identifying code "D" as the code for a health or safety exemption)), by the 2000-01 year, 177 transfer students claimed the health/safety exception.  (Exh. 4, at 122:19-23 (Bienski I); Exh. 24, at TEA 1217-1222 (Depo. Exh. 65))

66.     As of 2000, TEA permitted all transfers to MISD that qualified for hardship exceptions, (Exh. 10, at 25:13 to 27:2 (Gonzales I); Exh. 22, at TEA 15 (Depo. Exh. 2)), and it informed MISD in July 2000 that MISD was "in compliance with the federal court order."  (Exh. 4, at 126:20 to 127:4 (Bienski I); Exh. 26, at MISD 393 (Depo. Exh. 66))

**Misrepresenting Transfers as Qualifying for Hardship Exceptions**

67.     In the summer of 2002, TEA investigated MISD's reporting of transfers and determined that MISD had misrepresented 151 transfers as qualifying for hardship exceptions.  (Exh. 1, at 174:14-20; 80:13-16; 165:8-14 (Enos I); Exh. 27, at TEA 229-31, 233 (Depo. Exh. 8))

-14-

68.     Specifically, MISD misrepresented 31 "childcare" transfers, 31 "health" transfers and 89 "safety" transfers.  (Exh. 1, at 80:13-16; 165:8-14 (Enos I); Exh. 27, at TEA 229-232 (Depo. Exh. 8))

69.     With respect to the "childcare" transfers, (1) Bienski knew that for a transfer to qualify for a hardship exception for childcare reasons, there could be no childcare facility located in the sending district (Exh. 1, at 165:8 to 166:13 (Enos I); Exh. 27, at TEA 229 (Depo. Exh. 8); Exh. 1, at 168:11-14 (Enos I); Exh. 28, at TEA 36-37 (Depo. Exh. 23)); and (2) Bienski knew that Hearne ISD had childcare providers (Exh. 10, at 141:2-9 (Gonzales I); Exh. 1, at 170:2-4 (Enos I))

70.     With respect to the "health" transfers, Bienski knew that a "health" transfer required an explanation why a medical condition necessitated a transfer to the receiving district (Exh. 10, 33:8-17 (Gonzales I); Exh. 29 (Depo. Exh. 3); Exh. 4, at 132:22 to 133:5 (Bienski I); Exh. 1, at 165:8-14 (Enos I); Exh. 27, at TEA 231 (Depo Exh. 8); Exh. 4, at 130: 3-10 (Bienski I)), but the documentation that MISD produced to TEA's investigators did not support an exception for any of the 31 "health" transfers MISD had claimed.  (Exh. 1, at 170:13 to 172:1 (Enos I); Exh. 27, at TEA 230-31 (Depo. Exh. 8))

71.     With respect to the "safety" transfers, (1) Bienski knew that for a transfer to qualify for a safety exception, the superintendents of both the sending and receiving districts had to acknowledge the validity of the claimed safety reason (Exh. 1, at 80:3-16; 165:8-14 (Enos I); Exh. 27, at TEA 232 (Depo. Exh. 8); Exh. 1, at 168:11-14 (Enos I); Exh. 29 (Depo. Exh. 23); Exh. 4, at 130:3-10; 132:22 to 133:5 (Bienski I)); and (2) Bienski never

contacted the Hearne superintendent.  (Exh. 30, at 6:7-13 (II Depo. of Pete Bienski (Oct. 14, 2004) [hereinafter Bienski II])).

72.     Both TEA investigators, Drs. Sylvia Gonzales and Donald Enos, believe that Bienski purposefully misrepresented the transfers as qualifying for hardship exceptions.  (Exh. 10, at 121:9-14 (Gonzales I); Exh. 1, at 174:14-20 (Enos I))

73.     Despite its findings, TEA permitted, many and possibly all of these 151 transfers to stay at MISD with funding because of TEA's "baselining" and "grandfathering" decisions. (Exh. 10, at 117:11-18 (Gonzales I); Exh. 20, at 131:18 to 132:2 (Gonzales II))

74.     TEA did not decide to withhold funding for the 151 transfers that MISD had intentionally misrepresented as qualifying for hardship exceptions.  (Exh. 1, at 80:3-16; 165:8-14 (Enos I); Exh. 27, at TEA 233 (Depo. Exh. 8))

**Refusal to Comply with TEA Directives**

75.     Twice in July 2002, as a result of its investigation, TEA instructed MISD not to accept any new transfers, with or without exemptions.  (Exh. 3, at ¶ 41 (SG Aff.); Exh. 10, at 76:21-25 (Gonzales I); Exh. 31, at TEA 110 (Depo. Exh. 7); Exh. 10, at 77:5-8 (Gonzales I); Exh. 27, at TEA 233 (Depo. Exh. 8))

76.     Nevertheless, MISD thereafter accepted and enrolled at least 36 transfer students for the 2002-03 school year.  (Exh. 10, at 77:5-8 (Gonzales I); Exh. 27, at TEA 233 (Depo. Exh. 8))

77.     In addition, TEA instructed MISD not to accept any new transfers unless they are siblings of "baseline" students or children of MISD employees.  (Exh. 20, at 163:1-9 (Gonzales

II); Exh. 32, at TEA 284 (Depo. Exh. 28); Exh. 33, at 41:7-20 (Depo. of Ronald Rowell (Sept. 7, 2004) [hereinafter Rowell]); Exh. 34 (Depo. Exh. 50))

78.     Nevertheless, MISD accepted two new transfer students for the 2002-03 school year who were not siblings of baseline students or employees' children.  (Exh. 4, at 50:5-12; 57:10 to 58:9; 62:14 to 63:16 (Bienski I); Exh. 10, at 166:19 to 167:21; 163:1-9 (Gonzales II); Exh. 32, at TEA 287 (Depo. Exh. 28))

79.     MISD continues to accept unauthorized transfers.  MISD has accepted four new transfers for the 2004-05 school year who are not children of MISD employees and are not siblings of baseline students.  (Exh. 30, at 106:18 to 107:14 (Bienski II); Exh. 35, at 1 (Depo. Exh. 82))

80.     Ultimately, as a result of its investigation and monitoring, TEA decided to withhold funding from MISD for 71 transfers.  (Exh. 3, at ¶ 63 (SG Aff.))

81.     MISD has informed TEA that it will continue to accept transfers even without funding from TEA.  (Exh. 20, at 61:3-15 (Gonzales II))

**Improperly Claiming Transportation Funding for Transfers**

82.     TEA provides transportation funding to districts based on the number of students they transport and mileage, but TEA only permits districts to claim funds for the transportation of transfer students in certain situations.  (Exh. 36, at 7:20 to 8:12 (Depo. of Robert Sanchez (Sept. 7, 2004) [hereinafter Sanchez])

83.     After receiving another complaint against MISD, TEA found that MISD inappropriately had received funds for transporting transfer students from Hearne to Mumford during the 1999-2000 and 2000-01 school years.  (Id., at 8:14-19; Exh.3, at ¶¶ 36-36 (SG Aff))

84.    TEA determined that in claiming transportation funds for the 1999-2000 and 2000-01

school years, MISD had "over-reported total daily ridership . . . due to counting transfer

students," and that MISD had "extended the bus routes for the sole purpose of serving

these students."  (Exh. 36, at 10:2-14 (Sanchez); Exh. 37, at TEA 803 (Depo. Exh. 53))

85.    TEA thereafter adjusted the funding distributed to MISD for those two years to make up

for providing the unwarranted funding.  (Exh. 3, at ¶ 37 (SG Aff.); Exh. 36, at 11:4-13

(Sanchez))

86.    TEA relies on MISD to claim the appropriate amount of transportation funding and to

refrain from claiming any funding for transporting transfer students that violate the Court

Order.  (Exh. 36, at 12:21 to 13:8 (Sanchez))

87.    Without conducting another investigation, TEA cannot know whether MISD is claiming

the appropriate amount of transportation funding.  (Id., at 13:15-21)

**MISD's Complicity with TEA in Violating the Court Order**

88.    TEA notified MISD of the transfer provisions of the Court Order in its February 5, 1999

letter to Bienski regarding the effect of its transfers on Hearne ISD (Exh. 10, at 25:13 to

26:3 (Gonzales I); Exh. 22, at TEA 14 (Depo. Exh. 2)), in its March 2001 letter to MISD

explaining the need to report transfers to TEA (Exh. 4, at 130:3-10 (Bienski I); Exh. 28,

at TEA 35 (Depo. Exh. 23)), and in its July and August 2002 letters explaining the

preliminary and final reports of TEA's 2002 investigation into MISD (Exh. 10, at 76:21-

25 (Gonzales I); Exh. 31, at TEA 109 (Depo. Exh. 7); Exh. 10, at 77:4-8 (Gonzales I);

Exh. 27, at TEA 224 (Depo. Exh. 8)).

89.     TEA and MISD worked together during the summer of 2002 to establish an agreed list of

        "baseline" transfers at MISD and determined that the list would include 348 transfers.

        (Exh. 27, at ¶ 42-46 (Exh. 8))

90.     MISD understands that it can continue to enroll such transfers and that TEA will continue

        to fund these transfers regardless of whether they violate the Court Order.  (Exh. 30, at

        99:20-24 (Bienski II))

## ARGUMENT AGAINST TEA

The core legal dispute in this case is whether inter-district student transfers are reducing

or impeding desegregation in Hearne ISD.  If they are, the Court Order prohibits TEA from

providing any district with state funding for those transfers.  The undisputed facts in this case

show that transfers *are* reducing desegregation in Hearne ISD, that MISD is enrolling the great

majority of such transfers from Hearne, and that TEA continues to provide MISD with funding

for them while acknowledging that the transfers violate the Court Order.  As a matter of law,

therefore, TEA is violating the Court Order, and its continuing violation should be enjoined.  See

Argument § II.

In addition, the undisputed facts in this case show that MISD is running buses into

Hearne to transport illegitimate transfers to MISD, that the Court Order prohibits state funding

for such activity, and that so long as MISD continues to transport the illegitimate transfers, TEA

cannot be sure that it is complying with the Court Order.  The Court therefore should enjoin TEA

from providing transportation funding until MISD has ceased its transport of illegitimate

transfers.  See Argument § III.

Finally, the United States seeks relief with respect to 151 transfers for which MISD attempted to secure state funding through deception and misrepresentation to TEA.  The undisputed facts show that TEA concluded that MISD did purposefully misrepresent 151 transfers as qualifying for exceptions to the requirements of this Court's Order and that TEA continues to provide MISD with funding for them nevertheless.  Such funding undermines the continuing effectiveness of this Court's Order and must be enjoined.  See Argument § IV.

## I.    Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As shown below, the United States is entitled to judgment as a matter law because there is no genuine issue as to any material fact with respect to the United States' claims against TEA.

## II.    TEA Is Violating the Court Order by Funding Student Transfers that Reduce Desegregation at Hearne ISD.

Every year, TEA provides each school district in Texas with a certain amount of funding for each student that the district enrolls, whether the student resides in the district or transfers from another district.  (SMF 9)  This Court's August 9, 1973 Order, however, prohibits TEA from providing funding for inter-district student transfers whose cumulative effect is to "reduce or impede desegregation" in any district.  (SMF 11-13)

Hearne ISD is also under a desegregation order, and as explained in section II.A., below, inter-district student transfers are reducing desegregation there.  Indeed, TEA admits that MISD has accepted transfers from Hearne ISD "in contravention of this Court's Modified Order and its

amendments."  (State of Texas and Texas Education Agency's First Amended Answer and

Affirmative Defenses to Hearne Independent School District's Original Complaint, ¶ 24 (filed

June 15, 2004).)  Nevertheless, TEA continues to provide funding for such transfers to the

districts accepting the students, including MISD, because TEA has decided to allow all transfer

students in the state of Texas who were enrolled at their receiving schools during the 2000-01

and 2001-02 school years to remain at those districts *with funding* and *without regard to the*

*transfers' effects on desegregation at any other district* for as long as those transfer students

choose to remain at the receiving districts.  (See section II.B., below.)

A.      **Transfers Are Reducing Desegregation in Hearne ISD.**

In determining whether transfers reduce desegregation, a court may begin with a

quantitative analysis, measuring the numerical or percentage changes effected by the transfers on

a district's enrollment, but the effect of the transfers "ultimately must be measured qualitatively"

to judge whether they increase the racial identifiability of schools.  Lee v. Eufala City Bd. of

Educ., 573 F.2d 229, 233 (5th Cir. 1978); see United States v. Lowndes County Bd. of Educ.,

878 F.2d 1301, 1304-05 (11th Cir. 1989) (applying Eufala, 573 F.2d at 232-233).  Whether inter-

district transfers reduce desegregation by increasing the racial identifiability of schools depends

on whether the "increment of change in the racial composition of a school seems [likely] to alter

significantly general perceptions of a school's racial identity or the behavior of persons who rely

on such factors in determining whether or not to send their children to a particular school."  Lee

v. Lee County Bd. of Educ., 639 F.2d 1243, 1261 (5th Cir. 1981); see Lowndes, 878 F.2d at 1305

(applying the factor identified in Lee as "an index of racial identifiability").

The undisputed facts show that transfers from Hearne ISD have increased the racial

identifiability of its schools and have altered significantly general perceptions of the schools' racial identity.  Since 1996, Hearne's enrollment has shifted from one in which white students comprised 23% to one in which white students comprise only 14.5%.  (SMF 33)  This shift coincides with the acceptance by neighboring MISD of a steadily increasing number of transfer students since the mid-1990s.  (SMF 46)  Indeed, MISD has transformed itself from a school in which white students comprised 28.1% of its enrollment in 1996 to one in which white students make up nearly half of the student body.  (SMF 48)  As of the 2002-03 school year, fully 25% of the public school students residing in Hearne ISD were transferring out of the district, and 310 of those 422 students transferred to MISD.  (SMF 26, 47)

That same year, *more than half of the white public-school students residing in Hearne transferred out of the district*, and 70% of them transferred to MISD.  (SMF 27)  These students left a district that has become predominately black to transfer to one in which white students now comprise the largest racial group.  (SMF 48)  But for transfers, no single racial group would make up a majority of the enrollment in the district's schools, and white students would comprise almost 22% of the district's enrollment.  (SMF 28-29)  Due exclusively to transfers, however, the enrollment in Hearne's schools in 2002-03 was 55% black and only 14.5% white.  (Id.)

In short, transfers cause Hearne ISD to be predominately African-American when it would not otherwise be so, more than half of the white public-school students residing in Hearne are transferring out of the district, and 70% of those white transfers went to MISD in 2002-03 where white students make up the largest racial group and comprise almost half the enrollment. Moreover, when a group of students make up a small percentage of a district's enrollment to begin with, as white students do at Hearne ISD, then a change of eight to nine percent in the

district's white enrollment has a much more significant effect on the racial identifiability of a district.  See Eufala, 573 F.2d at 233 n.9; Lowndes, 878 F.2d at 1308.  This is so particularly when the neighboring district has a much higher percentage of white students.  Cf. Ross v. Houston Independent Sch. Dist., 583 F.2d 712, 714-15 (5th Cir. 1978) (holding that where the division of a school district would carve out 10.5% of that district's total white enrollment, and where the new neighboring district would have a majority white enrollment, the division would "impede the dismantling of the dual system" and therefore should be enjoined).  Under these circumstances, judged qualitatively, the transfers from Hearne ISD increase the racial identifiability of its schools and thereby reduce desegregation in the district.

This conclusion is buttressed by community perception.  According to longtime Hearne resident James Taylor, his coworkers in the Hearne community have noted in conversations with him that "Hearne ISD has become a predominately black school district because of student transfers leaving the district and that transfers are continuing this trend." (SMF 36)  Based on his conversations with co-workers and other Hearne residents, Mr. Taylor believes that this is the "general perception of Hearne ISD in the community."  (Id.)

The undisputed facts therefore establish that transfers from Hearne ISD have increased the racial identifiability of its schools and thereby reduced desegregation in Hearne ISD.

### B.      TEA Continues to Fund Transfers that Reduce Desegregation at Hearne.

Despite the fact that transfers are reducing desegregation in Hearne ISD, TEA continues to provide funding for those transfers to the districts taking them.  Indeed, TEA states in its Amended Answer to Hearne's Complaint:  "TEA admits that MISD has accepted transfer students in contravention of this Court's Modified Order and its amendments, as enforced by

TEA, and that the result has been to increase MISD's student population *and its share of state funding*." (Amended Answer, ¶ 24.)  This action plainly violates the Court Order, which provides that TEA "shall not . . . give support of any kind" to student transfers that "reduce or impede desegregation" in any district, Court Order at 1, ¶ A(1), and commands TEA specifically to withhold funding for such transfers from the districts that continue to take them, <u>see</u> <u>id.</u> at 4, ¶ A(6).

As of the 2002-03 school year, MISD enrolled 132 white transfer students from Hearne ISD whose cumulative effect is to reduce desegregation at Hearne ISD.  (SMF 47)  Significantly, TEA continues to fund these illegitimate transfers not because it disagrees with the conclusion that they reduce desegregation at Hearne ISD, but because TEA has made an administrative decision to allow all transfers in place during a certain two-year period to remain in their receiving districts with funding and *without regard to their effect on desegregation at any other districts*.  (SMF 39, 41-42)

 TEA made this decision when Dr. Sylvia Gonzales "was the person at TEA primarily responsible for monitoring compliance with the transfer provisions of CA 5281."  (SMF 38)  When asked whether TEA would allow transfers to go to the receiving districts "if TEA found out that a district, in accepting those baseline transfers, that the transfers had reduced or impeded desegregation at another district," Dr. Gonzales answered:  "Yes, that's what we did."  (SMF 40)  TEA's decision is simply irreconcilable with its obligations under the Court Order.

As of 2002-03, Mumford enrolled 119 white transfer students from Hearne ISD who did not qualify for any exception to the Court Order's requirements.  (SMF 44)  These transfers are among those whose cumulative effect is to reduce or impede desegregation in Hearne ISD.  TEA

provided MISD with funding for 93 of these unlawful transfers in 2002-03 (at least 82 of which are either "baseline," "grandfather" or "sibling" transfers).  (SMF 45)  TEA will continue to fund these transfers as long as they remain enrolled in MISD.  (Id.)  This funding constitutes a continuing violation of the Court Order and should be enjoined.

III.    **TEA Must Withhold Transportation Funding from MISD until MISD Stops Transporting Unlawful Transfers from Hearne ISD.**

The Court Order prohibits TEA from "distribut[ing] to the offending district any transportation funds which might accrue on account of transfer students accepted in violation of this order."  Court Order, at 4, ¶ A(7).  MISD currently sends buses into Hearne ISD to transport transfer students back to MISD.  (SMF 51)  TEA must not provide MISD with any funding that may accrue on account of MISD's transportation of those transfer students that reduce desegregation in Hearne ISD.

TEA investigated MISD's claims for transportation funding and found that MISD inappropriately had received to state funds for transporting transfer students from Hearne to Mumford during the 1999-2000 and 2000-01 school years.  (SMF 83)  Although TEA thereafter adjusted the funding distributed to MISD for those two years, it now relies on MISD to claim the appropriate amount of transportation funding and to refrain from claiming any funding for transporting transfer students that violate the Court Order.  (SMF 85-86)  Short of conducting another investigation, TEA has no way of confirming that MISD is claiming the appropriate amount of funding, however.  (SMF 87)  Given MISD's repeated attempts to circumvent the requirements of the Court Order through deception, both with regard to reporting transfer students to TEA and claiming inappropriate amounts of state transportation funding, and given that *all* of MISD's buses run into Hearne ISD to pick up transfer students, TEA cannot have any

reasonable assurance that it is satisfying its obligation under the Court Order to withhold funding for transporting illegitimate transfers.  Therefore, to ensure that TEA complies with the Court Order, TEA must withhold all transportation funding from MISD until MISD stops transporting any unlawful transfer from Hearne ISD.

IV.   **TEA Should Withhold Funding for the 151 Transfers that MISD Misrepresented as Qualifying for Hardship Exceptions to the Court Order.**

TEA investigated MISD's reporting of transfer information and determined that MISD purposefully misrepresented 151 transfers as qualifying for hardship exceptions to the Court Order.  (SMF 67)  Yet many and possibly all of these transfers were permitted to stay in MISD with funding because of TEA's "baselining" and "grandfathering" decisions.  (SMF 73)

School districts cannot be allowed to circumvent the requirements of this Court's Order through deception.  TEA's continued funding of the 151 transfers that TEA determined MISD to have misrepresented as qualifying for hardship exceptions undermines the Court Order's effectiveness and must be enjoined.

**ARGUMENT AGAINST MISD**

The United States is entitled to relief against MISD because MISD has repeatedly interfered with the Court Order in this case and impeded desegregation in Hearne ISD.  The Court Order prohibits TEA from providing support of any kind for inter-district student transfers that reduce desegregation in any district and from providing any funding for such transfers to districts that accept them.  Amendments to Modified Order of July 13, 1971, at ¶¶ A(1), (6) (Aug. 9, 1973) [hereinafter Court Order].  The undisputed facts show that MISD has interfered with the Court Order by accepting numerous inter-district transfers that reduce desegregation in Hearne ISD and has undermined--through deception and insubordination--TEA's efforts to

comply with the Court Order.  The Court therefore should exercise its authority under the All Writs Act to enjoin further interference and protect the viability of its Order and the relief it secures by enjoining MISD's acceptance of any transfers that reduce desegregation in Hearne ISD.  See Argument § V.

The undisputed facts also show that MISD has operated in active concert or participation with TEA violating the Order by accepting funding from TEA for transfers that reduce desegregation at Hearne ISD.  MISD itself therefore is subject to the Court Order's injunction under Federal Rule of Civil Procedure 65(d), and the Court should enforce its Order directly against MISD by prohibiting it from enrolling any transfers that reduce desegregation in Hearne. See Argument § VI.

Finally, this Court has the inherent authority to enjoin third parties from action that thwarts the relief provided by its orders, and it should exercise that authority to enjoin MISD from accepting any transfers that reduce desegregation in Hearne.  See Argument § VII.

## V.      **MISD Is Interfering with the Court Order.**

MISD has interfered with the Court Order by continuing to accept large numbers of transfers whose cumulative effect is to reduce desegregation at Hearne ISD and by refusing to comply with TEA directives designed to ensure that TEA satisfies its obligations under the Court Order.  MISD's continuing interference threatens the viability of this Court's Order, and the Court should exercise its power under the All Writs Act to enjoin it.

### A.      Legal Authority to Enjoin Interference

This Court previously has held that it is empowered under the All Writs Act, 28 U.S.C. § 1651(a), to enjoin interference with the transfer provisions of the Court Order.  See

United States v. Texas, 356 F. Supp. 469, 471-73 (E.D. Tex. 1972) (where state court ordered

school district to accept certain transfers that TEA previously had directed the district not to

accept, federal court could enjoin further state court proceedings in the case and to declare the

state court order void); see 28 U.S.C. §1651(a) ("[A]ll courts established by Act of Congress may

issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the

usages and principles of law.").  Indeed, the Court of Appeals for the Fifth Circuit has affirmed a

federal court's broad power under the All Writs Act to enjoin third parties from interfering with

its desegregation orders.  See Valley v. Rapides Parish Sch. Bd., 646 F.2d 925, 943 (5th Cir.

1981) (upholding injunction against non-parties including state court from interfering with

desegregation order by permitting sham custodial arrangements designed to enable parents and

students to avoid compliance with federal court-ordered student assignment plan).

> **B.**     **MISD's Continuing Acceptance and Encouragement of Transfers Interferes with the Effectiveness of the Court Order.**

This Court's August 9, 1973 Order prohibits TEA from providing support of any kind for

inter-district transfers that reduce desegregation in any district.  Court Order, at ¶ A(1).  The

Order requires TEA to withhold state funding from a district for all such transfers.  Id. at ¶ A(6).

MISD is interfering with the Court Order by accepting and encouraging numerous

transfers from Hearne.  In 2002-03, 62% of MISD enrollment consisted of transfer students from

Hearne ISD.[1]  (SMF47)  That year, MISD enrolled 132 white transfers from Hearne (id.), all of

whom reduced or impeded desegregation at Hearne ISD (see Part II.A., above).  In addition,

---

[1]  The United States has not yet received TEA's final enrollment information for the
2003-04 school year as it was not available to TEA until the end of October 2004.  The last year
for which TEA has final enrollment data is the 2002-03 school year.  According to MISD's
information, transfer students from Hearne ISD comprised 59% of MISD's enrollment in 2003-
04.  (SMF 49)

MISD encourages new transfers by sending out information for parents of prospective transfer students.  (SMF 50)  Moreover, Mumford sends buses into Hearne to carry transfer students to MISD. (SMF 51-52)

MISD has informed TEA that MISD will continue to enroll transfer students even without state funding.  (SMF 81)  Thus, simply requiring TEA to withhold funds for the transfers that reduce desegregation at Hearne will not by itself provide relief.  MISD's continuing acceptance of these segregative transfers undermines the very purpose of the Court Order and interferes with its effectiveness.

### C.    Interfering by Refusing to Comply with TEA Directives.

MISD has interfered with the effective operation of the Court Order through deception and insubordination as well, consistently refusing to comply with TEA directives stemming from the Court Order.

- In June 1998, MISD represented to TEA that it had not accepted any transfer students for the 1998-99 school year, when it in fact had accepted 143 transfers from Hearne ISD.  (SMF 53-56)

- In 1998-2000, MISD represented its transfer students as hardship exceptions regardless of whether the hardship requests were true.  (SMF 57-66)

- In 2002, MISD misrepresented 151 transfer students as qualifying for "safety," "health," or "childcare" exceptions, when Bienski knew that none of these transfers met TEA's criteria.  (SMF 66-74)

- In 2002-03, MISD defied TEA's order not to accept additional transfers from Hearne and continues to do so.  (SMF 75-79)

- In 1999-2001, MISD improperly claimed funds for transporting Hearne students. (SMF 82-85)

In sum, MISD's past and continued interference warrants an injunction against MISD's acceptance of transfers that reduce desegregation at Hearne ISD.

## VI.   **MISD Is Subject to the Court Order's Injunction under Rule 65(d).**

MISD has operated in active concert or participation with TEA in violating the Court Order and therefore is subject to the requirements of the Court Order itself, which prohibits support of any kind for the transfers that reduce desegregation in Hearne ISD.

Under Federal Rule of Civil Procedure 65(d), every order granting an injunction binds not only the parties to the action, but "those persons in active concert or participation with them" as well, provided such persons "receive actual notice of the order by personal service or otherwise." Fed. R. Civ. P. 65(d).  MISD has received actual notice of the Court Order's transfer provisions several times from TEA.  (SMF 88)  As explained above, TEA has decided to allow all transfers who were enrolled in their receiving districts during the 2000-01 school year to remain there with state funding regardless of those transfers' effects on desegregation at any other district.  (SMF 39)  TEA and MISD worked together during the summer of 2002 to establish an agreed list of these "baseline" transfers at MISD and determined that the list would include 348 transfers. (SMF 89)  These include 82 white transfers whose transfers reduce desegregation at Hearne ISD. (SMF 45)  Bienski understands that MISD can continue to enroll such transfers and that TEA will continue to fund them regardless of whether they violate the Court Order.  (SMF 90)

By continuing to enroll and accept TEA funding for these transfers students, MISD is operating "in active concert or participation" with TEA violating the Court Order.  See  F.D.I.C.

v. Faulkner, 991 F.2d 262, 267 (5th Cir. 1993) (holding that district court did not err in finding

that where husband transferred frozen assets to wife, wife was in active participation with

husband so that she was subject to the injunction freezing the assets).  Accordingly, under

Federal Rule of Civil Procedure 65(d), MISD is bound by the Court Order's injunction against

"permit[ting], mak[ing] arrangement for or giv[ing] support of any kind" to transfers that reduce

desegregation in any district, Court Order at 1, ¶ A(1), and the Court should enforce the

injunction by prohibiting MISD from continuing to enroll any and all transfer students whose

transfers reduce desegregation at Hearne ISD.

## VII .   Court's Inherent Authority

MISD's continued acceptance and enrollment of transfers that reduce desegregation in

Hearne ISD thwarts the attainment of the relief provided in the Court Order.  This Court has the

inherent authority to preserve its ability to render an effective judgment and may exercise that

authority to enjoin third-parties from action threatening the viability of its Order.  See United

States v. Hall, 472 F.2d 261, 265 (5th Cir. 1972) (holding in school desegregation case that court

had inherent power to preserve its ability to render judgment by enjoining non-parties from

action threatening the viability of the court's desegregation order).  The Court therefore should

exercise its inherent authority to enjoin MISD from accepting and enrolling all transfers that

reduce desegregation in Hearne ISD.

## VIII.   Consideration of All the Circumstances Favors an Injunction against MISD's
Interference.

The determination whether to grant an injunction "depends on the circumstances of each

case" and involves "a balancing of interests of the parties who might be affected by the court's

decision."  Hopwood v. Texas, 78 F.3d 932, 958 (5th Cir. 1996).  Additionally, " the essential

-31-

prerequisite to a permanent injunction is the unavailability of an adequate remedy at law." <u>Lewis</u>

v. <u>S.S. Baune</u>, 534 F.2d 1115, 1123-24 (5th Cir. 1976); <u>see also</u> <u>Deerfield Med. Ctr.</u> v. <u>City of</u>

<u>Deerfield Beach</u>, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot

be undone through monetary remedies.").

The inadequacy of a legal remedy for MISD's interference with the Court Order is plain.

The Court Order itself provides for equitable relief because a remedy at law was inadequate.

Thus, a legal remedy for MISD's interference with the equitable relief provided by the Court

Order must be inadequate as well.  As to the interests of the parties, "when the United States or a

sovereign state sues in its capacity as protector of the public interest," courts of equity place

"extraordinary weight" upon the public interest sought to be protected.  <u>United States</u> v. <u>Marine</u>

<u>Shale Processors</u>, 81 F.3d 1329, 1359 (5th Cir. 1996).  MISD finds itself in a dispute "over

money," Defendant MISD's Response to Plaintiff United States' Motion for Inj. Ag. MISD, at 1,

¶1.2 (June 30, 2004), and its interest in the money accompanying the transfers from Hearne ISD

is outweighed by the public's interest in protecting the relief afforded by the Court Order for

unconstitutional discrimination against black students in Texas.  So too must the interest of

parents and students in attending a public school outside of their district of residence yield to that

overwhelming public interest.  Indeed, this Court has made that determination once already in

ordering the relief provided in the transfer provisions of the Court Order.

Finally, the relief afforded by the Court Order for unconstitutional segregation of students

is, of course, in the public interest, and an injunction protecting that relief afforded by the Court

Order must be in the public interest as well.  The United States seeks only to protect the relief

provided in the Court Order from MISD's interference by enjoining MISD from enrolling and accepting transfers from Hearne that reduce desegregation there.

## IX.    <u>Conclusion</u>

There is no genuine issue as to any material fact and the United States is entitled to judgment as a matter of law with respect to each of its claims against TEA and MISD.  <u>See</u> Fed. R. Civ. P. 56(c).  The United States therefore asks that the Court enter judgment in its favor and, with respect to TEA, (1) enjoin TEA from providing funding to MISD for the student transfers whose cumulative effect is to reduce or impede desegregation at Hearne ISD; (2) enjoin TEA from providing funding to MISD for each of the 151 transfer students that TEA found MISD to have misrepresented as qualifying for a hardship exception to the Court Order; and (3) enjoin TEA from providing any transportation funding to MISD until MISD can show that it has ceased providing transportation to transfer students that reduce desegregation in Hearne ISD.  With respect to MISD, the United States asks that the Court enter summary judgment in its favor and enjoin Defendant MISD from enrolling any transfer students from Hearne ISD--including those transfers currently enrolled at MISD--that reduce desegregation in Hearne ISD.  The United States suggests that should the Court rule in its favor, the parties can cooperate in ascertaining precisely which transfers ought not be funded by TEA and which transfers should be enjoined.

Respectfully submitted,

MATTHEW D. ORWIG                         R. ALEXANDER ACOSTA
United States Attorney                          Assistant Attorney General


 /s/ Edward G. Caspar
JAVIER M. GUZMAN
EDWARD G. CASPAR

-33-

Attorney-in-Charge
Massachusetts Bar No. 650566
U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., N.W.--PHB
Washington, DC 20530
Ph: (202) 514-4092
Fax: (202) 514-8337
Attorneys for the United States of America

DATED:  November 8, 2004

## <u>CERTIFICATE OF SERVICE</u>

I, Edward G. Caspar, attorney for the United States, certify that on November 8, 2004, true and correct copies of the foregoing were sent to the following counsel of record by electronic service or first class mail.

| | |
|---|---|
| Nancy K Juren, Esq. | Nina Perales, Esq. |
| Office of the Attorney General | David G. Hinojosa, Esq. |
| General Litigation Division | Mexican-Amer. Legal Def. & Educ. Fund |
| PO Box 12548 | 140 E Houston, Suite 300 |
| Austin, Texas 78711-2548 | San Antonio, Texas 78205 |
| | |
| Roger Dean Hepworth, Esq. | Roger L. Rice, Esq. |
| Henslee Fowler Hepworth & Schwartz LLP | META Project |
| 816 Congress Avenue, Suite 800 | 240A Elm St |
| Austin, Texas 78701-2443 | Suite 22 Harvard University |
| | Somerville, MA 02144 |
| | |
| Richard A. Morris, Esq. | Dennis C. Hayes, Esq. *(first class mail)* |
| Feldman & Rogers | NAACP National Headquarters |
| 5718 Westheimer | 4805 Mt. Hope Drive |
| Suite 1200 | Baltimore, Maryland 21215 |
| Houston, TX  77057 | |

_____/s/_____

EDWARD G. CASPAR