# EXHIBIT NO. 1

Page 1

```
 1              THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION
 3   UNITED STATES OF AMERICA,   )
     ET AL                       )
 4                               )
              Plaintiffs,        )
 5                               )
     VS.                         )   CAUSE NO. 6:71-CV-5281
 6                               )
     STATE OF TEXAS, ET AL,      )
 7                               )
              Defendants.        )
 8
 9
     ****************************************************
10
                      ORAL DEPOSITION OF
11
                     DONALD ENOS, Ph.D.
12
                         VOLUME 1
13
                       JUNE 2, 2004
14
     ****************************************************
15
16      ORAL DEPOSITION OF DONALD ENOS, Ph.D., produced as a
17   witness at the instance of the Defendant Mumford ISD, was duly
18   sworn, was taken in the above-styled and numbered cause on the
19   JUNE 2, 2004, from 9:20 a.m. to 5:17 p.m., before Chris
20   Carpenter, CSR, in and for the State of Texas, reported by
21   machine shorthand, at the offices of Attorney General of
22   Texas, 300 West 15th Street, 11th Floor, Austin, Travis
23   County, Texas, pursuant to the Federal Rules of Civil
24   Procedure and the provisions stated on the record or attached
25   hereto.
```

Page 188

1  a particular district, TEA excludes from the calculations

2  altogether those transfers qualifying for a hardship

3  exemption?

4         A.    That is correct.

5         Q.    Do you see the paragraph headed "calculation"?

6         A.    Yes.

7         Q.    Does that paragraph accurately describe the

8  calculation that TEA uses to determine the numerical effect of

9  transfers on a district's enrollment?

10        A.    Yes.

11        Q.    And exempt students are not included in this

12 calculation?

13        A.    That's correct.

14        Q.    Okay.  Page 5 is headed, "Exemption hardship codes."

15        A.    335?

16        Q.    Uh-huh, page 336?

17        A.    Okay.

18        Q.    And runs to page 339.  Could you flip through it

19 just for a moment?  Do you recognize all those codes?

20        A.    I do.

21        Q.    Are those all of the hardship exemption codes that

22 TEA applies?

23        A.    Yes.

24        Q.    When was the last time these codes were clarified or

25 revised at all?

1    A.    Again, I can't recall.

2    Q.    Okay.  Is Sylvia the only person with factual

3 knowledge of the recruitment that you talked to?

4         MR. MORRIS:  Objection, form.

5    Q.    (By Mr. Caspar) You can answer.

6    A.    Yes.

7    Q.    Okay.  Turning -- okay.  Turning away from those

8 documents and going to another one.

9         MR. CASPAR:  I'm handing the reporter TEA 329

10 at the bottom and it's Pages 329 to 340.  I think that will be

11 Exhibit 27.

12        (Exhibit 27 marked for identification.)

13   Q.    Do you recognize this letter?

14   A.    Yes.

15   Q.    Okay.  Turning to Page 331, it says "The Student

16 Transfer Information Guide."  Do you recognize that?

17   A.    Yes.

18   Q.    How do you recognize it?

19   A.    It's the explanation of the new automated system

20 that exists not only in print but on the actual program.

21   Q.    Okay.  On page 3 of the guide which is TEA 334, do

22 you see where it lists ethnicity codes?

23   A.    Yes.

24   Q.    White is 5, Hispanic is 4, et cetera.  Do those look

25 like the right codes for you?

```
 1     A.    Yes.
 2     Q.    Those haven't changed?
 3     A.    No.
 4     Q.    Okay.  And they would have been the right codes
 5  since 2000 as well?
 6     A.    Yes.
 7     Q.    Below that, do you see where it says "exempt
 8  students"?
 9     A.    Yes.
10     Q.    What are exempt students?
11     A.    Those that qualify for a hardship code that is
12  listed there.
13     Q.    It says there that "exempt students will not be
14  counted in the calculations to determine
15  compliance/noncompliance status"?
16     A.    That is correct.
17     Q.    What is meant by the compliance/noncompliance
18  status?
19     A.    Violation of the one/three percent.
20     Q.    What does the guide mean when it says, "Exemptions
21  will not be counted in the calculations to determine
22  compliance"?
23     A.    It means they're exempt from the calculation and
24  they're not included.
25     Q.    So in calculating the percent affect on transfers in
```

1  students that TEA allowed to attend the receiving district
2  with funding so long as they were in receiving district during
3  the 2001-02 school year?
4      A.   That's correct.
5      Q.   Okay.  In the baseline part, it says, "Transfer
6  students who cause a one-/three-percent violation during 2000-
7  2001 school year."  Now, baseline students aren't
8  necessarily -- or didn't necessarily cause a violation, right?
9      A.   That's correct.
10     Q.   But they include those who could have?
11     A.   Who did.
12     Q.   Or who did, okay.  And in the grandfather parts, it
13  says, "First-time transfer students who cause an EEO
14  violation."  What is meant by EEO violation?
15     A.   Basically, again, it would be a violation of the one
16  or three percent.
17     Q.   So it's the same thing?
18     A.   Yes, just a different year.
19     Q.   Okay.  And then in the last sentence of that
20  grandfather paragraph, it says, "Only district who were in
21  noncompliance will have grandfathered students."
22          What does that mean exactly?
23     A.   That means if you were in compliance, there were no
24  students causing noncompliance, so therefore, only those that
25  were in noncompliance will be grandfathered.

```
 1      Q.   Got you.  Because the students who were in the
 2   compliant districts, there would be no need to grandfather
 3   them, because they didn't violate anything?
 4      A.   That's right.
 5      Q.   Okay.  Baseline grandfathered students are allowed
 6   to attend the receiving district with funding, right?
 7      A.   Yes.
 8      Q.   Why is that exactly?
 9      A.   We allowed them to stay and, therefore, we're
10   providing funding.
11      Q.   Okay.  Why did -- and they're allowed to stay
12   regardless of their effect on desegregation?
13      A.   Regardless on their effect on the one or three
14   percent.
15      Q.   Okay.  Now, you're in charge -- you're in charge of
16   the division that ensures compliance with the court order,
17   right?
18      A.   Yes.
19      Q.   And the court order says that TEA can't fund
20   transfers that reduce or impede desegregation, right?
21           MS. JUREN:  Objection, calls for legal
22   conclusion.
23      Q.   (By Mr. Caspar) You can answer.  I think you said
24   yes already?
25      A.   That's what the court order says, yes.
```

1  Q.  Right.  And then as a guidelines we talked about
2  earlier about the one-/three-percent violation -- or one --
3  there's a one-/three-percent guideline that you talked about
4  earlier?
5  A.  Yes.
6  Q.  Okay.  Regardless of these transfers' effect on the
7  one-/three-percent rule or whether they reduce or impede
8  desegregation, TEA allows them to attend the receiving
9  districts with funding; is that right?
10  A.  Yes.
11  Q.  And -- and why is that?
12  A.  Can you clarify your question?
13  Q.  Yeah.  The court order says that TEA can't fund
14  transfers that reduce or impede desegregation, but TEA has
15  allowed two whole classes of transfers to attend receiving
16  schools with funding, regardless of their effect on
17  desegregation, so why did TEA do that in light of the
18  requirement in the court order?
19  A.  If --
20        MS. JUREN:  Wait.  I object to that question;
21  it's compound.
22  Q.  (By Mr. Caspar) You can answer.
23  A.  We did this in order to avoid serious problems with
24  schools, because if we would have sent back all of the
25  students that caused a violation during the baseline year, it

```
 1     Q.   (By Mr. Caspar) You can answer.
 2     A.   Yes.
 3     Q.   Do you remember what their objection was?
 4     A.   I think it goes back to that they originally stated
 5  that they felt that these were correct.
 6     Q.   And TEA considered their objections?
 7     A.   We considered them and did not accept them.
 8     Q.   On the last paragraph of that page, the last
 9  paragraph is where it talks about the students that will be
10  denied funding as a result of the investigation, and I have a
11  point of clarification here to ask you.  Could you take a
12  moment to review the last paragraph?
13     A.   Okay.
14     Q.   We know that TEA established this baseline of
15  students, which was all -- which was 11 transfers who had been
16  in the district during the 2000-2001 year, right?
17     A.   Yes.
18     Q.   And they did that before your investigation into
19  Mumford?
20     A.   Yes.
21     Q.   Okay.  And we know that at some time Mumford also
22  decided to grandfather all transfers who enrolled in districts
23  during the 2001-2002 school year, right?
24          MS. JUREN:  Objection --
25     A.   Mumford did --
```

```
 1        A.    Exact date, I can't give you.  I don't know.
 2        Q.    Was it during -- scratch that.
 3              Do you remember that -- do you remember whether
 4  a meeting occurred where TEA discussed clarifying exemption
 5  hardship codes?
 6        A.    I remember internal meetings, yes.
 7        Q.    Do you remember like what year those occurred in?
 8        A.    2002.
 9        Q.    Could it be 2001?
10        A.    It could.  I was just --
11        Q.    Okay.  That's fine.  Since those meetings, have they
12  changed at all?
13        A.    No.
14        Q.    Okay.
15        A.    That was when we did the clarification.
16        Q.    Okay.  Okay.  On page 9 of this, which is TEA 340,
17  it says "baseline, grandfather, and sibling."  Do you see --
18  do you see where it says baseline?
19        A.    Yes.
20        Q.    These are the students that TEA decided to allow to
21  attend receiving districts with funding so long as they were
22  enrolled in receiving districts during the 2000-2001 school
23  year?
24        A.    Yes.
25        Q.    And where it says grandfathered students, these are
```

```
 1      A.   This was, again, the continued submission of
 2  documents with coding covering C and D which we had previously
 3  indicated was not acceptable.
 4      Q.   So -- so you determined that the coding of those
 5  transfers as C and D -- let me start that over.
 6           So the findings said that there were 31
 7  students miscoded as exemption C, right?
 8      A.   Yes.
 9      Q.   And there were 120 students miscoded as exemption D,
10  right?
11      A.   Yes.
12      Q.   So that's 151 students?
13      A.   That's correct.
14      Q.   And your finding was that Mumford misrepresented the
15  reason for those 151 students?
16      A.   Yes.
17      Q.   And do you think that by misrepresentation -- by
18  misrepresenting, do you mean that Mumford intentionally
19  misstated the reason for the -- for those exemptions?
20      A.   In my opinion, yes.
21      Q.   Do you know if Mumford ever raised an objection --
22  do you know if Mumford ever raised an objection with regard to
23  this finding, that it's -- had intentionally misrepresented
24  the reasons for the transfers under codes C and D?
25           MR. MORRIS:  Objection, form.
```

```
 1       A.    No.
 2             (Exhibit 15 marked for identification.)
 3       Q.    (By Mr. Morris)  Dr. Enos, you've been handed Exhibit
 4  Number 15 to your deposition, and thank you for handing it
 5  back to me.  Do you recognize this cover letter and the
 6  attached report as your final investigative report?
 7             MS. JUREN:  Hold on.  It's in the -- it's in
 8  the record already.  If we can for -- go off the record a
 9  moment.
10             MR. CASPAR:  It's Exhibit Number 8.
11       Q.    (By Mr. Morris)  For the record, I'll withdraw
12  Exhibit 15 and direct your attention to Exhibit 8.
13       A.    Okay.
14       Q.    Do you recognize this as the cover letter and
15  accompanying investigative report?
16       A.    Yes.
17       Q.    Did you prepare this investigative report in
18  collaboration with Ms. Gonzales?
19       A.    We prepared the preliminary report, yes.
20       Q.    Did you have any involvement in alterations between
21  the preliminary report and the final report?
22       A.    No.
23       Q.    Do you know why not?
24       A.    No.
25       Q.    Do you know who made changes to the preliminary
```

```
 1   the decision of what sanctions to take?
 2        A.    That's correct.
 3        Q.    Okay.  Were you involved with all of the decisions
 4   about what the final findings were going to be?
 5              MS. JUREN:  Objection, asked and answered.
 6        Q.    (By Mr. Caspar) You can answer.
 7        A.    I think so, yes.
 8        Q.    Okay.  Are there any findings in Exhibit 8 that you
 9   weren't involved in?
10        A.    In Exhibit 8?
11        Q.    Yeah, that's the final one.
12        A.    The findings?
13        Q.    Right.
14        A.    No.
15        Q.    Okay.  Okay.  Let's look at Exhibit 8.  On TEA 229,
16   which is Page 2 of the final investigative report, the report
17   lists the requirement for exemption C.  Could you take a
18   moment to -- to read it there?
19        A.    Out loud?
20        Q.    No, just to yourself.
21        A.    Okay.
22        Q.    Are these the circumstances that must be met for
23   transfers to qualify for this exemption?
24        A.    Yes.
25        Q.    On the same page, under Mumford, it says that
```

1  "Mumford was informed of the requirements for meeting hardship
2  code C, the child care exemption, in an administrator-
3  addressed letter dated March 6, 2001."
4      A.   Okay.
5      Q.   How did you make that finding?  How did you and
6  Sylvia reach that conclusion?
7      A.   That the letter was sent?
8      Q.   That they were informed of the requirements for
9  hardship code C.  What I mean is, did you look through
10 Mumford's files; did you find the letter there; how did you --
11     A.   That would be -- to administrator-addressed letter
12 of March the 6th would have been a letter that we would have
13 sent to all districts in the state of Texas.
14     Q.   So in looking through Mumford's files, did you find
15 that letter there?
16     A.   Sylvia would have had those files and my answer, I
17 think, is yes.
18     Q.   Sylvia would know better?
19     A.   Oh, yes.
20     Q.   Okay.  Did you ever discuss this finding with
21 anybody at Mumford?
22     A.   The finding of hardship code C?
23     Q.   Yeah, this particular finding about they were
24 informed of the hard -- about the requirements of the hardship
25 code.

...

1    Q.   So you don't know if anyone at Mumford expressed an
2  objection to this finding?
3    A.   No.
4    Q.   Okay.  I'm handing you a copy of the document number
5  TEA 33 at the bottom, a letter dated March 6, 2001.
6            (Exhibit 23 marked for identification.)
7    Q.   (By Mr. Caspar) Just take a moment to review it if
8  you could.
9            Do you recognize that document?
10   A.   Yes.
11   Q.   Is that the letter you're referring to in the final
12 investigative report?
13   A.   This is the letter we send to all districts in the
14 state of Texas, yes.
15   Q.   Okay.  Okay.  Also on Page 2 of the final
16 investigative report which is Exhibit 8 --
17   A.   Okay.
18          MS. JUREN:  What page?
19          MR. CASPAR:  TEA 229.
20   Q.   (By Mr. Caspar) Under findings there, it says, "The
21 31 students transferring from Hearne ISD to Mumford ISD under
22 code C do not qualify for exemption C.  These students do not
23 meet the exemption code for child care, because the exemption
24 is available only when the sending district has no child care
25 providers located within the district's boundaries."

1    for child care.
2        Q.   Did they dispute that Hearne had four child care
3    facilities?
4        A.   No.
5        Q.   Okay.  Moving on to Page 3, which is the next page,
6    TEA 230, could you take a moment to review the language under
7    exemption D there?
8        A.   Okay.
9        Q.   Are these the circumstances that must be met for a
10   transfer to qualify for this exception to the health -- for
11   health reasons?
12       A.   Yes.
13       Q.   Under findings on the same page, the report states,
14   "Mumford did not provide any acceptable medical documentation
15   to support the requirements for this exemption"?
16       A.   That is correct.
17       Q.   What did you do to reach this finding?
18       A.   We basically obtained copies of all of the medical
19   exceptions that were listed as code D for each child.
20       Q.   And how did you determine that none of the
21   documentation was acceptable?
22       A.   We basically looked at them on site and made an
23   additional determination, and then when we returned to the
24   Agency, we also consulted our legal staff and they made
25   another determination that they were not acceptable.

```
 1      Q.   Do you remember if Mumford ever objected to this
 2   finding?
 3      A.   Yes.
 4      Q.   What was their objection?
 5      A.   That the note from the doctor was sufficient and
 6   they shouldn't have to question the reason why the doctor has
 7   stated that they should come to Mumford.
 8      Q.   But TEA decided that this finding would stand
 9   despite Mumford's objections; is that right?
10      A.   Yes.
11      Q.   Why was that?
12      A.   We offered them the opportunity for the parents to
13   go back to their doctor to get a different note that would be
14   related to the definition of what was acceptable.
15      Q.   Were the -- was the documentation unacceptable
16   because the documentation didn't explain why the medical
17   conditions necessitated a transfer?
18      A.   On many occasions, the documentation was not a
19   medical reason, but it stated something to the effect that the
20   parents asked me to write this note or it wasn't even a doctor
21   that -- that basically wrote the note; it was a counselor or
22   somebody else.
23      Q.   But suffice it to say that none of the documentation
24   that you reviewed and none of the documentation that Mumford
25   produced was acceptable under the language of exemption D?
```

Page 172

1    A.    Correct.

2    Q.    Okay. Going on to page -- further down on Page 3.

3    Regarding the safety exemption, under exemption D, there's

4    Part 1 is health and Part 2 is safety and safety says, "Both

5    superintendents involved must acknowledge the validity of the

6    safety issue for which the transfer is granted."

7          Is that the circumstance that must be met for a

8    transfer to qualify for exemption D for safety reasons?

9    A.    Yes.

10   Q.    On Page 4, to the next page TEA 231, under findings,

11   the report states that "Mumford did not provide acceptable

12   documentation to support the transfer of a child to the

13   district based upon safety reasons nor has there been

14   agreement or discussion between the Mumford ISD and Hearne ISD

15   superintendents to justify the coding of a student for safety

16   reasons."

17         How did you reach that finding?

18   A.    We basically asked the superintendents if they had

19   spoken and they said no, and in the other case, we looked at

20   the reasons why they were -- that security or safety was

21   listed, and they really aren't something that is truly a

22   safety concern for the physical harm for nonphysical harm of

23   the child.

24   Q.    So none of the documentation that Mumford had on

25   record and provided to you were acceptable under that

```
 1        A.    No.
 2                    (Exhibit 15 marked for identification.)
 3        Q.    (By Mr. Morris) Dr. Enos, you've been handed Exhibit
 4   Number 15 to your deposition, and thank you for handing it
 5   back to me.  Do you recognize this cover letter and the
 6   attached report as your final investigative report?
 7              MS. JUREN:  Hold on.  It's in the -- it's in
 8   the record already.  If we can for -- go off the record a
 9   moment.
10              MR. CASPAR:  It's Exhibit Number 8.
11        Q.    (By Mr. Morris) For the record, I'll withdraw
12   Exhibit 15 and direct your attention to Exhibit 8.
13        A.    Okay.
14        Q.    Do you recognize this as the cover letter and
15   accompanying investigative report?
16        A.    Yes.
17        Q.    Did you prepare this investigative report in
18   collaboration with Ms. Gonzales?
19        A.    We prepared the preliminary report, yes.
20        Q.    Did you have any involvement in alterations between
21   the preliminary report and the final report?
22        A.    No.
23        Q.    Do you know why not?
24        A.    No.
25        Q.    Do you know who made changes to the preliminary
```