FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

FEB 14 2005

DAVID J. MALAND, CLERK

BY_____
DEPUTY

1
2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

3  UNITED STATES OF AMERICA, ) Docket No. 6:71-cv-5281 WWJ
   HEARNE INDEPENDENT SCHOOL )
4  DISTRICT                   )
                              )
5  vs.                        ) Tyler, Texas
                              )
6  STATE OF TEXAS, ET AL      ) January 24, 2005

7

8

TRANSCRIPT OF TRIAL ON THE MERITS
BEFORE THE HONORABLE WILLIAM WAYNE JUSTICE
VOLUME I OF V

9

10  APPEARANCES:

11  For the United States:        Mr. Edward Caspar
                                  Mr. Javier M. Guzman
12                                U.S. Department of Justice
                                  Civil Rights Division
13                                950 Pennsylvania Avenue, N.W.
                                  601 D Street, N.W, Suite 4300
14                                Washington, D.C. 20530

15

16  For Hearne I.S.D:             Mr. Roger Hepworth
                                  Ms. Sue M. Lee
17                                Henslee, Fowler, Hepworth & Schwartz
                                  816 Congress Avenue, Suite 800
18                                Austin, Texas 78701

19

20  For the State of Texas:       Ms. Merle Hoffman Dover
                                  Ms. Ingrid K. Hansen
21                                Ms. Nancy K. Juren
                                  Office of The Attorney General
22                                General Litigation Division
                                  P.O. Box 12548
23                                Austin, Texas 78711-2548

24

25

ORIGINAL

1    (Appearances Continued:)

2

     For Mumford I.S.D:          Mr. David M. Feldman
3                                Mr. Richard A. Morris
                                 Feldman & Rogers
4                                Coastal Banc Plaza
                                 5718 Westheimer, Suite 1200
5                                Houston, Texas 77057

6

     For MALDEF:                 Mr. David G. Hinojosa
7                                140 E. Houston Street, Suite 300
                                 San Antonio, Texas 78205

8

9

     Court Reporter:            Ms. Lily Iva Reznik, RPR, CRR
10                               200 W. 8th Street
                                 Austin, Texas 78701
11                               (512)916-5564

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

1                        **I N D E X**

2                                                        Page

3      Plaintiff's Opening Statements              36

4      Defendant's Openings Statements             39

5      Defendant's Opening Statements              46

6      Plaintiff's Opening Statements              55

7

8                    Direct    Cross    Redirect  Recross

9  Witnesses:

10

11  Norris McDaniel      61      97,175   169       177

12  Caroline J. Reed    181     198,214  212,219   216

13
    Proceedings Adjourned                          220
14

15

16                      **E X H I B I T S**

17                                         Offered   Admitted
    Plaintiff's
18

19  #10 9-24-98 Letter                     93        93

20

21

22  Defendant's

23  #202 2001 District

24  Accountability Data Tables             130       130

25

| | | |
|---|---|---|
| 01:42:50 | 1 | THE COURT:  Morning, counsel.  The Court calls Civil |
| 01:42:57 | 2 | Action No. 6: 71-CV-5281, <u>The United States of America vs. The</u> |
| 01:43:07 | 3 | <u>State of Texas</u>. |
| 01:43:07 | 4 | Who appears for the plaintiffs? |
| 01:43:11 | 5 | MR. HEPWORTH:  Roger Hepworth, appearing on behalf of |
| 01:43:15 | 6 | Hearne Independent School District, and we're ready. |
| 01:43:17 | 7 | MR. CASPAR:  Your Honor, my name is Edward Caspar for |
| 01:43:19 | 8 | the United States of America. |
| 01:43:21 | 9 | MR. GUZMAN:  Javier Guzman, on behalf of United States. |
| 01:43:24 | 10 | MR. HEPWORTH:  Should have introduced Sue Lee, one of |
| 01:43:26 | 11 | my attorneys, as well. |
| 01:43:28 | 12 | THE COURT:  Thank you.  Who appears for Defendant? |
| :43:29 | 13 | MR. FELDMAN:  Your Honor, David Feldman and Rick Morris |
| 01:43:31 | 14 | of Feldman & Rogers for Mumford I.S.D. |
| 01:43:35 | 15 | THE COURT:  You appear for? |
| 01:43:37 | 16 | MR. FELDMAN:  For Mumford I.S.D. and Pete Bienski. |
| 01:43:40 | 17 | THE COURT:  Very well. |
| 01:43:42 | 18 | MS. JUREN:  Your Honor, I'm Nancy Juren, and I have |
| 01:43:43 | 19 | with me Ingrid Hansen from the Texas Attorney General's Office, |
| 01:43:47 | 20 | on behalf of State of Texas and the Texas Education Agency.  And |
| 01:43:51 | 21 | also here today from the Texas Education Agency are their counsel |
| 01:43:54 | 22 | David Anderson and Sandy Lowe. |
| 01:43:56 | 23 | THE COURT:  Very well.  Thank you. |
| 01:43:59 | 24 | MS. JUREN:  And, your Honor, if I might.  I can't hear |
| ⌣⌐:44:01 | 25 | you very well.  I don't know if that microphone is working. |

| | | |
|---|---|---|
| 01:44:05 | 1 | THE COURT:  I don't.  Now can you hear me? |
| 01:44:13 | 2 | MS. JUREN:  That's better.  Thank you. |
| 01:44:20 | 3 | THE COURT:  Have the parties received the order that |
| 01:44:23 | 4 | was entered by the Court relating to the United States' motion to |
| 01:44:31 | 5 | quash a certain jury list? |
| 01:44:35 | 6 | MR. FELDMAN:  No, your Honor. |
| 01:44:36 | 7 | THE COURT:  I mean, witness list. |
| 01:44:38 | 8 | MR. CASPAR:  No, your Honor. |
| 01:44:39 | 9 | MR. FELDMAN:  We have not. |
| 01:44:41 | 10 | THE COURT:  All right.  Distribute it. |
| 01:45:04 | 11 | All right.  Mr. Hepworth, you may proceed. |
| 01:45:09 | 12 | MR. FELDMAN:  Your Honor, for the record, can Mumford |
| .:45:10 | 13 | be heard on this motion?  I realize the Court has -- |
| 01:45:13 | 14 | THE COURT:  I've ruled.  There's no need for the -- |
| 01:45:17 | 15 | that.  Mr. Hepworth, you may proceed. |
| 01:45:24 | 16 | MR. HEPWORTH:  Your Honor, there are a number of other |
| 01:45:26 | 17 | pending motions that United States and TEA have filed.  We would |
| 01:45:32 | 18 | inquire if you would like those parties to put those forward at |
| 01:45:36 | 19 | this time.  Additionally - |
| 01:45:37 | 20 | THE COURT:  Well, is it necessary that we -- that I |
| 01:45:40 | 21 | determine these motions before we begin? |
| 01:45:44 | 22 | MR. HEPWORTH:  Well, actually, none of the motions are |
| 01:45:46 | 23 | mine, so I'll let the people that have filed them address that. |
| 01:45:49 | 24 | And, additionally, in cooperation with the United States, we have |
| ᴜ1:45:54 | 25 | -- and, really, all parties, we've determined that the United |

| | | |
|---|---|---|
| 01:45:56 | 1 | States would go first, and then, Hearne would go second, if |
| 01:46:00 | 2 | that's okay with the Court. |
| 01:46:02 | 3 | THE COURT:  That's all right.  What other motions are |
| 01:46:05 | 4 | before the Court? |
| 01:46:06 | 5 | MR. FELDMAN:  Yes, your Honor.  Mumford has a motion |
| 01:46:08 | 6 | which is -- regarding the jurisdiction of the Court that we filed |
| 01:46:14 | 7 | over the weekend.  I have an extra copy for the Court. |
| 01:46:22 | 8 | THE COURT:  You filed it this weekend? |
| 01:46:24 | 9 | MR. FELDMAN:  Yes, your Honor. |
| 01:46:24 | 10 | THE COURT:  Well, you can object to the jurisdiction of |
| 01:46:29 | 11 | the Court at any time, so I guess I'll have to consider it.  Hand |
| 01:46:31 | 12 | a copy of it to my clerk.  You may proceed. |
| :54:17 | 13 | MR. FELDMAN:  Your Honor, in the motion, as the Court |
| 01:54:20 | 14 | has read, we raise the issue of the language in your original |
| 01:54:23 | 15 | order which states that it is not applicable to any school system |
| 01:54:28 | 16 | that is under a prior desegregation order.  That is the case |
| 01:54:34 | 17 | here.  Hearne is under a prior desegregation order. |
| 01:54:37 | 18 | We believe that fundamentally, this raises an issue of |
| 01:54:40 | 19 | primary jurisdiction.  If Hearne is to show in this court, as it |
| 01:54:46 | 20 | must, that -- or in this case, as it must, that the cumulative |
| 01:54:51 | 21 | effect of the transfers from Hearne to Mumford, or the transfers |
| 01:54:57 | 22 | out of Hearne was to reduce or impede desegregation in Hearne, |
| 01:55:04 | 23 | then that's a determination that ultimately must be made by the |
| 01:55:09 | 24 | Court with primary jurisdiction over a desegregation order. |
| 01:55:11 | 25 | That court, originally Judge Roberts, now Judge Nowlin, |

| | | |
|---|---|---|
| 01:55:17 | 1 | had a -- in its original -- in its order language dealing with |
| 01:55:29 | 2 | transfers and that the transfers could not have a cumulative |
| 01:55:29 | 3 | effect of reducing or impeding desegregation.  If this court were |
| 01:55:31 | 4 | to make a determination in this case, as it would have to in |
| 01:55:32 | 5 | order to provide relief to Hearne, that the cumulative effect was |
| 01:55:37 | 6 | to reduce or impede desegregation, then it would be invading the |
| 01:55:42 | 7 | province of the Court with primary jurisdiction. |
| 01:55:45 | 8 | Additionally, there also has to be a showing in the |
| 01:55:50 | 9 | context of the claims made by Hearne that there is a vestige of |
| 01:55:55 | 10 | discrimination present in Hearne I.S.D.  But we know from the |
| 01:55:58 | 11 | case law that that vestige has to be related to the original |
| 01:56:02 | 12 | constitutional violation.  Well, that original constitutional |
| .:56:05 | 13 | violation was determined by another court.  It would be that |
| 01:56:08 | 14 | court that would have the province to determine whether or not |
| 01:56:10 | 15 | there still is a vestige of that original constitutional |
| 01:56:14 | 16 | violation. |
| 01:56:15 | 17 | And, once again, if this court were to make a ruling on |
| 01:56:19 | 18 | that subject, it would invade the province of the Court with |
| 01:56:21 | 19 | primary jurisdiction.  For all reasons stated, your Honor, we |
| 01:56:25 | 20 | would submit that the claims brought by Hearne have to be |
| 01:56:29 | 21 | dismissed from this case. |
| 01:56:35 | 22 | THE COURT:  Does Hearne or the United States have a |
| 01:56:37 | 23 | position in this matter at this time? |
| 01:56:44 | 24 | MR. GUZMAN:  Your Honor, on behalf of the United |
| ʋ1:56:49 | 25 | States, we do object to the motion and would oppose its being |

| | |
|---|---|
| 01:56:53 | 1 |
| 01:56:56 | 2 |
| 01:57:00 | 3 |
| 01:57:03 | 4 |
| 01:57:07 | 5 |
| 01:57:11 | 6 |
| 01:57:13 | 7 |
| 01:57:17 | 8 |
| 01:57:19 | 9 |
| 01:57:22 | 10 |
| 01:57:26 | 11 |
| 01:57:29 | 12 |
| :57:36 | 13 |
| 01:57:39 | 14 |
| 01:57:43 | 15 |
| 01:57:46 | 16 |
| 01:57:50 | 17 |
| 01:57:53 | 18 |
| 01:57:55 | 19 |
| 01:57:59 | 20 |
| 01:58:02 | 21 |
| 01:58:07 | 22 |
| 01:58:10 | 23 |
| 01:58:12 | 24 |
| .1:58:16 | 25 |

1  granted at this, or any other, time in this proceeding.  The

2  motion essentially is premised on two bases, one being improper

3  venue in this case and, secondly, being subject matter

4  jurisdiction.  With respect to venue, venue is a waivable defense

5  under Rule 12(h) of the Federal Rules of Civil Procedure.  The

6  defendants in raising that issue, essentially the day before

7  trial, have waived that when it had multiple opportunities before

8  then to do so.

9        The question of the existence of the court order

10  governing Hearne, which is the basis for a venue objection, was

11  first raised by the United States, back in April of last year, on

12  their motion to enforce Court Order 5281 in this case.  So at

13  that point -- excuse me, Mumford would have been in a position if

14  it felt it had a genuine venue objection to raise, it did not in

15  its first responsive pleading.  It simply opposed our motion to

16  enforce on the merits.  Even if you look at the next time that

17  the order was entered or was raised, that would have been in our

18  summary judgment motion that the United States filed on November

19  8th, and that instance, again, we reference the order and we also

20  attach it as an exhibit to support our summary judgment motion.

21        Again, there was no mention of the order made by Hearne

22  -- or, excuse me, by Mumford at that point.  The first time

23  they've raised it, as they say in their pleadings, is that they

24  alleged to have found out about it on November -- later in

25  November, when Hearne responded to Mumford's summary judgment

| | |
|---|---|
| 01:58:20 | 1 |
| 01:58:24 | 2 |
| 01:58:27 | 3 |
| 01:58:29 | 4 |
| 01:58:33 | 5 |
| 01:58:36 | 6 |
| 01:58:39 | 7 |
| 01:58:41 | 8 |
| 01:58:44 | 9 |
| 01:58:49 | 10 |
| 01:58:53 | 11 |
| 01:58:57 | 12 |
| :59:01 | 13 |
| 01:59:05 | 14 |
| 01:59:07 | 15 |
| 01:59:10 | 16 |
| 01:59:14 | 17 |
| 01:59:17 | 18 |
| 01:59:20 | 19 |
| 01:59:25 | 20 |
| 01:59:30 | 21 |
| 01:59:32 | 22 |
| 01:59:35 | 23 |
| 01:59:48 | 24 |
| 01:59:48 | 25 |

1  motion and then, only came across the order in December, shortly

2  before Christmas, when Hearne made a supplemental production.

3  And that's just patently wrong.  They've known about the order

4  since April of last year.  They've had a copy of it since, at

5  least, November of last year.  And at this point, it's simply too

6  late to raise the question of venue.

7            With respect to the question of subject matter

8  jurisdiction, the Court certainly has subject matter jurisdiction

9  to hear this case.  This is a state-wide case, 5281 that was

10  imposed against State of Texas and Texas Education Agency.  What

11  the -- what Mumford is doing essentially is selecting a statement

12  out of the Court's opinion from 1970, to say what the order, in

13  fact, does is not state-wide but carves out certain districts

14  that may have been under their own orders.  I think, first of

15  all, you need to separate the court opinion from the court order

16  that sets forth what the parties were supposed to do or not do.

17            With respect to the Court order that was entered and

18  that's a second part of the 1970 opinion that's referenced, the

19  Court makes clear that TEA is not supposed to grant funding for

20  transfers that impede desegregation in the either sending or

21  receiving district.  There's no mention of certain districts in

22  the state being carved out.  That's also the case in 1973, when

23  the court amends its 1970 order.  Again, it's simply a blanket

24  prohibition on funding certain types of transfers.  There's no

25  mention of any carve-out.

01:59:48   1        The opinion itself does have the sentence that the

01:59:48   2   defendants or that Mumford quotes in it.  But clearly, if you

01:59:50   3   read the context of that sentence and what the Court is dealing

01:59:53   4   with is with the state-wide violation that TEA itself was

01:59:57   5   engaging in conduct that may result in segregation or

02:00:01   6   perpetuating the dual system in districts throughout the state;

02:00:05   7   and that the only way to prevent that is to put the power in TEA,

02:00:10   8   since it had it statutorily to prevent transfers from crossing

02:00:14   9   school district lines that impeded desegregation.

02:00:18   10        Given that power and, also, the power of the

02:00:20   11   pursestring in terms of funding, it was going to be TEA itself

02:00:23   12   that would have that authority.  This case essentially presents

:00:26   13   that issue to the Court.  We have a school district, Mumford, who

02:00:30   14   is losing students in a way that impedes the ability of Hearne to

02:00:34   15   operate its school system, in violation of 5281 because TEA

02:00:38   16   continues to fund the vast majority of those transfer students.

02:00:41   17        The action is properly before the Court to enforce

02:00:44   18   essentially its remedial orders in this case.  We have nothing

02:00:47   19   further unless the Court has questions.

02:00:53   20        THE COURT:  Thank you, counsel.

02:00:57   21        MR. GUZMAN:  Thank you, your Honor.

02:01:01   22        MR. HEPWORTH:  Your Honor, Civil Order 5281 has

02:01:04   23   uniformly been applied to Hearne over its existence.  Hearne has

02:01:07   24   had to make the reports of how many transfers are going to

02:01:13   25   Hearne.  We have been treated the same as other school districts

02:01:16   1   that we are under Civil Order 5281.  Furthermore, I agree with

02:01:21   2   the waiver argument, won't repeat that.  They've clearly waived

02:01:23   3   the venue portions of it.

02:01:26   4        You clearly have jurisdiction over Mumford.  That's who

02:01:28   5   we sued was Mumford.  Mumford's the one that's been violating the

02:01:33   6   order, and there's clearly jurisdiction over Mumford.

02:01:35   7   Furthermore, if they'd have brought this in a timely manner, at

02:01:39   8   some point in time -- I mean, we're supposed to even have ten

02:01:41   9   days to respond to this.  So I don't think you even have to rule

02:01:44   10  immediately on it, but if they would have brought that a long

02:01:48   11  time ago, we could have certainly -- or the United States as a

02:01:52   12  party to the Austin order, they could have moved the Austin judge

02:01:54   13  to consolidate it over under your jurisdiction to make it clean

02:01:58   14  so there's not any question about it.

02:02:00   15       So we believe that you have jurisdiction over Mumford.

02:02:08   16  In effect, we could still do that; we could still get the Austin

02:02:11   17  court to transfer jurisdiction over during the pendency of this

02:02:13   18  or afterwards.  So we submit that, number one, you don't have to

02:02:16   19  rule on that right now because, clearly, TEA, Mumford and the

02:02:20   20  United States are all proper parties to this, and whether or not

02:02:24   21  Hearne is, at a future date, you could determine that later on,

02:02:28   22  or we could have, if we wanted to clean up the record, filed a

02:02:31   23  motion with the Austin order to transfer jurisdiction over here

02:02:38   24  and that would clean it up, as well.  Thank you, your Honor.

02:02:41   25            THE COURT:  Any reply?

| | | |
|---|---|---|
| 02:02:46 | 1 | MR. FELDMAN: Briefly, your Honor. I would point out |
| 02:02:47 | 2 | that the United States' motion for production against Mumford |
| 02:02:52 | 3 | I.S.D. that was filed in April of this past year did not |
| 02:02:56 | 4 | reference the existence of a desegregation order. I've just |
| 02:03:00 | 5 | reviewed it again, sitting at this table. It's something I had |
| 02:03:03 | 6 | looked at this weekend, as well. |
| 02:03:05 | 7 | I would also point out to the Court, contrary to what |
| 02:03:09 | 8 | Mr. Guzman stated, in the amended order 5281, it does reference |
| 02:03:15 | 9 | the existence of other desegregation orders, specifically, in |
| 02:03:21 | 10 | paragraph A(4)(d). It states that when the -- as additional |
| 02:03:38 | 11 | guidelines that have to be considered by the TEA when it's |
| 02:03:43 | 12 | implementing your order, it has to consider a number of factors, |
| 1:03:47 | 13 | you know, including whether the receiving district or the home |
| 02:03:49 | 14 | district is composed solely of students of one race, ethnic |
| 02:03:53 | 15 | origin, et cetera. It also includes, specifically, whether the |
| 02:03:56 | 16 | sending or receiving school district is operating under the |
| 02:03:59 | 17 | provisions of another desegregation order. So, indeed, it is |
| 02:04:03 | 18 | referenced in the amended 5281 itself -- |
| 02:04:07 | 19 | THE COURT: In your opinion, can jurisdiction be |
| 02:04:13 | 20 | waived? |
| 02:04:15 | 21 | MR. FELDMAN: No, your Honor, it cannot. If it is |
| 02:04:18 | 22 | brought before the commencement of trial, that is, in fact, the |
| 02:04:27 | 23 | courts have stated that it can be brought, subject matter |
| 02:04:27 | 24 | jurisdiction can be raised at any time. |
| J2:04:27 | 25 | THE COURT: Yes. I think you're right in that |

| | | |
|---|---|---|
| 02:04:27 | 1 | connection.  In reading Judge Roberts' order, which I thought was |
| 02:04:34 | 2 | admirable, I don't see any reference to the Texas Education |
| 02:04:38 | 3 | Agency nor do I see any reference to the matter of funding for |
| 02:04:43 | 4 | the district -- in the districts involved in this litigation. |
| 02:04:53 | 5 | MR. FELDMAN:  If the Court will just give me a moment |
| 02:04:57 | 6 | to look at that order. |
| 02:04:58 | 7 | THE COURT:  Yes, sir. |
| 02:05:45 | 8 | MR. FELDMAN:  Well, your Honor, I certainly see that |
| 02:05:49 | 9 | the TEA was not a party to this case, and I had not suggested |
| 02:05:55 | 10 | that they were.  And thusly, I don't see anything in here that |
| 02:06:01 | 11 | relates to the issue of funding.  However, the Court does require |
| 02:06:07 | 12 | -- presumably, as part of its efforts to enforce the Singleton |
| 1:06:15 | 13 | time transfer provision in the order that the Court requires a |
| 02:06:18 | 14 | continual reporting by Hearne of the transfers in and out of the |
| 02:06:24 | 15 | school district. |
| 02:06:25 | 16 | THE COURT:  Yes, sir.  I'm sure of that.  I will take |
| 02:06:28 | 17 | that -- I will take your motion under advisement.  And in the |
| 02:06:31 | 18 | meantime, I request that counsel give me briefs on this matter |
| 02:06:37 | 19 | within two days.  That ought to be enough time.  If you have any |
| 02:06:45 | 20 | additional briefing to give the Court, I'd be pleased to receive |
| 02:06:50 | 21 | it. |
| 02:06:51 | 22 | MR. FELDMAN:  Thank you, your Honor. |
| 02:06:54 | 23 | THE COURT:  Having taken the motion under advisement, |
| 02:06:57 | 24 | let's proceed with the litigation.  You may proceed, the United |
| 02:07:02 | 25 | States. |

| | | |
|---|---|---|
| 02:07:02 | 1 | MS. JUREN: Excuse me, your Honor. If I might. There |
| 02:07:04 | 2 | is one clarification that I would ask of the Court. The order |
| 02:07:09 | 3 | that we received this morning addresses the United States' motion |
| 02:07:14 | 4 | to establish facts before trial. |
| 02:07:17 | 5 | THE COURT: Yes. |
| 02:07:19 | 6 | MS. JUREN: Actually, but the content of the order |
| 02:07:22 | 7 | addresses the United States' motion to exclude 54 "may call" |
| 02:07:27 | 8 | witnesses. The United States filed two separate orders, your |
| 02:07:31 | 9 | Honor -- excuse me, motions. One was to establish facts before |
| 02:07:36 | 10 | trial and one -- a different one was to exclude the 54 "may call" |
| 02:07:41 | 11 | witnesses. I'm concerned because this order, really, the content |
| 02:07:47 | 12 | of it addresses the United States' motion to exclude the 54 |
| 2:07:51 | 13 | witnesses, but, yet, it's granting the motion to establish facts |
| 02:07:58 | 14 | before trial. So I'd like to clarify for the record that the |
| 02:08:04 | 15 | order is really directed toward the United States' motion -- |
| 02:08:14 | 16 | THE COURT: Well, actually -- |
| 02:08:14 | 17 | MS. JUREN: -- motion to exclude Mumford witnesses. |
| 02:08:17 | 18 | THE COURT: Actually, it covers both of those motions, |
| 02:08:21 | 19 | as I understand. |
| 02:08:22 | 20 | MS. JUREN: Your Honor, in regard to the motion to |
| 02:08:24 | 21 | establish facts before trial, the TEA did oppose that motion and |
| 02:08:31 | 22 | with respect -- |
| 02:08:32 | 23 | THE COURT: What did you oppose? |
| 02:08:34 | 24 | MS. JUREN: A motion to establish facts before trial. |
| 02:08:36 | 25 | THE COURT: I know. But what in the -- what, |

| | | |
|---|---|---|
| 02:08:39 | 1 | specifically, did you not agree was established before the trial? |
| 02:08:43 | 2 | MS. JUREN:  Well, in the motion, the United States was |
| 02:08:46 | 3 | wanting to deem as facts in this record certain facts that they |
| 02:08:51 | 4 | laid out in their motion for summary judgment, which the TEA |
| 02:08:54 | 5 | opposed at that time.  But -- and I could go into the detail, but |
| 02:09:00 | 6 | I wanted to bring to the Court's attention, also, that the |
| 02:09:02 | 7 | parties have reached stipulated facts that, I think, for |
| 02:09:06 | 8 | technical reasons have not yet been presented to the Court; that |
| 02:09:11 | 9 | I believe, also in talking to Mr. Caspar from the United States, |
| 02:09:15 | 10 | that would supersede the United States' motion to establish facts |
| 02:09:19 | 11 | before trial. |
| 02:09:20 | 12 | The stipulated facts that the parties have entered into |
| 2:09:23 | 13 | cover the -- pretty much the whole gamut of facts covered -- |
| 02:09:30 | 14 | raised by this trial, and we would ask that those facts be |
| 02:09:34 | 15 | established on the record, as compared to the limited facts set |
| 02:09:38 | 16 | out in -- by the United States in their motion. |
| 02:09:41 | 17 | THE COURT:  What says the government?  Or what says the |
| 02:09:43 | 18 | United States? |
| 02:09:44 | 19 | MR. FELDMAN:  Your Honor, may Mumford also be heard on |
| 02:09:46 | 20 | that, your Honor? |
| 02:09:47 | 21 | THE COURT:  Yes.  Certainly. |
| 02:09:51 | 22 | MR. CASPAR:  Your Honor, we did file a motion to |
| 02:09:52 | 23 | establish facts, as well as a motion to exclude witnesses.  We |
| 02:09:57 | 24 | filed a third motion with respect to Mumford's expert witnesses, |
| 02:10:01 | 25 | which the Court can address before Mumford would put on its |

| | | |
|---|---|---|
| 02:10:07 | 1 | expert witnesses.  Their motion asks the Court to exclude the |
| 02:10:10 | 2 | expert witnesses from presenting expert testimony because they |
| 02:10:13 | 3 | just don't have -- |
| 02:10:15 | 4 | THE COURT:  What I'm interested in, have you agreed |
| 02:10:17 | 5 | upon some stipulated facts? |
| 02:10:28 | 6 | MR. CASPAR:  Absolutely. |
| 02:10:28 | 7 | THE COURT:  As stated by counsel for the State of |
| 02:10:28 | 8 | Texas? |
| 02:10:28 | 9 | MR. CASPAR:  We have not yet reviewed the final version |
| 02:10:28 | 10 | of the stipulated facts, but I anticipate agreeing to it, your |
| 02:10:30 | 11 | Honor. |
| 02:10:30 | 12 | THE COURT:  Has Mumford been consulted in this regard? |
| ?:10:33 | 13 | MR. CASPAR:  I think -- on the stipulated facts, I |
| 02:10:35 | 14 | think they have.  Contrary to what counsel for TEA suggests, |
| 02:10:38 | 15 | however, the United States would not withdraw our motion to |
| 02:10:40 | 16 | establish facts.  The facts that we alleged in our motion for |
| 02:10:45 | 17 | summary judgment, and which are not contested by any of the |
| 02:10:48 | 18 | parties, are fully consistent with the stipulated facts, your |
| 02:10:53 | 19 | Honor.  We would not have stipulated to facts that contest -- or |
| 02:10:57 | 20 | that contradict them.  And, indeed, there's more information in |
| 02:10:59 | 21 | the motion for summary judgment that we would ask the Court |
| 02:11:01 | 22 | establish. |
| 02:11:03 | 23 | THE COURT:  Well, I'm asking counsel for the TEA to |
| 02:11:08 | 24 | tell me which of these established facts as set out in the |
| 02:11:14 | 25 | government's motion you say are not established facts. |

| 02:11:18 | 1 | MS. JUREN:  Your Honor, it's as set out in the TEA's |
| 02:11:25 | 2 | response.  There are a number of facts set out, purportedly, by |
| 02:11:32 | 3 | the United States that TEA had contested in its summary judgment |
| 02:11:36 | 4 | motion.  The United States has represented that the facts were |
| 02:11:41 | 5 | uncontested, and, in fact, your Honor, the United States did |
| 02:11:44 | 6 | contest these facts.  I believe the basis for -- |
| 02:11:48 | 7 | THE COURT:  You said the United States contested the |
| 02:11:49 | 8 | facts. |
| 02:11:50 | 9 | MS. JUREN:  I'm sorry.  The TEA contested certain facts |
| 02:11:52 | 10 | set out by the United States.  The procedure under which the |
| 02:11:57 | 11 | United States brings this is Rules 56(d), which allows such a |
| 02:12:05 | 12 | thing only if there is no controversy over the facts, and that |
| 02:12:10 | 13 | TEA has contested certain of the facts.  For example, the United |
| 02:12:17 | 14 | States made a statement in its statement of material facts that |
| 02:12:21 | 15 | it wants the Court to adopt that TEA operated in, acted in |
| 02:12:25 | 16 | concert or participation with Mumford in violating the court |
| 02:12:28 | 17 | order.  That is one of the facts -- quote, unquote, facts that |
| 02:12:32 | 18 | the United States is asking this court to deem established. |
| 02:12:35 | 19 | The TEA offered ample evidence to demonstrate that it |
| 02:12:40 | 20 | has enforced the order and did not act in concert with Mumford. |
| 02:12:46 | 21 | That is one of the basic issues in this trial. |
| 02:12:54 | 22 | Next, the United States has asked that -- the United |
| 02:13:12 | 23 | States has stated that the cumulative effect of transfers from |
| 02:13:18 | 24 | Hearne to Mumford impeded Hearne's desegregation.  The TEA has |
| 02:13:23 | 25 | explained the data the United States has offered does not support |

| | | |
|---|---|---|
| 02:13:26 | 1 | this contention because the United States' calculations include |
| 02:13:29 | 2 | hardship transfers which the order excepts from consideration. |
| 02:13:34 | 3 | So the United States has -- excuse me.  TEA has |
| 02:13:37 | 4 | contested that statement on the part of the United States.  TEA |
| 02:13:44 | 5 | has also contested the facts claimed in three other of the United |
| 02:13:51 | 6 | States' statement of facts that TEA acted regardless of the |
| 02:13:58 | 7 | effect of its actions on desegregation in the state.  As the |
| 02:14:05 | 8 | revised stipulations say, TEA concedes that it acted in |
| 02:14:13 | 9 | baselining certain students and in grandfathering certain |
| 02:14:16 | 10 | students -- they did that whether or not that the districts were |
| 02:14:22 | 11 | in compliance at that time, and whether or not the effects could |
| 02:14:27 | 12 | be considered to have reduced or impeded desegregation. |
| 2:14:31 | 13 | But the facts also show that TEA did have some regard |
| 02:14:34 | 14 | for what it was doing because it baselined and grandfathered in |
| 02:14:39 | 15 | the years 2000 and 2001, knowing through experience that whatever |
| 02:14:45 | 16 | those numbers were and those dates, the numbers would trickle |
| 02:14:50 | 17 | down through attrition, and that is, in fact, your Honor, what |
| 02:14:53 | 18 | the TEA will show, if pressed, in this lawsuit. |
| 02:14:58 | 19 | So that, also, is a statement that the TEA would not |
| 02:15:03 | 20 | want deemed established because it's something that had been |
| 02:15:07 | 21 | hotly contested.  TEA also contested the facts claimed in |
| 02:15:12 | 22 | paragraph 66 of the United States' statement of facts that TEA -- |
| 02:15:24 | 23 | let's see -- has informed Mumford that it was in compliance with |
| 02:15:29 | 24 | the federal court order.  If I'm reading this correctly. |
| 02:15:35 | 25 | THE COURT:  I didn't understand what you're saying, |

| | | |
|---|---|---|
| 02:15:36 | 1 | counsel. |
| 02:15:39 | 2 | MS. JUREN:   TEA further contests paragraph 66 of the |
| 02:15:43 | 3 | United States' statement of facts by pointing to the Court that |
| 02:15:49 | 4 | the letter referenced by the United States does not support its |
| 02:15:53 | 5 | contention.   It's a question of that the United States' |
| 02:15:57 | 6 | documentation supporting what it's contending.   The evidence that |
| 02:16:07 | 7 | the United States uses to support its statement is not without |
| 02:16:18 | 8 | substantial controversy because TEA has contested the support, |
| 02:16:18 | 9 | the documentation offered in support. |
| 02:16:18 | 10 | TEA has also contested the ultimate facts claimed in |
| 02:16:22 | 11 | paragraph 80 of the United States' statement of material facts |
| 02:16:27 | 12 | that TEA decided to withhold funding from Mumford for 71 |
| 1:16:33 | 13 | transfers.   Your Honor, I think I have to withdraw that |
| 02:16:46 | 14 | objection.   I'm sorry.   The TEA did withhold funding for 71 |
| 02:16:50 | 15 | transfers.   I'm not sure what I was thinking.   I'm sorry. |
| 02:16:55 | 16 | Further, the United States had claimed that TEA relies |
| 02:17:03 | 17 | on Mumford to claim the appropriate amount of transportation |
| 02:17:05 | 18 | funding and to refrain from claiming any funding for |
| 02:17:08 | 19 | transportation -- for transporting transfers -- transfer students |
| 02:17:12 | 20 | that violate the court order; and that TEA cannot know whether |
| 02:17:17 | 21 | Mumford is claiming appropriate funding unless it does another |
| 02:17:21 | 22 | audit.   TEA also contested that statement by the United States, |
| 02:17:26 | 23 | saying that it has good reason to think that the transportation |
| 02:17:30 | 24 | situation in Mumford has been addressed, and after the |
| ᴠ2:17:37 | 25 | transportation audit that was done a number of years ago that |

02:17:40  1  Mumford has, in fact, reduced substantially the number of miles

02:17:44  2  in eight average daily ridership that it's claiming.  So the TEA

02:17:50  3  contested the United States' statement there.

02:17:54  4          Essentially, your Honor, all of these statements that

02:18:00  5  TEA has taken issue with were statements that were contested.  In

02:18:06  6  the briefing in the summary judgment, you know, probably, over

02:18:11  7  and over, and some of them are some of the basic issues in this

02:18:16  8  case.  So TEA just simply asks that they not be deemed

02:18:19  9  established on the record before the trial because the rule

02:18:22  10  requires that there not be any substantial controversy and there

02:18:27  11  is.

02:18:29  12          There are a number of other ones that, I guess, there's

02:18:32  13  a couple more.  Again, the question of whether TEA acted in

02:18:38  14  concert with Mumford came up again in some other paragraphs that

02:18:43  15  the United States wishes to have deemed established, and that

02:18:49  16  certainly is contested.  The TEA struggled with Mumford and did

02:18:54  17  not act in concert with Mumford.  The TEA did its best to get

02:19:04  18  Mumford to comply.  And in many cases, there was not much

02:19:07  19  agreement between Mumford and TEA.  So certainly TEA would not

02:19:11  20  want that deemed established before trial.

02:19:14  21          So for these reasons -- and, also, in addition to the

02:19:18  22  fact that the parties spent many, many, many, many hours working

02:19:23  23  on stipulated facts before trial and have come up, after many

02:19:28  24  drafts, with a set of stipulated facts, the TEA requests that the

02:19:32  25  Court deny the plaintiff, the United States' motion to establish

| | | |
|---|---|---|
| 02:19:40 | 1 | facts before trial as uncontroverted or without controversy and, |
| 02:19:44 | 2 | rather, look to the parties' joint stipulated facts that should |
| 02:19:49 | 3 | be filed and presented to the Court shortly. |
| 02:19:53 | 4 | THE COURT:  Counsel for Mumford. |
| 02:19:56 | 5 | MR. FELDMAN:  Yes, your Honor.  First of all, I must |
| 02:20:01 | 6 | say that I had never seen Rule 56(d) utilized in this way.  It |
| 02:20:09 | 7 | has always been my understanding -- and certainly it's the |
| 02:20:11 | 8 | understanding based upon the language of the rule -- that this |
| 02:20:13 | 9 | applies in cases where partial summary judgments are granted by |
| 02:20:17 | 10 | the Court.  This Court itself so held in the case that's styled |
| 02:20:25 | 11 | United States vs. U.S. Postmaster General, 947 F. Supp, 282. |
| 02:20:32 | 12 | THE COURT:  Which is a -- tell me, what did I hold in |
| 1:20:35 | 13 | that case? |
| 02:20:36 | 14 | MR. FELDMAN:  Well, you -- |
| 02:20:40 | 15 | THE COURT:  I have no recollection of it. |
| 02:20:42 | 16 | MR. FELDMAN:  I'm sorry, your Honor.  I wouldn't |
| 02:20:44 | 17 | either. |
| 02:20:45 | 18 | THE COURT:  It was the Eastern District, I assume. |
| 02:20:50 | 19 | MR. FELDMAN:  Yes, sir, it was. |
| 02:20:51 | 20 | THE COURT:  And what did I hold in that case? |
| 02:20:53 | 21 | MR. FELDMAN:  You held that -- you granted a partial |
| 02:20:55 | 22 | summary judgment, and then, you said, a court may also grant |
| 02:21:01 | 23 | partial summary judgment by identifying any undisputed issues of |
| 02:21:07 | 24 | material fact.  And, obviously, that's what you have to do if you |
| 02:21:12 | 25 | grant the summary judgment.  Such facts are then deemed |

02:21:16   1   established for trial.

02:21:20   2         And if you look at the face of the rule itself -- and

02:21:23   3   this is why I don't think I've ever seen this before -- it says,

02:21:26   4   first, in 56(d), it's entitled, case not fully adjudicated on

02:21:35   5   motion.  Not fully adjudicated, obviously implying that there is

02:21:40   6   some adjudication.  And it says, quote, if on motion under this

02:21:43   7   rule, judgment is not rendered upon the whole case or for all of

02:21:58   8   the relief asked and a trial is necessary, the Court at the

02:21:58   9   hearing of the motion by examining the pleadings and the evidence

02:22:02   10   before it, and by interrogating counsel shall, if practical,

02:22:08   11   ascertain what material facts exist without substantial

02:22:10   12   controversy and what material facts are actually in good faith

02:22:13   13   controverted.

02:22:15   14         That, your Honor, obviously, suggests that there would

02:22:18   15   be some ruling based on some uncontested or uncontroverted facts,

02:22:25   16   and then, those are deemed admitted or those are considered

02:22:32   17   uncontroverted for purposes of trial.

02:22:35   18         In addition to the procedural aspect of this motion, as

02:22:40   19   part of the summary judgment process, parties obviously assert

02:22:44   20   facts, and then, parties deny, oppose, controvert those facts.

02:22:50   21   It is impossible to read Mumford's response to the United States'

02:22:55   22   motion for summary judgment without drawing the conclusion that

02:22:58   23   Mumford is opposing factual assertions that go to the heart of

02:23:04   24   the case.  In other words, ultimate facts.

02:23:07   25         And there are some of those in this -- the material

| | | |
|---|---|---|
| 02:23:12 | 1 | facts set forth by the United States in their motion now which |
| 02:23:16 | 2 | the United States asks the Court to deem adjudicated.  For |
| 02:23:21 | 3 | example, No. 36 in the material facts states, Mr. Taylor, who is |
| 02:23:25 | 4 | the board president of Hearne, has learned -- lived in Hearne for |
| 02:23:29 | 5 | 17 years, he has been a member of the Hearne Booster Club, many |
| 02:23:33 | 6 | of Mr. Taylor's coworkers from Hearne -- are from Hearne, and he |
| 02:23:37 | 7 | has spoken with them and other coworkers about Hearne I.S.D. on |
| 02:23:42 | 8 | various occasions.  During these conversations, coworkers from |
| 02:23:45 | 9 | both Hearne and other school districts have noted that Hearne |
| 02:23:49 | 10 | I.S.D. has become a predominantly black school district because |
| 02:23:52 | 11 | of student transfers leaving the district. |
| 02:23:55 | 12 | It goes on to say, based on conversations with |
| ?:23:58 | 13 | coworkers and Hearne residents, and his familiarity with the |
| 02:24:01 | 14 | Hearne and surrounding communities, Mr. Taylor believes that this |
| 02:24:03 | 15 | is the general perception of Hearne I.S.D. in the community. |
| 02:24:07 | 16 | That would hardly be a fact that a court would accept as deemed |
| 02:24:14 | 17 | admitted.  It's a matter of opinion in opposing the motion.  We, |
| 02:24:19 | 18 | obviously, would oppose any kind of conclusion like that. |
| 02:24:21 | 19 | We have similar objections, your Honor, to No. 50 of |
| 02:24:26 | 20 | the material fact -- or objections in the sense that I don't see |
| 02:24:29 | 21 | how it's plausible to expect a party in response to a summary |
| 02:24:37 | 22 | judgment motion to necessarily address each and every factual |
| 02:24:42 | 23 | allegation.  Specifically, there is no rule that requires that. |
| 02:24:46 | 24 | You can oppose a summary judgment motion.  You can oppose the |
| ʋ2:24:50 | 25 | factual conclusions that are reached or asserted in the summary |

02:24:55   1   judgment motion, and that's what a lot of this is, factual

02:24:58   2   conclusions, not statements of fact but factual conclusions.

02:25:04   3          By way of example, your Honor, No. 50, moreover,

02:25:12   4   M.I.S.D. sends out information to parents on how new transfer

02:25:15   5   students can enroll.  This information is intended for parents of

02:25:18   6   students who have not yet transferred to Mumford.  That question

02:25:21   7   of intent is something that, obviously, the Court would under a

02:25:26   8   normal circumstance always have to reach a determination on.

02:25:29   9          No. 55, Bienski knew that he was misleading the TEA.

02:25:34   10   That is an ultimate factual conclusion for the Court to reach.

02:25:38   11   No. 68, M.I.S.D. misrepresented 31 childcare transfers, 31

02:25:46   12   healthcare transfers and 89 safety transfers.  The issue of

1:25:49   13   misrepresentation is one for the Court to determine, and merely

02:25:53   14   asserting that kind of bald conclusion does not -- certainly

02:25:58   15   cannot lead to a fact being -- deemed admitted.

02:26:04   16          Likewise, with No. 69, it says, Bienski knew that for a

02:26:08   17   transfer to qualify for a hardship exception for childcare

02:26:11   18   reasons, there could be no childcare facility located in the

02:26:14   19   sending district.  Well, that's disputed as to when he knew that.

02:26:18   20   Likewise, in No. 70 with respect to health transfers and No. 71

02:26:21   21   with respect to safety transfers.

02:26:23   22          For all the forgoing reasons, your Honor, and

02:26:27   23   particularly in light of all the time that the parties spent over

02:26:30   24   the last week on these joint stipulations, we would move that the

02:26:35   25   Court deny the United States' motion.

| | |
|---|---|
| 02:26:39 | 1 |
| 02:26:44 | 2 |
| 02:26:49 | 3 |
| 02:27:02 | 4 |
| 02:27:02 | 5 |
| 02:27:02 | 6 |
| 02:27:06 | 7 |
| 02:27:09 | 8 |
| 02:27:15 | 9 |
| 02:27:23 | 10 |
| 02:27:28 | 11 |
| 02:27:30 | 12 |
| :27:36 | 13 |
| 02:27:42 | 14 |
| 02:27:48 | 15 |
| 02:27:54 | 16 |
| 02:27:59 | 17 |
| 02:28:01 | 18 |
| 02:28:04 | 19 |
| 02:28:09 | 20 |
| 02:28:13 | 21 |
| 02:28:16 | 22 |
| 02:28:20 | 23 |
| 02:28:24 | 24 |
| 02:28:27 | 25 |

1     THE COURT:  Yes, sir.

2     MR. CASPAR:  Your Honor, I'm not going to take the

3  Court's time to go through each of these statements of fact that

4  the counsel has raised before you.  There was a proper time to do

5  that, your Honor, and that was at the summary judgment stage.

6     We asserted facts in our statement of material facts,

7  and under the local rules, the other parties are required to

8  state genuine issues in response to those facts.  Mumford stated

9  no genuine issues.  TEA stated five or six.  One of the ones

10  counsel for TEA has pointed out, we did not even include in our

11  motion to establish fact because we acknowledge that they

12  contested it.  The other facts that TEA raised are not facts at

13  all, but they contest the legal conclusions from the facts.  And

14  the same goes for Mumford.  Mumford says that it cannot agree to

15  the idea that Mr. Taylor has an opinion.  Well, the fact is that

16  he has an opinion.  But Mumford doesn't agree with the legal

17  conclusion from that opinion.

18     Now, we're at somewhat of a disadvantage, your Honor,

19  because we didn't receive TEA's response to our motion, and so,

20  we can't know what facts they're referring to.  But what we do

21  know is that they filed responses to our motion for summary

22  judgment, that Mumford's did not include a statement of genuine

23  issues, and they have not challenged any of the facts, putting

24  aside legal conclusions, that we alleged.  And TEA did file a

25  statement of genuine issues.  And if you look to those few that

| | | |
|---|---|---|
| 02:28:30 | 1 | they established or that they identified, they -- except for the |
| 02:28:34 | 2 | one that we left out, they had to do with legal conclusions from |
| 02:28:36 | 3 | the facts that we asserted. |
| 02:28:41 | 4 | Addressing counsel for Mumford's legal argument with |
| 02:28:45 | 5 | respect to Rule 56, indeed, counsel has said that in his |
| 02:28:50 | 6 | experience, he's never seen Rule 56(d) used this way before when |
| 02:28:54 | 7 | there hasn't been a ruling of partial summary judgment, at least. |
| 02:28:58 | 8 | Well, I can't speak to counsel's experience, but I can speak to |
| 02:29:01 | 9 | the experience of the Fifth Circuit, your Honor, and they have |
| 02:29:03 | 10 | seen such a case. |
| 02:29:05 | 11 | It's cited in our brief in Scott Paper Company vs. |
| 02:29:08 | 12 | Taslov, Incorporated. The Fifth Circuit says under federal -- |
| ?:29:12 | 13 | under Federal Rule of Civil Procedure 56(d), if a court finds |
| 02:29:16 | 14 | that summary judgment is inappropriate because there are genuine |
| 02:29:20 | 15 | issues to be tried, it shall, if practicable, ascertain what |
| 02:29:24 | 16 | material facts exist without controversy and enter an order |
| 02:29:28 | 17 | specifying those facts. The facts determined under Rule 56(d) |
| 02:29:33 | 18 | will be deemed established at trial, even if there was no grant |
| 02:29:37 | 19 | of summary judgment or partial summary judgment. |
| 02:29:40 | 20 | Now, your Honor, the Court will do as it may, of |
| 02:29:45 | 21 | course, but I really must object to the other parties', you know, |
| 02:29:52 | 22 | bald defiance, really, of the Federal Rules of Civil Procedure. |
| 02:29:56 | 23 | We're operating by a certain set of rules, and the other parties |
| 02:29:59 | 24 | apparently are not. And we would just ask the Court to apply the |
| 02:30:02 | 25 | Federal Rules of Civil Procedure so that we're on a level playing |

| | |
|---|---|
| 02:30:05 | 1 | field.
| 02:30:11 | 2 |          Oh, and -- well, TEA raised this idea that they're not
| 02:30:17 | 3 | -- that they're contesting this idea that they were acting in
| 02:30:19 | 4 | concert with Mumford.  Well, that's a legal conclusion.  In fact,
| 02:30:22 | 5 | that's not even something that's in our statement of material
| 02:30:25 | 6 | facts.  It's something that's a legal conclusion we say, later on
| 02:30:28 | 7 | in the brief, based on the facts in our statement of material
| 02:30:31 | 8 | facts that TEA does not contest.  So for those reasons, your
| 02:30:34 | 9 | Honor, we would respectfully ask that you grant our motion.  The
| 02:30:37 | 10 | motion is consistent with the stipulated facts, and there would
| 02:30:40 | 11 | be no inconsistency.  Thank you.
| 02:30:46 | 12 |          THE COURT:  What is encompassed in this stipulated
| 2:30:49 | 13 | facts?
| 02:30:51 | 14 |          MR. CASPAR:  The stipulated facts, your Honor, go
| 02:30:53 | 15 | through TEA's procedures for how they monitor transfers.  They go
| 02:30:58 | 16 | through a general history of this case, addressing Mumford's
| 02:31:06 | 17 | handling of transfers issues, and their compliance with TEA
| 02:31:09 | 18 | regulations, but they don't address a lot of the facts that are
| 02:31:15 | 19 | alleged and asserted in our statement of material facts.
| 02:31:19 | 20 |          Together they would present a more full picture and
| 02:31:23 | 21 | obviate the need for much litigation.  Now, I would note that
| 02:31:26 | 22 | lots of the facts that you heard counsel hear say they contest,
| 02:31:30 | 23 | you will hear evidence at trial that they will not contest
| 02:31:33 | 24 | because it's irrefutable, and they will have cost the Court's
| 02:31:38 | 25 | time in having us put it on.  Thank you, your Honor.

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
| 02:31:53 | 1  | THE COURT:  Well, I will, likewise, take under                |
| 02:31:56 | 2  | consideration the opposition to the -- that have been stated here |
| 02:32:07 | 3  | this morning to the supposed issues or supposed facts that the |
| 02:32:15 | 4  | government has -- the United States has tendered.             |
| 02:32:20 | 5  | What is the local rule that you refer to, counsel?            |
| 02:32:25 | 6  | MR. CASPAR:  Local rule 56(d), I believe, your Honor.         |
| 02:32:29 | 7  | THE COURT:  What does it provide?                             |
| 02:32:30 | 8  | MR. CASPAR:  It provides that in asserting summary            |
| 02:32:36 | 9  | judgment a party has to have a statement of material facts.  And |
| 02:32:38 | 10 | in responding and/or objecting to a motion for summary judgment, |
| 02:32:42 | 11 | a party should have a statement of genuine issues identifying the |
| 02:32:44 | 12 | contested facts.                                              |
| 1:32:46  | 13 | THE COURT:  Now, you'll recall that this is an Eastern        |
| 02:32:49 | 14 | District of Texas case.                                       |
| 02:32:49 | 15 | MR. CASPAR:  Yes, your Honor.                                 |
| 02:32:51 | 16 | THE COURT:  Are you referring to the local rules of the       |
| 02:32:52 | 17 | Eastern District of Texas?                                    |
| 02:32:53 | 18 | MR. CASPAR:  Yes, your Honor.                                 |
| 02:32:55 | 19 | MR. FELDMAN:  Your Honor, one final point.  There were       |
| 02:32:58 | 20 | cross motions for summary judgment -- or motions for summary  |
| 02:33:03 | 21 | judgment filed by all the parties.  You know, certainly, if we |
| 02:33:06 | 22 | want to get into this, then the other parties could file similar |
| 02:33:11 | 23 | motions.  But, in fact, when you have cross-motions, I believe |
| 02:33:15 | 24 | that the Court would have to consider the factual assertions  |
| 02:33:19 | 25 | asserted by all the parties in their motions.  And, indeed, in |

| | |
|---|---|
| 02:33:25 | 1 |
| 02:33:28 | 2 |
| 02:33:32 | 3 |
| 02:33:34 | 4 |
| 02:33:40 | 5 |
| 02:33:44 | 6 |
| 02:33:47 | 7 |
| 02:33:51 | 8 |
| 02:33:52 | 9 |
| 02:33:53 | 10 |
| 02:33:57 | 11 |
| 02:34:01 | 12 |
| ?:34:07 | 13 |
| 02:34:15 | 14 |
| 02:34:19 | 15 |
| 02:34:25 | 16 |
| 02:34:30 | 17 |
| 02:34:34 | 18 |
| 02:34:38 | 19 |
| 02:34:41 | 20 |
| 02:34:46 | 21 |
| 02:34:51 | 22 |
| 02:34:54 | 23 |
| 02:34:59 | 24 |
| ?2:35:03 | 25 |

1 the Mumford summary judgment motion, we were asserting facts

2 which contravene the facts that were being asserted by the United

3 States.  And, I believe, this court's orders on the pending --

4 all motions for summary judgment was considering the facts in all

5 the motions for summary judgment.

6          THE COURT:  Well, thank you, counsel.  As I've stated,

7 I'll take that motion under advisement, likewise.  Let's get on

8 with the case.

9          MR. FELDMAN:  Your Honor, there's one more motion,

10 though.  It's not my motion, but, as a practical matter, it

11 certainly affects me, and that is the motion filed to exclude

12 expert witnesses.  I believe the United States has filed the

13 motion to exclude both of our experts, Michael Say, who would be

14 testifying about the qualitative analysis required to determine

15 whether or not transfers have a cumulative effect in reducing or

16 impeding desegregation, and Leslie Johnston, a demographer, who

17 provided some data with respect to census, et cetera, over a

18 period of time in Mumford and Hearne.

19          The reason why it's -- it is important for us

20 logistically to have that addressed is that one of those experts

21 is an out-of-state witness.  It certainly would be most

22 convenient for the parties if we could have a determination as to

23 whether or not he's excluded before we -- the school district

24 would incur the expense of bringing him down here, or up here, to

25 testify before the Court.

```
02:35:06    1            The other factors involved that make this difficult and
02:35:09    2    require a ruling is that the -- Hearne is specifically offering
02:35:17    3    the reports of Dr. Say and Ms. Johnston as evidence in this case.
02:35:22    4    They have listed that -- or, excuse me, not the reports, but have
02:35:27    5    listed both of them as witnesses in their case.  And, in fact,
02:35:32    6    the -- on the exhibits, they have specifically tendered Dr.
02:35:38    7    Johnston's report.  So we are sort of caught between a rock and a
02:35:42    8    hard place here, your Honor, in determining how we would present
02:35:45    9    our case in light of these -- the motion that conflicts with the
02:35:51   10    assertions of the parties with respect to --
02:35:55   11            THE COURT:  Does the attorney for Mumford desire to
02:35:56   12    reply?
?:35:59    13            MR. HEPWORTH:  You mean Hearne, your Honor?
02:36:00   14            THE COURT:  I mean Hearne.
02:36:04   15            MR. HEPWORTH:  Your Honor, this isn't our motion.  We
02:36:09   16    agree with the United States.  We have not tendered the report.
02:36:15   17    Your Honor, so you'll know what the parties have done, we've
02:36:17   18    worked hard to have a joint list of exhibits to work from; and
02:36:21   19    then, once the exhibits were listed, then it was up to the
02:36:25   20    parties to put whether they objected to them or not.
02:36:27   21            We are not agreeing to the report of the demographer,
02:36:33   22    but we do agree to the underlying charts and statistics that are
02:36:37   23    in that report.  I don't recall us proffering anything with
02:36:41   24    regard to Mr. Say.  We object to, really, both of them as experts
02:36:48   25    and join with the United States in their motions.  And with
```

| | | |
|---|---|---|
| 02:36:51 | 1 | regard to the joint stipulations of fact, we have filed those. |
| 02:36:56 | 2 | This morning when we got here, there were a couple of minor |
| 02:36:58 | 3 | changes that TEA wanted to make, and we ran it past everybody. |
| 02:37:09 | 4 | We will be filing an amended one; it's substantially the same as |
| 02:37:09 | 5 | the one we've already filed.  It is lengthy.  I believe there are |
| 02:37:09 | 6 | 99 stipulations.  That will help us a great deal.  But with |
| 02:37:12 | 7 | regard to the experts, we agree with the United States: we don't |
| 02:37:14 | 8 | believe that they're proper expert testimony.  Only thing we |
| 02:37:18 | 9 | really agree to is the demographer's reports that are taken from |
| 02:37:21 | 10 | the United States statistics.  Thank you. |
| 02:37:26 | 11 | MR. FELDMAN:  Your Honor, to expedite matters, Mumford |
| 02:37:28 | 12 | will agree that the demographer doesn't testify but her report -- |
| 2:37:32 | 13 | or her numbers, her charts, as referred to by Mr. Hepworth, which |
| 02:37:36 | 14 | are attached to her report, that they come into evidence.  We -- |
| 02:37:40 | 15 | so we would stipulate to the charts that he's referring to that |
| 02:37:43 | 16 | are part of Dr. Johnston's report.  We would withdraw Dr. |
| 02:37:48 | 17 | Johnston as a witness.  We'd withdraw the remainder of her |
| 02:37:51 | 18 | report. |
| 02:37:51 | 19 | THE COURT:  Well, what says the United States as to |
| 02:37:53 | 20 | this? |
| 02:37:56 | 21 | MR. GUZMAN:  I'm sorry, your Honor, could you repeat |
| 02:37:59 | 22 | the question? |
| 02:37:59 | 23 | THE COURT:  What is your position with reference to -- |
| 02:38:01 | 24 | MR. GUZMAN:  Let me make sure I understand.  I have an |
| 2:38:03 | 25 | extra copy of the motion, your Honor.  You want me to pass it up |

| | | |
|---|---|---|
| 02:38:05 | 1 | to you.  I'll be -- while I discuss it.  If not, I'm happy to get |
| 02:38:10 | 2 | into what our position is specifically. |
| 02:38:12 | 3 | THE COURT:  Just summarize for me what you're -- |
| 02:38:14 | 4 | MR. GUZMAN:  Sure.  Our position, in a nutshell, is |
| 02:38:16 | 5 | that this isn't a case about that's an expert case, and it |
| 02:38:19 | 6 | certainly isn't about two experts that come up, one to tell you |
| 02:38:22 | 7 | what the law is and whether 5281 should remain in effect or not, |
| 02:38:24 | 8 | and another witness to come up and say that she performed |
| 02:38:28 | 9 | arithmetic on certain underlying data and then, came out with |
| 02:38:32 | 10 | certain end numbers from that. |
| 02:38:33 | 11 | There's -- I guess there's been some colloquy with |
| 02:38:37 | 12 | respect to the second expert, Ms. Johnston, and demographic data |
| 2:38:41 | 13 | that she pulled from publicly available sources.  We objected to |
| 02:38:45 | 14 | both the reports as constituting hearsay and not being the proper |
| 02:38:50 | 15 | scope of expert testimony.  But if -- we certainly would not |
| 02:38:55 | 16 | object to the underlying data from her report coming into |
| 02:38:58 | 17 | evidence in the case.  If the rest of the report is withdrawn, |
| 02:39:00 | 18 | then we would not object to the report itself coming in.  But |
| 02:39:02 | 19 | with respect to the merit of the issue, which is to say whether |
| 02:39:05 | 20 | these two individuals should be permitted to come in and testify |
| 02:39:07 | 21 | as experts, our position is that neither one should. |
| 02:39:11 | 22 | With respect to Dr. Say, this is the first we've heard |
| 02:39:16 | 23 | about he being -- him being proffered to testify about a certain |
| 02:39:20 | 24 | qualitative analysis that you do under 5281 to determine whether |
| 02:39:24 | 25 | transfer should be permitted or not.  If you look at Dr. Say's |

| 02:39:27 | 1 | report, his three-page report that he submitted in this case, as |
| 02:39:32 | 2 | well as the deposition that he gave in the case, clearly what |
| 02:39:36 | 3 | he's opining about is what 5281 requires legally; and whether he |
| 02:39:39 | 4 | believes, in this day and age, 5281 should remain in effect. |
| 02:39:43 | 5 | Those are questions that invade the province of the Court.  You |
| 02:39:45 | 6 | already have a set of lawyers on all sides to talk about those |
| 02:39:48 | 7 | issues.  We don't believe that the Court needs an expert on the |
| 02:39:50 | 8 | stand to also offer an opinion, particularly when the expert |
| 02:39:53 | 9 | himself is not a lawyer either by training or degree. |
| 02:39:56 | 10 | THE COURT:  What is his name? |
| 02:39:57 | 11 | MR. GUZMAN:  His name is Michael Say. |
| 02:40:00 | 12 | THE COURT:  Dr. Say, you referred to? |
| ?:40:04 | 13 | MR. GUZMAN:  Yes.  Correct. |
| 02:40:07 | 14 | THE COURT:  If I understood what counsel was -- for |
| 02:40:11 | 15 | Mumford was saying, it is that they won't call the witness if his |
| 02:40:18 | 16 | charts are permitted. |
| 02:40:19 | 17 | MR. FELDMAN:  That is with respect to the demographer, |
| 02:40:21 | 18 | Leslie Johnston, your Honor.  And we will stipulate to that, that |
| 02:40:24 | 19 | only the -- her charts come in, and the report doesn't come in, |
| 02:40:28 | 20 | and she won't testify. |
| 02:40:29 | 21 | Dr. Say is a different matter.  Looking at his report, |
| 02:40:33 | 22 | you can see that it refers to a qualitative analysis, doesn't use |
| 02:40:38 | 23 | that term.  We know that's a term of art that comes from the |
| 02:40:40 | 24 | courts.  But nevertheless, this is the same Dr. Say that this |
| .2:40:44 | 25 | court let testify in the Forest Springs case, back in the |

```
02:40:49    1    mid-'90s.

02:40:51    2            THE COURT:  The Forest Springs case.

02:40:53    3            MR. FELDMAN:  Yes, your Honor.  The cite on that is --

02:40:59    4    it involved the subdivision that was -- that existed between

02:41:02    5    Livingston and Goodrich, where -- on the border of Livingston and

02:41:07    6    Goodrich, and the subdivision was attempting to detach from

02:41:19    7    Goodrich and annex to Livingston.  And you permitted Dr. Say to

02:41:19    8    testify in that case with respect to a number of matters.  In

02:41:20    9    fact, he was quoted by the Fifth Circuit with reference to his

02:41:23   10    testimony on the tipping phenomenon in their decision in that

02:41:30   11    case.

02:41:30   12            He is a recognized expert in the area of desegregation.

1:41:34    13    He has worked in it for many, many years, and he would be

02:41:38   14    speaking to the qualitative analysis.  We do not intend to

02:41:42   15    introduce through Dr. Say any matters that will be in the form of

02:41:42   16    pleading --

02:41:54   17            MR. GUZMAN:  Your Honor, again, if that's the case,

02:41:54   18    this is the first we're hearing of it.  If you look at Dr. Say's

02:41:57   19    report, it's clear what he says he's going to testify about, and

02:42:01   20    he reaffirms that in his deposition.  Essentially it's this.

02:42:05   21    Three points.  The court order transfer provision should not be

02:42:08   22    imposed, quote, so as to disallow parents to make a school choice

02:42:11   23    when that choice is not racially motivated.  Essentially that's a

02:42:16   24    legal conclusion, saying that 5281 should not apply in this case.

2:42:19    25            Second, that Mumford, in particular, quote, should not
```

| | | |
|---|---|---|
| 02:42:21 | 1 | be subject to transfer provisions.  Again, that's simply a legal |
| 02:42:23 | 2 | assertion.  It's the same assertion that counsel for Mumford will |
| 02:42:27 | 3 | be making mostly, shortly, throughout the week of this trial. |
| 02:42:29 | 4 | Thirdly, while the transfers from Hearne to Mumford |
| 02:42:33 | 5 | exceed the court order's transfer percentage guidelines, that |
| 02:42:36 | 6 | impact is small compared to the impact already imposed on Hearne |
| 02:42:39 | 7 | by demographic changes.  Now, it turns out in his deposition |
| 02:42:42 | 8 | testimony they amended that opinion to say that the changes are |
| 02:42:44 | 9 | actually on par between both demographics and the transfers.  But |
| 02:42:48 | 10 | again, none of this goes to -- all of this goes to the question |
| 02:42:52 | 11 | of legal impact or legal opinion with respect to how 5281 should |
| 02:42:58 | 12 | apply in this case. |
| 2:42:59 | 13 | THE COURT:  Well, the Court does not intend to consider |
| 02:43:02 | 14 | any matters regarded as inadmissible, even though it might be -- |
| 02:43:08 | 15 | the Court may hear it.  I'm going to hear that witness. |
| 02:43:11 | 16 | MR. FELDMAN:  Thank you, your Honor. |
| 02:43:15 | 17 | THE COURT:  All right.  I think this disposes of the |
| 02:43:16 | 18 | preliminary matters. |
| 02:43:17 | 19 | MR. FELDMAN:  Well, except one that I think would be |
| 02:43:19 | 20 | good news for the Court in terms of minimizing the trial. |
| 02:43:22 | 21 | Mumford would represent to the Court that it is withdrawing its |
| 02:43:26 | 22 | counterclaim against the Texas Education Agency. |
| 02:43:28 | 23 | THE COURT:  Very well.  The government may -- United |
| 02:43:31 | 24 | States may proceed. |
| 02:43:33 | 25 | MR. CASPAR:  Your Honor, the United States is prepared |

| | | |
|---|---|---|
| 02:43:38 | 1 | to go forward with an opening statement.  If your Honor would |
| 02:43:40 | 2 | prefer, however, the parties skip opening statements, we're |
| 02:43:44 | 3 | prepared to put on our first witness. |
| 02:43:46 | 4 | THE COURT:  Well, go ahead and make your opening |
| 02:43:48 | 5 | statement. |
| 02:43:49 | 6 | MR. CASPAR:  Yes, your Honor. |
| 02:43:52 | 7 | PLAINTIFF'S OPENING STATEMENTS |
| 02:43:55 | 8 | MR. CASPAR:  Your Honor, this case is about two |
| 02:43:58 | 9 | defendants who think that they are above the law, and it's about |
| 02:44:03 | 10 | one district devastated by student transfers.  Hearne I.S.D. is |
| 02:44:08 | 11 | the district that's losing transfers, and it has been for several |
| 02:44:12 | 12 | years.  The evidence will show that without the transfers, it |
| 1:44:17 | 13 | would be a diverse school district; no one ethnic group would |
| 02:44:22 | 14 | have the majority of the enrollment and; indeed, each ethnic |
| 02:44:26 | 15 | group would be significantly represented there. |
| 02:44:28 | 16 | But due exclusively to transfers, Hearne has become |
| 02:44:31 | 17 | racially isolated and racially identifiable as a black school |
| 02:44:34 | 18 | district.  And you will hear witnesses testify to the effect that |
| 02:44:37 | 19 | that has had on Hearne socially, financially, academically.  And |
| 02:44:45 | 20 | Hearne joins us in this case in asking the Court to enforce the |
| 02:44:51 | 21 | court order. |
| 02:44:51 | 22 | The court order in the desegregation case -- in this |
| 02:44:54 | 23 | case is the desegregation order from 1973, and that's the |
| 02:44:57 | 24 | applicable law here and that's the law that neither Mumford nor |
| 02:45:01 | 25 | TEA feel that they have to comply with. |

| | | |
|---|---|---|
| 02:45:04 | 1 | Now, the court order provides that TEA can't fund any |
| 02:45:08 | 2 | transfers that reduce or impede desegregation in any district, |
| 02:45:12 | 3 | and the evidence will show your Honor that that's exactly what's |
| 02:45:15 | 4 | happening here.  Hearne is losing the transfers and TEA is |
| 02:45:19 | 5 | funding them.  Most of the transfers are going to Mumford. |
| 02:45:22 | 6 | Indeed, in the last several years, more than half of the white |
| 02:45:28 | 7 | resident population has left Hearne, and most of them have gone |
| 02:45:31 | 8 | to Mumford.  Mumford, for its part, has made it easy for the |
| 02:45:34 | 9 | Hearne transfers.  It runs all five of its buses, the evidence |
| 02:45:37 | 10 | will show, into Hearne to pick up these transfers and bring them |
| 02:45:40 | 11 | to Mumford. |
| 02:45:42 | 12 | TEA has regulations designed to ensure compliance with |
| 2:45:53 | 13 | the court order, but Mumford doesn't feel like it has to comply |
| 02:45:53 | 14 | with those regulations.  The evidence will show -- that TEA's |
| 02:45:54 | 15 | regulations require each district in the State of Texas to report |
| 02:45:58 | 16 | to TEA the number of transfers they have each year, and to |
| 02:46:02 | 17 | identify each transfer and whether each transfer qualifies for a |
| 02:46:06 | 18 | hardship code to the court order.  And your Honor will recall the |
| 02:46:11 | 19 | court order permits a hardship exemption.  The evidence will show |
| 02:46:14 | 20 | that in 1998, Mumford told TEA that it had no transfers. |
| 02:46:20 | 21 | THE COURT:  Had no transfers? |
| 02:46:21 | 22 | MR. CASPAR:  Had no transfers at all whereas, in fact, |
| 02:46:24 | 23 | the evidence will show that Mumford had at least 143 transfers |
| 02:46:27 | 24 | that year, every single one of them from Hearne I.S.D. |
| 2:46:31 | 25 | The evidence will show, as well, that Mumford |

| | |
|---|---|
| 02:46:34 | 1 |
| 02:46:37 | 2 |
| 02:46:41 | 3 |
| 02:46:47 | 4 |
| 02:46:52 | 5 |
| 02:46:56 | 6 |

1  resubmitted a transfer form for that year, identifying those

2  transfers.  And a couple of months later, the evidence will show

3  that Mumford heard from TEA that the transfers were not allowed

4  by the court order because of their effect on Hearne's white

5  enrollment.  TEA instructed Mumford not to take any more white

6  transfers from Hearne unless they had a hardship exception.

7  The evidence will show that the next year, when Mumford

8  submitted its transfer report, Mumford had even more transfers

9  and many more of them had hardship exceptions.  The evidence will

10  show that the year after that, Mumford submitted another transfer

11  report with over 200 transfers, and every single one of them had

12  a hardship exception.

13  TEA got wise, at some point, and investigated Mumford

14  in 2002, and determined that Mumford had misrepresented 151

15  transfers as qualifying for a hardship.  Despite this, TEA

16  decided to work with Mumford to figure out how many transfers

17  Mumford could take, no matter what.  TEA calls this a baseline.

18  The baseline decision or the evidence will show that in 2000 to

19  '01 that TEA decided for that year, all the transfers that were

20  in any district could remain in those districts, no matter what

21  their effect on the racial enrollment at any other district.  And

22  even though TEA had just determined that Mumford misrepresented a

23  bunch of hardship codes, they nevertheless worked with Mumford to

24  establish that 348 transfers that Mumford had in 2000 and 2001

25  could stay with Mumford, no matter what, and TEA would fund them.

| | | |
|---|---|---|
| 02:48:26 | 1 | The evidence will show, your Honor, that because of |
| 02:48:28 | 2 | that decision, there are in the last couple of years, and there |
| 02:48:32 | 3 | are today, transfers from Hearne who are white, and who are |
| 02:48:36 | 4 | impeding desegregation, and who don't have a hardship, that they |
| 02:48:39 | 5 | are in Mumford, and that TEA is funding them still, and that |
| 02:48:42 | 6 | violates the court order. |
| 02:48:44 | 7 | Now, TEA and Mumford are at odds a lot over the |
| 02:48:49 | 8 | transfer issue, obviously, but they are not at odds on one |
| 02:48:52 | 9 | matter.  Neither one of them feels like they have to comply with |
| 02:48:56 | 10 | the court order.  And the United States is here, your Honor, to |
| 02:48:58 | 11 | tell them that they do, that the court order is the law of the |
| 02:49:01 | 12 | land, and neither one of them is exempt, and it's designed to |
| 02:49:06 | 13 | protect districts like Hearne.  And we ask the Court to enforce |
| 02:49:09 | 14 | the court order and protect Hearne from the deleterious effects |
| 02:49:14 | 15 | of the transfers on desegregation.  Thank you, your Honor. |
| 02:49:17 | 16 | THE COURT:  Does the TEA decide to make an opening |
| 02:49:25 | 17 | statement? |
| 02:49:27 | 18 | MS. HANSEN:  Yes, your Honor. |
| 02:49:28 | 19 | THE COURT:  Come forward. |
| 02:49:30 | 20 | MS. HANSEN:  Thank you. |
| 02:49:30 | 21 | THE COURT:  If you will identify yourself for the |
| 02:49:32 | 22 | record. |
| 02:49:32 | 23 | DEFENDANT'S OPENING STATEMENTS |
| 02:49:33 | 24 | MS. HANSEN:  I will, your Honor.  Your Honor, my name |
| 02:49:36 | 25 | is Ingrid Hansen.  I'm an Assistant Attorney General.  I'm here |

| 02:49:39 | 1 | on behalf of the State of Texas and the Texas Education Agency. |
| 02:49:42 | 2 | And may it please the Court, counsel. |
| 02:49:43 | 3 | The question in this case from the view of the Texas |
| 02:49:48 | 4 | Education Agency, your Honor, is did we properly enforce under |
| 02:49:52 | 5 | 5281, and we believe we did for the following reasons.  If I may, |
| 02:49:57 | 6 | your Honor, I'd like to step back for a moment and put this case |
| 02:49:59 | 7 | in what I think is its proper context, which involves, in some |
| 02:50:02 | 8 | respects, the context of 5281 in the 21st century and the impact |
| 02:50:10 | 9 | that it's having on rural small school districts in the State of |
| 02:50:14 | 10 | Texas. |
| 02:50:15 | 11 | In the year 2000, beginning of this century, Texas |
| 02:50:20 | 12 | became an urban state.  We have over a thousand independent |
| 1:50:23 | 13 | school districts in Texas and some 200 charter schools.  So |
| 02:50:34 | 14 | there's 1200 sets of reports that the Texas Education Agency |
| 02:50:34 | 15 | reviews every year for compliance with 5281.  We are now an |
| 02:50:35 | 16 | urban-suburban state.  We're not a rural state anymore. |
| 02:50:39 | 17 | Consequently, your Honor, the impact of 5281 falls, |
| 02:50:43 | 18 | practically exclusively, on very small districts.  We have |
| 02:50:47 | 19 | numerous districts in Texas that have less than 100 students.  So |
| 02:50:50 | 20 | the transfer of one student can trip the percentage balances in |
| 02:50:56 | 21 | the court's order.  We do not believe -- TEA does not believe |
| 02:51:00 | 22 | that in that instance the transfer of one student requires |
| 02:51:03 | 23 | sanctions when our history and our experience has been that |
| 02:51:08 | 24 | ordering these districts and working with superintendents to |
| 02:51:11 | 25 | cease taking transfers, that in 99.9 percent of the cases have |

| | | |
|---|---|---|
| 02:51:16 | 1 | been complied with through natural attrition, which you will also |
| 02:51:20 | 2 | see in this dispute between Hearne and Mumford, restores that |
| 02:51:24 | 3 | balance in a relatively short period of time. |
| 02:51:26 | 4 | You will hear in this case, and you have heard already |
| 02:51:31 | 5 | from the United States, only a table-thumping, I think, about the |
| 02:51:34 | 6 | baselining, and the grandfathering, and the enormous numbers of |
| 02:51:39 | 7 | students.  What this court will look at in this trial and what |
| 02:51:41 | 8 | any order that results from this trial will be about is where are |
| 02:51:48 | 9 | we today, today in January of 2005.  And where we are today, your |
| 02:51:51 | 10 | Honor, is that there are less than 50 students at Mumford that |
| 02:51:55 | 11 | the United States claims are being illegally funded by the TEA. |
| 02:51:59 | 12 | When the TEA made the decision about how much money to |
| 2:52:03 | 13 | withhold from Mumford, because we did under the order sanction |
| 02:52:06 | 14 | them, and I believe it was appropriate and I believe the evidence |
| 02:52:10 | 15 | will show that it was appropriate.  When we did sanction them, we |
| 02:52:13 | 16 | had to balance, your Honor, the number of students involved, the |
| 02:52:17 | 17 | disruption of the educational process of those students, the |
| 02:52:20 | 18 | impact on the families, as well as the financial impact on the |
| 02:52:25 | 19 | I.S.D; and that also see, based on our experience and our |
| 02:52:29 | 20 | history, whether over time these numbers were going to be |
| 02:52:32 | 21 | diminished.  They have diminished substantially in this case |
| 02:52:35 | 22 | since TEA took sanctions. |
| 02:52:37 | 23 | THE COURT:  I don't understand what you mean by when |
| 02:52:39 | 24 | you say that they were diminished.  What are you referring to? |
| J2:52:43 | 25 | MS. HANSEN:  What I mean, your Honor, is that by |

| | |
|---|---|
| 02:52:45 | 1 |
| 02:52:47 | 2 |
| 02:52:48 | 3 |
| 02:52:49 | 4 |
| 02:52:52 | 5 |
| 02:52:54 | 6 |
| 02:52:57 | 7 |
| 02:53:02 | 8 |
| 02:53:04 | 9 |
| 02:53:08 | 10 |

1  attrition the numbers --

2           THE COURT:  What do you mean by attrition in this

3  context?

4           MS. HANSEN:  This will be the example.  By attrition I

5  mean that students move all the time, and that some of these

6  students that the United States subjected to TEA's funding of are

7  no longer at Mumford, so they're not being funded at Mumford

8  anymore.  The disparity between the resident student population

9  at Hearne and the student enrollment at Hearne has also

10 diminished to the point that in 2003 and 2004, after TEA took

11 sanctions, the disparity is down to seven percent.

12          I am not saying that that doesn't violate the one

13 percent in the court order.  Of course it does, however, it's

14 more than just that mechanical formula that we have to look at.

15 The raw number of students the United States just spoke about,

16 348 students that were baselined by TEA today, less than 50 of

17 those remain at Mumford.  And this is the point that I am trying

18 to make, your Honor, when I talk about attrition.

19          And as is obvious, I think, in the annual reports that

20 have been sent to this court, there are always some districts

21 that are out of compliance because of the way those percentages

22 work on small districts and the number of students.  There were a

23 lot of students taken to Mumford that shouldn't have been taken.

24 There's no question about it.  And I don't think anybody disputes

25 that.

| 02:54:00 | 1 | What has happened now -- |
| 02:54:02 | 2 | THE COURT: I would think that Mumford probably does. |
| 02:54:05 | 3 | MS. HANSEN: Well, I'm sure Mumford does, your Honor. |
| 02:54:06 | 4 | What has happened now with the automation of the system |
| 02:54:09 | 5 | is that there's, practically, instantaneous notification to the |
| 02:54:14 | 6 | district by accepting a certain student or certain number of |
| 02:54:18 | 7 | students that are going to trip the percentage in this order. |
| 02:54:21 | 8 | They can now choose to accept a transfer student that will not be |
| 02:54:25 | 9 | funded. This is all done automatically now. |
| 02:54:28 | 10 | At the end of the day, your Honor, I think that the |
| 02:54:30 | 11 | evidence in this case will show that this is really about money. |
| 02:54:40 | 12 | That we have these small school districts in areas that have a |
| 2:54:40 | 13 | declining population, and then, they're in competition with each |
| 02:54:42 | 14 | other to get students because they want the funding. |
| 02:54:45 | 15 | Hearne, I think, is complaining because they have less |
| 02:54:48 | 16 | money. Mumford, obviously, wants back the money that TEA |
| 02:54:51 | 17 | withheld. I think it's about money. But I think that TEA's |
| 02:54:55 | 18 | sanctioning of Mumford in this case was taken in good faith and |
| 02:54:59 | 19 | in compliance with 5281. It was reasonable and it was fair as we |
| 02:55:04 | 20 | tried to consider the impact, okay, of drastically withdrawing a |
| 02:55:09 | 21 | huge sum of money. |
| 02:55:11 | 22 | As I had mentioned earlier, although the United States |
| 02:55:15 | 23 | emphasizes that 50 percent of the whites left Hearne, it fails to |
| 02:55:19 | 24 | advise this court, and the evidence will show, not all of those |
| 02:55:23 | 25 | transfers went to Mumford. Many of those transfers went to other |

02:55:26    1   surrounding districts, and there's no evidence in this case that

02:55:30    2   they were improper or not eligible under this court's order.  I

02:55:33    3   think that's an important factor, your Honor.  I think the United

02:55:36    4   States has skewed its statistics by counting every transfer out

02:55:40    5   of Hearne regardless of where that student went.  It's not a fair

02:55:44    6   depiction of the effect of Mumford's actions.

02:55:48    7        When TEA discovers these kinds of violations they

02:55:51    8   normally do what's called a desk audit.  They get on the

02:55:54    9   telephone, they talk to the superintendent, and 99.9 percent of

02:55:57   10   the time, as I mentioned, they work it out, and over the next

02:55:59   11   year or two, the balance is restored.  That's because we have a

02:56:03   12   lot of mobility in these districts, as well.

1:56:07   13        I'm sorry, your Honor.  I have to pause for a moment.

02:56:10   14   In light of the fact that Mumford has just now withdrawn their

02:56:13   15   cross-claims against us, I am kind of shifting some of my opening

02:56:17   16   statement here.  But my point, also, is that in the two years

02:56:20   17   since the sanctions were taken, the balance of white students in

02:56:25   18   Hearne is returning, and that the history shows that the focus of

02:56:33   19   this kind of enforcement, which was explicitly approved by the

02:56:37   20   Department of Justice and the Office of Civil Rights in 1992 --

02:56:40   21   this method of enforcement was explicitly approved.  And we're

02:56:45   22   going to put those documents in evidence -- that it was

02:56:48   23   reasonable for TEA to respond this way and to act this way.  This

02:56:51   24   is what we've been doing since 1992.  This is what we understood

02:56:54   25   was acceptable.

02:56:57   1    Further, I think it's important to note that today,

02:57:00   2   your Honor, neither Hearne nor Mumford is a one-race school, and

02:57:04   3   throughout the course of this dispute that really began in 1998,

02:57:08   4   neither one of them was or was becoming a one-race school.  The

02:57:16   5   fact is that the bulk of these transfers started in 1998.  I

02:57:20   6   think that, in and of itself, your Honor, is evidence of the fact

02:57:22   7   that it's not a vestige of -- of desegregation that this court

02:57:29   8   was concerned with in 5281.  The segregative effect of those

02:57:33   9   improper transfers is lessening every day, and there's no

02:57:36   10   evidence that any person at TEA acted with any kind of racial

02:57:41   11   animus.  I don't believe there's any evidence that anybody at

02:57:43   12   Mumford acted with any racial animus.  And I submit to the Court

2:57:46   13   that the evidence will show that it's really about a dispute

02:57:50   14   about money and a struggle for these rural districts to survive

02:57:54   15   in an era of declining population and urbanization of this state.

02:57:58   16    This court's order under Section A(6) explicitly

02:58:02   17   authorizes the TEA to withhold funds when a district disobeys its

02:58:08   18   directives not to take any more transfer students.  That's why

02:58:12   19   the sanctions were taken against Mumford and because Mumford

02:58:16   20   repeatedly ignored the directives from the TEA.  I think it's of

02:58:21   21   prime importance, your Honor, that this court affirm the ability

02:58:24   22   of the Texas Education Agency to sanction a school district that

02:58:29   23   ignores it, that files false reports, and incomplete reports, or

02:58:35   24   fails to file at all.  And, frankly, there were some public

2:58:38   25   defiance of this court's order.  There was no secret that Mumford

| | |
|---|---|
| 02:58:42 | 1 |
| 02:58:46 | 2 |
| 02:58:51 | 3 |
| 02:59:05 | 4 |

1  didn't think the order should apply to it.  I think the TEA is

2  entitled to sanction the school district that behaves in that

3  way.  If we can't, your Honor, then there's no meaningful way to

4  enforce the order.

5       THE COURT:  I had thought that the original order gave

6  you all the authority you needed.

7       MS. HANSEN:  I believe it does, your Honor, and I

8  believe we acted appropriately under that authority, and that's

9  just the point I'm making.  And thank you very much.  I

10  appreciate it.

11       THE COURT:  Mumford desire to make an opening

12  statement?

13  DEFENDANT'S OPENING STATEMENTS

14       MR. FELDMAN:  Yes, your Honor, we do.  For the record,

15  your Honor, Mumford would also invoke the Rule at the appropriate

16  time.

17       Your Honor, Mumford comes before the court, recognizing

18  that the record in this case is somewhat unique, but we ask the

19  Court to not view the case in a vacuum but, rather, as part of a

20  much larger whole.  We ask the Court to consider the effect of

21  three decades of intervening Supreme Court and Fifth Circuit

22  jurisprudence, affecting the applicability and enforcement of

23  5281.  And in that connection, we also ask the Court to consider

24  the following requisite burden of proof that must be imposed on

25  the United States and Hearne today, based on that intervening

| | | |
|---|---|---|
| 03:00:17 | 1 | authority and given the relief that they're seeking against |
| 03:00:21 | 2 | Mumford in this case. |
| 03:00:24 | 3 | First, that they must show that there is a vestige of |
| 03:00:28 | 4 | discrimination present in Hearne I.S.D. today and within the |
| 03:00:36 | 5 | relevant time frame, which basically runs from the mid-'90s to |
| 03:00:40 | 6 | the present day, and that this vestige of discrimination relates |
| 03:00:45 | 7 | back. |
| 03:00:46 | 8 | THE COURT:  You said from the mid-'90s. |
| 03:00:49 | 9 | MR. FELDMAN:  Yes, sir. |
| 03:00:50 | 10 | THE COURT:  What are you referring to? |
| 03:00:50 | 11 | MR. FELDMAN:  When the transfers began. |
| 03:00:53 | 12 | THE COURT:  All right. |
| 3:00:56 | 13 | MR. FELDMAN:  They also must show that this vestige of |
| 03:00:59 | 14 | discrimination relates to the original constitutional violations |
| 03:01:04 | 15 | for which they were placed under a desegregation order, which, |
| 03:01:09 | 16 | obviously, takes us into that primary jurisdiction issue. |
| 03:01:13 | 17 | We suggest to the Court that other than what Hearne has |
| 03:01:17 | 18 | asserted in its briefing that the vestige of discrimination is |
| 03:01:21 | 19 | the desegregation order, that that is no evidence of a vestige, |
| 03:01:28 | 20 | and that beyond that, there are no facts that show that there's a |
| 03:01:31 | 21 | vestige of discrimination at Hearne I.S.D. relating to its |
| 03:01:35 | 22 | original constitutional violation of establishing or maintaining |
| 03:01:39 | 23 | a dual school system. |
| 03:01:43 | 24 | From all the facts, we believe it will show -- that it |
| 03:01:46 | 25 | will be shown that Hearne I.S.D. is 20 -- excuse me, is 30 years |

```
03:01:54    1   beyond the dual school system, and that, indeed, it is a unitary
03:01:59    2   system.  In addition, as part of that burden of proof, once the
03:02:07    3   vestige of discrimination relating to the original constitutional
03:02:10    4   violation is shown, then both Hearne and the United States would
03:02:15    5   -- and, again, given the relief that they're seeking in this
03:02:17    6   case, they would then have to show that Mumford engaged in
03:02:21    7   intentional discrimination in connection with student transfers
03:02:26    8   such that there was state action that had the purpose of reducing
03:02:31    9   or impeding desegregation.
03:02:34   10            That state action element under Supreme Court and Fifth
03:02:37   11   Circuit authority today is essential.  Private choices.  We have
03:02:42   12   been told now, any number of times, by those courts, private
 :02:46    13   choices such as a decision to move, are not the basis for a
03:02:52   14   finding of that the effect is to reduce or impede desegregation.
03:02:58   15   A federal court in 2005 has jurisdiction over state action, and
03:03:03   16   that state action must be proven in this case.
03:03:14   17            In addition, your Honor, in the final of what we would
03:03:16   18   say is a three-prong burden of proof, Hearne and the United
03:03:19   19   States must then show that the cumulative effect of that state
03:03:24   20   action is state action by Mumford, not the action that may
03:03:28   21   involve other school districts which are not parties to this
03:03:32   22   case, who also accepted transfers from Hearne, particularly Gause
03:03:36   23   and Milano I.S.D; rather, the United States and Hearne must show
03:03:41   24   that Mumford engaged in state action which had the cumulative
 3:03:46   25   effect of reducing or impeding desegregation at Hearne, and
```

| | | |
|---|---|---|
| 03:03:52 | 1 | viewed not nearly from a quantitative standpoint as the -- those |
| 03:03:57 | 2 | plaintiffs would have the Court do, but from a truly qualitative |
| 03:04:02 | 3 | standpoint, which requires that, amongst other things, we look |
| 03:04:06 | 4 | behind the raw numbers to determine what is happening in Hearne |
| 03:04:11 | 5 | to cause these transfers.  And, rather, whether, indeed, the |
| 03:04:16 | 6 | racial identifiability of Hearne has been significantly altered |
| 03:04:20 | 7 | in the process. |
| 03:04:21 | 8 | The United States in its opening statement, in its |
| 03:04:33 | 9 | briefing, and similarly Hearne, always speaks in terms of black |
| 03:04:33 | 10 | students and white students.  Somehow the Hispanic students have |
| 03:04:35 | 11 | gotten lost in the shuffle in their analysis.  And somehow while |
| 03:04:40 | 12 | this court in 5281 spoke in terms of white versus minority, or |
| 3:04:46 | 13 | what was perceived at the time majority versus minority, rather, |
| 03:04:53 | 14 | they speak, Hearne and U.S., in terms of black and white. |
| 03:05:00 | 15 | No.  Under your order, your Honor, we would |
| 03:05:02 | 16 | respectfully submit that the assessment always has to be white |
| 03:05:06 | 17 | versus minority, which in that order is defined to include |
| 03:05:10 | 18 | blacks, Hispanics, Asians, Native Americans, Pacific Islanders, |
| 03:05:15 | 19 | et cetera. |
| 03:05:18 | 20 | The United States also represents to the Court in its |
| 03:05:22 | 21 | opening statement that the black -- Hearne is now a predominantly |
| 03:05:27 | 22 | black school district.  That Hearne now has a majority of black |
| 03:05:32 | 23 | students, but they've never had that before.  Well, you will -- |
| 03:05:35 | 24 | the Court will see that their own evidence in this case belies |
| 03:05:38 | 25 | that because, indeed, what their evidence shows, their statistics |

| | | |
|---|---|---|
| 03:05:44 | 1 | show that we have stipulated to is that while the black |
| 03:05:48 | 2 | representation of Hearne for the Hearne student body was 52 |
| 03:05:53 | 3 | percent in 1996-'97, indeed, the black percentage of Hearne and |
| 03:06:00 | 4 | the student body in 2003-2004 was 55.64 percent.  So it has gone |
| 03:06:08 | 5 | from 52.08 percent to 55.64 percent.  It's very difficult for |
| 03:06:15 | 6 | anyone to look at those raw numbers and say, well, gee, that |
| 03:06:19 | 7 | increases racial identifiability. |
| 03:06:22 | 8 | Again, they omit any discussion or determination with |
| 03:06:29 | 9 | respect to the Hispanic presence and the -- what we will show the |
| 03:06:36 | 10 | Court is how the Hispanic presence is a significant factor where |
| 03:06:40 | 11 | Hispanic students choose to live and where they choose to go to |
| 03:06:44 | 12 | school is a very significant factor. |
| 1:06:47 | 13 | THE COURT:  Well, what is the -- what is your |
| 03:06:50 | 14 | understanding of the percentage of Mexican-American or Latino |
| 03:06:57 | 15 | students in the Hearne Independent School District and in your |
| 03:07:03 | 16 | school district? |
| 03:07:05 | 17 | MR. FELDMAN:  Your Honor, in the Hearne School District |
| 03:07:09 | 18 | -- Mumford is currently 40 percent white, 60 percent minority. |
| 03:07:19 | 19 | And the representation of Hispanics is substantial amongst |
| 03:07:23 | 20 | that -- |
| 03:07:25 | 21 | THE COURT:  Well, I understand.  Do you have a |
| 03:07:26 | 22 | percentage? |
| 03:07:27 | 23 | MR. FELDMAN:  Yes, your Honor, I do.  If the Court |
| 03:07:29 | 24 | would just give me a moment.  You're asking for data for Mumford, |
| 03:07:47 | 25 | your Honor? |

| | | |
|---|---|---|
| 03:07:47 | 1 | THE COURT:  Both school districts. |
| 03:07:49 | 2 | MR. FELDMAN:  All right.  Would the Court like a spread |
| 03:08:09 | 3 | over a period of years? |
| 03:08:10 | 4 | THE COURT:  Presently. |
| 03:08:12 | 5 | MR. FELDMAN:  Presently, your Honor, the student |
| 03:08:16 | 6 | enrollment at Hearne I.S.D. is -- and this is as of 2003-2004, |
| 03:08:24 | 7 | because that's the last year we have data for -- is 55.64 percent |
| 03:08:28 | 8 | black; 31 -- or 30.96 percent, or 31 percent Hispanic. |
| 03:08:39 | 9 | THE COURT:  31 percent, you say? |
| 03:08:41 | 10 | MR. FELDMAN:  Yes, sir. |
| 03:08:42 | 11 | THE COURT:  At which school district? |
| 03:08:43 | 12 | MR. FELDMAN:  At Hearne.  And it is 13 percent white. |
| 3:08:49 | 13 | THE COURT:  And what about Mumford? |
| 03:08:51 | 14 | MR. FELDMAN:  At Mumford, your Honor, it is 45.5 |
| 03:09:10 | 15 | percent Hispanic, 13.8 percent black, and 40.8 percent white. |
| 03:09:23 | 16 | The Hispanic population of Mumford is now and has, for a number |
| 03:09:28 | 17 | of years, been the predominant population. |
| 03:09:35 | 18 | The evidence will also show that a substantial number |
| 03:09:39 | 19 | of Hispanic students -- even though the resident population of |
| 03:09:45 | 20 | Hearne I.S.D., which is the -- a number that is arrived at by |
| 03:09:52 | 21 | taking the actual enrollment, subtract -- or adding back the |
| 03:09:56 | 22 | transfers, and then, taking away the transfers in, because each |
| 03:10:01 | 23 | year, indeed, Hearne has received transfers including more white |
| 03:10:05 | 24 | transfers than black transfers into its school district. |
| 03:10:09 | 25 | But looking at that resident population, which is a |

| | |
|---|---|
| 03:10:12 | 1 |
| 03:10:15 | 2 |
| 03:10:21 | 3 |
| 03:10:26 | 4 |
| 03:10:30 | 5 |
| 03:10:33 | 6 |
| 03:10:38 | 7 |
| 03:10:42 | 8 |
| 03:10:53 | 9 |
| 03:10:54 | 10 |
| 03:10:59 | 11 |
| 03:11:04 | 12 |
| 1:11:11 | 13 |
| 03:11:16 | 14 |
| 03:11:18 | 15 |
| 03:11:22 | 16 |
| 03:11:24 | 17 |
| 03:11:29 | 18 |
| 03:11:34 | 19 |
| 03:11:43 | 20 |
| 03:11:48 | 21 |
| 03:11:51 | 22 |
| 03:11:53 | 23 |
| 03:11:55 | 24 |
| 03:11:56 | 25 |

1  very meaningful statistic that is ignored by the United States

2  and Hearne, what it shows is that it is the Hispanic population

3  that has remained relatively constant, and the black and white

4  population that has decreased.  Now, that's the resident

5  population.  That's not only kids going to public school at

6  Hearne, but going to public school elsewhere, as well.

7          And what the evidence shows is that 33 percent of the

8  Hispanic students in the Hearne I.S.D. community choose to

9  transfer out of Hearne.  A third of that minority group chooses

10  to transfer out of Hearne.  And even though the transfers to

11  Mumford have declined substantially since the imposition of the

12  TEA sanctions, lo and behold, the evidence shows that if those

13  students can't transfer to Mumford, they're transferring

14  elsewhere.  They are not going back to Hearne, and that is true

15  of the black students who have transferred out.  And,

16  incidentally, your Honor, the evidence will show that ten percent

17  of black students choose to transfer out of Hearne.  But across

18  the board, the students that transfer to Mumford are now

19  transferring somewhere else, black, white and Hispanic.

20          Mumford has always been a Hispanic school district, if

21  we're looking at the predominant population.  And as we look

22  at --

23          THE COURT:  When was Mumford created?

24          MR. FELDMAN:  Your Honor, I don't know the answer to

25  that question.  Mr. Bienski?

| | | |
|---|---|---|
| 03:12:01 | 1 | MR. BIENSKI:  1925. |
| 03:12:01 | 2 | MR. FELDMAN:  1925. |
| 03:12:02 | 3 | THE COURT:  And you say it was a Latino school at that |
| 03:12:07 | 4 | time?  I mean, by that the transfer of students -- |
| 03:12:10 | 5 | MR. FELDMAN:  Throughout the '90s, it has been, your |
| 03:12:11 | 6 | Honor.  I can't -- I cannot speak to 1925.  I highly doubt in |
| 03:12:15 | 7 | 1925 it was.  I suspect in 1925, it was either all white or |
| 03:12:21 | 8 | predominantly white.  We have -- |
| 03:12:26 | 9 | THE COURT:  When segregation was the rule of the day. |
| 03:12:28 | 10 | MR. FELDMAN:  I'm talking about the actual population |
| 03:12:30 | 11 | of the town.  Mumford only has about 300 people, your Honor. |
| 03:12:34 | 12 | THE COURT:  How many? |
| 3:12:34 | 13 | MR. FELDMAN:  Three-hundred people.  And with the great |
| 03:12:37 | 14 | -- today, the great bulk of the population of Mumford consists of |
| 03:12:41 | 15 | individuals who work on the farms that are located in that area. |
| 03:12:47 | 16 | And that is one of the reasons why it so happens that the |
| 03:12:51 | 17 | population has been and remains substantially Hispanic in the |
| 03:12:57 | 18 | modern era. |
| 03:13:00 | 19 | If you look at Mumford today -- the testimony will show |
| 03:13:03 | 20 | that if you look at Mumford today, it is literally a laboratory |
| 03:13:09 | 21 | of diversity.  It has 40 percent white, 60 percent minority.  It |
| 03:13:16 | 22 | is a rainbow coalition throughout its grades.  The evidence will |
| 03:13:22 | 23 | also show that the reason why students transfer there is not a |
| 03:13:27 | 24 | matter of white flight.  Indeed, if there's any flight in this |
| 03:13:32 | 25 | case, it is enrollment flight, because students that are black |

03:13:37   1   students, that are Hispanic, and students who are white have

03:13:41   2   chosen to leave Hearne I.S.D. to go to Mumford.   And an

03:13:47   3   interesting statistic that we're going to also show this court is

03:13:50   4   that the transfers to Mumford, in particular, from Hearne are

03:13:56   5   more minority than majority when compared to the other school

03:14:00   6   districts.   In other words, the transfers to the other school

03:14:03   7   districts are more predominantly white than they are to Mumford.

03:14:08   8   Mumford takes all comers and the population -- if you look at all

03:14:12   9   the students that transfer from Hearne, the minority students,

03:14:17   10  the Hispanic, and black students are going in substantial

03:14:20   11  percentages to Mumford, as opposed to other school districts that

03:14:23   12  are available in Robertson County.

03:14:27   13          So we ask this court to look at the burden of proof and

03:14:33   14  weigh the evidence, in light of the reality of what exists today.

03:14:41   15  The world, obviously, is a different place.   And this is a world,

03:14:45   16  I believe, based both on the reality, on the ground, so to speak,

03:14:53   17  as well as the urging of our federal government and state

03:14:56   18  government that parents today are making choices about where they

03:15:02   19  educate their children, not based on race but, rather, based on

03:15:08   20  where is the best place for my child to get a good education.

03:15:14   21          And that's why the transfers going into Mumford have

03:15:19   22  been, are across the board.   We also believe that the Court

03:15:27   23  should recognize in evaluating the burden of proof or evaluating

03:15:31   24  the evidence, rather, in connection with the burden of proof, as

03:15:35   25  I have indicated already, that it must view minorities versus

| | | |
|---|---|---|
| 03:15:42 | 1 | white, not simply black versus white. |
| 03:15:45 | 2 | THE COURT:  Well, the record will reflect that this |
| 03:15:48 | 3 | court has had the problem of Latino students involved in other |
| 03:15:58 | 4 | litigation that came out of the U.S. against Texas.  For example, |
| 03:16:04 | 5 | the controversy between the San Felipe Independent School |
| 03:16:10 | 6 | District and the Del Rio Independent School District, which ended |
| 03:16:13 | 7 | with the districts being consolidated.  They're now San Felipe |
| 03:16:27 | 8 | Consolidated Independent School District. |
| 03:16:27 | 9 | MR. FELDMAN:  I understand that.  But this is a -- this |
| 03:16:27 | 10 | is truly a unique fact situation and I'd ask the Court to -- |
| 03:16:32 | 11 | THE COURT:  Nearly every case submitted to me is |
| 03:16:35 | 12 | unique. |
| 3:16:35 | 13 | MR. FELDMAN:  I understand that, your Honor. |
| 03:16:37 | 14 | THE COURT:  The Court will be in recess for 15 minutes. |
| 03:17:53 | 15 | (Recess.) |
| 03:32:41 | 16 | THE COURT:  Yes, sir. |
| 03:32:44 | 17 | MR. HEPWORTH:  May I make my opening statement, your |
| 03:32:46 | 18 | Honor? |
| 03:32:46 | 19 | THE COURT:  Yes, sir.  I thought all of them had been |
| 03:32:48 | 20 | made.  Excuse me. |
| 03:32:50 | 21 | PLAINTIFF'S OPENING STATEMENTS |
| 03:32:50 | 22 | MR. HEPWORTH:  I will be brief.  Obviously, we're quite |
| 03:32:53 | 23 | aligned with the United States and agree with what they've had to |
| 03:32:55 | 24 | say. |
| 03:32:57 | 25 | Hearne has complaints against TEA and against Mumford. |

| | | |
|---|---|---|
| 03:33:01 | 1 | And I'll try to not be too repetitive, but the complaint we have |
| 03:33:04 | 2 | against TEA is we found out these transfers were going on, they |
| 03:33:08 | 3 | were reducing the number of students we had, and particularly the |
| 03:33:11 | 4 | number of white students, and made a complaint in 1998 and |
| 03:33:15 | 5 | nothing was done.  They sent us a letter back saying, we'll look |
| 03:33:18 | 6 | into it, and that's all we ever heard.  They sent another letter |
| 03:33:21 | 7 | in 2001.  And finally, in 2002, there was an investigation, but |
| 03:33:28 | 8 | in the meantime, they had grandfathered several hundred students |
| 03:33:33 | 9 | and allowed them to continue to attend.  And, obviously, along |
| 03:33:37 | 10 | with the United States, we're saying that that's not proper to |
| 03:33:40 | 11 | allow all these students to continue to attend.  And we're |
| 03:33:44 | 12 | talking about, you know, 100 to 150 white students.  Mumford has |
| 1:33:52 | 13 | -- they have an enrollment of 450, but they only have 300 people |
| 03:33:56 | 14 | that even live there and fewer than a hundred people that are |
| 03:33:59 | 15 | actually students that live in Mumford. |
| 03:34:03 | 16 | The original order says that TEA is to withhold |
| 03:34:05 | 17 | funding, and if they continue to take white students, they're to |
| 03:34:10 | 18 | reduce their accreditation status.  At one point in time, TEA |
| 03:34:13 | 19 | proposed to do that but then, backed off of it and never have. |
| 03:34:18 | 20 | The result of this is that if you have, just for example -- well, |
| 03:34:25 | 21 | Hearne got into an accreditation problem, and a lot of the reason |
| 03:34:28 | 22 | is because all of these transfers. |
| 03:34:31 | 23 | Mumford has adopted a policy -- they said they don't |
| 03:34:35 | 24 | enforce it, but they published it for four different years and |
| 03:34:37 | 25 | everybody believes it's their policy -- that they'll only take |

03:34:40   1   students that have passed all sections of the TAAS or TAKS test.

03:34:46   2        THE COURT:  They will what?

03:34:47   3        MR. HEPWORTH:  That they will only take students that

03:34:48   4   have passed all of the state-wide assessment tests, the TAKS and

03:34:52   5   now the -- previously, the TAAS test and now, the TAKS.  And

03:34:56   6   students who have no discipline problem and students who have no

03:35:00   7   attendance problems.  Well, if you take -- you take 3 or 400

03:35:05   8   students, even 300 students under those guidelines, number one,

03:35:10   9   it's discriminatory against the blacks because not as high a

03:35:14   10  percentage of the blacks passed that state-wide assessment test.

03:35:17   11  So you're going to get a higher percentage of whites.

03:35:19   12       So that's discriminatory in itself.  And, you know,

03:35:22   13  they're asking for state action is discriminatory.  There it is.

03:35:26   14  What was the effect on Mumford -- I mean, on Hearne, they had too

03:35:33   15  high of a dropout ratio, therefore, became the only state -- or

03:35:38   16  the only school district in the state that was academically

03:35:40   17  unacceptable because of their dropout ratio.  Well, if you take

03:35:45   18  400 students out of a district that's got a thousand students,

03:35:50   19  then you're leaving the ones that are most likely to drop out,

03:35:53   20  and you're taking 400 students.  They're not going to drop out;

03:35:57   21  they've passed all the assessments of TAAS; they don't have any

03:36:00   22  attendance problems, any discipline problems.  You've taken all

03:36:02   23  those people away and resulted in Hearne getting that rating,

03:36:05   24  which maybe further engenders the problem.

03:36:09   25       Had they not taken all of those -- for example, if

| | |
|---|---|
| 03:36:12 | 1 | you've got 100 students and nine drop out, that's a nine-percent |
| 03:36:16 | 2 | dropout rate.  If ten percent was the cut-off, if you're higher |
| 03:36:22 | 3 | than 10-percent dropout rate, you're academically unacceptable. |
| 03:36:25 | 4 | If you allow 80 students in the district and allow 20 of them to |
| 03:36:29 | 5 | transfer and you still have nine dropouts, all of a sudden, |
| 03:36:32 | 6 | you're more than ten percent, you're academically unacceptable. |
| 03:36:36 | 7 | So that's one of the impacts. |
| 03:36:38 | 8 | TEA has also talked about they grandfathered everybody |
| 03:36:42 | 9 | because of the financial impact that it would have to send these |
| 03:36:55 | 10 | students back.  Well, what about the financial impact on the |
| 03:36:55 | 11 | school district that lost them?  The school district gets about |
| 03:36:55 | 12 | $5500 per student.  If you only count the white students, if you |
| 3:36:58 | 13 | only had 100 of them, that would be $550,000 a year.  And there's |
| 03:37:03 | 14 | anywhere from 100 to 150 white students, anywhere from around 300 |
| 03:37:08 | 15 | that are transferring down. |
| 03:37:11 | 16 | Mumford -- complaint we have against Mumford is they |
| 03:37:16 | 17 | wanted to take the law into their own hands.  They did not follow |
| 03:37:20 | 18 | your order, even though it's a valid and existing order, because |
| 03:37:23 | 19 | they decided it shouldn't be any more, apparently.  So they |
| 03:37:26 | 20 | didn't turn in any records from '92 to '98.  No transfer records |
| 03:37:31 | 21 | whatsoever.  '98, they filed a false one in June, saying they had |
| 03:37:34 | 22 | zero transfers when, in fact, two-thirds of their students -- I'm |
| 03:37:38 | 23 | not sure exactly two-thirds, but more than half of their students |
| 03:37:40 | 24 | were transfers.  A lot of them were transfers. |
| 03:37:43 | 25 | Then, in -- later, in '98, they found out they had to |

| | | |
|---|---|---|
| 03:37:47 | 1 | make these reports perhaps in response to the letter that we |
| 03:37:51 | 2 | filed complaining about the transfers.  So they turned in a |
| 03:37:55 | 3 | report that said 143.  That report wasn't accurate either.  It |
| 03:38:00 | 4 | was about 20 people short, as shown by the records they produced. |
| 03:38:03 | 5 | There are fewer than a hundred resident students with a |
| 03:38:08 | 6 | population of 450, most of whom are from Hearne.  The hardship |
| 03:38:14 | 7 | codes, they clearly knew what those codes were.  They put in |
| 03:38:17 | 8 | false codes or allowed false codes to be presented.  That is also |
| 03:38:21 | 9 | state action that shows discriminatory action.  As far as the |
| 03:38:30 | 10 | white versus minority, if you even look at the white versus |
| 03:38:35 | 11 | minority including the Hispanics, you'll discover that more than |
| 03:38:40 | 12 | 50 percent of the whites that live in our district are |
| 1:38:43 | 13 | transferring, most of them, to Mumford. |
| 03:38:50 | 14 | They say that Mumford is a laboratory of diversity. |
| 03:38:54 | 15 | It's a rainbow coalition.  They're nice phrases.  We used to be. |
| 03:38:58 | 16 | We used to have a pretty good mix.  We used to have about 28, |
| 03:39:02 | 17 | 29-percent white.  Now we have only about 13-percent white.  We |
| 03:39:08 | 18 | don't have that rainbow anymore very much because the whites are |
| 03:39:12 | 19 | fleeing.  Thank you, your Honor. |
| 03:39:18 | 20 | THE COURT:  All right.  You may present your evidence. |
| 03:39:22 | 21 | MR. CASPAR:  Your Honor, counsel for Mumford included |
| 03:39:25 | 22 | quite a bit of argument about the -- what we deem erroneous legal |
| 03:39:29 | 23 | standards to guide the case. |
| 03:39:31 | 24 | THE COURT:  I'll hear that later.  Let's get into the |
| 03:39:34 | 25 | case.  I want to hear some evidence. |

03:39:35   1          MR. CASPAR:  Absolutely.  Your Honor, the United States

03:39:37   2   calls Norris McDaniel.

03:39:39   3          THE COURT:  I believe someone had asked for the Rule in

03:39:41   4   the case.  Who was it?

03:39:44   5          MR. FELDMAN:  Yes.  I asked that the Rule be invoked,

03:39:45   6   your Honor.

03:39:47   7          THE COURT:  Let all witnesses in the courtroom rise.

03:39:54   8   The witnesses have been placed under the Rule of the Court, which

03:39:57   9   means this:  That you must leave the courtroom and remain outside

03:40:01   10   the hearing and presence of any of the proceedings in court.

03:40:06   11   While you are outside the courtroom, you do not discuss your

03:40:14   12   testimony with any of your fellow witnesses or with anyone else

1:40:19   13   except for the attorneys in the case.  If you discuss the

03:40:24   14   evidence, your testimony with an attorney, it must be outside the

03:40:28   15   hearing and presence of the remaining witnesses.  You may leave

03:40:31   16   the courtroom.

03:40:38   17          I ask the marshal to put the witnesses in the witness

03:40:42   18   room.

03:40:51   19          MR. HINOJOSA:  Your Honor, my name is David Hinojosa.

03:40:53   20   I just wanted to note for the record I'm from MALDEF, I represent

03:40:54   21   the LULAC intervenors, and we're certainly pleased to be here

03:40:58   22   before the Court.  And although we will be here in a monitoring

03:41:03   23   position in order to submit a post-trial --

03:41:07   24          THE COURT:  You're perfectly -- the Court is willing to

03:41:09   25   hear anything you might want to submit.

| | | |
|---|---|---|
| 03:41:12 | 1 | MR. HINOJOSA:  I'm sorry, your Honor? |
| 03:41:12 | 2 | THE COURT:  I said the Court is -- this thing's not on |
| 03:41:15 | 3 | yet. |
| 03:41:16 | 4 | MR. FELDMAN:  It's working now, your Honor. |
| 03:41:18 | 5 | THE COURT:  I was thinking that if you have evidence to |
| 03:41:20 | 6 | present, the Court would be willing to go ahead and proceed. |
| 03:41:24 | 7 | MR. HINOJOSA:  Yes, your Honor, we understand that. |
| 03:41:25 | 8 | But at this time, we're just going to be monitoring.  We don't |
| 03:41:28 | 9 | intend to offer any evidence other than to submit post-trial |
| 03:41:32 | 10 | brief. |
| 03:41:32 | 11 | THE COURT:  Very well.  Your first witness.  Come |
| 03:41:38 | 12 | forward, sir.  Please take the oath.  Raise your right hand and |
| 3:41:43 | 13 | be sworn. |
| 03:41:44 | 14 | (Witness was sworn.) |
| 03:41:53 | 15 | THE COURT:  Sir, the witness stand is right over here. |
| 03:42:10 | 16 | Please proceed. |
| 03:42:11 | 17 | NORRIS MCDANIEL, called by the Plaintiff, duly sworn. |
| 03:42:11 | 18 | DIRECT EXAMINATION |
| 03:42:21 | 19 | BY MR. CASPAR: |
| 03:42:21 | 20 | Q.   Mr. McDaniel, thank you for coming in today.  Could you |
| 03:42:21 | 21 | introduce yourself to the Court? |
| 03:42:21 | 22 | A.   I'm Norris McDaniel. |
| 03:42:22 | 23 | Q.   Do you live in Hearne, sir? |
| 03:42:24 | 24 | A.   Yes, I do, sir. |
| 03:42:25 | 25 | Q.   How long have you lived in Hearne? |

| | | | |
|---|---|---|---|
| 03:42:27 | 1 | A. | Just about all of my life. |
| 03:42:30 | 2 | Q. | Did you grow up there? |
| 03:42:31 | 3 | A. | Yes, I did. |
| 03:42:32 | 4 | Q. | When were you born there? |
| 03:42:33 | 5 | A. | I was born May 9th, 1942. |
| 03:42:37 | 6 | Q. | Did you go to the Hearne schools? |
| 03:42:38 | 7 | A. | Yes, I did. |
| 03:42:39 | 8 | Q. | What schools did you go to? |
| 03:42:41 | 9 | A. | I attended the Blackshear School. |
| 03:42:44 | 10 | Q. | When did you graduate? |
| 03:42:45 | 11 | A. | I graduated in May 1960. |
| 03:42:50 | 12 | Q. | When you graduated, had the Hearne schools integrated yet? |
| 3:42:54 | 13 | A. | No, they had not. |
| 03:42:56 | 14 | Q. | So did you go to -- was Blackshear a black school? |
| 03:43:00 | 15 | A. | Yes, it was.  Blackshear was the all-black school. |
| 03:43:03 | 16 | Q. | What did you go do when you graduated? |
| 03:43:05 | 17 | A. | I graduated and went to college at Prairie View. |
| 03:43:10 | 18 | Q. | Did you go through any kind of scholarship? |
| 03:43:12 | 19 | A. | Yes, I did.  Went on a football scholarship. |
| 03:43:15 | 20 | Q. | How long were you at Prairie View? |
| 03:43:17 | 21 | A. | Four years. |
| 03:43:18 | 22 | Q. | What position did you play? |
| 03:43:19 | 23 | A. | I played tight end. |
| 03:43:21 | 24 | Q. | Did you do all right? |
| 03:43:25 | 25 | A. | Kept my scholarship. |

| | | |
|---|---|---|
| 03:43:26 | 1 | Q. That's good enough. |
| 03:43:27 | 2 | A. Yeah. |
| 03:43:29 | 3 | Q. After you graduated from Prairie View, what did you do then? |
| 03:43:32 | 4 | A. Then, I went to work in the Bryan Independent School |
| 03:43:37 | 5 | District for one year. |
| 03:43:40 | 6 | Q. That was in 1964? |
| 03:43:42 | 7 | A. 1964. |
| 03:43:43 | 8 | Q. When did you finally come back to Hearne? |
| 03:43:46 | 9 | A. I went back to Hearne in 1966. |
| 03:43:54 | 10 | Q. Had you lived there the rest of your life? |
| 03:43:56 | 11 | A. Yes.  I lived there even while I worked in Bryan, sir. |
| 03:44:03 | 12 | Q. When did Hearne finally integrate schools the first time? |
| 3:44:07 | 13 | A. Hearne finally integrated 1968. |
| 03:44:13 | 14 | Q. And where were you then? |
| 03:44:15 | 15 | A. I was employed by the Hearne Independent School District. |
| 03:44:18 | 16 | Q. And what capacity? |
| 03:44:20 | 17 | A. I was a teacher and a coach at Blackshear School. |
| 03:44:25 | 18 | Q. Blackshear was the black school? |
| 03:44:27 | 19 | A. That's correct. |
| 03:44:27 | 20 | Q. After Hearne integrated, were you reassigned? |
| 03:44:30 | 21 | A. I was. |
| 03:44:31 | 22 | Q. Where did you go then? |
| 03:44:32 | 23 | A. I went to the Hearne High School. |
| 03:44:37 | 24 | Q. Was the Hearne High School the only high school in Hearne |
| 03:44:40 | 25 | after integration? |

| | | |
|---|---|---|
| 03:44:41 | 1 | A.    Yes, it was. |
| 03:44:42 | 2 | Q.    So did black students and white students go there? |
| 03:44:44 | 3 | A.    Correct. |
| 03:44:46 | 4 | Q.    What kind of school was the high school before integration? |
| 03:44:51 | 5 | A.    It was the -- it was named the Hearne High School, and this |
| 03:44:55 | 6 | is where the white students attended school. |
| 03:45:01 | 7 | Q.    How long were you at Hearne High School? |
| 03:45:04 | 8 | A.    I was at Hearne High School until 1972, I think, sir. |
| 03:45:12 | 9 | Q.    And then, what did you do? |
| 03:45:13 | 10 | A.    Then, I was hired as an assistant principal for the |
| 03:45:24 | 11 | elementary and junior high grades. |
| 03:45:27 | 12 | Q.    What years were you the junior high principal? |
| 1:45:31 | 13 | A.    I was a junior high principal in 1974-'75. |
| 03:45:36 | 14 | Q.    And in '75, where did you go? |
| 03:45:38 | 15 | A.    In 1975, I went to work at Sam Houston State University as a |
| 03:45:43 | 16 | coach and a teacher. |
| 03:45:45 | 17 | Q.    Did you come back to Hearne? |
| 03:45:48 | 18 | A.    After one year, I was employed in Hearne as the elementary |
| 03:45:57 | 19 | principal. |
| 03:45:58 | 20 | Q.    Was that Blackshear? |
| 03:45:59 | 21 | A.    That was Blackshear Elementary. |
| 03:46:02 | 22 | Q.    How long were you the principal of Blackshear Elementary? |
| 03:46:04 | 23 | A.    I was principal at Blackshear Elementary for 20 years. |
| 03:46:08 | 24 | Q.    1976 to 1996? |
| 03:46:10 | 25 | A.    That's correct. |

| | | |
|---|---|---|
| 03:46:11 | 1 | Q.    So you were living in Hearne and actually working at the |
| 03:46:14 | 2 | school district when Hearne first integrated? |
| 03:46:16 | 3 | A.    Yes.   That's correct. |
| 03:46:18 | 4 | Q.    Could you describe the reaction in the community to |
| 03:46:20 | 5 | integration? |
| 03:46:21 | 6 | A.    The community -- |
| 03:46:23 | 7 | MR. FELDMAN:  Objection, your Honor.  It's over the |
| 03:46:25 | 8 | broad -- no foundation. |
| 03:46:28 | 9 | THE COURT:  This is a hearing before the Court without |
| 03:46:30 | 10 | a jury.  I'll hear the evidence.  Overrule the objection.  I'm |
| 03:46:34 | 11 | likely to overrule every objection that's made by any party.  Go |
| 03:46:38 | 12 | ahead. |
| 1:46:40 | 13 | MR. FELDMAN:  Does that mean you will? |
| 03:46:43 | 14 | THE COURT:  As I've stated for the record, I do not |
| 03:46:45 | 15 | intend to give credence or, really, give any effect to any |
| 03:46:52 | 16 | evidence that I regard as inadmissible. |
| 03:46:55 | 17 | MR. FELDMAN:  I hope the Court isn't offended if we do |
| 03:46:58 | 18 | object. |
| 03:46:59 | 19 | THE COURT:  Oh, no.  Make your objections.  Go ahead. |
| 03:47:02 | 20 | Q.    (BY MR. CASPAR) Sir, could you describe the reaction in the |
| 03:47:04 | 21 | community to integration in 1968 or 9? |
| 03:47:07 | 22 | A.    The community did not respond openly to it, especially the |
| 03:47:12 | 23 | white community.  The black community seemed real eager to get to |
| 03:47:18 | 24 | go to the, quote, high school.  But the white community didn't |
| 03:47:24 | 25 | seem to accept it very well. |

| | | |
|---|---|---|
| 03:47:35 | 1 | Q.   Well, when the black students finally went to the previously |
| 03:47:35 | 2 | white high school, were they well received? |
| 03:47:35 | 3 | A.   I think so.   There were some problems, of course, when we -- |
| 03:47:40 | 4 | when you put them all together, but then, it seemed like they |
| 03:47:42 | 5 | were received better by the students than the community overall. |
| 03:47:48 | 6 | Q.   Did the black students ever at the high school ever express |
| 03:47:52 | 7 | dissatisfaction with being assigned to the white high school? |
| 03:47:57 | 8 |          MR. FELDMAN:   Objection, your Honor.   Calls for |
| 03:47:58 | 9 | hearsay. |
| 03:47:59 | 10 |          THE COURT:   The objection's overruled. |
| 03:48:01 | 11 |          MR. CASPAR:   Your Honor, for the record Federal Rule of |
| 03:48:03 | 12 | Evidence 803(20) allows the witness to testify about historical |
| 3:48:13 | 13 | events in general according to the community. |
| 03:48:15 | 14 | A.   State your question again. |
| 03:48:17 | 15 | Q.   (BY MR. CASPAR) At some point, while you were at the high |
| 03:48:18 | 16 | school, did the black students ever express their dissatisfaction |
| 03:48:20 | 17 | with anything going on at the high school? |
| 03:48:22 | 18 | A.   Yes.   I remember in one case that was a -- I guess you could |
| 03:48:27 | 19 | call it a sit-in or sit-out demonstration and that lasted for a |
| 03:48:32 | 20 | few days.   The concern -- some of the concerns I learned, later |
| 03:48:37 | 21 | on, were that there weren't any other black teachers at the high |
| 03:48:48 | 22 | school.   Many of the black teachers that they had worked -- had |
| 03:48:52 | 23 | taught them were not there at the high school. |
| 03:48:55 | 24 | Q.   You were a black teacher at the high school, right? |
| 03:48:58 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 03:48:58 | 1 | Q.   How many others were there? |
| 03:48:59 | 2 | A.   I think there were -- I think there might have been three |
| 03:49:03 | 3 | others.  Some were part-time, but there might have been three |
| 03:49:07 | 4 | others. |
| 03:49:08 | 5 | Q.   How many high school teachers altogether? |
| 03:49:11 | 6 | A.   I think there were over 25. |
| 03:49:14 | 7 | Q.   And what was the reaction of the white students having to go |
| 03:49:18 | 8 | to Blackshear, the previously black school? |
| 03:49:22 | 9 | MR. FELDMAN:  Same objection, your Honor. |
| 03:49:25 | 10 | THE COURT:  I overrule the objection. |
| 03:49:26 | 11 | A.   They really objected to going to Blackshear.  And there was |
| 03:49:31 | 12 | talk from the high school administration that he felt that it was |
| 3:49:35 | 13 | better that the high school be relocated to the black community |
| 03:49:40 | 14 | so that the smaller children wouldn't have to go into the black |
| 03:49:43 | 15 | community if they thought the parents would accept that more |
| 03:49:46 | 16 | readily. |
| 03:49:47 | 17 | Q.   (BY MR. CASPAR) So the Blackshear was an elementary school? |
| 03:49:51 | 18 | A.   Yes.  It was five through nine at that time. |
| 03:49:56 | 19 | Q.   Did it -- was there a school that served earlier grades? |
| 03:49:59 | 20 | A.   Yes, there was. |
| 03:50:01 | 21 | Q.   Was that the east side? |
| 03:50:02 | 22 | A.   East side. |
| 03:50:02 | 23 | Q.   When you went to become principal of Blackshear, did this |
| 03:50:08 | 24 | sort of resistance from the white community continue? |
| 03:50:12 | 25 | A.   Yes, it did. |

| 03:50:13 | 1 | Q. And throughout your 20 years as principal at Blackshear, do |
| 03:50:17 | 2 | you feel like it ever ended? |
| 03:50:19 | 3 | A. No, I don't. |
| 03:50:20 | 4 | MR. FELDMAN: Your Honor, could I have just a running |
| 03:50:22 | 5 | objection so I don't have to interrupt? |
| 03:50:24 | 6 | THE COURT: No running objection. If you want to make |
| 03:50:26 | 7 | an objection, go ahead and make it. I overrule your objection. |
| 03:50:28 | 8 | Go ahead. |
| 03:50:31 | 9 | Q. (BY MR. CASPAR) So did it ever go away, this resistance? |
| 03:50:34 | 10 | A. No, it did not. |
| 03:50:36 | 11 | Q. And what ways did it manifest itself? |
| 03:50:40 | 12 | A. There were parents who openly admitted that they didn't want |
| 3:50:47 | 13 | their children have to go into the community, and there were |
| 03:50:55 | 14 | other community members who voiced the same concerns. |
| 03:51:04 | 15 | Q. A few years or -- well, at some point, after you became |
| 03:51:08 | 16 | principal of Blackshear, did you have an occasion to decide |
| 03:51:11 | 17 | whether to start grouping students by ability? |
| 03:51:14 | 18 | A. Yes, I did. We kept up with the research, and the research |
| 03:51:23 | 19 | showed that heterogeneous grouping was the best method for |
| 03:51:31 | 20 | educating boys and girls in communities such as we have in |
| 03:51:36 | 21 | Hearne. |
| 03:51:37 | 22 | Q. Is that what you did when you first started as principal of |
| 03:51:39 | 23 | Blackshear? |
| 03:51:40 | 24 | A. Not when I first started, but a few years after that is when |
| 3:51:44 | 25 | we started, somewhere around 1980. |

| | | |
|---|---|---|
| 03:51:48 | 1 | Q.   Is when you started ability grouping? |
| 03:51:51 | 2 | A.   We started ability grouping. |
| 03:51:52 | 3 | Q.   So how did you feel about ability grouping? |
| 03:51:54 | 4 | A.   I did not feel that ability grouping was the best |
| 03:51:58 | 5 | arrangement for our students at Hearne. |
| 03:52:01 | 6 | Q.   Why not? |
| 03:52:02 | 7 | A.   Because it isolated students from other students |
| 03:52:07 | 8 | academically and socially. |
| 03:52:10 | 9 | Q.   What do you mean? |
| 03:52:12 | 10 | A.   And whenever we are ability grouped, then you would end up |
| 03:52:17 | 11 | with, say, all of the white students in the upper groups, and |
| 03:52:25 | 12 | then, we have most of the minority and black students in the |
| 3:52:30 | 13 | lower groups. |
| 03:52:31 | 14 | Q.   So the ability group, did it tend to segregate students by |
| 03:52:35 | 15 | race? |
| 03:52:35 | 16 | A.   Yes, it did.  It most certainly did. |
| 03:52:38 | 17 | Q.   Why did you decide to start ability grouping around 1980? |
| 03:52:43 | 18 | A.   Because the other campus ability grouped. |
| 03:52:46 | 19 | Q.   When you say the other campus, do you mean the lower |
| 03:52:58 | 20 | elementary school? |
| 03:52:58 | 21 | A.   The lower elementary school. |
| 03:52:58 | 22 | Q.   Was that East Side School? |
| 03:52:58 | 23 | A.   The East Side School ability grouped.  And I was told, and |
| 03:52:58 | 24 | talking to the administrator, that the parents really liked it |
| 03:53:00 | 25 | and it's something that we should do because the children were |

| | | |
|---|---|---|
| 03:53:04 | 1 | already accustomed to it, and they were also accustomed to being |
| 03:53:07 | 2 | with their friends and their associates.  So they thought it |
| 03:53:11 | 3 | would take the pressure off of me, even if I would just consider |
| 03:53:16 | 4 | doing that. |
| 03:53:16 | 5 | Q.   Did the principal of East Side tell you that? |
| 03:53:18 | 6 | A.   Yes, he did. |
| 03:53:19 | 7 | Q.   Well, was he white? |
| 03:53:21 | 8 | A.   We, he was. |
| 03:53:22 | 9 | Q.   Were there any other black principals in the district |
| 03:53:24 | 10 | besides you? |
| 03:53:25 | 11 | A.   No.  I was the only one. |
| 03:53:29 | 12 | Q.   After you started ability grouping around 1980, what was the |
| 3:53:33 | 13 | effect in Blackshear of ability grouping? |
| 03:53:40 | 14 | A.   It isolated the students, and I was never comfortable with |
| 03:53:48 | 15 | it because all the research I read it just never did show that we |
| 03:53:50 | 16 | would get our best results. |
| 03:53:52 | 17 | Q.   Isolated students academically? |
| 03:53:54 | 18 | A.   Academically and socially. |
| 03:53:55 | 19 | Q.   And did it isolate students racially? |
| 03:53:58 | 20 | A.   Yes, it did. |
| 03:54:00 | 21 | Q.   For how long did you ability group after you started in |
| 03:54:07 | 22 | 1980? |
| 03:54:07 | 23 | A.   Seemed like to me we worked with that system for four years. |
| 03:54:10 | 24 | I think about four years. |
| J3:54:15 | 25 | Q.   Why did you decide to stop? |

03:54:17   1   A.    Because continuing with the research and reading, I was

03:54:24   2   still getting more and more evidence that it was not the best way

03:54:26   3   to educate boys and girls.  So we chose to stop.

03:54:34   4   Q.    Why didn't you think it's the best way to educate boys and

03:54:39   5   girls?

03:54:39   6   A.    One of the reasons is what I observed.  In addition to the

03:54:42   7   research, I observed that when we had students mixed -- I

03:54:47   8   remember a specific case if you allow me to.  We had students

03:54:51   9   mixed and there was a very, very bright student in a classroom,

03:54:58  10   and I noticed a nearly very, very bright student that was a very,

03:55:03  11   very challenging student, one who spent a lot of time in the

03:55:06  12   office with me, and he was what you would call disruptive.  What

1:55:11  13   he did, he just interfered with the teacher, trying to teach.  So

03:55:17  14   whatever he -- he didn't have his supplies, so then, I noticed he

03:55:22  15   would say Ms. Blank, I don't have a pencil.  Well, then, the real

03:55:27  16   smart student there, so to speak, she had a pencil.  She'd just

03:55:32  17   give him a pencil, and he'd get on with the work; and whatever he

03:55:35  18   needed, she just started providing it.  So she took care of him

03:55:39  19   so that he could go on and get what she needed.  And I thought,

03:55:42  20   my goodness, that was very, very good.

03:55:44  21        Then, another case, I observed a brighter student and

03:55:50  22   gifted student, so to speak.  They were able to -- using the same

03:55:59  23   skill, we were able to get the gifted students to even work on

03:56:05  24   their skill but then, still help some other students who were

3:56:08  25   struggling and having trouble and in the simple things -- the

| | | |
|---|---|---|
| 03:56:14 | 1 | gifted student could devise games and things that children could |
| 03:56:17 | 2 | use, use high-order skill.  They could do things like this and |
| 03:56:22 | 3 | still reap a lot of benefit, because when you have to teach |
| 03:56:26 | 4 | someone else, you definitely learn a lot. |
| 03:56:28 | 5 | Q.   And that was under the heterogeneous grouping? |
| 03:56:31 | 6 | A.   That is correct. |
| 03:56:31 | 7 | Q.   That did not occur under ability grouping? |
| 03:56:33 | 8 | A.   No. |
| 03:56:35 | 9 | Q.   What other sort of social concerns did you have with respect |
| 03:56:40 | 10 | to ability grouping? |
| 03:56:44 | 11 | A.   Social concern is just isolating it for the segregated the |
| 03:56:50 | 12 | students. |
| 1:56:50 | 13 | Q.   You've testified that you -- correct me if I'm wrong. |
| 03:56:54 | 14 | A.   Okay. |
| 03:56:54 | 15 | Q.   You thought it was helpful for students of different |
| 03:56:56 | 16 | academic abilities to work with one another? |
| 03:56:58 | 17 | A.   Correct.  Yes, I did. |
| 03:57:00 | 18 | Q.   Did you think there were any benefits to students of |
| 03:57:03 | 19 | different racial backgrounds to being together in the same |
| 03:57:07 | 20 | classrooms? |
| 03:57:07 | 21 | A.   Yes.  It was very beneficial.  They learned to get along and |
| 03:57:11 | 22 | learned to work with each other and those -- I remember those. |
| 03:57:17 | 23 | Q.   And that couldn't happen in ability grouping? |
| 03:57:19 | 24 | A.   No. |
| 03:57:19 | 25 | Q.   Well, when you stopped ability grouping, was it around 1984 |

| 03:57:22 | 1 | or '85? |
| 03:57:24 | 2 | A.    1984, '85, that's right. |
| 03:57:25 | 3 | Q.    When you stopped ability grouping, did that go over very |
| 03:57:27 | 4 | well with the parents in the community? |
| 03:57:28 | 5 | A.    No, it did not.  We had some opposition and teachers talked |
| 03:57:35 | 6 | to me, parents talked to me and started talking about things that |
| 03:57:48 | 7 | they would have to do such as leaving if we did not go back to |
| 03:57:52 | 8 | the grouping such as we had. |
| 03:57:53 | 9 | Q.    What kinds of things were the parents talking to you about? |
| 03:57:56 | 10 | A.    They wanted their children with their friends, and they |
| 03:58:00 | 11 | wanted certain teachers to teach their children.  They didn't |
| 03:58:06 | 12 | want their children to go to certain teachers or to be with |
| :58:09 | 13 | certain students. |
| 03:58:11 | 14 | Q.    So, at some point, did you decide to go back to ability |
| 03:58:15 | 15 | grouping? |
| 03:58:16 | 16 | A.    For a short period the pressure got to me, so I did it |
| 03:58:20 | 17 | again. |
| 03:58:20 | 18 | Q.    Why did you decide to go back to it? |
| 03:58:21 | 19 | A.    Because I feared that we were going to start losing |
| 03:58:25 | 20 | students. |
| 03:58:25 | 21 | Q.    Did you fear that parents were going to start pulling their |
| 03:58:28 | 22 | kids out of the school? |
| 03:58:29 | 23 | A.    Yes. |
| 03:58:29 | 24 | Q.    And did you fear that parents were going to start |
| 03:58:32 | 25 | transferring their kids to some other schools? |

| | | |
|---|---|---|
| 03:58:35 | 1 | A.   Yes, I did. |
| 03:58:36 | 2 | Q.   For how long did you ability group -- well, actually, let me |
| 03:58:39 | 3 | ask you this. |
| 03:58:40 | 4 | When you started ability grouping again, did you see |
| 03:58:44 | 5 | the same effects as before? |
| 03:58:44 | 6 | A.   Yes, I sure did.  Even worse. |
| 03:58:48 | 7 | Q.   So did you see that -- well, tell me what those effects were |
| 03:58:51 | 8 | the second time. |
| 03:58:55 | 9 | A.   I noticed that some children just -- the lower groups didn't |
| 03:59:03 | 10 | seem to even try.  I have reports from teachers that they were |
| 03:59:07 | 11 | convinced that they were not going to do well.  They had been |
| 03:59:12 | 12 | that way, they had been with their friends all the way through, |
| :59:13 | 13 | and they just wondered why they couldn't -- what would it take to |
| 03:59:19 | 14 | get with the other students because all of the years they've just |
| 03:59:23 | 15 | been with certain students. |
| 03:59:26 | 16 | Q.   When you ability grouped again, was this in the mid to late |
| 03:59:29 | 17 | '80s? |
| 03:59:30 | 18 | A.   That's right. |
| 03:59:30 | 19 | Q.   When you ability grouped again, did it have that same sort |
| 03:59:33 | 20 | of segregated effect racially? |
| 03:59:35 | 21 | A.   Yes, it did. |
| 03:59:36 | 22 | Q.   Did it tend to create classes with mostly white students? |
| 03:59:41 | 23 | A.   Correct. |
| 03:59:41 | 24 | Q.   And did it tend to create other classes with mostly black |
| ᴜ3:59:44 | 25 | students? |

| | | |
|---|---|---|
| 03:59:45 | 1 | A.    That's correct. |
| 03:59:47 | 2 | Q.    Well, how long did you ability group this time? |
| 03:59:50 | 3 | A.    Maybe just a couple of years. |
| 03:59:55 | 4 | Q.    Why did you stop? |
| 03:59:57 | 5 | A.    Because research kept coming out and I kept reading, and |
| 04:00:06 | 6 | once I saw where there was a professor, Dr. Kennedy, in Virginia, |
| 04:00:11 | 7 | who published a grouping pattern, modified heterogeneous grouping |
| 04:00:16 | 8 | pattern. |
| 04:00:17 | 9 | Q.    Modified heterogeneous grouping pattern? |
| 04:00:20 | 10 | A.    Yes, uh-huh.  So I thought maybe that would work because he |
| 04:00:26 | 11 | in Virginia -- I talked to him by phone.  He told me he had some |
| 04:00:29 | 12 | of the same problems that I was faced with, and sharing with him |
| :00:32 | 13 | that I was concerned with losing students and people not thinking |
| 04:00:38 | 14 | that we were a good school. |
| 04:00:41 | 15 | Q.    Had you read some of his articles? |
| 04:00:43 | 16 | A.    Yes, I did read his articles. |
| 04:00:45 | 17 | Q.    How did you come and talk with him? |
| 04:00:46 | 18 | A.    By just calling the number that he had, then, in one of the |
| 04:00:51 | 19 | journals. |
| 04:00:51 | 20 | Q.    Did you ever meet him? |
| 04:00:53 | 21 | A.    I did.  I sure did. |
| 04:00:55 | 22 | Q.    Where was that? |
| 04:00:55 | 23 | A.    In Wichita Falls.  He did a seminar there at Midwestern |
| 04:00:59 | 24 | University.  I think that's the name of the university in Wichita |
| 04:01:02 | 25 | Falls.  So he invited me over to spend a few days with him at |

| | | |
|---|---|---|
| 04:01:07 | 1 | Wichita Falls.  So he showed me, as he taught the classes there, |
| 04:01:14 | 2 | how to group students. |
| 04:01:17 | 3 | MR. FELDMAN:  Objection, your Honor.  Nonresponsive. |
| 04:01:18 | 4 | THE COURT:  Overrule the objection. |
| 04:01:19 | 5 | A.   And, therefore, we went to that system. |
| 04:01:25 | 6 | Q.   (BY MR. CASPAR) You went to the modified heterogeneous |
| 04:01:27 | 7 | grouping? |
| 04:01:29 | 8 | A.   That's correct. |
| 04:01:29 | 9 | Q.   So this system was something different from ability |
| 04:01:30 | 10 | grouping? |
| 04:01:31 | 11 | A.   That's correct. |
| 04:01:32 | 12 | Q.   When did you go to this heterogeneous grouping? |
| 1:01:37 | 13 | A.   After an accreditation visit from the Texas Education |
| 04:01:43 | 14 | Agency. |
| 04:01:43 | 15 | Q.   Well, around what years? |
| 04:01:46 | 16 | A.   Oh, around 1989 -- '90. |
| 04:01:49 | 17 | Q.   Around then? |
| 04:01:50 | 18 | A.   Uh-huh. |
| 04:01:53 | 19 | Q.   And so, you decided -- did you decide to do it because of |
| 04:01:56 | 20 | your meeting with the professor from Virginia? |
| 04:01:58 | 21 | A.   We did, the modified heterogeneous group.  Then, after the |
| 04:02:02 | 22 | visit from -- the Texas Education Agency, the accreditation |
| 04:02:07 | 23 | visit, then we went back to the peer heterogeneous grouping. |
| 04:02:15 | 24 | Q.   So when you went back to the heterogeneous grouping, what |
| 04:02:17 | 25 | was the effect in Blackshear as far as the assignment of |

| | | |
|---|---|---|
| 04:02:20 | 1 | students? |
| 04:02:23 | 2 | A.    They were mixed. |
| 04:02:23 | 3 | Q.    There were mixed academically? |
| 04:02:25 | 4 | A.    Academically and -- |
| 04:02:27 | 5 | Q.    Were they mixed racially, as well? |
| 04:02:29 | 6 | A.    -- racially, as well. |
| 04:02:29 | 7 | Q.    So they no longer had the predominantly white classes? |
| 04:02:33 | 8 | A.    No, we did not. |
| 04:02:34 | 9 | Q.    Predominantly black classes separately? |
| 04:02:44 | 10 | A.    Did not anymore. |
| 04:02:44 | 11 | Q.    What was the reaction among parents in the community to your |
| 04:02:44 | 12 | going back to heterogenous grouping? |
| 1:02:44 | 13 |             MR. FELDMAN:  Objection. |
| 04:02:46 | 14 |             THE COURT:  Wait a minute.  Did you object? |
| 04:02:47 | 15 |             MR. FELDMAN:  Yes, sir. |
| 04:02:48 | 16 |             THE COURT:  What's the objection? |
| 04:02:48 | 17 |             MR. FELDMAN:  The grounds that it's hearsay. |
| 04:02:51 | 18 |             THE COURT:  Overrule the objection. |
| 04:02:52 | 19 |             MR. CASPAR:  Your Honor, I would reiterate at this time |
| 04:02:53 | 20 | the Federal Evidence 803(20) permits this question. |
| 04:03:00 | 21 |             THE COURT:  Please proceed. |
| 04:03:02 | 22 | Q.    (BY MR. CASPAR) You were talking about the reaction among |
| 04:03:05 | 23 | parents going back to heterogenous grouping? |
| 04:03:07 | 24 | A.    Then, I noticed that parents continued to take their |
| 04:03:12 | 25 | children out but then, even more after we went back to the |

| | | |
|---|---|---|
| 04:03:16 | 1 | heterogeneous grouping. |
| 04:03:18 | 2 | Q.   Well, around when did parents start to really pull their |
| 04:03:23 | 3 | kids out of the school because of that? |
| 04:03:27 | 4 | A.   '91, '92, somewhere there.  '92 is when we -- |
| 04:03:34 | 5 | Q.   Had you been worried before that -- or had you had any |
| 04:03:39 | 6 | inclination that parents may do that? |
| 04:03:39 | 7 | A.   Yes.  Yes, we did.  And I talked to -- if I might just go |
| 04:03:45 | 8 | ahead.  I talked to the administration. |
| 04:03:46 | 9 | Q.   The superintendent? |
| 04:03:47 | 10 | A.   The superintendent about it and asked him what should I do. |
| 04:03:50 | 11 | What did he want me to do. |
| 04:03:51 | 12 | Q.   What did he say? |
| 1:03:51 | 13 | A.   He said, well, Norris, just do whatever you would like, |
| 04:03:56 | 14 | whatever you think is best.  And he said, but I can tell you one |
| 04:04:01 | 15 | thing.  If you mix the students the way that you are, many of |
| 04:04:07 | 16 | them are going to leave. |
| 04:04:09 | 17 |       MR. FELDMAN:  Your Honor, we object to all this |
| 04:04:10 | 18 | testimony as being pure hearsay. |
| 04:04:12 | 19 |       THE COURT:  The objection is overruled. |
| 04:04:14 | 20 |       MR. CASPAR:  It's not offered for any particular matter |
| 04:04:16 | 21 | asserted, your Honor; it's offered because that's his statement. |
| 04:04:20 | 22 | Q.   (BY MR. CASPAR) Mr. McDaniel, did anybody else warn you |
| 04:04:23 | 23 | about what would happen if you heterogenously grouped? |
| 04:04:26 | 24 | A.   Yes, teachers did.  I had teachers who had students in |
| J4:04:29 | 25 | school and even had some parents. |

04:04:34    1   Q.   And what did they say?

04:04:36    2   A.   They told me that if we continued, if I didn't put their

04:04:40    3   children with their friends, then they were going to have to take

04:04:43    4   their children out of school.  And they visited me in my home,

04:04:46    5   and they visited me wherever they saw me, to tell me that if I

04:04:52    6   didn't change that school was going to go up the tube.

04:04:57    7           MR. FELDMAN:  Objection to any statements of parents as

04:04:59    8   being hearsay.

04:05:00    9           THE COURT:  Overrule the objection.

04:05:01   10   Q.   (BY MR. CASPAR) Mr. McDaniel, did these warnings prove to be

04:05:05   11   true?

04:05:06   12   A.   Yes, they did.  I told the superintendent that if it was

:05:12   13   going to be my call, then I would stick with what I felt was in

04:05:15   14   the best interest of the students, and he said okay.

04:05:20   15   Q.   At some point, Mr. McDaniel, you became superintendent of

04:05:24   16   the Hearne schools; is that right?

04:05:25   17   A.   Yes.  That's right, sir.

04:05:27   18   Q.   When was that?

04:05:28   19   A.   1996.

04:05:30   20   Q.   And you went straight from being a principal at Blackshear

04:05:32   21   to the superintendent?

04:05:33   22   A.   The superintendent, sure did.

04:05:35   23   Q.   How were you selected for the job?

04:05:38   24   A.   I was hired by the board.

04:05:40   25   Q.   Did they take a vote to hire you?

| | | |
|---|---|---|
| 04:05:42 | 1 | A.   They took a vote.  Yes, sir. |
| 04:05:43 | 2 | Q.   What was the racial makeup of the board at that time? |
| 04:05:46 | 3 | A.   We had three African-Americans, three whites, and one |
| 04:05:52 | 4 | Hispanic. |
| 04:05:53 | 5 | Q.   Well, given your 20-year, 25 years of experience at the |
| 04:05:59 | 6 | time, was it a unanimous vote to elect you? |
| 04:06:00 | 7 | A.   No, it was not.  It was not a unanimous vote. |
| 04:06:04 | 8 | Q.   What was the vote? |
| 04:06:06 | 9 | A.   Three African-Americans voted for me, three whites voted |
| 04:06:10 | 10 | against me, and the Hispanic voted for me. |
| 04:06:13 | 11 | Q.   Okay.  Were you the first black superintendent in Hearne |
| 04:06:18 | 12 | I.S.D? |
| 1:06:18 | 13 | A.   Yes, I was. |
| 04:06:19 | 14 | Q.   And you retired in 2002; is that right? |
| 04:06:24 | 15 | A.   That's correct. |
| 04:06:25 | 16 | Q.   Has there ever been another black superintendent? |
| 04:06:27 | 17 | A.   No, there has not. |
| 04:06:31 | 18 | Q.   I'd like to ask you about your responsibilities briefly as a |
| 04:06:35 | 19 | superintendent.  So what did you do day-to-day as superintendent? |
| 04:06:38 | 20 | A.   I had to oversee the overall operations of the district. |
| 04:06:42 | 21 | Q.   Fair to say that you were sort of the CEO of the district? |
| 04:06:45 | 22 | A.   CEO of the district, that's right. |
| 04:06:46 | 23 | Q.   Did you go to all the board meetings? |
| 04:06:48 | 24 | A.   I sure did. |
| 04:06:48 | 25 | Q.   Did you have occasion to meet with a lot of parents? |