UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| HEARNE INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Plaintiff-Intervenor, | § | |
| v. | § | Civil Action No. 6:71-CV-5281 |
| | § | |
| STATE OF TEXAS, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION

# INTRODUCTION

## I.

### THE TRIAL AND THE MEMORANDUM OPINION

From January 24 through 28, 2005, the Court held a bench trial on the issues of (1)

whether the Texas Education Agency[1] is violating the August 9, 1973, Judgment in Civil Action

No. 5281, Tyler Division, by funding interdistrict student transfers that reduce or impede

desegregation in the Hearne Independent School District[2]; (2) whether the Mumford Independent

School District[3] is in active concert or participation with TEA in this violation; and (3) whether

---

[1] Hereinafter, Texas Education Agency will be referred to as "TEA."

[2] Hereinafter, Hearne Independent School District will be referred to as "Hearne" or "Hearne ISD."

[3] Hereinafter, Mumford Independent School District will be referred to as either "Mumford" or "Mumford ISD" and the actions undertaken by Mumford were those of its officials. Dr. Pete J. Bienski Jr., the Superintendent of Mumford ISD, will be referred to as "Bienski."

1

Mumford is otherwise interfering with the Judgment. Following the trial, the Court invited the

parties to submit briefs on several of the legal issues involved in this case.  The following is a

memorandum opinion that enjoins Mumford from accepting, and enjoins TEA from providing

Mumford with funding for all of the transfers that are reducing or impeding desegregation in

Hearne.  Part One of the opinion details the Court's findings of fact regarding Defendants'

specific violations of the Judgment in No. 5281, as interpreted by the Court.  Part Two addresses

the Court's conclusions of law, based on its factual findings.  The Court's Permanent Injunction

accompanies these findings of fact and conclusions of law as a separately issued order.

## II.

### No. 5281 BACKGROUND

*A. No. 5281 Background*

Plaintiff United States of America filed this lawsuit against the State of Texas and TEA

on March 6, 1970, alleging that the State of Texas had prevented the dismantling of the former

dual system by, *inter alia*, funding transfers of white students leaving predominately minority

schools and school districts to attend predominately white ones.[4] As a result, the Court ordered

TEA to reevaluate and revamp its programs and policies "to insure that no student in Texas will

be effectively excluded from equal educational opportunities based on race, color, or national

origin and that the dual school system heretofore maintained will be eliminated root and branch."

*United States v. Texas*, 321 F. Supp. 1043, 10588 (E.D. Tex. 1970)(citing *Swann v. Charlotte-*

*Mecklenburg Bd. of Educ.*, 402 U.S. 1, (1971), *aff'd as modified*, 447 F.2d 441 (5th Cir. 1971),

---

[4]This case was originally styled *United States v. State of Texas, et. al.,* Civil Action No. 1424 (Marshall Division) until March 9, 1971, at which time, it was transferred to the Tyler Division and re-styled Civil Action No. 5281.

*cert. denied*, 404 U.S. 1016 (1972).

Since 1971, the Texas public education system has been subject to the Court's No. 5281

Final Judgment[5], which was designed to ensure that "no child will be effectively denied equal

opportunity to educational opportunities on account of race, color or national origin."

Amendments to Modified Order of July 13, 1971, at 1 (Aug. 9, 1973). The Court held "that the

record in this case demonstrates that policies of TEA in administering the public school system

in Texas have frequently – whether inadvertently or by design – encouraged or resulted in the

continuation of vestiges of racially segregated public education within the State." *United States*

*v. State of Texas*, 321 F.Supp. at 1057, aff'd and modified, 447 F.2d 441 (5th Cir. 1971). No.

5281 provides, *inter alia*, that the state of Texas, the TEA, its officers, agents and employees

> shall not permit, make arrangements for, approve, acquiesce in, or give support of
> any kind to student transfers, between school districts, when the cumulative effect,
> in either the sending or receiving school or school district, will be to reduce or
> impede desegregation, or to reinforce, renew or to encourage the continuation of acts
> and practices resulting in discriminatory treatment of students on the grounds of race,
> color, or national origin.

 Ct. Order at 1, ¶A(1).  No. 5281 also sets out guidelines to be used in determining the

cumulative effect of transfers, instructing TEA not to approve transfers "where the effect of such

transfers will change the majority or minority percentage of the school population, based on

average daily attendance in such districts by more than one per cent, (1 %), in either the home or

receiving district or the home of the receiving school." *Id.* at ¶ A(3).  It further provides for TEA

to investigate complaints of violations of transfer decisions. *Id.*  at ¶ A(4)(b).

---

[5] Hereinafter, the 1971 Court Order and the Amendments to the Modified Order will be referred to as simply "No. 5281" or "Ct. Order." The Court's Memorandum Opinion is published at *United States v. Texas,* 321 F. Supp. 1043 (E.D. Tex. 1970), but the text of the judgment in No. 5281 is published at 447 F.2d. 441 (5th Cir. 1971).

Additionally, No. No. 5281 requires TEA to withhold funds for transporting students accepted in violation of the Order. *Id.* at ¶ A(7).  If the offending district continues to accept transfers that adversely affect desegregation, TEA must warn the district that its accreditation status is in danger, and thereafter, if warranted, suspend the district's "TEA accreditation."[6]  *Id.*

The only effective way to remedy TEA's violation was to insure that TEA and its officials, agents and employees responsible for revamping its programs and practices no longer impeded the dismantling of the dual school system. *United States v. State of Texas*, 321 F.Supp. at 1058.  *See also United States v. Texas*, 330 F. Supp. 235, 241 (E.D. Tex. 1971) ("The impetus for the scope of this portion of [No. 5281], therefore, came largely from the Court's belief that the [school districts] involved in this case could not have operated without state support and that, as a consequence, it would be advisable to delineate for the State with some care how to avoid such deprivations of constitutional rights in the future.").  No. 5281 requires TEA to review all student transfers and to notify districts of transfers that do not appear to comply with the terms of the Order. Ct. Order at 4, ¶A(5).[7]

Moreover, No. 5281 further provides that if a district accepts any transfers that do not comply with the provisions of No. 5281, TEA

> shall refuse to transfer the funds, based on the average daily attendance of the transfer students involved[,] to the account of the receiving district, and shall, thereby, terminate and refuse to grant or continue paying to the offending district a percentage

---

[6]This sanction mirrors those contained in Section C of the Modified Order No. 5281, School Transportation, as well as the sections relating to school boundaries, extra-curricular activities, faculty and staff, student assignment, and conveyances of real property.  It was absent from Section A until the August 9, 1973, Amendments to the Modified Order. Amendments to Modified Order of July 13, 1971, at 1 (Aug. 9, 1973).

[7]TEA must refuse to fund transfer students in violation of No. 5281. However, No. 5281 does not authorize TEA to force the return of transfer students to their home districts.  It remains up to the individual parents and school districts as to whether to self-finance the cost of the transfer, if it violates No. 5281.

of state funds equivalent to the district's entitlement based on the average daily attendance of the students transferring in violation of this order.

*Id.* at 4, ¶A(6). It also permits TEA to grant exceptions to these requirements in "hardship situations," which the Order does not define. *Id.* at 2,  ¶A(2)(c). Section A(4) of No. 5281 allows TEA to develop guidelines necessary to carry out its obligations under the Order. Pursuant to that provision, TEA has maintained hardship exception codes since at least 1986, when the United States Department of Education, Office of Civil Rights directed TEA to make changes in its exemption codes as part of a remedial plan for enforcing No. 5281.  *See, e.g.,* Tr. Exh. 1, 2. TEA has defined nine different types of "hardship situations" qualifying for the hardship exception to No. 5281, including – pertinent to the disputes in the instant case, situations concerning childcare needs – and a student's health or safety.[8]  In addition, TEA may apply other guidelines to approving or disapproving student transfers that are *submitted to the Court and the parties without objection*.  Court Order, at ¶ A(4)(e) (emphasis added).

**B. Procedural Background**

On April 9, 2004, the United States moved to enforce No. 5281 against TEA to halt funding to Mumford for student transfers from neighboring Hearne. *See* United States' Motion to Enforce Or. Ag. TEA (April 9, 2004).  As already described, Defendant TEA is an agency of the state of Texas which annually provides each school district in Texas with a certain amount of funding for each student that the district enrolls, whether the student resides in the district or

---

[8]These exemption codes are available to the districts, and are listed and defined on the Student Transfer forms that the districts are required to submit annually.  *See, e.g.,* Tr. Exh. 8, 17, 21. Moreover, since TEA developed its automated system in 2002, the exception codes have since been available electronically on TEA's website.

transfers from another district.  Texas Educ. Code §§7.055(b)(35), 42.005, 42.101.  TEA is

"charged with fulfilling the duty placed on the State by the Constitution of the State of Texas to

operate a system of public schools." Stip. No. 1; *United States v. Texas*, 321 F. Supp. at 1046.

Specifically, the United States seeks to enjoin TEA from (1) providing Mumford with funding

for numerous transfers that reduce or impede desegregation in Hearne; (2) providing Mumford

with funding for 151 specific transfers that Mumford misrepresented as qualifying for a hardship

exception to No. 5281; and (3) providing Mumford with any transportation funding until

Mumford can show that it has ceased transporting transfer students that reduce desegregation in

Hearne.  *Id.* TEA maintains that it carried out all of its obligations under No. 5281 in good faith

and in compliance with No. 5281. *See, e.g.,* TEA's Response to US' Mot. for Summary

Judgment, at ¶¶ 1, 6-10, 28-29, 30-31.

On the same date, the United States filed a Motion for Injunctive Relief Against

Mumford and Bienski, its superintendent, maintaining that Mumford was interfering with the

operation of No. 5281. *See* United States' Mot. for Inj. Against Mumford (April 9, 2004), Docket

No. 373.[9] Mumford is a public school district located in Robertson County and is a political sub-

division of the State of Texas.  Stip. No. 2; Mumford's Ans. to Compl. in Interv., at 3 ¶ 13 (Sept.

---

[9] The complaint must state a cause of action created by federal law or it must assert a state law cause of action requiring the "resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). *See also, Aquafaith Shipping, Ltd. v. Jarillas*, 963 F.2d 806 (5th Cir.), *cert. denied,* 506 U.S. 955, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992). In this case, it is undisputed that the United States, as Plaintiff, filed a complaint which alleged a cause of action created by federal law. The only issue that remains for the Court is whether, because Hearne, as Plaintiff-Intervenor, is subject to a separate desegregation order in another district court, it removes subject matter jurisdiction from the Court in the instant case. A reading of the court order from the Western District of Texas only addresses situations where Hearne might be a defendant; in other words, if Hearne permits or allows transfers of students that impede desegregation. Hearne is not a defendant in the instant litigation.  The current action is a complaint brought by the United States, in which Hearne was Plaintiff-Intervenor, against the TEA and Mumford for allegedly allowing students to transfer, in contravention to Hearne's lack of consent. Order Denying Mumford's Mot.to Dismiss (June 22, 2005).

23, 2003). The Superintendent of Schools for Mumford is responsible for the general management of the public schools in that district, under the direction and supervision of the district's board of trustees and the State of Texas, its agents and officers. Mumford has received and continues to receive substantial state aid.

As claimed within its Motion for Injunctive Relief, the United States alleges that (1) Mumford was interfering with No. 5281 and that further interference ought to be enjoined under the All Writs Act, 28 U.S.C. § 1651(a); (2) Mumford has operated "in active concert or participation" with TEA in violating No. 5281, and that No. 5281 should be enforced against Mumford; and (3) Mumford's continued acceptance of transfer students from Hearne has thwarted the enforcement of No. 5281 and, therefore, ought to be enjoined pursuant to the Court's inherent authority.[10] *See id.*  Mumford, in response, maintains that it is not a party to No. 5281, that the United States cannot prove that Mumford accepted transfers in a discriminatory matter or based on any discriminatory motive, and that it cannot be demonstrated that Mumford's acceptance of transfers has had a segregative effect on Hearne. Mumford's Opposition re: Motion for Permanent Injunction (Docket No. 411).

Jurisdiction for Plaintiff's present demand for relief is based on the Court's continuing jurisdiction in *United States v. Texas*.[11]   The statement of jurisdiction reads as follows: "This

---

[10]Hearne asserts that the Court has jurisdiction over the intervention of Hearne by virtue of its continuing jurisdiction over the matter entitled and numbered *United States v. State of Texas*, Civil Action No. 6:71-CV-5281 (E.D. Tex 1970), and pursuant to 28 U.S.C. § 1331, which creates original jurisdiction for the Court over all civil actions arising under the Constitution, laws, or treaties of the United States.

[11]Mumford maintains that the Court lacks subject matter jurisdiction over the instant controversy because Hearne, as Plaintiff-Intervenor, remains a party to a separate desegregation order in the Western District of Texas. The Court responded to, and rejected in full, this argument in its denial of Defendant Mumford's Motion to Dismiss. Order Denying Mumford's Mot. To Dismiss (June 22, 2005). Additionally, the Court highlights this passage from the 5th Circuit review of the Court's jurisdiction in *United States v. Texas*: "[t]he jurisdiction of any other federal district court over school desegregation suits, whether pending or future, is not affected by the order of this court that

7

court retains jurisdiction for all purposes including the entry of any and all further orders which may become necessary for the purpose of enforcing or modifying this Order." *United States v. Texas*, 321 F.Supp. 1043, 1062 (E.D. Tex 19790). The Court's jurisdiction to issue "all further orders which may become necessary for the purpose of enforcing or modifying this Order [No. 5281]" is consistent with the power of a federal court to enforce equitable relief. *United States v. State of Texas*, 321 F.Supp. at 1057, aff'd and modified, 447 F.2d 441, 445 (5th Cir. 1971). Federal district courts may "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

Plaintiff-Intervenor Hearne, as already shown, is a public school district located in Robertson County and is a political subdivision of the State of Texas. First Amended Joint Stipulation of Facts[12], No. 3,  Docket No. 517. Hearne moved to intervene in No. 5281 on July 25, 2003, to prevent continued funding of transfer students by TEA and acceptance of any transfer students by Mumford. Docket No. 331. The Court granted the motion and accepted Hearne's complaint-in-intervention against TEA and Mumford. Order (Aug. 14, 2003), Docket No. 337. Hearne was granted leave to intervene on the ground that their claims raised questions of law and fact in common with the main action. FED. R. CIV. P. 24(B). TEA's objections to Hearne's standing to bring this action are without merit.

---

does no more than enjoin a state court from interfering with the Commissioner of Education in effectuating the provisions of *United States v. Texas, supra.* Thus, the decision here in no way assumes or affects the jurisdiction of the United States District Court for the Western District of Texas as to any pending or future suits to desegregate the pubic schools. Nor does this court's decision reach the merits of the decision made by the Commissioner on these particular transfers." *United States v. State of Texas*, 447 F.2d 441, 449 (5th Cir. 1971)

[12]Hereinafter, the First Amended Joint Stipulation of Facts will be referred to only as "Stip."

### C. Hearne Has Standing As Plaintiff-Intervenor

The constitutional requirements for standing contain three elements: (1) the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is concrete and particularized, and actual or imminent; (2) there must be a causal connection between the injury and the conduct complained of – the injury is fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-1 (1992); *Federal Election Commission v. Akins*, 524 U.S. 11 (1998); *American Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 296 (5th Cir. 1998). The question of standing addresses concerns whether the interest sought to be protected by Hearne is "arguably within the zone of interests protected by the statute or constitutional guarantee in question." *Assoc. Of Data Processing Service Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970).

Traditionally, standing was required only of parties seeking to initiate a lawsuit. *See Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464 ("[A]t a irreducible minimum, Art. III requires the party who invokes the court's authority to [show standing]"). Over the past twenty years, some courts have required intervenors to possess standing as well. *See, e.g., Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996); *United States v. 39.96 Acres of Land*, 754 F.2d 855, 859 (7th Cir. 1985). However, the Court of Appeals for the Fifth Circuit has held that Article III does not require intervenors to possess standing. *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998).[13] *See also Yniguez v. State of Arizona*, 939 F.2d 727,

---

[13]One holding in *Ruiz v. Estelle* was that Article III does not require intervenors to have standing as a matter of constitutional law. *Ruiz. v. Estelle*, 161 F.3d 814, 831-3 (5th Cir. 1998). The Court of Appeals for the Fifth Circuit remained silent as to whether intervention under Rule 24(a)(2) requires such a showing. As to Rule 24(a)(2), see

731 (9th Cir. 1991) (requiring Article III standing only where intervenor sought to pursue appeal on his own); *Associated Builders & Contractors v. Perry,* 16 F. 3d 688, 690 (6th Cir. 1994) ("An intervenor need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing lawsuit where the plaintiff has standing", *citing Trbovich v. United Mine Workers*, 404 U.S. 528 (1972)); *Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989); *United States Postal Service v. Brennan*, 579 F.2d 188 (2d Cir. 1978) ("The existence of a case or controversy having been established as between the Postal Service and the Brennans, there was no need to impose the standing requirement upon the proposed intervenor.").

These cases recognize that the Article III standing doctrine serves primarily to guarantee the existence of a "case" or "controversy" appropriate for judicial determination, *see Allen v. Wright*, 468 U.S. 737 (1984) and hold that Article III does not require each and every party in a case to have such standing.[14]  "Perhaps it should go without saying, but it must be understood that there is a difference between the question whether one is a proper plaintiff or defendant in an initial action and the question whether one is entitled to intervene." David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 HARV. L. REV. 721, 726 (1968).[15] Federal Rule of Civil Procedure Rule 24, authorizing intervention, presumes that a

generally *New Orleans Public Service v. United Gas Pipe Line*, 732 F.2d 452, 463-66 (5th Cir.), *cert. denied,* 469 U.S. 1019 (1984).

[14]*Cf. Wichita R. & Light Co. v. Public Utilities Commission of State of Kansas*, 260 U.S. 48 (1922) ("Jurisdiction once acquired on that ground [diversity of citizenship] is not divested by a subsequent change in the citizenship of the parties. . . . Much less is such jurisdiction defeated by the intervention, by leave of the court, of a party whose presence is not essential to a decision of the controversy between the original parties.").  This can be distinguished from the instant case as subject matter jurisdiction is based on federal question jurisdiction grounds, rather than diversity.

[15]"When one seeks to intervene in an ongoing lawsuit, these basic questions [whether the controversy is ripe for adjudication, whether the proper parties are before the court, and whether the interests are sufficient to invoke jurisdiction] have presumably been resolved." David L. Shapiro, *Some Thoughts on Intervention Before Courts,*

justiciable case or controversy already exists before the Court.  *See id; See also,* 7C Wright,

Miller, and Kane, *Federal Practice and Procedure: Civil 2d* § 1917 (2d ed. 1986) at 457

("Intervention presupposes the pendency of an action in a court of competent jurisdiction. . . .")

(footnote omitted).  The presence of additional parties, like Hearne, although they alone could

independently not satisfy Article III's requirements, does not itself destroy jurisdiction already

established. Because Hearne, as Plaintiff-Intervenor, does not need independent standing, the

Court need not address the constitutional standing requirements.[16]

Hearne was granted leave to intervene on the ground that its claims raised questions of

law and fact in common with the main action.  FED. R. CIV. P. RULE 24; Doc. No. 337 (Order

Allowing Hearne Intervention, Aug. 12, 2003). "[A] Plaintiff need not show a sure gain from

winning in order to prove that some probability of gain is better than none, and thus, he suffers

injury in fact."  Easterbrook, *Forward: The Court and the Economic System*, 98 HARV. L. REV. 4,

40 (1984).  Moreover, since the Court "can act on the motion of original parties, or even *amicus

curiae*, to take the action necessary to protect and effectuate its judgment, questions of standing

pose little procedural difficulty."  *United States v. Texas*, 356 F.Supp. 469, 473 (E.D. Tex. Sept.

3, 1972).  Hearne's intervention in this case is for the limited purpose of determining whether

and to what extent TEA's funding to Mumford violated No. 5281 and to seek all appropriate

relief for any such violations.

---

*Agencies and Arbitrators*, 81 HARV L. REV. 721, 726 (1968).

[16]Even if Hearne required independent standing, Mumford's objections are without merit. Hearne alleged particularized injury – by pointing to specific violations of No. 5281 by TEA and Mumford which have affected Hearne socially, financially, and academically.

# PART ONE: FINDINGS OF FACT

## I.

### HISTORY OF STUDENT ASSIGNMENT IN HEARNE

Hearne formerly assigned students to schools based on race, with white students assigned to one set of schools and black students to another.  In 1970, the United States sued Hearne to desegregate the school system, and the United States District Court for the Western District of Texas entered an order setting forth a desegregation plan for Hearne. *United States v. Hearne Indep. Sch. Dist.*, No.70-CA-80 (W.D. Tex. Sept. 17, 1970). Under the desegregation plan, all Hearne students attended elementary school grades at the formerly all-black Blackshear school, and all Hearne students attended high school at the formerly all-white high school building.

The Court was particularly impressed by the testimony of Mr. Norris McDaniel,[17] who presented a detailed chronology about Hearne's educational history over the past fifty years. McDaniel was uniquely qualified to tell the Court about the history of the Hearne schools, as he has lived in Hearne for almost all of his 62 years and attended Hearne schools under the former dual system. Moreover, McDaniel served as Hearne's first Black superintendent[18] from 1996 through his retirement in 2002, and as principal of Blackshear Elementary School from 1976 through 1996, where his performance evaluations were consistently "excellent." This testimony demonstrated a lengthy pattern of racial tensions, with white families remaining reluctant to

---

[17]Hereinafter, Mr. Norris McDaniel will be referred to as "McDaniel."

[18]McDaniel became Hearne Superintendent in 1996 when the Hearne Board of Education voted to hire him for the job.  The Board consisted of three African-American members, one Latino member, and three white members. The three African-American members and one Latino member voted to hire McDaniel while the three white members voted against hiring him.  McDaniel was, and remains, the first and only Black Superintendent at Hearne.

having their children in the same classrooms as those with minority children.  McDaniel testified, first, that many in the white community resisted sending their children to the formerly all-black Blackshear school, which was located in a predominantly black area of town.  McDaniel further testified that this resistance never fully abated during his 20 year tenure as Blackshear's principal.

### A. Ability Grouping

Subsequent to being ordered to desegregate, Hearne adopted an "ability grouping" system for assigning students to classrooms in the two elementary schools, Blackshear and Eastside.[19] This system resulted in the creation of racially identifiable classrooms, with white students placed nearly exclusively in the highest ability classes and black students placed nearly exclusively in the lower ability classes.  Ability grouping was not instituted simultaneously. Rather, Hearne began ability grouping at Blackshear in 1980 in response to pressure from parents of children attending Eastside, which served the lower elementary grades immediately preceding the grades served by Blackshear. As Blackshear's principal, McDaniel found that grouping students by ability tended to segregate students by race and was an ineffective way to educate students.  Thus, in approximately 1984, Hearne stopped ability grouping at Blackshear.  The decision was not well received by some parents, and they advised that they would leave the school system if ability grouping was not reinstated.

Concerned that Hearne would start losing students, the Board of Trustees of Hearne ordered that ability grouping be resumed at Blackshear in the mid-to-late 1980s. McDaniel again observed the same detrimental effects as before, including the segregation of students by race.

---

[19]Eastside Elementary school served the lower elementary grades and Blackshear Elementary school served the upper elementary grades. Eastside Elementary was formerly the all-white elementary school.

Therefore, following an accreditation visit by TEA in 1990, Hearne again abandoned ability grouping at Blackshear in favor of a heterogenous grouping system. Under the new heterogenous grouping system, Blackshear no longer had predominately white classes and separate, predominately black classes.  The classes were racially mixed.  Robert Alexius, Ph.D., who worked on school desegregation issues for TEA from 1972-1990, credibly testified that a school where predominately black students end up in the lower ability group still suffers from the lingering effects of segregation.

After Hearne again discontinued ability grouping at Blackshear in 1990, parents again objected. Parents, as well as teachers, repeatedly warned McDaniel that they were going to pull their children out of Blackshear. In fact, Hearne parents began transferring their children in earnest around 1991 or 1992.[20]  Even Hearne school board members transferred their children out of Blackshear.  As the leaders of Hearne, these members' decisions to transfer their children raised serious questions in the community about their school district and exacerbated the transfer problem for Hearne.

## B. Student Transfers Out Of Hearne

McDaniel noticed that starting in 1991 or 1992, after he stopped grouping students by ability in Blackshear, increasing numbers of parents began to transfer their children out of Hearne. Indeed, Hearne's overall enrollment and white student enrollment declined each year

---

[20]Between 1990 and 1993, Hearne's total enrollment decreased from 1689 to 1578 students, the vast majority of this loss coming from the white student population.  Over the same period, Mumford's total enrollment nearly doubled from 57 to 101 students.  *See* Tr. Exh. 212, at 1199, 1201 (Johnston Reports Figures VI and VII). Per the parties' stipulations, the only part of the Johnston Report admitted into evidence were the Figure tables appended to the report  ([Feldman, Attorney for Mumford]: "This is with respect to the demographer Leslie Johnson, your Honor, and we will stipulate to that, that only the – her charts will come in and the report doesn't come in and she won't testify." Tr. Tr. 30: 4-18 (Jan. 24, 2005)).

from 1990 to 2000. Tr. Exh. 212, at 1199. Hearne's black student enrollment did not experience

decline each year over this period. *Id.* From 1990 to 1991, Mumford's white enrollment jumped

80%, and from 1991 to 1992, Mumford's white enrollment jumped 133%. Tr. Exh. 212, at 1201.

In Mumford, the overall enrollment and white student enrollment steadily increased each year

from 1990 to 2000. *Id.* Yet, Mumford's resident student population did not increase

significantly.  Accepting the transfer students has increased Mumford's student population.  Stip.

No. 40.  In 2002-03, for example, Mumford enrolled 500 students of whom only 102 lived in

Mumford itself. Tr. Exh. 238.

## II.

### TEA'S MONITORING OF TRANSFERS

#### A. Current TEA Hardship Exemptions

To track inter-district transfers and their effects, TEA requires each district to inform it of

each transfer that the district has accepted for the following school year and as well, to identify

the type of hardship exception for which each transfer qualifies, if any. These hardship

exemptions are important, in that if a student qualifies for a hardship exemption, TEA does not

factor the student into account when TEA analyzes the ethnic balance of the district for the

purposes of No. 5281. TEA has developed a series of Exemption/Hardship Codes and they are,

as follows:

> Exemption/Hardship Codes
> (Exempt students will not be counted in the calculations to determine
> compliance/non-compliance status.)
>
> A. Student taking academic courses needed for graduation and not offered in the
> district of residence;
>
> B. Graduating senior who has attended the receiving district for at least the two

previous years;

C. Student with two working parents, or whose sole parent works (in a single-parent home), and no childcare facility is located in the sending district.  Only children less than ten years of age will be considered as needing childcare unless it can be demonstrated that a child suffers a handicap which renders him or her incapable of self-care;

D. Student whose health or safety is involved. 1) Health: Documentation from a medical doctor delineating a specific medical diagnosis and how the condition can be better served by a transfer must be obtained and on file. 2) Safety: Both superintendents involved must acknowledge the validity of the safety issue for which the transfer is granted;

E. Student whose parent/guardian is employed by the receiving district and currently contributes to the Texas Teacher Retirement System;

F. Student whose home is more than 20 miles closer to the receiving school than the school of residence (Is there a 20 mile difference between the distances from the student's home to each of the two schools involved?);

G. Student transferring to a regional day school for the deaf (CA No. 5281);

H. Special education student from district where the special education class for which the student is qualified is unavailable and such class is available in the receiving district.  Student has been properly screened according to Agency guidelines by the receiving district (CA No. 5281);

I. Student residing in a district which does not offer the grade level of that student and which has a contractual transfer agreement with the receiving agreement;

        Non-Exempt Transfer Codes
(Non-exempt students will be counted in the calculations to determine compliance/noncompliance status)

J. Students who do not qualify for any exemptions/hardships. Districts that accept such students in violation of the one/three percent rule will not receive ADA funds for these students.

Gf. Students (grandfathered) who caused a one/three percent violation during the 2001-2002 school year, but were allowed to attend the district. (NOTE: The determination of which students are grandfathered will be based on the PEIMS 2000-01 data.)

16

Sib. Students (siblings) new to the district who are siblings of students who attended the receiving district during the 2000-01 school year.

Notice: It is extremely important that caution be taken when submitting data regarding student transfers and the use of codes. Misuse or wrongful use of the codes, whether by accident or intent, constitutes an illegal act and could result in the loss of Average Daily Attendance (ADA) funds.  For this reason, districts are encouraged to establish and maintain documentation and a records filing system for the purposes of verification should an audit be conducted or in the event of an inquiry or complaint.

Tr. Exh. 223. TEA has applied a one percent guideline to all inter-district transfers since 1986.[21] As was made clear by both Sylvia Gonzales[22], Ph.D., and David Anderson[23], TEA does not use the one percent guideline rigidly; rather, TEA uses the percentage change as a "red flag" to determine whether future evaluation is needed.  If a transfer causes a change in the ethnic balance between the resident student population and the total student population of either the sending district or the receiving district by one percent or more, TEA then conducts a further analysis to determine the "cumulative effect" of the transfer.[24]  Where a transfer exceeds the one percent

---

[21]In 1986, the United States Department of Education, Office of Civil Rights and TEA agreed to apply the one percent guideline of Court Order ¶ A(3)(b) as part of its remedial plan.  The remedial plan was submitted to the Court and to the United States.  As of 2001-02, TEA has applied a three percent guideline to districts with a total student enrollment of less than 300.  Tr. Exh. 25, 232 at TEA 5120-21.  This change resulted from an agreement of the parties to No. 5281.  Tr. Exh. 26.  Hereinafter, any reference to the one percent rule after the 2001-02 school year also implies the three percent rule applicable to smaller schools.

[22]Hereinafter, Dr. Sylvia Gonzales will be referred to as "Gonzales." Gonzales worked for TEA's Equal Educational Opportunity Unit and from 2000 to 2002.  She was the person at TEA primarily responsible for monitoring compliance with the transfer provisions of No. 5281.

[23]Hereinafter, David Anderson will be referred to as "Anderson." Anderson is General Counsel for TEA.

[24]*See, e.g.,* Tr. Trans. 106: 4-17 (Jan. 28, 2005):
"Q [Juren, Attorney for TEA]: What does TEA consider as non-compliance with the court order?
A [Anderson, General Counsel for TEA]: We go through a calculation, two-step calculation and you've had that discussion earlier, the exemptions are outside of this.  But we ask the question, have trans – have net transfers with this school district changed its racial composition, Anglo versus minority, by more than one percent?  And then, that's your base group you need to look further at. We then do a second analysis to say, okay, the racial composition of this district or of another district by virtue of the transfers has moved by more than one percent.  Is it moving in a direction that potentially reestablishes a dual school system, meaning is it moving in a direction that impedes desegregation?"

guideline and moves the affected district(s) toward greater racial diversity, TEA approves and funds the transfer in the receiving district.  However, where a transfer moves the affected district(s) toward one race – thereby appearing to reduce desegregation – TEA is to notify both the sending and the receiving districts of the effect of the transfer and begins to work with the districts to resolve the matter.

Before TEA switched to an electronic reporting system in 2002, districts reported transfer data via a written TEA-form, identifying each transfer student and type of hardship exception for which the transfer qualified. The form included instructions on how to complete the form and an explanation of the qualifications for each type of hardship exception, and it required the superintendent to sign and date the form at the bottom.

In the spring of 2002, TEA implemented a new automated system to track transfers. Under the new automated "Student Transfer System,[25]" TEA still requires districts to enter the same information on transfers, but districts now submit the information electronically.  Once the district enters the information, STS automatically calculates the numerical effect of the transfers on the racial make-up of all districts affected.[26]  To calculate the effect of transfers on a particular district, TEA starts with the district's total enrollment then subtracts from that figure all transfers going into the district and adds to it all transfers leaving the district. In this calculation, TEA does

---

[25]Hereinafter, the Student Transfer System will be referred to simply as "STS."

[26]To be plain, under STS, TEA notifies the districts immediately and electronically when a transfer that exceeds the one percent guideline and appears to reduce desegregation.  *See, e.g.,* Tr. Exh. 233, at TEA 5197.  The system allows a superintendent to choose to keep transfers that cause it or another district to exceed the one percent if the district agrees to forego ADA funding for those students, and those transfers are flagged electronically as "non-funded."

not include any transfers that the district has indicated as qualifying for a hardship exception.[27]

Then, TEA analyzes whether the effect of those transfers has caused the racial composition of

either the receiving or the sending school district to change by the applicable one percent, or

three percent, threshold.

### B. The Court is Frustrated by Incomplete Data Sources in the Record

Of extreme concern to the Court is the lack of consistency in hardship reporting data

regarding transfers to Mumford in the record. A major issue in the instant case revolves around

how many students (especially white students) transferred from Hearne to Mumford and how

many of these transfers were funded by TEA. The Court is dismayed by TEA's record keeping in

this case. After many hours of pouring through the record and trial exhibits, the Court is unable

to find a complete and comprehensive summary of how transfers to Mumford were coded. In the

relevant trial exhibits, including but not limited to Tr. Exh. 71, 88, 162, 170, 171, 239, and 240[28],

the Court was provided with a disorganized, inconsistent, and fragmented picture of student

allocations, suggesting a disappointing failure on the part of TEA to consistently monitor schools

known to require substantial oversight.

Trying to document TEA hardship coding trends forward 1998-99, the Court found that

many reported figures failed to coincide on the most basic of levels. Often, two trial exhibits

---

[27]STS still allows a superintendent to choose to keep transfers that cause it or another district to exceed the one percent rule, if the district agrees to forego ADA funds for these students.  These transfers are flagged electronically as "non-funded." *See, e.g.,* Tr. Exh. 233, at TEA 5213.

[28]In detail, those trial exhibits mentioned were: Tr. Exh. 71 (TEA's Final Investigative Report regarding Mumford), Tr. Exh. 88 (Notes from on-site meeting between District and TEA in 2002), Tr. Exh. 162 (TEA's 2000-01 Baseline Student List), Tr. Exh. 170 (TEA's 2001-02 Grandfathered and Sibling-Coded Students List), Tr. Exh. 171 (TEA's 2002-03 Mumford Students Not Receiving ADA Funding), Tr. Exh. 239 (U.S. summary chart of Hearne's enrollment and transfers to Hearne from 1996-2004), Tr. Exh. 240 (U.S. summary chart of Mumford's transfer reports to TEA from 1998-2001).

provided conflicting numbers for the same item.[29] Such discrepancies were not marginal. In a

case in which student attendance records and TEA funding of students is crucial, these numeric

incompatibilities provide an egregious obstacle to evaluating what data was presented.

A massive discrepancy in hardship transfer coding was just one of the many troubling

inconsistencies embedded throughout the facts in this case.[30] In presenting findings of fact, the

_____

[29]In Tr. Exh. 239 and 240, for example, the total number of transfers to Mumford in 2000-01 are reported as 216 and 348 respectively, a discrepancy of *132 students*.

[30]The Court found a number of significant data discrepancies between trial exhibits. The following is a partial list of such disparities, the existence of which troubled and frustrated the Court. The Court understands that several of the below-mentioned trial exhibits were subject to pre-trial objections (including Tr. Exh. 211, 212, 253, 254, and 255). However, the Court wishes to include them, nonetheless. Regardless of whether the objections were valid, the existence of such exhibits contributed to the numerous data discrepancies encountered by all parties involved, as well as the Court. As such, the inclusion of these exhibits below elucidates the facts pertinent to enforcing No. 5281.

1.   Inconsistent figures regarding Hearne District Enrollment:
    a.    For 1996-97, Tr. Exh. 237 lists a total enrollment of 1,613 while Tr. Exh. 212 lists a total enrollment of 1,453;
    b.    For 1997-98, Tr. Exh. 237 lists a total enrollment of 1,571 while Tr. Exh. 212 lists a total enrollment of 1,387;
    c.    For 1998-99, Tr. Exh. 237 lists a total enrollment of 1,489 while Tr. Exh. 212 lists a total enrollment of 1,343;
    d.    For 1999-2000, Tr. Exh. 237 lists a total enrollment of 1,451 while Tr. Exh. 212 lists a total enrollment of 1,296;
    e.    For 2000-01, Tr. Exh. 237 lists a total enrollment of 1,353 while Tr. Exh. 212 lists a total enrollment of 1,201;
    f.    For 2001-02, Tr. Exh. 237 lists a total enrollment of 1,267 while Tr. Exh. 212 lists a total enrollment of 1,124;
    g.    For 2002-03, Tr. Exh. 237 lists a total enrollment of 1,280 while Tr. Exh. 212 lists a total enrollment of 1,164;
    h.    For 1998-99, Tr. Exh. 237 lists a Hispanic enrollment of 393 while Tr. Exh. 255 lists a Hispanic enrollment of 403;
    i.    For 1999-2000, Tr. Exh. 237 lists an Asian enrollment of 3 and a Native American enrollment of 1, while Tr. Exh. 255 lists an "Other" enrollment (comprised of Asian and Native American students) of 3;
2.   Inconsistent figures regarding Mumford District Enrollment:
    a.    For 1996-97, Tr. Exh. 238 lists a total enrollment of 192 while Tr. Exh. 212 lists a total enrollment of 156;
    b.    For 2002-03, Tr. Exh. 238 lists a total enrollment of 500, Tr. Exh. 212 lists a total enrollment of 455, and Tr. Exh. 71 lists a total enrollment of 454.
3.   Inconsistent figures regarding transfers from Hearne to Mumford:
    a.    For 2001-02, Tr. Exh. 254 lists 60 transfers without hardship exemption while Tr. Exh. 239 lists a160 transfers without hardship exemption.
    b.    For 1998-99, Tr. Exh. 255 lists a total of 156 transfers while Tr. Exh. 239 lists a total of 159

Court braved a disparate assortment of charts, lists, and transcripts. Simple calculations were impossible, as the incomplete facts failed to cover the simplest of questions.[31] Confronted with a confused and contradictory body of evidence, the Court was often forced to choose one set of conflicting data over another. In doing so, the Court carefully examined all possibilities before accepting any for the purposes of judgement. Whenever possible, the Court hopes to elucidate the justifications behind inclusion of data in its own analyses.[32]

For the purpose of quantitative analysis, the Court relies principally on data from four documents: Tr. Exh. 212, 218, 237, and 239. Chosen after extensive comparison with all other available data, the Court finds these exhibits provide the most recent, complete, and relevant figures for its analytical purposes.

---

transfers.

 c. For 1999-2000, Tr. Exh. 254 and 255 list a total of 205 transfers while Tr. Exh. 239 lists a total of 204 transfers.

 d. For 2000-01, Tr. Exh. 254 lists a total of 304 transfers while Tr. Exh. 239 lists 303. The discrepancy stems from a difference in figures for white students, a total of 143 white transfers listed in Tr. Exh. 254 and a total of 142 white students listed in Tr. Exh. 239.

 e. For 2002-03, Tr. Exh. 254 lists a total of 310 transfers while Tr. Exh. 239 lists 309. The discrepancy stems from a difference in figures for white students, a total of 129 white transfers listed in Tr. Exh. 254 and a total of 130 white students listed in Tr. Exh. 239.

4. Inconsistent figures regarding all transfers to Mumford:

 a. For 1998-99, Tr. Exh. 239 lists 178 transfers while Tr. Exh. 211 lists 179 transfers.

 b. For 1999-2000, Tr. Exh. 239 lists 242 transfers while Tr. Exh. 211 lists 194 transfers.

 c. For 2001-02, Tr. Exh. 239 lists 431 transfers while Tr. Exh. 211 lists 371 transfers.

 d. For 2002-03, Tr. Exh. 239 lists 398 transfers while Tr. Exh. 211 lists 391 transfers.

5. Inconsistent figures regarding all transfers from Hearne:

 a. For 1998-99, Tr. Exh. 253 lists 236 transfers while Tr. Exh. 237 lists 266 transfers.

 b. For 2000-01, Tr. Exh. 253 lists 450 transfers while Tr. Exh. 237 lists 451 transfers.

 c. For 2001-02, Tr. Exh. 253 lists 494 transfers while Tr. Exh. 237 lists 495 transfers.

 d. For 2003-04, Tr. Exh. 253 lists 369 transfers while Tr. Exh. 237 lists 359 transfers.

[31]Nowhere could the Court find a list of Mumford's resident population over the years in question, for example. Such data on Hearne was easily located, while Mumford's profile remained elusive.

[32]The Court rejected numerous examples of partial, out-of-date and un-sourced data analyses entered into the record. These unverifiable documents might have further illuminated the issues at hand if they had been more complete, but the Court was unwilling to base decisions on data of uncertain origin.

The Court cites Tr. Exh. 212 for its yearly breakdown of student enrollment at Hearne and Mumford from 1990-91 to 2003-04. Dated September 9, 2004, the exhibit is a recent demographic report prepared by Leslie Johnston of Johnston & Associates.[33] Rigorously complete, the tables appended to the report include population figures by ethnicity for the Hearne Independent School District, the city of Hearne, the Mumford Independent School District, the city of Mumford, and Robertson County. Tr. Exh. 212 also features source citations to the U.S. Census Bureau, the Texas State Data Center, the Texas Workforce Commission, and TEA. The Court appreciates these tables as complete, up-to-date, and assembled from reliable data.

The Court's use of Tr. Exh. 218 is directly related to its approval of Tr. Exh. 212. Gonzales testified that Tr. Exh. 218 was created from data in Tr. Exh. 212. Consequently, the Court finds Tr. Exh. 218 to be legitimate and credible.

The Court also relies on Tr. Exh. 237 and 239. The potential reliability of both exhibits was discussed extensively at trial, especially from the testimony and cross-examination of Chris Hayes, of the litigation support group for the Department of Justice, allowing the Court a confident grasp of each document's intricacies.[34] For purposes of origin, both exhibits (Tr. Exs.

---

[33]Per the parties' stipulations, the only part of Tr. Exh. 212 (Johnston Report) admitted into evidence were the Figure tables appended to the end. Tr. Tr. at 28:8-14 (Jan. 24, 2005).

[34]*See, e.g.,* "Q: [Hansen, Attorney for TEA] I have a couple questions about Exhibit 237.
A: [Hayes, Litigation Support for the United States] Okay.
Q: You took data from the TEA enrollment reports, correct?
A: Correct.
Q: And you sent it off to somebody?
A: We have a contractor, correct.
Q: And who was that?
A: Lockheed Martin.
Q: And what did Lockheed Martin do with the data that you sent them.  They took the hard copy and they queued it into a [database]. . . And the hard copy was, was it not, PEIMS data for Hearne Independent School District for each of the years that are indicated on chart 237?
A: Correct.. . . .

237 and 239) cite specific TEA sources in their creation.[35] Additionally, both were assembled

recently, displaying printout dates of either January 12, 2005 (Tr. Exh. 237) or January 13, 2005

(Tr. Exh. 239). Ultimately, the Court found that Tr. Exs. 237 and 239 were substantiated by their

origins and dates of creation. Because both trial exhibits originated from TEA data and were

processed only a day apart, the Court sometimes uses their data in conjunction.[36]

### III.

### EFFECT OF TRANSFERS ON HEARNE AND MUMFORD'S ENROLLMENTS

Mumford's enrollment grew considerably as a result of accepting transfers, mostly from

Hearne. Mumford enrolled a total of 57 students in 1990. Tr. Exh. 218 at 1291. By 2002-03,

Mumford enrolled 500 students, of whom 398 were transfer students and 309 were from Hearne.

Tr. Exhs. 238 and 239; *see also,* Stip. No. 40. Thus, *80 percent of Mumford's entire student*

*population resided outside the school district.* As McDaniel and Barbara Brannon[37] both

testified, Mumford began building new school buildings during McDaniel's tenure as Hearne's

Superintendent. Before accepting transfers, Mumford had served only grades kindergarten

through eighth grade and had sent its high school students to Hearne. By 1998, Mumford added a

ninth grade, and then one grade per year until it served all high school grades by the 2001-02

---

Q: [Hepworth, Attorney for Hearne] Mr. Hayes, the numbers that you were working with were provided by TEA; is that correct?
A: [Hayes, Litigation Support for the United States] Correct.
Q: And do you what – where TEA got those numbers?
A: No sir." Tr. Tr. 21: 8-25, 22:1-2, 29: 19-25 (Jan. 25, 2005).

[35]Full copies of Tr. Exs. 237 and 239 are attached to this opinion as appendices.

[36]Consequently, in charts B and C, Mumford transfer numbers from Tr. Exh. 239 were compared to figures on Hearne's outgoing transfers and resident population in Tr. Exh. 237.

[37]Hereinafter, Barbara Brannon will be referred to simply as "Brannon."  Brannon is the business manager for Mumford ISD, under the supervision of Bienski.

year.

Moreover, Mumford has facilitated and encouraged student transfers from Hearne ISD to Mumford ISD, by providing transportation services to transfer students.  As was made clear by the testimony of McDaniel and Brannon, in 1996, Mumford began running two to four buses into Hearne to transport transfer students to Mumford ISD. By the 2004-05 school year, Mumford was running all five of its buses into Hearne to transport transfer students back to Mumford ISD.[38]

As a result of these transfers, mainly from Hearne, the racial makeup of Mumford's

_____

[38]As read into the record from the Depositions of Bienski, Vol. 1 (Sept. 14, 2004),
"Q: [Caspar, Attorney for the United States] How many buses is Mumford running into Hearne this year the 2004 to 2005 school year?
A: [Bienski, Superintendent of Mumford ISD] Five.
Q: Is Mumford sending in those buses to pick up transfer students in Hearne and bring them into Mumford?
A: Yes.
Q: Where do you pick up students with your buses in Hearne district?
A: We have buses that go to St. Mary's Church. I believe it is called the ball field, the little field, and I believe, it is called East Side Park.
Q: Just those areas?
A: Yes.
Q: Do you pick up any students at their homes?
A: No.
Q: Go into residential areas to pick up students?
A: No.
Q: So, it is your testimony it's just those three places?
A: Yes.
Q: Did you used to pick up at a Wal-Mart?
A: Yes.
Q: That's a high school now, isn't it?
A: Yes.
Q: How many buses do you send within your district, not counting the five you send outside the district? How many buses do you send in your own district?
A: We have at least probably three or four that run routes in our district.
Q: Do any of those include routes that pick up people from Hearne?
A: Yes.
Q: Do you have any that don't go to Hearne at all?
A: No.
Q: So, every route includes Hearne people?
A: I believe that's correct.
Q: Do you run buses into other areas other than Hearne School District and Mumford School District?
A: No." Tr. Trans. 180:17-25; 181: 7-25, 182: 1-13 (Jan. 26, 2005) (taken from Depositions of Bienski, Vol. 1 (Sept. 14, 2004), p. 150, 247).

enrollment has changed considerably. Mumford's changing racial profile, as well as its increasing enrollment numbers, is clearly illustrated by Chart A, "Mumford Student Enrollment by Ethnicity" displayed on the next page. From this bar graph, it is clear that Mumford ISD's white enrollment has ballooned over time. In 1990, before transfers began to leave Hearne in increasing numbers, Mumford had 57 total students: 5 white, 17 black, and 35 Latino. Tr. Exh. 218, at 1291.  By 2000, Mumford had 371 students, including: 182 white, 48 Black, and 141 Latino.  *Id.*  By 2002-03, Mumford's enrollment was 46 percent white, 40 percent Latino and 14 percent Black. Tr. Exh. 238.  In sum, between 1990 and 2000, Mumford's white enrollment grew by 3,540 percent.  Tr. Exh. 218, at 1291.





In contrast, Hearne's white enrollment has declined significantly. This is plain from examining Chart B, "Hearne's Student Enrollment by Ethnicity." From 1990-2000, Hearne's white enrollment decreased by 68 percent. Tr. Exh. 218, at 1291. In 1990, Hearne enrolled 1,689 students, of whom 547 (32 percent) were white, 748 (44 percent) were Black and 394 (23 percent) were Latino.  Tr. Exh. 218, at 1291.  By 2003-04, Hearne's enrollment had dropped to 1,179, of whom 153 (13 percent) were white, 656 (56 percent) were Black, 365 (31 percent) were Latino, and 5 were of other ethnicities.  Tr. Exh. 237, at 2042.

In recent years, more than half of the white public school students living in Hearne have transferred out of the district to other public schools. In the 2000-01 year, 430 white public school students resided in Hearne, and 225 (52.3 percent) transferred out of the district to other public schools.  Tr. Exh. 237, at 2041.  In the 2001-02 year, 383 white public school students lived in Hearne, and 233 (60.8 percent) transferred out of the district to other public schools. *Id.* In the 2002-03 year, 362 white public school students lived in Hearne and 187 (51.7 percent) transferred out of the district.  *Id.* at 2042.  In the 2003-04 year, 295 white public school students lived in Hearne, and 147 (49.8 percent) transferred out of the district. *Id.*

The great majority of the transfers leaving Hearne went to Mumford.  In 2003-04, 422 students transferred out of Hearne, and 309 of those transferred to Mumford. Tr. Exh. 237, at 2042; Tr. Exh. 239. In 2001-02, 495 students transferred out of Hearne, and 372 of those transferred to Mumford. Tr. Exh. 237, at 2041; Tr. Exh. 239.

 Further, the great majority of white transfers leaving Hearne went to Mumford. In the 2002-03 year alone, 187 white students transferred out of Hearne, and 130 of those transferred to Mumford.  Tr. Exh. 237, at 2042; Tr. Exh. 239.  Of those 130 transfers to Mumford, 120 did *not*

27

qualify for hardship exemptions under No. 5281.  Tr. Exh. 239.  In the 2001-02 year, 233 white

students transferred out of Hearne, and 164 of those transferred to Mumford. Tr. Exh. 237, at

2041; Tr. Exh. 239.  Of those 164 transfers, 160 had no hardship exemption.  Tr. Exh. 239.

## IV.

### TEA's Continued Funding of Transfers to Mumford

Mumford has accepted transfer students in contravention of No. 5281, thereby increasing

Mumford's student population and its state funding.  From May 2000 to November 2002, Dr.

Sylvia Gonzales was the person at TEA primarily responsible for monitoring compliance with

the transfer provisions of No. 5281. During the trial, Gonzales testified as to TEA's policies

during the transition to the STS system.

In implementing the automated STS in the spring of 2002, TEA decided to allow all

transfers who were enrolled in their receiving districts during the 2000-01 school year to remain

there with state funding regardless of those transfers' effects on desegregation in any other

district, needless of whether the transfers qualified for an exemption, and also irrespective of

whether the transfers violated No. 5281.  As Gonzales testified, when TEA discovered that the

"baseline transfers" a district accepted reduced or impeded desegregation in another district,

TEA, nevertheless, allowed those transfers to go to the receiving district.  Some months after

implementing the STS in 2002, TEA decided, as well, to allow the 2001-02 class of transfer

students to remain at their receiving districts, with funding, and without regard to whether they

reduced or impeded desegregation in any district in violation of No. 5281.  TEA refers to these

Case 6:71-cv-05281-RWS   Document 554   Filed 08/04/05   Page 29 of 103 PageID #:  12634

2001-02 transfers as "grandfathered" transfers.[39]  Also, in implementing the STS, TEA further

decided to allow districts to accept all transfers who were siblings of a "baseline" transfer

student, with funding, and irrespective of the effect of the transfers on desegregation in any other

district. To put a stop to the incoming transfers that were not eligible, TEA refused to allow

districts to accept siblings of "grandfathered" (2001-02) transfer students.

As of 2002-03, TEA continued to fund 93 such transfers who were still enrolled at

Mumford, of whom at least 82 are either "baselined," "grandfathered," or "sibling" transfers.

Unless restrained, TEA will continue to provide funding for these students for so long as they

remain enrolled at Mumford.

## V.

### MUMFORD'S EFFORTS TO CIRCUMVENT THE REQUIREMENTS OF NO. 5281

**A. Mumford's Fraudulent Reporting of Transfers to TEA**

As Gonzales explained, TEA requires each Texas school district to report to TEA the

number of transfer students it accepts each year. *See* Stip. No. 20. Each year, since at least 1992,

TEA sent all districts, including Mumford, a letter directing each district to list its accepted

transfers on a form and return it to TEA. Stip. Nos. 21-22.  TEA requires each district to submit

such reports, in order that TEA could ensure compliance with No. 5281.  Stip. Nos. 10, 12, 20-

21.

*1. Mumford Fails to Report Its Transfers to TEA*

Despite its continued acceptance of transfers, Mumford did not report to TEA its

---

[39]*Infra,* Section VI(A),(B),(C), and (D) for a detailed explanation of TEA's decision to "baseline" students, grandfather those "baseline" transfers, and, as well, their siblings.

29

acceptance of any transfers before 1998.  Tr. Exh. 14; Stip. No. 43.  In 1998, McDaniel heard

that Mumford may not have been reporting transfers to TEA.  McDaniel thereupon requested

information from  Dr. Thomas Villarreal, who was then director of the TEA unit responsible for

monitoring interdistrict transfers.  Dr. Villarreal informed McDaniel that all districts were

required to report the transferred students they had enrolled to TEA, and that TEA had not

received a transfer report from Mumford.[40]  TEA also determined that Mumford, again, failed to

report accurately  its transfers for the 2000-01 school year.  In that year, Mumford reported

having enrolled about 200 transfers, when it actually had enrolled 348.

*2. Mumford Fraudulently Reports Having No Transfers*

On June 2, 1998, Bienski submitted a transfer report for the first time.  The report stated

that Mumford had no transfer students for the 1998-99 school year.  Bienski signed the form at

the place indicated on the form.  Tr. Exh. 8 (1998 Mumford Transfer Report).  Bienski knew at

the time that Mumford did have transfer students, and he also knew that he was reporting false

information to TEA.  Stip. Nos. 44-45.

On September 24, 1998, McDaniel wrote to Dr. Villarreal at TEA, indicating that

students from Hearne were attending school in Mumford.  Tr. Exh. 10 (Sept. 24, 1998 letter).

Dr. Villarreal called Bienski about Mumford's initial transfer report, and Bienski thereafter

submitted a revised transfer report for 1998 on November 11, 1998.  In that report, Mumford

stated that it had actually accepted 143 transfer students, every one of them from Hearne.  Tr.

Exh. 13 (Mumford's revised 1998 transfer report); Stip. No. 46.

---

[40]*See* Tr. Exh. 9 (List of 12 Districts Reporting No Transfers for 1998-1999, which includes Mumford)
(Sept. 2, 1998).

*3. Mumford Begins Claiming, Fraudulently, That Transfers Qualified for Hardship Exceptions to No. 5281*

The transfer reports that districts submitted to TEA required that each transfer student who qualified for a hardship exception to No. 5281 be specified.  As already discussed, TEA had identified certain types of hardship exceptions, including those allegedly transferred for childcare or health or safety reasons.  *See infra*; Stip. No. 23.  As Gonzales testified, hardship exceptions, particularly those for health or safety reasons, should be reserved for "very serious situations." This was sensible, she testified, because TEA was allowing these transfers "as an exception to a federal court order."  Tria.l Tr. 122:4-7 (Jan. 25, 2005).  From 2000 to 2002, Gonzales was the person at TEA primarily responsible for monitoring compliance with the transfer provisions of No. 5281.

Mumford's revised 1998 transfer report stated that 56 of its 143 transfers qualified for hardship exceptions, and that 23 transfers in particular qualified for a health or safety hardship exception.  Tr. Exh. 240 (Summary of Transfer Reports); Tr. Exh. 13; Stip. No. 47.  After evaluating the effects of Mumford's transfers on surrounding districts, TEA sent Mumford a letter indicating that their transfers had too great an effect on the ethnic make-up of Hearne's enrollment; and TEA instructed Mumford not to accept any new white transfers from Hearne "who do not qualify for an approved hardship/exemption."  Tr. Exh. 15 at 105 (Feb. 5, 1999 letter).  Three months after receiving that letter, Mumford submitted its transfer report for the 1999 year.  Of the 86 transfers that six months before Mumford had reported as *not* qualifying for any hardship exception, Mumford reported now that 63 *did* qualify for hardship exceptions.  Tr. Exh. 240.  Bienski knew what the requirements were for each type of hardship exception, because the requirements for claiming hardship exceptions were included with the 1999 transfer

31

form that TEA previously sent to Mumford to complete. Tr. Exh. 17, at 112; *see, e.g.,* Tr. Exh. 25, at 148.

The following year, Mumford submitted its 2000 transfer report to TEA.  Tr. Exh. 22 (2000 Mumford transfer report). Mumford's 2000 report stated that *all* of Mumford's transfers qualified for hardship exceptions. Tr. Exh. 240.[41]  Mumford also reported that 177 transfers qualified for the health or safety exception – up from just 23 in 1998.  Tr. Exh. 240.  Gonzales testified that there were also other instances as well where Bienski changed the information about certain transferred students, including the type of hardship exceptions each claimed and his or her ethnicity, so that the transferred students would be permitted to continue attending Mumford.

*4. TEA Reiterates Requirements for Claiming Hardship Exceptions*

After receiving telephone calls from McDaniel, Gonzales explained that TEA noticed in 2001 that Mumford had claimed a disproportionately high number of hardship exceptions compared to other school districts of Mumford's size.  As a result, Gonzales spoke with Bienski several times about his use of the hardship codes and the requirements for the health/safety exception.  Bienski stated the reasons for the claimed hardship exceptions, and Gonzales explained to him that the reasons Bienski stated did not qualify for the safety exception since they were not sufficiently serious.

On August 20, 2001, TEA sent Bienski a letter explaining the requirements for the health/safety hardship exception.  With respect to the safety exception, the letter stated that the superintendents of both the sending and the receiving districts had to acknowledge the validity of

---

[41]TEA subsequently determined that Mumford did not report all of its 2000-01 transfers. See, *infra,* Section VI.(A).

the safety issue. Tr. Exh. 35 (Aug. 29, 2001 letter).[42]

With respect to the health exception, the August 29, 2001, letter stated that the district receiving the transferred student must have documentation from a medical doctor explaining the medical reasons for the transfer.  Tr. Exh. 35 (Aug. 29, 2001 letter).  This same requirement had been listed in the transfer form instructions that TEA sent to all districts, including Mumford, in previous years explaining the requirements for the different hardship exceptions.  *See, e.g.,* Tr. Exh. 25, at 148 (Mar. 6, 2001 letter); Tr. Exh. 17, at 112 (Mumford's 1999 Transfer Report). The August 29, 2001, letter to Bienski further explained that a medical "reason" called for documentation that identified the medical condition and explained how the condition could be ameliorated by a transfer.  Tr. Exh. 35 (Aug. 29, 2001 letter).  The added explanation did not change the requirement for the health exception as previously stated in the March 2001 letter, *i.e.,* a medical reason for a health transfer was *always* required.

Indeed, prior to August 2001, TEA had informed all districts – including Mumford – each year of the requirements for each type of hardship exception, including the childcare and health/safety exceptions.  The August 29, 2001, letter also stated that the basis for each transferred student's hardship exception must be verified each year (Tr. Exh. 35); that is, districts may approve transfers only on an annual basis, and the situation justifying a hardship exception to No. 5281 must exist each year in order for the transfer to qualify for a hardship exception.

---

[42]Before TEA issued this letter, Gonzales explained that  it had been a long-standing practice of superintendents in Texas to confer with one another, if a transfer claimed a hardship exception for safety reasons. Additionally, TEA had posted that requirement for the safety exception on its website.  In Gonzales's experience, superintendents of districts sending the transfers would indeed acknowledge the validity of genuine safety issues.

*5. TEA's Investigation Into Mumford's Misrepresentation of Transfers as Qualifying for Hardship Exceptions*

On April 18, 2002, McDaniel wrote TEA asking it to investigate Mumford's use of hardship exceptions. Tr. Exh. 43. In compliance with the request, TEA began investigating Mumford's use of hardship exceptions in May 2002.  Tr. Exh. 49 (May 1, 2002 letter).  Gonzales and her supervisor, Don Enos, visited Mumford in June 2002 and reviewed all of the documentation that Mumford had to support its claim of hardship exceptions for its transfers. Both Gonzales and Enos had formal training in conducting investigations, and each had conducted numerous investigations before.  As a result of its investigation, TEA found that Mumford had purposely misrepresented 151 transfers as qualifying for hardship exceptions to No. 5281.  Tr. Exh. 71, at 347, 348, 351 (TEA Final Investigative Report).

Specifically, TEA found that Mumford had claimed 31 transfers qualified for the childcare exception when Bienksi knew the requirements were not met[43]; Mumford had claimed another 31 transfers for hardship exceptions for health reasons when the supporting documentation did not satisfy TEA's requirements. Mumford had claimed 89 transfers for hardship exceptions for safety reasons which Bienski knew did not qualify, because he had never contacted the superintendents of the sending districts to discuss the claimed safety issues, as was required by TEA. *Id.* at 347-50.  TEA determined that *none* of the transfers Bienski claimed

---

[43]With respect to Mumford's use of the childcare hardship codes, Bienski claimed that Mumford had a pre-kindergarten program for three-year olds when Hearne did not, that Mumford's pre-kindergarten program had longer hours of operation than the childcare facilities in Hearne, that Mumford offered free childcare, and that Hearne daycare facilities were full. The TEA investigators determined that *all* of these claims were inaccurate or irrelevant. TEA determined that all Hearne childcare facilities had programs for low-income families.  Ultimately, the fact that the Hearne school system did not itself have a childcare program was irrelevant, as other childcare facilities were located within the geographic boundaries of Hearne.  It was found that Hearne had four childcare facilities and Mumford had none. Tr. Exh. 71, at 347 (TEA Final Investigative Report).

under the childcare and health/safety exceptions actually qualified for those exceptions.  As has

been shown, TEA had notified Bienski of the requirements for the health/safety exception in its

August 29, 2001, letter, and it had notified Bienksi of all of the hardship requirements, including

the childcare exception, in its March 6, 2001, letter, which included instructions on how to

complete the annual transfer form.  Tr. Exh. 35 (Aug. 29, 2001 letter); Tr. Exh. 25 (Mar. 6, 2001

letter).  Nevertheless, Bienski permitted 120 transfers that failed to meet TEA's requirements.

### B. Mumford Steered Parents Towards Claiming Hardship Exceptions

In the course of its investigation into Mumford's misuse of hardship exceptions, TEA

also determined that Mumford had encouraged parents of transferred students to claim hardship

situations to justify their children's transfers to Mumford, as the testimony of Gonzales made

plain.  For example, in a notice to parents of transferred students for the 2000-01 school year,

Mumford advised parents that "[t]o ensure that your child's transfer request is approved, please

check an exemption on the transfer form, if applicable."  Tr. Exh. 135, at 550).  The form listed

three hardship exemptions: one for childcare, one for Mumford employees' children, and one for

health or safety.  Tr. Exh. 135, at 551.  With respect to the health or safety exemption, the notice

to parents advised that it "can be used by *all* students. You must state the reason you feel that

your child is safer at Mumford than in their [sic] home district."  *Id.* at 550 (emphasis added).

The notice then provided two examples of what the parents could write: "Smaller school district

offers safer, more stable learning environment," and "Home district has problems with discipline,

resulting from an unsafe learning environment." *Id.*  Not surprisingly, the year Mumford

distributed that 2000-01 transfer notice, the number of transfers claiming a hardship exception

for health or safety reasons shot up to 177 – up from just 23 two years earlier.  Tr. Exh. 240

(Summary of Transfer Reports).

### C. Mumford Defies TEA's Directives Not To Accept New Transfers

In July and August 2002, during the course of TEA's investigation, Gonzales instructed Mumford not to accept any new transfers after May 1, 2002, because of the effect of the transfers on Hearne.  Nevertheless, Mumford enrolled 36 new transfer students for the 2002-03 school year.[44] Tr. Exh. 71, at 351 (TEA Final Investigative Report). As a result of the investigation, TEA appointed a monitor to keep track of the transfers that Mumford accepted.  Tr. Exh. 77 at 365. The monitor determined that, after the beginning of the 2002-03 school year, Mumford accepted an additional two illegitimate transfers in contravention of TEA's directives. Tr. Exh. 90, at 410.

### VI.

### TEA's Decisions Regarding Transfers To Mumford

The core legal dispute in this action is whether the inter-district student transfers are reducing or impeding desegregation in Hearne.  If they are, No. 5281 prohibits TEA from providing any district with state funding for those transfers.  The undisputed facts from the evidence shows that transfers *are* reducing desegregation in Hearne, that Mumford is enrolling the great majority of such transfers from Hearne, and that TEA continues to provide Mumford with funding for them while acknowledging that the transfers violate No. 5281.  Therefore, TEA is also violating No. 5281.

### A. The "Baseline" Decision

In 2002, TEA implemented a computerized system by which school districts report their

---

[44]Mumford complains about the timing of TEA's directive, but the salient point remains that Mumford knew before school started in August 2002, that it was not to accept new transfers, and that Mumford did so, nonetheless.

transfers electronically instead of by paper. Stip. Nos. 28-29.  In implementing the new

computerized system, TEA decided to allow each school district in Texas to continue to accept

all transferred students that each district had enrolled during the 2000-01 school year.  Districts

could continue to accept such transfers, and TEA would continue to provide the districts with

funding for such transfers, for as long as the transferred students remained in the school districts,

*i.e.*, TEA would continue to provide the districts with funding for all such transfers regardless of

their effects on desegregation in any other school districts. Stip. No. 30. TEA called these 2000-

01 school-year transfers "baseline" transfers.  *Id.  See also, supra,* Section V.(A).

### B. TEA Worked with Mumford to Establish Mumford's "Baseline" Transfers

During the summer of 2002, in the course of investigating Mumford's misuse of hardship

exceptions for transferred students, TEA cooperated with officials of Mumford to determine

which of Mumford's transfer students would be in Mumford's "baseline" class.  That is, TEA

worked with Mumford officials to determine which transfers had been enrolled in Mumford ISD

during the 2000-01 school year, in order that Mumford could continue to accept and fund them.

Bienski understood that TEA was allowing Mumford to accept all of its 2000-01 "baseline"

transfers, with funding, irrespective of whether those transfers complied with No. 5281. This

decision was made by TEA, even though Mumford had received actual notice of No. 5281's

transfer provisions several times from TEA, including in TEA's February 5, 1999, letter

regarding the effect of Mumford's transfers on Hearne, TEA's March 2001, letter explaining the

need to report transfers to TEA, and TEA's July and August 2002, letters explaining the

preliminary and final reports of TEA's 2002, investigation into Mumford's misuse of hardship

exceptions, among other notifications.  Stip. No. 98; Tr. Exh. 15 (Feb. 5, 1999 letter); Tr. Exh.

25 (Mar. 6, 2001 letter); Tr. Exh. 56 (July 12, 2002 letter); Tr. Exh. 70 (Aug. 23, 2002 letter).

In collaborating with Bienski to establish the number of "baseline" transfers at Mumford, TEA discovered that Mumford had never reported the full number of transfers that it had accepted during the 2000-01 year.  Mumford had reported to TEA that it had accepted about 200 transfers during the 2000-01 school year, but in working with TEA to establish its "baseline" number of transfers, Mumford revealed that it actually had accepted *348 transfers* for the 2000-01 school year.  Mumford had reported these 348 transfers to TEA's Public Education Information Management System[45] with full intent that Mumford would receive state funding for the students. However, Mumford had not reported these students as transfer students to TEA's Equal Educational Opportunity Unit[46], which was responsible for monitoring compliance with the transfer provisions of No. 5281.

Gonzales explained that TEA believed Mumford had been "dishonest" in failing to report all of its transfers for the 2000-01 year, and that Bienski was purposely trying to evade No. 5281. Nevertheless, TEA decided to include *all 348* transfers as Mumford's "baseline" transfers, with the result that, as previously shown, they could remain at Mumford with funding from TEA, no matter what their effect on desegregation in any district.

## C. The "Sibling" Decision

TEA also allows each school district to accept all siblings of the "baseline" transfers that it has enrolled.  Stip. No. 32.  TEA  provides districts with state funding for these "sibling" transfers, regardless of how these transfers would affect desegregation in any other district.  *Id.*

---

[45]Hereinafter, Public Education Information Management System will be referred to simply as "PEIMS."

[46]Hereinafter, Equal Education Opportunity Unit will be referred to as "EEO."

TEA has continued to allow Mumford to enroll such "sibling" transfers from Hearne, and TEA has provided Mumford with funding for them, despite their effect on desegregation in Hearne.

### D. Long-Term Effects of "Baseline" And "Sibling" Transfers

Unless restrained from doing so, a transfer student who was enrolled in pre-kindergarten at Mumford during the 2000-01 "baseline" year will graduate from Mumford in 2014, and TEA will provide Mumford with funding for that transfer student as long as the student remains at Mumford.

Mumford has accepted very young transfer students, *e.g.,* in the 2000-01 school year, the "baseline" year, Mumford enrolled about 24 white students from Hearne in the kindergarten or pre-kindergarten grades.  Tr. Exh. 175(e), at 744-45.  Moreover, under TEA's ruling, siblings of these young "baseline" transfers may enroll in Mumford at any time in the future, and Mumford may receive state funding for them, without respect to their effect on desegregation in Hearne.

### E. TEA Acknowledges its Continuing Violations of No. 5281

Gonzales acknowledges that No. 5281 requires TEA to withhold funding for transfers that reduce or impede desegregation in any district, and that No. 5281 requires TEA to withhold funding for "baseline" transfers that reduce or impede desegregation.  Even so, TEA intends to continue to provide funding for such transfers.  Gonzales further recognizes that TEA is violating No. 5281 by funding "baseline" students at Mumford. TEA has informed Mumford that TEA will not fund some new transfers to Mumford; however, TEA has continued to give Mumford funding for all new transfers that are siblings of "baseline" transfers.  Sibling transfers do not, without more, qualify for legitimate hardship exceptions.

With TEA's partial restrictions, Gonzales testified variously that it will be "several

39

years," "many years," or "a couple of years," before the transfers to Mumford stop negatively

impacting desegregation in Hearne.[47]  But she also testified that she did not know how many

young transfers Mumford was accepting from Hearne and that she could not know how many

such transfers might remain in Mumford until graduation in 2014.

TEA alleges that it "notified the US and the Court of the 'baselining' and

'grandfathering' in its 2001-02 annual report to the Court, and again in its 2002-2002 and

subsequent annual reports."  TEA Post-Trial Brief, at p. 22.  The Court finds TEA's assertion of

notification to be misleading, at best.  Pursuant to No. 5281, TEA must provide the Court with an

annual report detailing its compliance with the Order.  Within these reports is a section on

student transfers and within this action are, *inter alia*, copies of form letters sent to all school

administrators, a copy of compliance forms, and a list of those districts whose transfers affected

other school districts.  On average, the section on student transfers of these annual reports is 100

pages long.[48]  There is no index provided for the student transfer section, no cover letter

---

[47]It is TEA's position that TEA may violate No. 5281, but only for a couple of years, and that it will self-correct with time.  The Court disagrees with this finding, as there is no statistical support for TEA's argument.  In light of this and the Court's own comprehensive analysis conducted in Section V, the Court rejects TEA's conclusion.  *Infra,* Section VII.  TEA's baseline decision may self-correct, but the Court believes it would take many years.

[48]Moreover, the TEA Annual Report includes lengthy updates on more topics than just student transfers.  In fact, TEA provides copies of letters and action items undertaken by TEA in compliance with No. 5281 on 11 topics: Student Transfers, Changes in School District Boundaries, School Transportation, Extra-Curricular Activities, Faculty and Staff, Student Assignment, Curriculum and Compensatory Education, Complaints and Grievances, Notification, Conveyances of Real Property by a School District and Jurisdiction. The entire annual report is usually at least 500 pages in length.  The only part of the report specifically addressed to the Court is the cover letter. The cover letter typically reads as follows:
"Dear Honorable Judge Justice:
Enclosed is the 2003-2004 Annual Report on Civil Action No. 5281 required under Item (7) of Section F of the court order United States v. State of Texas styled as Civil Action No. 5281.  The report reflects detail [sic] on procedures and copies of documents used by the Texas Education Agency staff in implementing the requirements mandated by the court decree.
All information provided in this report is for the period covering June 1, 2003 to May 31, 2004.  Copies of this report are being distributed to the parties required in the court order.  If the Agency made be of assistance on this report or any of its contents, please contact Dr. Donald F. Enos at (512) 463-9290.

regarding changed policies of TEA, and certainly no permission or approval requested for

changes which might affect the implementation of No. 5281.  Court Order at ¶ A(4)(e).

The only notification with which the Court was provided of TEA's decision to "baseline"

transfers was an obscure item buried in a list from a form entitled "Automated Transfer System

Calculations," which, for example, was listed in the June 2001-May 2002 Report on pages 5178

and 5180, contained within the Student Transfer section of the Report spanning from pages

5114-5184.  Notification seventy pages into a report without any specific direction by TEA of

such a major change is inadequate. The Court finds it disingenuous for TEA to assert that this

guilefully camouflaged policy decision is adequate notice to satisfy the letter or spirit of No.

5281.  *See e.g. Milliken v. Meyer*, 311 U.S. 457 (1940) (holding that an elementary and

fundamental requirement of due process in any proceeding which is to be accorded finality is

notice reasonably calculated, under all of the circumstances, to apprize interested parties of the

pendency of the action and afford them an opportunity to present their objections); *Mullane v.*

*Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950); *Grannis v. Ordean,* 234 U.S. 385

(1914); *North Alabama Exp., Inc. v. United States,* 585 F.2d 1783, 781 (5th Cir. 1978). No. 5281

specifically provides that TEA may apply other guidelines to approving or disapproving student

transfers "*that are submitted to the Court and parties without objection*." Court Order at ¶

A(4)(e) (emphasis added).  It seems obvious that, in order to make any significant changes to the

hardship exemptions, TEA must *meaningfully* inform the parties and the Court of such changes.

However, especially regarding these transfer exceptions, TEA did not find it necessary to

---

Sincerely,
Gene Lenz, Deputy Associate Commissioner, Special Programs, Monitoring, and Interventions."  TEA No.
5281 Annual Report June 2003-May 2004 Cover Letter (Nov. 2, 2004).

clearly apprize the Court of its major new policy. Since TEA's "baseline" decision represents a

significant departure from long established and consistent practice that substantially affects the

monitoring of No. 5281, TEA is obliged, under the terms of No. 5281, to submit the change for

notice and review. *See, e.g., Shell OffShore Inc. v. Babbitt*, 238 F.38 622, 630-1 (5th Cir. 2001)

("An agency that, as a practical matter, has enacted a new substantive rule cannot evade the

notice and comment requirements of the APA [Administrative Procedure Act] by avoiding

written statements or other 'official' interpretations of a given regulation."); *Buckner Trucking,*

*Inc. v. United States*, 354 F.Supp. 120, 1219 (S.D. Tex. 1973) (finding the operative test for

notice is that "the notice as published must reasonably apprize any interested person of the issues

involved in the proceeding.").

   The Court was not given adequate or timely notice of TEA's "baseline," "sibling," or

"grandfather" exemptions from which it could determine whether they should be rejected.

Consequently, regardless of its effect, TEA violated this provision of No. 5281 by denying to the

Court, as well as the remaining Parties, meaningful review of this decision to exempt "baseline,"

"sibling," and "grandfather" transfer exemptions.

### F. TEA Has Continued to Fund Transfers that Reduce Desegregation in Hearne

   As a result of its investigation, TEA withheld funds from Mumford for a total of 71

transferred students who were enrolled in Mumford during the 2002-03 year.  These are the only

transfers for which TEA has withheld funding from Mumford.  Of these 71 transfers, about 27

are white transfers from Hearne.  As of the 2002-03 school year, Mumford enrolled about 120

white transfers from Hearne who did not qualify for any hardship exceptions to No. 5281's

transfer rules. Tr. Exh. 239.  Thus, since TEA has only withheld from Mumford funding for

about 27 white transfers from Hearne, as of 2002-03, TEA continued to fund about 93 white

transfers from Hearne to Mumford who did not qualify for any hardship exceptions.  According

to TEA, at least 81 white transfers from Hearne remained in Mumford during 2003-04 school

year, and at least 59 are "baseline" transfers or their siblings.  Tr. Exh. 258.

## VII.

### QUANTITATIVE ANALYSIS

Defendants assert that violating No. 5281 "in the short term" is appropriate "because the

goal of the Order [No. 5281] is to reduce or impede segregation.  TEA's practice allows a

district's student population to return to its balance of resident students over time, through

attrition." TEA Post-Trial Brief, at 13. *See also* Mumford Post-Trial Brief at 29. One of the chief

purposes of No. 5281 is to prevent the phenomenon of "white flight," *i.e.,* the efforts of white

parents to keep their children from attending desegregated schools by transferring them from

such a school to one which is all-white (or nearly so).  In many instances, white flight may be

inferred or detected when the racial profile of a school does not approximate the racial profile of

the community in which the school is located.

After a careful examination of the data, the Court finds Defendants' attrition argument to

be specious. Even without student transfers from Hearne to other districts, the cumulative effect

of the transfers from Hearne to Mumford *alone* - taking into account demographic changes and

private decisions to home-school students or to send students to private schools - has been to

significantly diminish the proportion of Hearne's white enrollment.  Moreover, while the

proportion of white enrollment at Hearne has substantially decreased, the resulting proportion of

black enrollment has exceeded 55 percent.   In sum, TEA's continued funding of transferred

students in violation of No. 5281, as well as Mumford's disregard of No. 5281's relevant

provisions,  have a substantially affected the racial composition of Hearne ISD, to the extent that

the racial profile of Hearne's schools does not resemble the racial profile of the community.  This

is clearly evident from a quantitative analysis, and, in addition, an extensive qualitative

examination of the enrollment data.

### A. Data Sources

This section is intended to show, through logical, understandable, and transparent

analyses, the proper methods needed to evaluate the preceding questions and the only reasonable

conclusions.[49] Again, unfortunately, no single exhibit in the record provided all of the data and

information necessary to complete this analysis. As a result, the Court has conducted its analysis

by relying upon data carefully collected from Tr. Exh. 237, 239, as well as from the Court's own

hand-counting of PEIMS records, Tr. Exh. 175(a)-(j). The data will be reproduced in the analysis

below, as needed.

### B. Quantitative Analysis of Annual Data Proves White student transfers from Hearne to Mumford cause the racial enrollment profile of Hearne to be unlike the racial profile of the population

A careful examination of the data proves that the white student  transfers from Hearne to

Mumford, and TEA's continued funding of those transfers, have resulted in a significant

reduction in the proportion of white students attending Hearne - resulting in the enrollment

---

[49]*Cf.* Mumford's Arithmetical Calculations which have been refuted by the Court, *infra,* Section C of this Quantitative Analysis Section.

profile of Hearne not resembling the racial profile of the resident population.[50]  Moreover, data analysis proves that since TEA validated "baseline" transfers to Mumford in 2001-02, the percentage of white enrollment dropped, and remains substantially below what it was in 1996-1997.  This examination reveals that, contrary to TEA's assertions otherwise, TEA's decision to "baseline" white transfers from Hearne to Mumford has contributed to the substantial segregative effect on Hearne's enrollment. Therefore, the forthcoming quantitative and qualitative analyses reflect Defendants' wanton disregard for the provisions of No. 5281, and also evidence that the decision to baseline had a segregative effect.

The issue of free choice in school selection has been presented in this litigation.  The effect of transfers on the proportion of Hearne's white enrollment is far greater in any given year than the decline in the number of white students living in Hearne.  It has been argued that losses in the proportion of Hearne's white enrollment were not due to inter-district transfers, but rather to changing population demographics. It would follow, then, that a shift in racial balance might merely reflect the ebb and flow of the resident population

The following analysis calculates the effect of the white student transfers from Hearne to Mumford, by school year, from 1998 through 2003. This perusal shows how the transfers from Hearne to Mumford have altered the racial profile of students enrolled at Hearne, rather than an enrollment racial profile that reflects the resident population of the community.  The white

---

[50]*See, e.g.,* Holmes, The Path of the Law, 10 HARV. L. REV. 457, 469 (1897) ( 'For the rational study of law the black letter man may be the man of the present, but the man of the future is the man of statistics and the master of economics.').

student transfers to Mumford cause the proportion of white students enrolled in Hearne to be disproportionately lower than their proportion in the community.[51]

The method of evaluation adopted by the Court is meant to be mathematically sound. The evaluation steps are: 1) determine Hearne's resident population profile; 2) determine Hearne's actual enrollment profile; 3) determine Hearne's enrollment profile *as if there were no white student transfers to Mumford* (the 'no-transfer' profile); 4) analyze the difference between (1) the racial profile of Hearne *without white student transfers to Mumford* and (2) Hearne's actual enrollment profile. This difference is the effect of white transfers to Mumford for a given year. The effect of the white transfers to Mumford will show numerically –  in actual percentage point differences –  how the racial profile of Hearne was changed, in a given year, by the transfer of white students from Hearne to Mumford. From this annual number, a cumulative effect of the transfers will be determined and discussed.

*1. Determine Hearne's resident population profile.*

The resident population is defined to be the number of students living in Hearne who are eligible to attend Hearne schools because their parents/guardians reside in Hearne. Tr. Exh. 237 and Table C, below show the resident population of Hearne, categorized by race, for the years 1998-99 to 2003-04.

---

[51]This analysis looks solely at the effect of white transfers to Mumford – controlling for other variables on which Mumford attempts to place blame (such as: private schools, home schooling, and transfers to other schools).

Table C. Hearne Resident Population by year (Tr. Exh. 237)

| Year | Res White [52] | Res White % [53] | Res Latino [54] | Res Latino % [55] | Res Other [56] | Res Other % [57] | Res Black [58] | Res Black % [59] | Total Res Pop [60] |
|---|---|---|---|---|---|---|---|---|---|
| 98-99 | 449 | 26.18% | 487 | 28.40% | 1 | 0.06% | 778 | 45.36% | 1715 |
| 99-00 | 432 | 24.62% | 523 | 29.80% | 0 | 0.00% | 796 | 45.36% | 1755 |
| 00-01 | 430 | 24.27% | 552 | 31.15% | 1 | 0.06% | 786 | 44.36% | 1772 |
| 01-02 | 383 | 22.11% | 552 | 31.87% | 0 | 0.00% | 790 | 45.61% | 1732 |
| 02-03 | 362 | 21.57% | 541 | 32.24% | 8 | 0.48% | 767 | 45.71% | 1678 |
| 03-04 | 295 | 19.41% | 518 | 34.08% | 6 | 0.39% | 701 | 46.12% | 1520 |

---

[52] White Resident Population is the number of white students living in Hearne who are eligible to attend Hearne schools because their parents/guardians reside in Hearne.

[53] Hearne White Resident Population / Hearne Total Resident Population

[54] Latino Resident Population is the number of Latino students living in Hearne who are eligible to attend Hearne schools because their parents/guardians reside in Hearne.

[55] Hearne Latino Resident Population / Hearne Total Resident Population

[56] Other Resident Population is the number of other students living in Hearne who are eligible to attend Hearne schools because their parents/guardians reside in Hearne.

[57] Hearne Other Resident Population / Hearne Total Resident Population

[58] Black Resident Population is the number of Black students living in Hearne who are eligible to attend Hearne schools because their parents/guardians reside in Hearne.

[59] Hearne Black Resident Population / Hearne Total Resident Population

[60] Total Resident Population is the number of all students living in Hearne who are eligible to attend Hearne schools because their parents/guardians reside in Hearne.

47

The racial profile of the population is computed by dividing the number of residents of each race divided by the total resident population.  Figure D, illustrates this data graphically.



Figure C. Hearne Resident Population Profile

Figure C and the data in Table C show that the proportion of white resident population slowly declines each year, from 26.18 percent in 1998-99 to 19.41 percent in 2003-04. The figure and table also show the proportion of Black resident population remains relatively unchanged and the Latino resident population slightly increased during this same time period, staying at approximately 44 to 46 percent.

*2. Determine the racial profile of students actually enrolled at Hearne.*

Table D shows the actual enrollment of Hearne, categorized by race, for the years 1998-99 to 2003-04.

Table D. Hearne Actual Enrollment by year (Tr. Exh. 237)

| Year | Enroll White | Enroll White %[61] | Enroll Latino | Enroll Latino %[62] | Enroll Other | Enroll Other %[63] | Enroll Black | Enroll Black %[64] | Total Enroll |
|------|------|------|------|------|------|------|------|------|------|
| 98-99 | 336 | 22.57% | 394 | 26.46% | 4 | 0.27% | 775 | 50.71% | 1489 |
| 99-00 | 260 | 17.92% | 416 | 28.67% | 4 | 0.28% | 771 | 53.14% | 1451 |
| 00-01 | 218 | 16.11% | 389 | 28.75% | 4 | 0.30% | 742 | 54.84% | 1353 |
| 01-02 | 165 | 13.02% | 378 | 29.83% | 6 | 0.47% | 718 | 56.67% | 1267 |
| 02-03 | 186 | 14.53% | 378 | 29.53% | 8 | 0.63% | 708 | 55.31% | 1280 |
| 03-04 | 153 | 12.98% | 365 | 30.96% | 5 | 0.42% | 656 | 55.64% | 1179 |

The racial profile of the school is computed by dividing the number of students of each race divided by the total enrollment in the school. Figure D shows this data graphically.

---

[61] Hearne White Enrollment  / Hearne Total Enrollment

[62] Hearne Latino Enrollment  / Hearne Total Enrollment

[63] Hearne Other Enrollment  / Hearne Total Enrollment

[64] Hearne Black Enrollment  / Hearne Total Enrollment



Figure D. Hearne Actual Enrollment Profile

Figure D and the data in Table D show that the proportion of white students enrolled at Hearne significantly declines each year, from 22.57 percent in 1998-99 to 12.98 percent in 2003-04. The figure and table also show the proportion of Black student enrollment grows during this same time period, from 50.71 percent in 1998-99 to 55.64 percent in 2003-04.

The actual enrollment profile can be compared to the resident profile. Figure E shows this comparison graphically.



Figure E. Population racial profile compared to enrollment racial profile. (Overlay of Figure C on Figure D)

Figure E shows that the racial profile of the school does not approximate the racial profile of the community for any year. In every year, the proportion of white students enrolled at Hearne is significantly less that the proportion of white resident population, and the proportion of black students enrolled at Hearne is significantly greater than the proportion of black resident population.

The only reason for the differing profiles is student transfers from Hearne to other schools. If no students transferred out of the district, the racial profile of the enrolled students would exactly match the racial profile of the resident population.[65] Figure E above illustrates how, in general, the transfer of all races of students to all other school districts affects the racial profile of enrolled students at Hearne. This effect can be quantified. For example, in 1998-99, the proportion of white resident population was 26.18 percent (from table C) and the proportion of white enrolled students was 22.57 percent. Since the only reason these numbers can differ is because of transfers and home schooling, the effect of all transfers to all schools in 1998-99 was to decrease the proportion of white students from 26.18 percent to 22.57 percent, or decrease the white enrollment by 3.61 percentage points.

In the same manner, the effect of all transfers to all schools can be calculated for all races across all years.

---

[65]In addition to transferring out of Hearne to another school district, parents could also chose to home school their children.  But as made clear during the testimony of Gonzales, home schooling places a heavy burden on parents who chose to home school their children, and it is far less common than the choice to transfer.

Table F. Effect of Transfers on Actual Enrollment (Tr. Exh. 237)

| Year | Res White %[66] | Enroll White %[67] | **White Effect[68]** | Res Latino %[69] | Enroll Latino %[70] | **Latino Effect[71]** | Res Black %[72] | Enroll Black %[73] | **Black Effect[74]** |
|---|---|---|---|---|---|---|---|---|---|
| 98-99 | 26.18% | 22.57% | **-3.62%** | 28.40% | 26.46% | **-1.94%** | 45.36% | 50.71% | **5.34%** |
| 99-00 | 24.62% | 17.92% | **-6.70%** | 29.80% | 28.67% | **-1.13%** | 45.36% | 53.14% | **7.78%** |
| 00-01 | 24.27% | 16.11% | **-8.15%** | 31.15% | 28.75% | **-2.40%** | 44.36% | 54.84% | **10.48%** |
| 01-02 | 22.11% | 13.02% | **-9.09%** | 31.87% | 29.83% | **-2.04%** | 45.61% | 55.67% | **11.06%** |
| 02-03 | 21.57% | 14.53% | **-7.04%** | 32.34% | 29.53% | **-2.71%** | 45.71% | 55.31% | **9.60%** |
| 03-04 | 19.41% | 12.98 | **-6.43%** | 34.08% | 30.96% | **-3.12%** | 46.12% | 55.64% | **9.52%** |

| Year | Res Other %[75] | Enroll Other %[76] | **Other Effect[77]** |
|---|---|---|---|
| | | | |

[66]*Infra,* Table C (Hearne White Resident Population / Hearne Total Resident Population)

[67]*Infra,* Table D (Hearne White Enrollment  / Hearne Total Enrollment)

[68]This is a percentage point change based upon the subtraction of Hearne Resident White Population percentage from Hearne White Actual Enrollment percentage

[69]*Infra,* Table C (Hearne Latino Resident Population / Hearne Total Resident Population)

[70]*Infra,* Table D (Hearne Latino Enrollment / Hearne Total Enrollment)

[71]This is a percentage point change based upon the subtraction of Hearne Resident Latino Population percentage from Hearne Latino Actual Enrollment percentage

[72]*Infra,* Table C (Hearne Black Resident Population / Hearne Total Resident Population)

[73]*Infra,* Table D (Hearne Black Enrollment / Hearne Total Enrollment)

[74]This is a percentage point change based upon the subtraction of Hearne Resident Black Population percentage from Hearne Black Actual Enrollment percentage

[75]*Infra,* Table C (Hearne Other Resident Population / Hearne Total Resident Population)

[76]*Infra,* Table D (Hearne Other Enrollment  / Hearne Total Enrollment)

[77]This is a percentage point change based upon the subtraction of Hearne Resident Other Population percentage from Hearne Other Actual Enrollment percentage

| | | | |
|---|---|---|---|
| 98-99 | 0.06% | 0.27% | **0.21%** |
| 99-00 | 0.00% | 0.28% | **0.28%** |
| 00-01 | 0.06% | 0.30% | **0.24%** |
| 01-02 | 0.00% | 0.47% | **0.47%** |
| 02-03 | 0.48% | 0.15% | **0.15%** |
| 03-04 | 0.39% | 0.03% | **0.03%** |

This table shows how transfers in general affect the racial profile of Hearne. However, the Court is only interested in looking at the effect of the white student transfers from Hearne to Mumford. Therefore, the next step in the analysis is only to isolate the effects of white transfers from Hearne to Mumford.

*3) Determine the racial profile of Hearne <u>as if there were no white student transfers to Mumford</u>*

The next step in the analysis is to examine what Hearne's enrollment would have been without white transfers to Mumford. For simplicity in the forthcoming explanation, the Court will refer to what Hearne's enrollment would have looked like if no white transfers were made to Mumford as "no-transfer" enrollment.

The "no-transfer" enrollment is determined by adding the number of white students transferred from Hearne to Mumford to the actual enrollment of Hearne. Again, this data is not explicitly in any one exhibit. The Court carefully compiled the relevant data necessary for this analysis. Table G shows the relevant data.

Table G. Hearne Enrollment with no white transfers to Mumford ("No-Transfer" Enrollment)
(Tr. Exh. 237, Tr. Exh. 239 and Tr. Exh. 175(a)-(j))

| Year | White Enroll | White Transfers to Mumford | "No-transfer" White[78] | Latino Enroll[79] | Other Enroll[80] | Black Enroll[81] | Total "No-transfer" Enroll[82] |
|------|------|------|------|------|------|------|------|
| 98-99 | 336 | 67 | 403 | 394 | 4 | 755 | 1552 |
| 99-00 | 260 | 102 | 362 | 416 | 4 | 771 | 1553 |
| 00-01 | 218 | 142 | 360 | 389 | 4 | 742 | 1496 |
| 01-02 | 165 | 164 | 329 | 378 | 6 | 718 | 1430 |
| 02-03 | 186 | 130 | 316 | 378 | 8 | 708 | 1408 |
| 03-04 | 153 | 84 | 237 | 365 | 5 | 656 | 1263 |

Again, the "no-transfer" white enrollment is simply the number of white students actually enrolled at Hearne in a given year, plus the number of white students that were transferred to Mumford. The "no-transfer" white enrollment shows what the white enrollment of Hearne would have been if there were no white transfers to Mumford.  The "total no-transfer" enrollment is the sum of the "no-transfer" white enrollment and the actual black, Hispanic and other enrollment at Hearne for a given year. The "total no-transfer" enrollment is how many students would have attended Hearne if no white students had been transferred to Mumford, in a given year.

---

[78] Hearne White Enrollment plus White Transfers to Mumford

[79] *Infra,* Table D

[80] *Infra,* Table D

[81] *Infra,* Table D

[82] *Infra,* Table D (Hearne Total Enrollment plus White Transfers to Mumford)

From this data, the racial profile of Hearne if no white students had been transferred to Mumford can be calculated. Table G shows the "no-transfer" enrollment profile of Hearne, categorized by race, for the years 1998-99 to 2003-04.

Table H. Hearne "No-Transfer" Enrollment by year (Tr. Exs. 237, 239, 175(a)-(j))

| Year | "No-transfer" White Enroll[83] | "No-transfer" White %[84] | Latino Enroll[85] | Latino %[86] | Other Enroll[87] | Other %[88] | Black Enroll[89] | Black %[90] | Total "No-Transfer" Enroll[91] |
|---|---|---|---|---|---|---|---|---|---|
| 98-99 | 403 | 25.90% | 394 | 25.32% | 4 | 0.26% | 755 | 48.52% | 1556 |
| 99-00 | 362 | 23.31% | 416 | 25.79% | 4 | 0.27% | 771 | 49.65% | 1553 |
| 00-01 | 360 | 24.08% | 389 | 26.02% | 4 | 0.27% | 742 | 49.63% | 1495 |
| 01-02 | 329 | 22.99% | 378 | 26.42% | 6 | 0.42% | 718 | 50.17% | 1431 |
| 02-03 | 316 | 22.41% | 378 | 26.80% | 8 | 0.57% | 708 | 50.21% | 1410 |
| 03-04 | 237 | 18.76% | 365 | 28.90% | 5 | 0.40% | 656 | 51.94% | 1263 |

---

[83] White Hearne Enrollment plus White Hearne to Mumford Transfers

[84] "No-Transfer" Enrollment / Total Hearne Enrollment with No White Mumford Transfers

[85] *Infra,* Table D

[86] Hearne Latino Enrollment / Hearne Total Enrollment with No White Mumford Transfers

[87] *Infra,* Table D

[88] Hearne Other Enrollment / Hearne Total Enrollment with No White Mumford Transfers

[89] *Infra,* Table D

[90] Hearne Black Enrollment / Hearne Total Enrollment with No White Mumford Transfers

[91] Hearne Total Enrollment plus White Transfers to Mumford

Figure H, shows this data graphically.



Figure H. Hearne "No-Transfer" Enrollment Profile. White transfers to Mumford are added back to Hearne enrollment data

Figure H and the data in Table H show that the proportion of "no-transfer" white students enrolled at Hearne declined from 25.71 percent in 1998-99 to 18.76 percent in  2003-04. The figure and table also show the proportion of "no-transfer" black resident population grew slightly during this same time period, from 48.65 percent in 1998-99 to 51.94 percent in 2003-04.

4) *Compare the difference between the racial profile of Hearne <u>as if there were no white student transfers to Mumford</u> and the racial profile of the students enrolled at Hearne*

The "no-transfer" enrollment profile can be compared to the actual enrollment profile. Because the "no-transfer" enrollment data accounts for the white students transferred to Mumford: any differences in the two profiles are due to white transfers from Hearne to Mumford only. Graphically, the difference in "no-transfer" enrollment profile and the actual enrollment profile is illustrated in Figure I.

Figure I. "No-transfer" racial profile compared to enrollment racial profile. (Overlay of Figure D on Figure H)



Figure I shows that if there had been no white transfers to Mumford, the racial profile in Hearne would look significantly different than what it actually was. The figure shows that if there

had been no white transfers to Mumford, in every year the proportion of white students enrolled would have been greater than it actually is. If there had been no white transfers to Mumford, in every year, the proportion of black students enrolled would have been less than it actually was. Stated differently, transferring white students to Mumford had the effect of lowering the proportion of white student enrollment in Hearne, and increasing the proportion of black student enrollment in Hearne, every year.

Because the differences in these two racial profiles are due only to white student transfers to Mumford, the differences between the actual enrollment and the "no-transfer" enrollment is the effect of white student transfers to Mumford on Hearne.

The effect of white student transfers to Mumford on Hearne can be quantitatively determined by simply subtracting the "no-transfer" enrollment percentage from the actual enrollment percentage. Table J show the effect of the white transfers to Mumford, categorized by race.

Table J. Effect of White Transfers to Mumford on Hearne (Tr. Exs. 237, 239, 175(a)-(j))

| Year | "No-transfer" White %[92] | White Enroll %[93] | White Effect[94] | "No-transfer" Latino %[95] | Latino Enroll %[96] | Latino Effect[97] | "No-transfer" Black %[98] | Black Enroll %[99] | Black Effect[100] |
|---|---|---|---|---|---|---|---|---|---|
| 98-99 | 25.09% | 22.57% | **-3.13%** | 25.32% | 26.46% | **1.04%** | 48.52% | 50.71% | **2.19%** |
| 99-00 | 23.31% | 17.92% | **-5.39%** | 25.79% | 28.67% | **2.88%** | 49.65% | 53.14% | **3.49%** |
| 00-01 | 24.08% | 16.11% | **-7.97%** | 26.02% | 28.75% | **2.73%** | 50.17% | 54.84% | **4.67%** |
| 01-02 | 22.99% | 13.02% | **-9.97%** | 26.42% | 29.83% | **3.41%** | 50.21% | 56.67% | **6.46%** |
| 02-03 | 22.41% | 14.53% | **-7.88%** | 26.80% | 29.53% | **2.73%** | 51.94% | 55.31% | **3.37%** |
| 03-04 | 18.76% | 12.98% | **-5.78%** | 28.90% | 30.96% | **2.06%** | 51.94% | 55.64% | **3.70%** |

---

[92]*Infra,* Table H ("No-Transfer" Enrollment / Total Hearne Enrollment with No White Mumford Transfers")

[93]*Infra* Table D, (Hearne White Enrollment / Hearne Total Enrollment)

[94]This is a percentage point change based upon the subtraction of "No-Transfer" White % from White Enrollment %

[95]*Infra,* Table H (Hearne Latino Enrollment / Hearne Total Enrollment with No White Mumford Transfers)

[96]*Infra,* Table D (Hearne Latino Enrollment / Hearne Total Enrollment)

[97]This is a percentage point change based upon the subtraction of "No-Transfer" Latino percentage from Latino Enrollment percentage

[98]*Infra,* Table H (Hearne Black Enrollment / Hearne Total Enrollment with No White Mumford Transfers)

[99]*Infra,* Table D (Hearne Black Enrollment / Hearne Total Enrollment)

[100]This is a percentage point change based upon the subtraction of "No-Transfer" Black percentage from Black Enrollment percentage

| Year | "No-Transfer" Other %[101] | Other Enroll %[102] | **Other Effect[103]** |
|-------|------------|------------|------------|
| 98-99 | 0.26% | 0.27% | **0.01%** |
| 99-00 | 0.27% | 0.28% | **0.01%** |
| 00-01 | 0.27% | 0.30% | **0.03%** |
| 01-02 | 0.42% | 0.47% | **0.05%** |
| 02-03 | 0.57% | 0.63% | **0.05%** |
| 03-04 | 0.40% | 0.42% | **0.03%** |

Table J shows the effect of the white transfers to Mumford for 1998-99 to 2003-04. For example, in 2001-02 the proportion of white students that would have been enrolled in Hearne had there been no white transfers to Mumford ("no-transfer" enrollment) was 22.94 percent. This demonstrates that if there had been were no white students transferred to Mumford, 22.94 percent of the Hearne student population would have been white. In 2001-02, the actual proportion of white students enrolled at Hearne (because of transfers to Mumford) was only 13.03 percent. In 2001-02, then, the effect of the white transfers to Mumford was -9.91 percentage points. Stated differently, white transfers to Mumford in 2001-02 were the direct cause of the proportion of white students enrolled at Hearne decreased by 9.91 percentage points, that is, the effect of the white transfers to Mumford was to decrease the proportion of white students at Hearne by nearly ten percentage points.

---

[101]*Infra,* Table H (Hearne Other Enrollment / Hearne Total Enrollment with No White Mumford Transfers)

[102]*Infra,* Table D (Hearne Other Enrollment / Hearne Total Enrollment)

[103]This is a percentage point change based upon the subtraction of "No-Transfer" Other percentage from Other Enrollment percentage

This effect can be shown graphically. Figure J shows the effect on all racial groups in percentage points of white student transfers to Mumford.



Figure J. Effect of white transfers to Mumford in percentage points. [actual enrollment percentage - no transfer enrollment percentage].

As the figure illustrates, in every year, transfers of white students to Mumford had the effect of reducing the percentage of white enrollment at Hearne and increasing the percentage of Black enrollment at Hearne.[104] Again, this analysis shows the effect of the white transfers alone;

_____

[104] *Cf.* Tr. Exh. 258 (TEA's Graph of Mumford Baselined Students). The Court finds Tr. Exh. 258 to be less than compelling as to the allegation that "baselined" transfers are diminishing to the point that they are not adversely affecting Hearne's racial make-up. Due to the properly redacted student enrollment data in the record , the Court is unable to substantiate the numbers alleged within Tr. Exh. 258; and given the numerous other inconsistencies provided to the Court from the record, the Court simply cannot adopt these figures as reliable. *See Infra,* Section II, B. Moreover, the data contained in Tr. Exh. 258 is incomplete. Even if TEA is correct in its

demographic changes in the community are factored into the analysis by design - the only changes in the racial profiles are due to the transfer of white students.

### C. Mumford's Mathematical Calculations Are Disingenuous and Misleading

In support of its argument that white transfers from Hearne to Mumford do not affect the racial profile of Hearne, Mumford makes several specious and misinformed arithmetical comparisons. Mumford's confusion arises from the use of percentages, apparently because of inconsistent usage and misunderstanding of basic arithmetic. For clarity, the Court will critique each calculation separately.

*1. Mumford is Mistaken: the Change in the White Demographic in Hearne between 1998-99 and 2003-04 Decreases by 34.30 percent, and the Change in the Actual White Enrollment in Hearne between 1998-99 and 2003-04 Decreases by 54.46 percent.*

First, Mumford alleges that "a composition of the changes in [Hearne's] white enrollment to its white resident population reveals that all transfers out of Hearne only had a net effect on white enrollment of -2.82%." Mumford Post-Trial Brief, at 28. This is reveals a misunderstanding of simple statistics: Mumford misuses the data and confuses "percent" with "percentage points." This is not just semantics. These two terms have very different meanings.

---

calculations of "baselined siblings," TEA cannot reliably predict what the number of Hearne "baseline" sibling transfers will be in the future. Siblings of "baselined" white Hearne students may not yet be school age, or even born. Based on TEA's "sibling" provision, those young or yet-unborn sibling transfers will qualify to be funded by TEA in the future. This uncertainty is significant, as it undermines TEA's bold allegation that the number of students affected by the decision to baseline will only continue to decline.  That assertion simply cannot be proven.

Even assuming, *arguendo* that only 58 white Hearne "baselined" students still remain in Mumford schools as of 2003-04, this amount of students remains substantial, given the proportionally small number of white students attending Hearne. Figure I alone makes this clear.

The Court agrees with TEA in the basic premise that the originally "baselined" students will eventually leave Mumford.  Assuming the youngest white Hearne transfers to Mumford were enrolled in kindergarten during the "baseline" year, those transfers will remain funded at Mumford for a maximum of 13 years (until their senior year in high school).  The issue still remains, however, of the unknown and unpredictable number of siblings of those "baselined" students and how they will continue to affect the racial profile of Hearne. Additionally, even if the Court were to accept that only 58 white Hearne transfers from the "baselined" group remained at Mumford, this number remains significant; with a substantial and noticeable effect on Hearne's racial make-up.

The concept of percentages is a powerful tool by which the context of many raw numbers can be explained. The calculation of a percentage simply involves dividing the part by the whole. FED. R. CIV. P. 201(B)(2). The Court takes judicial notice of Glen James & Robert C. James, *Mathematics Dictionary: Fourth Edition* 285 (4th ed. 1976). Percentages are used either: (1) to show how a part relates to the whole (*i.e.*, as one piece of a pie graph relates to the whole); or (2) to show in relative terms how much something has increased or decreased. FED. R. CIV. P. 201(B)(2*)*; *See, e.g.,* Karl J. Smith, *Mathematics: Its Power and Utility*, § 7.3 (ed. 1983). These two comparisons are exclusive. Yet, as a first mistake, Mumford uses the same percentages to achieve both goals (explained more fully below). This is patently wrong.

Moreover, Mumford confuses the percentage decrease with percentage point reduction. The term "percentage point" is used to get around an ambiguity in English when comparing two different percentages. The problem is that "percent" implicitly refers to a relative change (some fraction of an original amount) rather than an absolute change (some specified amount). A percentage change is a difference divided by some base number, while a "percentage point" change is simple addition or subtraction.

The Court will undertake a brief aside to make this distinction plain. For example, suppose that 68 percent of American taxpayers had filed their tax returns on or before April 15 in 1996, and that 72 percent of them had done so in 1997. It clearly would be accurate to say that there had been an increase in the percentage of taxpayers filing by the deadline. But only a naive or careless person might note that the difference between 68 percent and 72 percent is 4 percent

64

and thus be tempted to say that this increase was 4 percent.[105]  This is incorrect.  It is true that there would have been an increase of four percentage points, but that is not the same as four percent.  Except as they relate to interest rates, *changes in percentage points tend to be useless information*, because they fail to show the needed context.  It is not clear from the context, or lack thereof, what the percentages are relative to.

In order to most clearly refute Mumford's calculations, the Court must first walk through how Mumford arrives at a "net effect" of -2.82 percent.[106]  The Court finds it helpful to best

---

[105]The Court takes judicial notice of the difference between a percentage change and a percentage point change. FED. R. CIV. P. 201(B)(2); Solomon Garfunkel, *For All Practical Purposes: Introduction to Contemporary Mathematics* Box 14.2 (Lynn A. Steen, ed., W.H. Freeman and Co. 1988); Darrell Huff, *How to Lie with Statistics* 74-86 (2ed., W.W. Norton and Co. 1954); Kathleen Woodruff Wickham, *Math Tools for Journalists* 23-27 (ed., Marion Street Press, Inc. 2002). Another illustration of the difference between percentage point change and percentage change is as follows, "if support for the President has decreased from 60 percent to 30 percent, it has dropped 30 percentage points but decreased 50 percent (because the drop of 30 percentage points is 50 percent of the original 60 percentage points). Garfunkel, *For All Practical Purposes: Introduction to Contemporary Mathematics,* at Box. 14.2.

[106]Q: [By Mr. Feldman, Attorney for Mumford]: I'd like to see perhaps if you might be a bit more helpful to us in terms of understanding the data.  I would like to go to the U.S. Charts for Exhibit – specifically, Exhibit 237. And let us start off with the year 1998-99.
A: [Chris Hayes, Litigation Support for United States]: Okay.
Q: In that year – let me write 1998-99. In that year, the percentage of whites in the actual district enrollment according to your calculations, was 22.57 percent; is that correct?
A: Correct.
Q: And if we also, then, look at the white enrollment in 2003-04, we see that it is 12.98 percent; is that correct?
A: That is correct.
Q: Can you tell us the difference in the percentages [actually percentage points] in terms of the decline of the white population in the student enrollment?
A: Approximately declined by ten percent [percentage points].
Q: Well, to be exact, wouldn't it be a decline of – let's see.  It's actually less than ten percent, is it not? This is a decline of 9.41? Or excuse me, 9.59.  Would you agree with that? 9.59 percent? Would you have any reason to dispute that?
A: No. I wouldn't have any reason to dispute that.
Q: It's just a question of subtracting numbers.  Sometimes we have to write it down as opposed to doing it in our head.
A: Alright.
Q: This is what we call district enrollment.  That's the actual kids in the schools, am I right?
A: Correct.
Q: So, that would take into consideration the impact of all of the transfers going in and going out. Am I right?

Mr. Caspar, Attorney for United States: Objection to form. It's not clear what that means.
The Court: I did not hear you.
Mr. Caspar: Objection to the form of the question.  I wasn't sure what that means. I thought counsel was referring to

65

explain the error of this argument visually. Mumford begins by examining snap-shot

comparisons of Hearne's enrollment by racial make-up in 1998-99 with Hearne's enrollment by

racial make-up in 2003-04.

---

district enrollment.
Mr. Feldman: I am.
The Court: Rephrase your question, counsel.

Q [Feldman]: Well, this would be a reflection of the change in the district enrollment during this six-year period, 1998-99 to 2003-04; isn't that correct?
A [Hayes]: It appears that way.
Q: You did put these numbers together.  I thought you testified the way you did it was you took the – well, as I understand it, what you did was you took the district enrollment, then you added the outgoing transfers and subtracted the incoming transfers to come up with the resident population?
A: Correct.
Q: So the resident population, in turn, reflects what the school district would look like if there were no transfers at all?
A: Yes.
Q: Alright. So let's look at the numbers on the resident population.  What was the resident population in 1998-99 of white students?
A: It's 26.28 percent
Q: Alright. And what was the residential population in 2003-04? Was it 19.41 percent white?
A: For the white, 19.41 percent.
Q: Would you agree with me that the difference in percentage of white students in the resident population or resident population of Hearne I.S.D – In '98-'99 was 6.77 percent [percentage points] more than the percentage of white students in the residential population of Hearne in 2003-2004?
A: Again, I never did the – but yeah.
Q: So that represents a reduction of 6.77 percent [percentage points only] in the resident population of whites?
A: Correct.
Q: Sir, can you tell us what the difference is between these two numbers, the district enrollment and the variation in district enrollment over this six-year period and the variation of resident population over this six-year period?
A: Approximately three percent.
Q: Three percent. So what is that – what does that actually tell us in terms of the differences, the effect of the transfers? Indeed the effect of the transfers on the – and actually, it is – you would agree with me, it's a bit less than three percent [percentage points]. It's more like 2.82 percent [percentage points]?
A: Correct. Yes.
Q: Let's be exact. It is minus 2.82 percent is the net effect of the transfers. Wouldn't you agree?
A: Yes.
Tr. Trans. 10: 1-25, 11: 1-25, 12: 1-25, 13: 1-12 (Jan. 25, 2005) (corrections by the Court reflected in brackets).

66



First, Mumford isolates the declining white population in Hearne's actual enrollment to begin its overall calculations.  The Court finds it helpful to provide these pie graphs to display that the percentages of the different racial groups in Hearne from Tr. Exh. 237 reflect the total enrollment population at Hearne. The entire "pie" represents the total enrollment of students in Hearne in any given year.  The white percentage of enrollment in Hearne in the given year is depicted by the lightest shaded slice of the pie graph; the Latino percentage of enrollment in Hearne in the given year is depicted by the darkest slice of the pie graph; and the Black percentage of enrollment in Hearne in the given year is depicted by the gray shaded slice of the pie graph.

To calculate the change in Hearne's actual white enrollment from 1998-99 to 2003-04, Mumford simply subtracts 12.98 percent (the white enrollment percentage at Hearne in 2003-04) from 22.37 percent (the white enrollment percentage at Hearne in 1998-99), which is 9.59 percent. This subtraction calculation, in essence, measures the reduction of the lightest shaded

slice of the pie graph over the six year period. Mumford then concludes that 9.59 percent

represents the percentage change in actual white enrollment at Hearne. This is patently wrong.

The 9.59 number only represents that the white enrollment in Hearne has declined by 9.59

*percentage points*, and this tells us nothing about absolute change in the underlying white

population.

 To undertake a meaningful evaluation of the change in actual white enrollment at Hearne,

one needs to examine the raw numbers that underlie those percentages in the pie charts above.  In

1998-99, Hearne's Actual White Enrollment was 336 students; in 2003-04, Hearne's Actual

White Enrollment was 153 students.  *See* Chart A; Tr. Exh. 237. To do Mumford's desired

calculation correctly, the percent change in actual white enrollment would be the new percentage

minus the old percentage divided by the old percentage. In this case, that would be (336-153) /

336 which is equal to a 54.46 percent decrease.  Therefore, the 9.59 percentage point decrease is

*actually a 54.46 percent decrease* in the white enrollment at Hearne.

 Second, Mumford examined the change in the white resident population in Hearne

between 1998-99 and 2003-04. The Court finds it helpful to provide these additional pie graphs

to display that the percentages of the different racial groups in Hearne from Tr. Exh. 237 reflect

the total resident population in Hearne in 1998-99 and 2003-04. The entire "pie" represents the

total resident population in Hearne in any given year.  The white percentage of the resident

population in Hearne in the given year is depicted by the lightest shaded slice of the pie graph;

the Latino percentage of the resident population at Hearne in the given year is depicted by the

darkest slice of the pie graph; and the Black percentage of the resident population in Hearne in

the given year is depicted by the gray shaded slice of the pie graph.

68



To calculate the change in Hearne's white resident population from 1998-99 to 2003-04, Mumford simply subtracted 19.41 percent (the white resident population percentage in Hearne in 2003-04) from 26.18 percent (the white resident population percentage in Hearne in 1998-99), which is 6.77 percent. This subtraction calculation, in essence, measures the reduction of the lightest shaded slice of the pie graph over the six year period. Mumford then concludes that 6.77 percent represents the percentage change in Hearne's white resident population. This, again, is plainly incorrect. The 6.77 number only represents that the white resident population has declined in Hearne by 6.77 *percentage points*, and this tells us nothing about absolute change in the underlying white population.

To undertake a meaningful evaluation of the change in actual white resident population in Hearne, one needs to examine the raw numbers that underlie those percentages in the pie charts above.  In 1998-99, Hearne's Actual White Resident Population was 449 students; in 2003-04, Hearne's Actual White Resident Population was 295 students.  *See* Chart A; Tr. Exh. 237. To do Mumford's desired calculation correctly, the percent change in white resident population would

be the new percentage minus the old percentage divided by the old percentage. In this case, that would be (449 - 295) / 449 which is equal to a 34.30% percent decrease. Therefore, the 6.77 percentage point decrease is *actually a 34.30 percent decrease* in the white enrollment at Hearne.

Third, and finally, Mumford attempts to calculate the "net effect" of the transfers by subtracting its "change in residential population" from 1998-2004 (6.77 percent) from its "change in actual white enrollment" from 1998-2004 (9.59 percent), to arrive at the total of -2.82 percent. Calculating the "net effect" in this way appears baseless to the Court. The Court has already contemplated an evaluation of the effect of transfers on Hearne's racial make-up, as evidenced by Tables and Graphs C-I, above. In order to reflect meaningfully the effect of white transfers from Hearne to Mumford, one must look at annual changes in Hearne's enrollment and resident population, and isolate the effect of Mumford transfers[107].

However, for the sake of completeness, the Court will now undertake to complete, with accuracy, Mumford's calculation.  As explained above, Mumford's calculation is wrong: Mumford relied on percentage point comparisons devoid of any context in deriving its figure. Instead, if one desires to undertake a meaningful comparison between the change in white resident population in Hearne ISD and the change in actual white enrollment at Hearne, he or she must compare meaningful percentages to one another. In this case, the "effect of the transfers" from 1998-99 to 2003-04 would be calculated by subtracting 34.3 percent (the change in white resident population) from 54.46 percent (the change in actual white enrollment) to arrive at a 20.16 percentage point effect.  This number is irrelevant in determining whether Mumford and

---

[107]Mumford asserts that much of the racial profile of the school has changed as a result of home schooling and transfers to other schools, although Mumford never isolated Mumford's effect on Hearne in its subtraction of percentage points. *Infra,* Table I.

TEA violated No. 5281, however; the Court, instead, need only isolate the annual effect of non-exempt transfers from Hearne to Mumford.

*2. Mumford is Incorrect: White Transfers from Hearne to Mumford Account for a 12.72 percentage point decrease in the White Population at Hearne between 1998-99 and 2003-04.*

Relying heavily on the explanations set forth above, the Court will now analyze and demonstrate the invalidity of Mumford's argument that the "net affect [sic] of white transfers to [Mumford] is actually only a difference of -.34 %, which represents the difference between the changes in white resident population (6.77 %) and white student enrollment at Hearne without the [Mumford] transfers (7.1 %)."  Mumford Post-Trial Brief, at 28. To be clear, in refuting

71

Mumford's calculations, the Court will begin by outlining Mumford's argument.[108]  Again,

_____

[108]Q [Feldman, Attorney for Mumford]: Let's take this a step further. Let me show you another exhibit, sir, which is Exhibit 255, which shows the net effect of the transfers from Mumford, specifically, or the transfers to Mumford specifically, just isolates those numbers. If you look at 255, sir, could you take that out or can you see it here?

A [Hayes, Litigation Support for the United States]: I only have Exhibits up to 245.

Q: Okay. It does not seem to be in these books. But can you see this?

A: Yeah, if I lean over here.

Q: Okay. And what it reflects is that in 1998-'99, the enrollment of white – that the effect of the transfers to Mumford, in particular, was to – approximately a two-percent difference with the respect to the student enrollment at Hearne. Do you see that the enrollment was the 2–?

Mr. Caspar, Attorney for the United States: Your Honor, I object, counsel is testifying as to what the contents of the chart are and there's been no foundation laid to show that the witness has ever seen the chart before or could testify intelligently on.

The Court: I'll overrule the objection.

Q [Feldman]: Mr. Hayes –?

The Court: I could assume you'll bring that up on redirect.

Q: Do you see that in 1998-'99, the student enrollment percentage is reflected in the other charts, the white population was 22 percent.  And it also shows that if the Mumford transfers went back to Hearne that time, in other words, had there been no transfers from Mumford but there could have been transfers the other transfers to the other school districts would have been allowed.  Do you see that the white population under those circumstances would have been – the actual student population would have been 24.1 percent. Do you see that?

A: Yes.

Q: And in 2003-04, the student enrollment, the white percentage – or the percentage of white students in Mumford in 2003-04, without the impact of the Mumford transfers specifically would have been 17 percent.  Do you see that?

A: Yes.

Q: The actual enrollment was 13. It would have been 17 without the Mumford transfers, 17 percent. Do you see that?

A: Yes.

Q: So without Mumford, the decline in the white enrollment of Hearne from '98-'99 to 2003-04 would have been how many percent – how many points [percentage points] were dropped in terms of the white population?

A: About seven percent [percentage points].

Q: 7.1 percent?

A: Correct.

Q: Excuse me.  I'm sorry. It's 6.9 percent. Would you agree with that?

A: Yes, sir.

Q: Minus 6.9 percent. So if we look at the change in the resident population of the Hearne community, the available students going to public schools in the Hearne community, wherever they're going, if we look at that change in the white percentage, we know that was 6.77 percent [percentage points].  In other words, no transfers or anything.  It's dropped 6.77 percent [percentage points], correct.

A: Correct.

Q: And – ??

The Court: I did not hear what the witness said.

Hayes: Correct.

The Court: He asked you if this 6.77 was correct. Is it or not? I do not know.

Hayes: Correct.

Q [Feldman]: And the net effect without the Mumford transfers over that period of time was a drop of 6.9 percent. What is the difference between 6.9 percent and 6.77 percent?

A: .23 percent, approximately.

Q: Actually, that's 6.9.  Should be 7.1. I apologize. The 6.9 representing the difference between the percentage of

Mumford confuses percentages with percentage points.

First, Mumford misstated the change in white resident population as a percentage difference, rather than as a reduction by 6.77 percentage points.  *Infra* p.44.  Then, Mumford calculated the change of the enrollment in Hearne without white Mumford transfers.  In so doing, it relied on the sloppily constructed Tr. Exh. 255, which contains numerous mathematical errors and incorrect figures. *Infra,* note 24. However, for transparency, the Court will use Tr. Exh. 255 briefly to show how Mumford arrives at its conclusions.  In Tr. Exh. 255, there is a column "Enrollment W/O Mumford Transfers," which is based upon the addition of the annual enrollment in Hearne of each racial group with the total number of transfers to Mumford of each racial group.  Mumford only looked to the white enrollment and transfers data.  To calculate its

---

whites in the enrollment in '99-'99 with what the – excuse me.  The percentage of whites that would have been in the student body at Hearne in '98-'99 without the Mumford transfers and declining to the percentage in 2003-04 of the white population in the student enrollment without the Mumford transfers, and that represents a difference of 7.1 percent.  I had 6.9 before but that was incorrect.

A: Correct.

Q: Now, if we subtract 6.77 from 7.1, what are we left with?

A: .34.

Q: So the actual impact of the transfers from Hearne to Mumford on the white population, on the student body from '98-'99 to 2003-04 was a net effect of minus .34 percent; is that correct?

A: Correct.

Q: Your Honor, at this time, we would ask that we mark – be able to mark this as an exhibit and admitted into evidence?

Mr. Caspar: Your Honor, we object to the offering.  This is just pure mathematics and if counsel would like, he can write his mathematics as an exhibit. –.

The Court: I'll overrule the objection. I'm admitting everything. I don't know what these figures prove.

Feldman: Well, your Honor, it proves the net effect of Mumford.

The Court: Alright.

Feldman: That there was a decline in the demographic. There was a change in the demographics in Hearne.

The Court: Alright. Go ahead.

Feldman: Have you seen the –?

The Court: For the record, the exhibit is admitted. How is it marked?

Mr. Feldman: Well, I'm not sure what the next number is.

The Clerk: It's 259.

Feldman: Your Honor, we would offer Exhibit No. 260 into evidence.

The Court: Alright. Exhibit 260's admitted into evidence.

Tr. Trans. 13: 13-25, 14: 1-25, 15: 1-25, 16: 1-25, 17: 1-25 (Jan. 25, 2005) (corrections by the Court reflected by brackets).

"change of enrollment in Hearne without Mumford transfers," Mumford simply subtracts the 2003-04 figure from Tr. Exh. 255's "Enrollment W/O Mumford Transfers" column entry (which was 17 percent) from the 1998-99 figure from the same column (which was 24.1 percent). This difference is a 7.1 percentage point decline, but Mumford claims it to be a 7.1 percent decrease in white enrollment, assuming no transfers to Mumford.

Next, Mumford attempted to determine the "natural effect" of the decline in white enrollment assuming there had been no transfers to Mumford. To do this, Mumford merely subtracted 6.77 (the percentage point change in actual white enrollment from 1998-99 to 2003-04) from 7.1 (the percentage point change in enrollment assuming no white transfers to Mumford). Mumford arrives at a difference of .34 percent, which, if anything, reveals a .34 percentage point change. Mumford's use of .34 percent is, yet again, totally inaccurate. These percentages were again taken out of context and without meaning, so the result from their subtraction remains equally insignificant.

Moreover, Mumford made an even simpler mathematical error. The actual difference between 6.77 and 7.1 is 0.33, rather than 0.34. This basic subtraction error further underscores Mumford's hasty and sloppy arithmetic. Additionally, the numbers on which Mumford relies in Tr. Exh. 255 are incorrect. After the Court's counting PEIMS data for Hearne and Mumford in 1998-99, the total number of white transfers from Hearne to Mumford was found to be 67, resulting in the white enrollment of Hearne without Mumford transfers as 403, and the total enrollment of Hearne without Mumford transfers as 1648. *See* Appendix A. Additionally, Tr. Exh. 237 does not provide data regarding total transfers to Mumford for 2003-04, therefore, the

Court will simply shorten the comparison to 2002-03, where there is verifiable and accurate data to rely upon.

To evaluate accurately the change in white enrollment in Hearne without any transfers to Mumford, Mumford needed to use actual raw numbers.  The percent change in enrollment in Hearne without transfers to Mumford would be the new percentage minus the old percentage, and divided by the old percentage. In 1998-99, the total white enrollment in Hearne without transfers to Mumford would have been 403 students. *See* Appendix A; Tr. Exh. 237. In 2002-03, the total white enrollment in Hearne without transfers to Mumford would have been 316 students. *Id.* In this case, that would be (403-316) / 403 which is equal to a 21.58 percent decrease.  While the statistical comparison is not as useful as an annual comparison would have been (as the Court undertook, above), for the sake of completeness, the Court will complete the arithmetical calculations.  To properly isolate the effect of transfers to Mumford on Hearne's enrollment, the "net effect" is calculated by subtracting 21.58 from 34.3, which amounts to a 12.72 percentage point change.

*3. Mumford is Wrong: White Transfers from Hearne to Mumford Account for far more students than 29 students.*

Mumford also alleges that "while there was a 50% decline in white enrollment from 1998-99 to 2003-04, it was also shown that the net loss of white enrollment attributable to [Mumford] in absolute terms was only 29 white student transfers." Mumford Post-Trial Brief, at p. 29.  Like the previously discussed arithmetical errors shown above, this conclusion that Hearne's net loss of white students to Mumford is 29 students is simply wrong.

It is evident that the only way to conduct a meaningful comparison of residential population and district enrollment is to examine the data annually, as was done above. *Infra,*

75

Tables F, G and H (where it was shown that if no white students transferred to Mumford, the proportion of white enrollment at Hearne would have been nearly identical to the proportion of the white resident population).  It is meaningless to compare the differences over a spread of years; and moreover, it is misleading to then affix the difference of those subtraction calculations as being a "net loss."[109]  For one, No. 5281 review by TEA, as evidenced in the language of No.

---

[109]  Mumford simply undertakes a series of subtraction calculations and affixes the resulting difference as a "net loss," without providing any working definition for net loss, any methodology underlying the subtraction, or even any context as to the years chosen.  In fact, the only witness that Mumford works through this "net loss"theory is Chris Hayes, litigation support for the United States.  The Court finds that Hayes lacked the necessary foundation to undertake the analysis necessary to understand the significance of certain calculations. As clear from the forthcoming transcript excerpt, Hayes was able to follow only the basic subtraction calculations asked of him by Mumford.  He was not knowledgeable as to the meaning of  "net loss," nor how it should be properly calculated or applied in this case.

Q [Feldman, Attorney for Mumford]: Mr. Hayes, counsel for Hearne was asking you questions about a drop in the white student enrollment from '98-'99 to 2003-2004, a drop of 50 percent. Do you recall that?
A [Hayes, Litigation Support for United States]: Vaguely.
Q: Vaguely. All right. So in 1998'99 in terms of actual enrolment of whites at Hearne, it was, let's see, 336 white students enrolled at Hearne in '98-'99; is that correct?
A: That is correct.
Q: All right. And then, in '03-'04, 2003-2004, you show that there were 153 white students enrolled at [Hearne]?
A: That's correct.
Q: All right. And 336 minus 153, would you agree with me is 183 students?
A: That sounds correct.
Q: So there was a loss of 183 white students enrolled at [Hearne] from 1998-'99 to 2003-2004, right?
A: Correct.
Q: Let's go to the resident population. That is with no effective transfers.  In 1998-'99, the resident population of whites in Hearne, the Hearne community was 449; is that correct?
A: Yes.
Q: And the – in 2003-2004, the resident population of the Hearne community, resident student population of the Hearne community was 295; is that correct?
A: Yes.
Q: And do you know what the 449 minus 295 is? Would you agree with me that it's 154?
A: That sounds right.
Q: So would you agree with me that from 1998-'99 to 2003-2004, there were 150 less white students going to any public schools whether it be Hearne or otherwise, in the community of Hearne?

Caspar [Attorney for the United States]: Objection to the lack of foundation of the witness. The witness can testify to what the numbers are seen on the chart, but as far as where they're going to school, I don't believe the witness has the foundation to answer that question.
The Court: Well, I'll overrule the objection.  Go ahead. If you know the answer, answer it.  If you don't, say so.

A [Hayes]: I agree the number decreases there. Yes.
Q [Feldman]: And so the net loss – in other words, had there been no transfers at all, there still would have been a loss of 154 white students from Hearne; is that correct?
A: That's correct.
Q: So the net loss of the white student population in Hearne, the actual enrollment, the impact was a loss of 29 white

5281 itself, is to be evaluated annually.  More importantly, the net loss can only be measured

annually.[110]  A net loss of transfers cannot be conducted merely by subtracting the differences of

the changed Hearne residential population between 1998-99 to 2003-04 from the changed Hearne

actual white enrollment between 1998-99 to 2003-04.

---

students; is that right?

Caspar: Objection to the form of the question.  It's just not clear what counsel is referring to by net loss nor the calculations that he's performing and counsel for the United States can't even see the calculation.
The Court: Rephrase your question, counsel, so as to make it more clear.
Feldman: Yes, your Honor.

Q [Feldman]: If we compare the difference between the diminished number of white students in the actual enrollment of 183 with the decrease in the white student population in the Hearne community of 154, we only see a net difference – we see a net difference of 29 students.
A: Correct.
Q: So under these circumstances, even if there had been no transfers at all, there would still have been a precipitous drop in the white student enrollment at [Hearne.]

Caspar: Objection to the form of the question as far as the meaning of precipitous.
Feldman: Significant or –.
Caspar: The witness can testify to the numbers themselves, but as far as counsel's own characterization of those numbers, I don't believe the witness has a foundation to testify.
The Court: I think I perceive that. I overrule the objection.
Feldman: Your Honor, that's all we have at this point in time. I'd like to offer what I'll mark as Exhibit 261 at this time.
Tr. Trans. 39: 21-25, 40: 1-25, 41: 1-25, 42: 1-22 (Jan. 25, 2005).

[110]Mumford's formula fails to stand to reason.  To show the inherent flaw in the calculation, one must simply borrow Mumford's formula and use it in any one year period. As an example, the Court attempts to calculate Mumford's "net effect" of white Hearne transfers to Mumford in 1998-99.  Adopting Mumford's equation, one would subtract the change in the resident population (449-449 = 0) and also the change in the actual enrollment ( 336- 336 = 0).  Tr. Exh. 237; *Infra* Tables F, G, and H.  Subtracting the difference of the resident population (0) from the difference in actual enrollment (0) equals zero. Using Mumford's equation in an isolated year leads to an illogical result.  It is clear from Tr. Exh. 237, Table F, and Mumford's own admission that, in 1998-99, there were 67 transfers to Mumford, which results in a much greater net effect than zero.
    As a result of this anecdotal example, a few critiques of Mumford's formula become evident. Mumford's formula ignores multiple variables affecting actual enrollment, including: first, it does not account for already illegal transfers in 1998-99, for transfers in or transfers out to schools other than Mumford, and double counts those who move in or out and also transfer in or out of Hearne.  Second, as the 1998-99 example makes clear, the formula does not result in any mathematical conclusion.  The only way to measure the effect of white transfers from Hearne to Mumford is to examine the data annually, as the Court undertook in its own quantitative analysis. Third, Mumford chose to compare the two smallest years of white transfers to Mumford. In 1998-99, there were 63 white Hearne transfers to Mumford; in 2003-04, there were 84 white Hearne transfers to Mumford. However, in the years in between, Mumford recruited and accepted far more white transfers from Hearne.

To demonstrate this, the Court prepared Tables G and H, which provides the annual percentage of the white resident population at Hearne that transferred to Mumford.  The percentage of white transfers from Hearne to Mumford each year substantiates the Court's conclusion that white transfers to Mumford substantially affect the racial profile of Hearne, by significantly reducing the white population enrolled in Hearne.  Additionally, Table K shows the percentage of the white resident population in Hearne that transferred to Mumford.

Table K. Percentage of White Hearne Resident Population Transferred to Mumford

|  | White Hearne Transfers to Mumford[111] | White Hearne Resident Population[112] | Percentage of White Hearne Resident Population Transferred to Mumford[113] |
|---|---|---|---|
| 1998-99 | 67 | 449 | 14.92% |
| 1999-00 | 102 | 432 | 22.61% |
| 2000-01 | 142 | 430 | 33.02% |
| 2001-02 | 164 | 383 | 42.82% |
| 2002-03 | 130 | 362 | 35.91% |

Looking at Table K, it is obvious that the white Hearne resident population has declined from 1998-99 to 2003-04. Tr. Exh. 237; Chart H. The white resident population in Hearne decreased from 449 in 1998-99 to 362 in 2002-03. *Id.*  Yet, it remains equally pellucid that at the same time, the number of white Hearne transfers to Mumford has increased.  As the white population moved out of Hearne, an increasing number of those white students still living in Hearne have transferred to Mumford. The number of white transfers to Mumford has jumped

---

[111]*Infra* Table G.

[112]*Infra* Table C. White Resident Population is the number of white students living in Hearne, who are eligible to attend Hearne schools because their parents/guardians reside in Hearne.

[113]White Hearne Transfers to Mumford / White Hearne Resident Population

from 67 in 1998-99 to 130 in 2002-03 (with 142 white transfers to Mumford in 2000-01 and 164

white transfers to Mumford in 2001-02).  Thus, the relative effect of the transfers to Mumford

has also increased.  This is demonstrated by the increasing annual percentages of white resident

population transferring to Mumford (the third column of Graph K).[114]

      Figure L, illustrates this data graphically.

Graph L: Line Graph of the Percentage of White Hearne Resident Population Transferred to
Mumford



Percentage of White Hearne Resident Population to Mumford

      This line graph illustrates several important lessons about the effect of white Hearne

transfers to Mumford.  The average percentage of the white resident population living in Hearne

that transferred to Mumford was 29.59 percent.  This is critical: on average, about 30 percent of

white resident students living in Hearne have transferred to Mumford.  Naturally, the racial

make-up of Hearne schools became askew, when an average of 30 percent of the white

---

[114] The smaller the denominator, the greater the percentage of transfers will be obtained on division. FED. R.
CIV. P. 201(B)(2); *See, e.g.,* Karl J. Smith, *Mathematics: Its Power and Utility*, § 7.1 (ed. 1983).

population living there transferred to Mumford. The percentage of the white Hearne resident population that attended Mumford has ranged from 14.03 percent in 1998-99 to as high as 42.56 percent in 2001-02.

## VIII.

### SOCIAL, FINANCIAL, AND ACADEMIC IMPACTS OF TRANSFERS ON HEARNE

The transfers from Hearne have resulted in members of Hearne and neighboring communities perceiving Hearne as "basically a black school district," comprising mainly or exclusively black students. Trial Tr. at 84:3-7 (Jan. 24, 2005) (McDaniel); *Id.* at 191:19-25, 212: 9-13 (Reed) ("The community overall perceives [Hearne] as a predominately black school district" and continued loss of white student transfers "reinforce[s]" that perception); Tr. Tr. at 70:11-19; 71:13-15 (Jan. 25, 2005) (James Taylor[115]) (Hearne is perceived as a "black school district").  Hand-in-hand with the perception of being a "black" school district, Hearne also has developed a reputation apparently based on negative stereotypes.   Although these claims were never substantiated, parents desiring their children attend Hearne alleged in their transfer forms that their children were unsafe at Hearne. Among their reasons for transfers based on the hardship safety exemption were the following vague claims:

- "Children were being harassed and threatened at Hearne."
- "Hearne is a bad school with drugs; gangs and teaching is poor."

---

[115]James Taylor has served on the Hearne I.S.D. Board of Trustees for six years, the last year as its President.  He has lived in Hearne for 17 years, and has two children who have attended Hearne schools, a son who graduated high school with honors and a daughter who is scheduled to graduate one year early from high school from Hearne I.S.D.  As a Hearne I.S.D. school board member and parent, Taylor "often" speaks with other parents and community members about the school system. Tr. Trans. 66:9-67:5 (Jan. 25, 2005).

The Court finds that Taylor had the proper foundation to testify as to community perceptions of Hearne schools, as he is a long-time resident of Hearne, active in the Hearne community, and interacts frequently with parents and other people interested in school affairs. The Court also finds that McDaniel, as a former principal, superintendent of Hearne and lifelong resident of Hearne, to have the proper foundation necessary to describe the effects of the transfers on Hearne.

- "I wont [sic] [my child] to attend Mumford School because both parents works [sic]; his child care is in Mumford and that works well for both parents because no child care is located in Hearne district."
- "Safety was the reason."
- "I do not went [sic] she [sic] to go to Hearne School because of the drugs."
- "Too many fights in Hearne."
- "I feel more comfortable with the smaller number of students. I also feel there are better values bestowed in the students that attend Mumford."
- "Smaller school district offers safer, more stable learning environment."
- "Drugs and violence."
- "To [sic] much fighting and student unrest – lack of discipline makes learning difficult – lack of teacher control."
- "Hearne has problems controlling discipline."
- "I feel my children would not be safe in Hearne."
- "She safer [sic] going to Mumford School than Hearne School."
- "Better attitude, No problem with fighting and arguments with other students."
- "I feel my child is safer in Mumford, where there are less discipline problems."
- "Negative comments on Hearne about Gangs and Fighting. [My child] will not be associated with such."

Tr. Exhs. 246, 247, and 248 (several excerpts from 1998-1999, 1999-2000 and 2000-2001 Parent/District Transfer Agreement Forms for parents desiring their children transfer to Mumford; specifically, the quotations are taken from the responses written on the line immediately following the "Parent documentation is need [sic] for safety reasons" question). The Court finds no substantial basis for any of these allegations in the record. Hearne is perceived to have discipline problems, although the discipline issues at Hearne appear to be no different and no worse than those of the more affluent and less diverse school districts.

However, these perceptions affect parents' school choices, and the exodus of students, particularly white students, from a small overall white student population is making it much harder for Hearne to retain any remaining white students. All of the Hearne educators clearly

explained that this makes it harder for Hearne to attract new students, because parents hear about Hearne's reputation and are aware of the large number of transfers leaving.[116]

These transfers also hurt Hearne academically. Mumford targeted Hearne's higher-performing students, and many such students transferred to Mumford.  Hearne school officials complained of Mumford is actively soliciting only the highest achieving students from Hearne during the past four years. Tr. Exh. 24 corroborates Hearne's concern that Mumford was selectively enrolling transfers only when they had passing TAAS scores and no discipline problems.  Mumford sent this letter to interested community members regarding student registration for 2001-02; the pertinent language is excerpted as follows:

1. Mumford School is accepting registration for new students entering the Ninth through Eleventh Grade.  We will accept a limited number of students who meet the following requirements:

a) Student must have passed all three (Reading/Math/Writing) sections of the 8th grade TAAS test.  This requirement does not apply to students with Special Education, or Limited English Proficiency exemptions. Home School, Private School, and out-of-state students will be considered on an individual basis.

b) No previous discipline problems – in or out of school: such as supervision, in-school suspension, or juvenile probation department.

c) Acceptable Attendance the prior year. . . .

3. Registration for new students in Grades K through 8 is also being taken at this time. . . .

5. Early registration is important.  If you or your friends have new students, please register them now.  Space will cause us to limit the number of students we will accept for the next school year.[117]

---

[116] As an example, Reed described how people discouraged her from working in Hearne because of its "reputation."

[117] As the United States pointed out during its cross-examination of Brannon, Mumford would not refuse resident students enrolling in its schools, so this line applied only to transfer student enrollment. Tr. Trans. 23: 18-23 (Jan. 28, 2005).

Tr. Exh. 24. A variation of this same letter was also published in the *Hearne Democrat,* Hearne's primary local newspaper.  Vol. 1 of Brannon's Depo., p. 36 at line 6, p. 37, at line 2. Even though Brannon explained that these "requirements" were not actually used when deciding which students Mumford would allow to transfer into their schools, no one in the community knew that these "requirements" were merely aspirations of the Mumford administration.  The language of the letter  – and others like it which were continually sent over a four year period – used forceful language indicating that those who had passed TAAS tests and had no discipline problems need only apply to Mumford to be accepted.

McDaniel, the former superintendent of Hearne, explained to the Court how it became more challenging for Hearne to prepare for the requirements of TAAS tests.  Taylor, President of the Hearne ISD Board of Trustees, credibly noted that transfers "caused a negative impact when you take the top students of the school and leave the ones that's [sic] less fortunate into your school district and, therefore, it causes problems for the test scores." Trial Tr. 72:18-23 (Jan. 25, 2005). *See, e.g., infra* Tr. Ex. 24.

The transfers hurt Hearne financially, as well. Each student transferring out of Hearne costs the district approximately $5,500.[118]  This funding loss affected the educational programs offered by Hearne.  For instance, Hearne created smaller classes in order to be able to work more intensely with the academically struggling students remaining in the district, but Hearne ultimately could not afford to retain the same number of teachers or the smaller classes.

---

[118]In Texas, funding follows the individual student.  At the end of each school year, TEA calculates the actual student enrollment in that district for a school year and adjusts payments made to each district in the following school year based on that enrollment.  This enrollment includes students who reside in the district or transfer from another one. Stip. Nos. 5-6.

The transfers also diminish the social benefits derived from interaction among students of different races in Hearne. As McDaniel explained, "[t]he kids who [are] left there don't have the opportunity to interact with white students as they had previously.  So they don't really know how to get along with people as they should and learn to work with people as they should and as they could if we still had our population as it was." Trial Tr. 81:25-82:9 (Jan. 24, 2005) (McDaniel).  Indeed, the transfers have led to increased racial division within Hearne.  They have "create[d] a racial division in Hearne because your school is normally the focal point of a small community, and nothing is being done with the transfer issue to help us to bring the community together in more of a community atmosphere." Trial Tr. at 195:11-18 (Jan. 24, 2005) (Reed).  As it currently stands, a substantial number of the white school aged residents of Hearne attend Mumford schools.

## IX.

### HEARNE IS NOT UNSAFE AND DOES NOT HAVE UNUSUAL DISCIPLINE PROBLEMS

TEA assesses whether individual districts have safety problems, and Hearne was not identified as an unsafe school at the time of TEA's investigation into Mumford.

Caroline Reed[119] has been the principal of Hearne High School since August 2004, and she was the principal of Hearne's Blackshear Elementary School for the previous eight years.

---

[119]Hereinafter, Caroline Reed will be referred to as "Reed."

Reed left a more affluent school district for Hearne, in order to work with a large minority student population and "see what [she] could do to help them have a successful educational career." As a principal, Reed speaks with students and parents on a daily basis. Additionally, although her primary residence is 65 miles away, Reed spends many weekends in Hearne to attend high school and community events.

The Court finds Reed had the proper foundation to testify as to community perceptions of Hearne schools, as she is the current principal of Hearne High School and was the principal of Blackshear Elementary for eight years before that, that she remains active in the Hearne community, and that she interacts frequently with parents and other people interested in school affairs.

She had previously been an assistant principal in the Montgomery, Texas, school district for five years and a teacher there for 12 years.  The Montgomery district was fairly affluent when compared to Hearne, which has a higher proportion of minority students and a smaller economic base.  Reed testified that she encountered the same sort of discipline issues in Montgomery as she encounters in Hearne, such as classroom disruptions and disrespect for teachers. The discipline incidents in Hearne are neither more serious nor more pervasive than she found them to be in Montgomery, she opined.

Reed also previously taught in Navasota, Texas, school district for four years.  The Navasota district was located in a rural area, and its enrollment was about 55% white and 45% black.  As with the Montgomery school district, Reed found Navasota's discipline issues to be comparable to those in Hearne. Moreover, Reed taught previously in the Cy-Fair, Texas, school district for three years.  She testified credibly that Cy-Fair is an affluent, largely white school district in suburban Houston. Like Montgomery and Navasota, Cy-Fair had about the same discipline issues as in Hearne.

Reed further testified that she has never encountered any major discipline problems in any of the districts she has worked in, including Hearne. As principal at Blackshear, Reed had occasion to speak with four parents who were transferring their children to Mumford. None of these parents said that they were transferring their children for safety reasons.  Reed explained that during her tenure in the Hearne school system, parents have threatened to transfer their children to Mumford when the parents were unhappy with something school officials had decided to do in Hearne, "whether it be discipline, whether it be grades, whether it be a teacher, they'll just tell us, well, that's okay, we'll just take them to Mumford."

Mumford's attorneys presented testimony at trial from two guardians who had transferred their children from Hearne to Mumford.  Only one, Dorothy Camarata, mentioned safety concerns as her reason for transferring, and her two safety concerns were both resolved by the Hearne schools within a reasonable time. First, Ms. Camarata was concerned that when the wind blew and it was raining, three one-foot metal grates in the sidewalk would become slick.  The school resolved the issue the next year, by putting texture on the grates.  Second, Ms. Camarata was concerned that the sidewalk between the school building and the driveway was without a painted line for children to stand behind; thus, she was afraid that children would dart into the driveway when school let out.  The school also resolved this concern by painting such a line by the next school year.

In sum, Mumford has failed to show that Hearne has unique safety or discipline problems. TEA failed to identify Hearne as an unsafe school.  Hearne's principal perceives no unique problems; and concerned parents have had their concerns addressed promptly.

# PART TWO:  CONCLUSIONS OF LAW

## I.

### TEA Is Violating No. 5281

No. 5281 prohibits TEA from providing Mumford funding for any transfers that reduce desegregation in Hearne, yet TEA is doing so. No. 5281 provides that TEA "shall not permit, make arrangement for or give support of any kind to student transfers, between school districts, when the cumulative effect, in either the sending or receiving district, will be to reduce or impede desegregation. . ." Ct. Order at ¶ A(1).  No. 5281 further provides that TEA must notify districts

when they appear to be accepting transfers in violation of No. 5281, *id.* at ¶ A(5), and that if such

a district continues to accept the transfers, TEA

> shall refuse to transfer the funds, based on the average daily attendance of the transfer students involved to the account of the receiving district, and shall, thereby, terminate and refuse to grant or continue paying to the offending district a percentage of state funds equivalent to the district's entitlement based on the average daily attendance of the students transferring in violation of this order.

*Id.* at 4, ¶ A(6).  Thus, No. 5281 prohibits TEA from providing any district with funding for

student transfers that reduce desegregation in any other district.  Determining whether TEA is

violating No. 5281 requires two inquiries: (1) Whether the cumulative effect of transfers to

reduce desegregation in Hearne, and (2) Whether TEA is providing Mumford with funding for

accepting such transfers. The Court finds the answer to both inquiries is yes.

### A. Transfers Are Reducing Desegregation In Hearne

In determining whether transfers reduce desegregation, a court may begin with a

quantitative analysis, measuring the numerical or percentage changes effected by the transfers on

a district's enrollment; but the effect of the transfers "ultimately must be measured qualitatively"

to judge whether they increase the racial identifiability of schools. *Lee v. Eufala City Bd. of*

*Educ.,* 573 F.2d 229, 233 (5th Cir. 1978); *see United States v. Lowndes County Bd. of Educ.,* 878

F.2d 1301, 1304-05 (11th Cir. 1989) (applying *Eufala*, 573 F.2d at 232-233); *United States v.*

*State of Texas*, 158 F.3d 299, 307 (5th Cir. 1998).  Whether inter-district transfers reduce

desegregation by increasing the racial identifiability of schools depends on whether the

"increment of change in the racial composition of a school seems [likely] to alter significantly

general perceptions of a school's racial identity or the behavior of persons who rely on such

factors in determining whether or not to send their children to a particular school." *Lee v. Lee*

*County Bd. of Educ.,* 639 F.2d 1243, 1261 (5th Cir. 1981); *see Lowndes*, 878 F.2d at 1035

(applying the factor identified in *Lee* as "an index of racial identifiability").

*1. The "Say" Factors*

Dr. Michael Say, whom Mumford proffered as an expert on the type of qualitative

analysis needed to performed, testified to the factors that one should consider in determining

whether transfers qualitatively reduce desegregation.[120]   According to Say, one must look at the

demographic changes in the community at issue; but also, that one also would need to consider

"the actual transfer data."   However, Say cautioned that a proper qualitative analysis must go

beyond a mere statistical analysis and should consider, *inter alia*:

- Whether the district is perceived in the community as an predominately one-race school district;
- Whether transfers are interfering with the district's ability to remedy a constitutional violation and otherwise fulfill its desegregation obligations;
- The desegregation history of the school district in question;
- Whether the district is under a desegregation order;
- The financial impact of the transfers on the sending district;
- The conduct of the receiving district in securing transfers and reporting them to TEA;
- Whether the receiving district was taking steps to circumvent No. 5281;
- Whether the receiving district disregarded directives from TEA not to accept new transfers;
- Whether the receiving district had wholly failed to report transfers to TEA.

*2. Transfers From Hearne Are Reducing Desegregation in Hearne*

The facts in the instant case overwhelmingly show that the student transfers leaving

Hearne are reducing or impeding desegregation there.   Transfers from Hearne have increased the

racial identifiability of its schools and have altered significantly general perceptions of the

schools' racial identity.

---

[120]Hereinafter, Dr. Michael Say will be referred to only as "Say."

First, student transfers from Hearne by themselves have significantly altered the racial make-up of Hearne's enrollment, increasingly marginalizing the white student population and transforming the district into a predominately African-American district when it would not otherwise be so.  During the trial, Mumford went to great pains to make this a case about demographic forces. "Dr. Say also opined that while there has been a reduction in the number of whites in [Hearne,] it is not a one-race school district.  He testified that [Hearne,] whose white enrollment has never dipped below ten percent, still has an integrated school district and an opportunity for students of all ethnicities to achieve a quality education." Mumford & Bienski's Post-Trial Brief, at p. 30.  But even Dr. Say, Mumford's expert, conceded that the changes wrought by transfers were on par with any demographic changes.

More importantly, Mumford's argument misses the point.  Demographic changes in Hearne do not change the impact caused by transfers, nor do they minimize its significance. It is true that the number of white public school students living in Hearne has declined in recent years, but it has not declined to the point where the return of the white transfers leaving the district would have an insignificant effect on the racial makeup of Hearne's enrollment.  About 20% of all public students residing in Hearne over 2002-03 and 2003-04 school years were white, but transfers have reduced that proportion to 13%.  Tr. Exh. 237.  Moreover, the decreasing population of white public school students living in Hearne make the transfers of such students out of Hearne all the more harmful.  In recent years, half of the white students living in Hearne transferred to other districts.  Given the decreasing white student resident population in Hearne, any transfer of white students is magnified and makes it more likely that the transfers will impede desegregation. *Eufala*, 573 F.2d at 2233 n.9 (where white student proportion of enrollment is

89

small to begin with, further change due to transfers is "significant in measuring qualitative segregative effect"); *Lowndes*, 878 F.2d 1308.

Applying the qualitative factors prescribed by Say buttresses this conclusion.  Whether inter-district transfers reduce desegregation by increasing the racial identifiability of schools depends on whether the "increment of change in the racial composition of a school seems [likely] to alter significantly general perceptions of a school's racial identity or the behavior of persons who rely on such factors in determining whether or not to send their children to a particular school." *Lee v. Lee County Bd. of Educ.,* 639 F.2d 1243, 1261 (5th Cir. 1981); *see Lowndes*, 878 F.2d at 1035 (applying the factor identified in *Lee* as "an index of racial identifiability").  The Hearne school board president, the former superintendent and a current principal – all longtime members of the community – testified at trial that Hearne is perceived by parents and school administrators and teachers in and around the district as a predominately black district and that the transfers have fueled this perception.  Neither Mumford nor TEA presented evidence to the contrary.

The transfers and Hearne's desegregation history are tightly linked.  After Hearne initially departed from its racially dual system, it adopted ability grouping methods in its elementary schools, which tended to segregate the students within those schools by race.  When Hearne finally discontinued ability grouping at Blackshear Elementary School, through which all Hearne students had to matriculate, parents of white students objected and transfers out of the district, particularly of white students, began. Since that time, an increasing proportion of Hearne's white students have transferred out of Hearne to other public schools, thereby hampering Hearne's ability to realize the benefits of a unitary system. The transfers impair Hearne's ability to remedy

90

its prior constitutional invalidity and otherwise fulfill its desegregation obligations.  The transfers interfere with the ability to finally remedy the prior systematic discrimination against African-American students in Hearne, and also deny the students remaining in Hearne the social and academic benefits that would otherwise accrue from the enrollment of Hearne's diverse resident public-school student population.

The financial impact on Hearne of losing so many transfers weighs in favor of enjoining the transfers. Say acknowledged that a significant amount of money is involved with the high number of transfers out of Hearne. Indeed, for each student who transfer, Hearne loses $5,500, and the financial drain has cost Hearne the ability, among other things, to offer smaller classes to its students.

Consideration of all of these factors weighs heavily in favor of Hearne. The evidence undisputably establishes that, despite its acceptance of student transfers, Mumford failed to report any such transfers to TEA until 1998; Mumford was dishonest to TEA in 1998, reporting that Mumford had no transfers when it had at least 143; in 2000, it disingenuously reported to TEA that it had only 200 transfers when it had at least 348; it fraudulently reported to TEA regarding whether its transfers qualified for hardship exceptions to No. 5281; it steered parents towards claiming hardship exceptions when Mumford officials knew that the transfers did not qualify for such exceptions; it facilitated transfers from Hearne by sending all five of Mumford's buses into Hearne to transport the transfers to Mumford; it advertised the opportunity to transfer to Mumford in the Hearne newspaper; it sent notices to Mumford parents containing information for new transfers to Mumford and expected those parents to spread the word to other parents; it

defied TEA directives to stop accepting new transfers because of their effects on Hearne; and it persistently tried to evade the requirements of No. 5281.

Put simply, the Say factors unanimously point toward the conclusion that the cumulative effect of transfers from Hearne was to reduce and impede desegregation there.[121]

## B. TEA is Funding Transfers that Reduce Desegregation in Hearne

Transfers from Hearne are reducing desegregation there by significantly diminishing Hearne's white enrollment and causing Hearne's schools to become racially identifiable as black schools.  The vast majority of transfers from Hearne went to Mumford, as are the vast majority of white transfers from Hearne.  TEA recognizes that the transfers of white students from Hearne reduce desegregation there; indeed, TEA has instructed Mumford not to accept new transfers because of the transfers' effect on Hearne's white enrollment.  Yet, TEA continues to fund significant numbers of white transfers from Hearne to Mumford who do not qualify for any exception authorized by No. 5281.[122]

---

[121]In all other respects, the Court finds Say's testimony is non-probative.  First, Say offered an opinion only about the effect of transfers to Mumford, not, as No. 5281 requires, the cumulative effect of transfers leaving Hearne. The ultimate determination required by No. 5281 is whether the "*cumulative* effect, in either the sending or receiving school or school district, will be to reduce or impede desegregation." Court Order, at ¶A(1).  Using Say's approach would defeat the purpose of No. 5281, because transfers to any one district may not impede desegregation, but transfers to all districts taken together may.

Second, Say admits that his own evaluation is "incomplete."  For example, Say did not go beyond a statistical analysis (as he said one must), but looked only at enrollment and demographic data. Say did not interview any parents of students as he said one must, he did not consider whether Hearne was under a court order or whether the transfers interfered with its remedial obligations; and he never visited the Hearne schools (as he said one must). In short, Say testified that a proper qualitative analysis could not be done quickly and easily, yet it appears that is exactly how he analyzed the issues.

[122]No. 5281 provides for three types of exceptions to its prohibition of funding for transfers that reduce desegregation: transfers to schools for the deaf, transfers for special education purposes, and transfers for hardship situations. Court Order, at ¶A(2).  In 2002-03, TEA was funding at least 93 white transfers from Hearne to Mumford who did not qualify for any such exceptions.

General Counsel for TEA, David Anderson[123], provided the Court with a novel interpretation of No. 5281: he suggested at trial that No. 5281 does not prohibit TEA from funding all transfers to a receiving district that reduce desegregation in a sending district.   Under his interpretation, only those students a receiving district accepts for the first time after TEA has notified the receiving district that its transfers violate No. 5281 would not be funded by TEA.   That is simply a misinterpretation of No. 5281.   Paragraph A(5) requires TEA to review all transfers and notify districts promptly of "all transfers which do not appear to comply with the terms of this order." Court Order, at ¶A(5).   Paragraph A(6) provides that if, after receiving such notice,

> the receiving district shall continue to accept the transfer of students. . . . [TEA] shall refuse to transfer the funds, based on the average daily attendance of the transfer students involved to the account of the receiving district, and shall, thereby, terminate and refuse to grant or continue paying to the offending district a percentage of state funds equivalent to the district's entitlement based on the average daily attendance of the students transferring in violation of this order.

*Id.* at ¶A(6).   In short, TEA must notify districts of transfers "which *do not appear to comply with the terms of this order," id.* at ¶ A(5)(emphasis added), and it must thereafter withhold funds for "*the students transferring in violation of this order,"id.* at ¶ A(6)(emphasis added).   Nowhere does No. 5281 provide that TEA shall withhold funding only for transfers accepted *after* TEA provides the notice.

Moreover, No. 5281's principal provision provides that TEA "shall not permit, make arrangement for *or give support of any kind* to student transfers" that reduce desegregation. Court Order at ¶ A(1) (emphasis added).   Requiring TEA to withhold funds only for transfers that a district enrolls after receiving notice that prior transfers violate No. 5281 is inconsistent with its principal injunction.   Dr. Gonzales acknowledged as much when she testified that No. 5281

---

[123]David Anderson will, hereinafter, be referred to as "Anderson."

prohibits funding for transfers that reduce desegregation, and that TEA is violating No. 5281 by funding transfers to Mumford.

Mumford's misconduct also shows the flaw in TEA's interpretation, because Mumford's persistent fraudulent conduct made it impossible for TEA's imagined system to work.  Inasmuch as Mumford consistently failed to report or misrepresented its transfers since before 1998, TEA could never have given it the notice required by paragraph A(5) of the Order.

Finally, even under TEA's interpretation, TEA is violating No. 5281.  TEA suggests that it notified Mumford to stop accepting white transfers from Hearne before the 2001-02 school year, and that it has not funded such transfers since then; but this is false. TEA argues that it has properly exercised its authority under No. 5281 by "sanctioning" Mumford since 2002 in the form of lengthy advisory conversations with Superintendent Bienski, numerous letters advising Mumford of TEA's hardship policy, and even appointing a Monitor to help Mumford comply with its reporting requirements.  However, the fact remains that, nevertheless, TEA has steadily funded transfers to Mumford which the agency itself admitted were violative of No. 5281, those being the "baseline" transfers. Moreover, TEA continues to provide Mumford with funding for all siblings of transfer students who were enrolled in Mumford during the 2000-01 school year (the "baseline" year), even if they are white transfers from Hearne who do not qualify for any hardship exception to No. 5281.

## II.

### MUMFORD IS IN ACTIVE CONCERT AND PARTICIPATION WITH TEA IN VIOLATING NO. 5281

Mumford is in active concert and participation with TEA in its violation of the provisions of No. 5281 and, therefore, must be enjoined from accepting further transfers that reduce

desegregation in Hearne. Under Federal Rule of Civil Procedure 65(d), every order granting an injunction binds not only the parties to the action, but (1)"those persons in active concert or participation with them" as well, provided (2) such persons "receive actual notice of the order by personal service or otherwise."  Fed. R. Civ. P. 65(d); *see F.D.I.C. v. Faulkner*, 991 F.2d 262, 267 (5th Cir. 1993) (holding that district court did not err in finding that where husband transferred frozen assets to wife, wife was in active participation with husband so that she was subject to the injunction freezing the assets). Both facts are present here. Mumford has received actual notice of No. 5281's transfer provisions several times from TEA.  Both Bienski and Gonzales admit that TEA and Mumford worked together to establish Mumford's "baseline" transfers.

Further, TEA admits that, as of 2003-04, it has continued to provide Mumford with funding for at least 59 white transfers from Hearne who are among Mumford's "baseline" transfers or who are siblings of Mumford's "baseline" transfers.  Tr. Exh. 258.  Accordingly, under Federal Rules of Civil Procedure 65(d), Mumford is bound by No. 5281's injunction against "permit[ing], mak[ing] arrangement for or giv[ing] support of any kind" to transfers that reduce desegregation in any district, Court Order at 1, ¶ A(1); and the Court should enforce the injunction by prohibiting Mumford from continuing to enroll any and all transfer students whose transfers reduce desegregation at Hearne.

### III.

### MUMFORD'S INTERFERENCE WITH NO. 5281 MUST BE ENJOINED

Through its patten of fraudulent conduct since first accepting transfers in the 1990s, Mumford has demonstrated a consistent and persistent willingness to circumvent the

requirements of No. 5281 whenever possible.  No. 5281 requires TEA to keep track of student transfers between districts and to monitor their effects on desegregation, in order that TEA can respond appropriately when it perceives that transfers are reducing desegregation.  By consistently and fraudulently misrepresenting to TEA whether it was accepting transfers, how many transfers it was accepting, and whether its transfers qualified for hardship exceptions mentioned in No. 5281, Mumford made it impossible for that court-ordered system to function effectively.  As Anderson, General Counsel for TEA, testified, "the most grievous sin is to submit inaccurate data to TEA which we then rely on."  Tr. Trans. 115: 21-23 (Jan. 28, 2005). Moreover, even as Mumford's fraudulent conduct was discovered, Mumford defied TEA directives to stop accepting new transfers, further undermining the effectiveness of No. 5281.

Mumford to this day continues to interfere with No. 5281, by seeking out and accepting hundreds of transfers from Hearne that it knows violate No. 5281, sending information about transferring to Mumford to parents with the expectation that parents will spread the word, publishing information about transferring to Mumford in the Hearne newspaper, and sending all five of its buses into Hearne to transport transfer students back to Mumford.

The Court previously has held that it is empowered under the All Writs Act, 28 U.S.C. § 1651(a), to enjoin interference with the transfer provisions of No. 5281.  *See United States v. Texas,* 356 F.Supp. 469, 471-73 (E.D. Tex. 1972) (where a state court ordered a school district to accept certain transfers that TEA previously had directed the district not to accept, federal court could enjoin further state court proceedings in the case and declare the state court order void); *see also Valley v. Rapides Parish Sch. Bd.,* 646 F.2d 925, 943 (5th Cir. 1981) (upholding injunction under All Writs Act against non-parties from interfering with desegregation order by permitting

sham custodial arrangements designed to enable parents and students to avoid compliance with court-ordered student assignment plan); All Writs Act, 28 U.S.C. § 1651(a) ("[A]ll court established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

Contrary to Mumford's argument, the United States did not have to file a complaint in order to gain relief from Mumford's interference.  The proper procedural method for seeking relief from a third party's interference with an existing desegregation order is by motion in the preexisting civil action in which the court order was entered.  That was the exact procedure followed in *Valley*, *see* 646 F.2d at 935-36, and in prior proceedings in this case, *see United States v. Texas*, 356 F. Supp. at 470 (involving transfers to Highland Park school district).

In addition, the Court may act upon its inherent authority to preserve its ability to render an effective judgment, and it may exercise that authority to enjoin third parties from action threatening the viability of its Order. *See United States v. Hall*, 472 F.2d 261, 265 (5th Cir. 1972) (holding in school desegregation case that court had inherent power to preserve its ability to render judgment by enjoining non-parties from action threatening the viability of the court's desegregation order).  Mumford's continued acceptance and enrollment of transfers that reduce desegregation in Hearne thwarts the relief provided in No. 5281; and the Court, therefore, has the inherent authority to enjoin Mumford from accepting all transfers.

# IV.

## MUMFORD'S COUNTER ARGUMENTS LACK MERIT

### A. Whether Mumford Intentionally Discriminated Is Irrelevant

First, Mumford submits that the United States must show that Mumford has intentionally discriminated on the basis of race in accepting transfer students.  Such intentional discrimination would be relevant if the United States had sued Mumford under the Equal Protection Clause to enjoin intentional discrimination, but the United States brought no such claims.  Instead, the United States sought to enforce a preexisting court order prohibiting the funding of transfers whose cumulative *effect* is to reduce or impede desegregation.  Whether transfers reduce or impede desegregation depends on whether the transfers increase the racial identifiability of a district's schools, not on whether another district has acted with discriminatory intent.  *See Eufala*, 572 F.2d 232-33; *Lowndes*, 878 F.2d at 1305-05.

Mumford has also emphasized that students transferring to Mumford may not be racially motivated; but, again, the motivation of the transfers is irrelevant so long as the *effect* of the transfers is to reduce desegregation in Hearne. *Lowndes*, 878 F.2d at 1307 ("The fact that the transfers. . . may not now be racially motivated loses its relevance if the result of the transfers is to impede desegregation. . . .").

In any event, many of the non-racial reasons that Mumford suggested as motivation for transfers from Hearne were not proven at trial or occurred after the transfers started to leave Hearne following the end of ability grouping at Blackshear.  Mumford suggested that parents were transferring their children for "safety" reasons, but it offered no evidence of any significant

safety concerns in Hearne.[124]  Indeed, TEA determined in its investigation that Mumford's

claimed safety reasons were insufficient to justify any transfers under a hardship exception.

Mumford also suggested that Hearne had deficient academic programs, but Hearne received an

unacceptable rating in only one year, 2001, ten years after the transfers from Hearne began.  Tr.

Exh. 202. Moreover, Mumford offered no evidence to show that its academic standing was any

better. To the contrary, Say testified that, as a very small school district, Mumford would have

trouble offering the full array of educational programs required by the state. Finally, Mumford

targeted Hearne's higher performing students and many such students transferred to Mumford,

leaving fewer students at Hearne capable of scoring well on the state-wide assessment tests.

Thus, not only did the transfers begin before such academic issues materialized, it appears that

the transfers contributed to them.

### B. Mumford Has Not Shown That Vestiges of Discrimination Have Been Eliminated

Mumford maintains that the United States must demonstrate that vestiges of prior

unconstitutional discrimination remain before No. 5281 may be enforced.[125]  Mumford has it

backwards.  The Supreme Court repeatedly has made it clear that parties challenging a

desegregation order bear the burden to show that vestiges of the prior unconstitutional conduct

have been eliminated.  *See United States v. Fordice*, 505 U.S. 717, 739; *Freeman v. Pitts*, 503

U.S. 467, 494 (1992); *Bd. of Educ. v. Dowell*, 498 U.S. 237, 249-250 (1991); *Moses v.*

---

[124]The only evidence of safety concerns at Hearne was that Hearne's Blackshear elementary school had three, one-foot wide metal grates in its sidewalks that became slippery when it rained and that it did not have a line painted on a sidewalk to keep children away from a driveway.  Both of these "safety" issues were remedied by the next school year after they were pointed out to school officials. *Infra,* Part One, Section IX.

[125]". . . [B]ecause [Hearne's] action is premised solely upon a violation of this Court's Order, [Hearne] must prove that vestiges of dual school systems exist.  As demonstrated below, [Hearne] and the United States cannot point to any vestige of discrimination in Hearne that this Court's Order (or Judge Robert's [sic] order) sought to remedy." Mumford and Bienski's Post-Trial Brief at 11 (Feb. 11, 2005). *See also*, *id.* at pp. 12-16.

*Washington Parish Sch. Bd.*, 379 F.3d 319, 327 (5th Cir. 2004).  Since Mumford no longer

challenges No. 5281 by seeking the elimination of the transfers provisions, it is unclear how such

an inquiry remains relevant.[126]  In any case, as the party contending that No. 5281 ought not to be

enforced, it is Mumford who bears the burden to show that vestiges of discrimination have been

eliminated.  Mumford has failed to meet this burden.[127]  Mumford has simply offered no

evidence that the vestiges of TEA's prior discrimination have been eliminated statewide.  Nor

has Mumford shown that vestiges of the prior racially dual system in Hearne have been

eliminated.[128]

---

[126]The Court denied Mumford's Motion to Modify Court Order No. 5281 by its Order on January 14, 2005.

[127]The purpose of a court-ordered desegregation plan is to transition from a dual system to a unitary, non-racial system of public education. *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 436 (1968).  The Supreme Court identified six relevant factors for evaluating whether a desegregation plan should be dissolved: student assignments, faculty, staff, transportation, extracurricular activities, and facilities.  *Id.* at 436.  The Court may also consider the quality of education offered.  *Flax v. Potts*, 864 F.2d 1157, 1161 (5th Cir. 1989).  The Court cannot determine from the evidence presented in this case whether Texas has reached a unitary, non-racial system of public education as a whole.  In the instant case, no party presented any evidence regarding the circumstances existing throughout the entire state of Texas relating to the desegregation plan.  The parties failed to provide any evidence relating to the *Green* factors of student assignments, faculty, staff, transportation, extracurricular activities and facilities on a statewide basis.  Neither the pleadings, nor the evidence, are sufficient for the Court to evaluate, much less determine, whether the transfer policies should be eliminated from No. 5281.
   In order to achieve partial unitary status and to obtain partial release from judicial oversight – as Mumford contends – Mumford must present facts to justify release from No. 5281. *Freeman v. Pitts,* 503 U.S. 467, 489 (1992).  A school system must show that vestiges of past discrimination are eradicated to the extent possible; full and satisfactory compliance with No. 5281 has been made in areas where supervision is to be withdrawn; retention of judicial control is necessary or practicable to achieve compliance with No. 5281 in other facets of the system; and the district has made a good faither commitment, demonstrated to the public and to the parents and students of the once disfavored race, to the whole of the order and to those provisions of the law and the Constitution that laid the predicate for judicial intervention.  *Id.* at 491.  The record before the Court fails to contain evidence satisfying the factors laid out in *Freeman*.  There is no evidence of Mumford's efforts to eradicate the vestiges of past discrimination to any extent.  This controversy involves two districts regarding student transfers – no party presented evidence of the State's full and satisfactory compliance with No. 5281 in any of the other areas.  In sum, no party in this suit, including Mumford, affirmatively pled, or proved, that supervision of the transfer policies should be withdrawn on a statewide basis.

[128]In 1989, the United States notified the court in the Hearne case (in the Western District of Texas) that it appeared Hearne had complied with its own desegregation order in many respects, *see* Tr. Exh. 245, but neither Hearne nor the United States asked the court in that case to find that Hearne had achieved unitary status, and no such finding has been made.  Hearne remains under a desegregation order, and so long as it does, Mumford bears the burden to show that vestiges of its prior racial segregation have been eliminated. *Fordice*, 505 U.S. at 739; *Freeman*, 503 U.S. at 494.

### C. TEA's Transfer Guidelines Are Simply Not At Issue in This Case

Mumford submits that the Fifth Circuit's recent opinion in *Cavalier v. Caddo Parish Sch. Bd.,* No. 03-30395, 2005 WL 469611 (5th Cir. March 1, 2005), forecloses the use of race-conscious transfer guidelines by TEA.  Mumford's argument misses the mark for two reasons.

First, TEA's transfer guidelines are simply not at issue in this case.  At issue is only whether transfers from Hearne are reducing desegregation there.  If they are, No. 5281 forbids TEA from funding any such transfers. Ct. Order, ¶¶A(1), (6).

Second, *Cavalier v. Caddo Parish Sch. Bd.* has no bearing where, as in the instant case, the school district has been ordered by a court to remedy a system of *de jure* segregation.  TEA operates under a federal desegregation court order – No. 5281 – that requires it to consider whether transfers reduce desegregation in Hearne, an analysis that necessarily involves consideration of race. *See United States v. Lowndes County B.d of Educ.,* 878 F.2d 1301, 1305 (11th Cir. 1989).  Because it did not concern action compelled by a court order, *see Caddo Parish,* 2005 WL 469611, at *2, *6, the *Caddo* opinion has no bearing on the outcome of this case.

In an apparent oversight, Mumford incorrectly states that as "an alternative ground" for its opinion, the court in *Caddo* concluded that even if the district had been under court order, its race-conscious assignment police still would not survive strict scrutiny.  There had been *dicta* to that effect in the Fifth Circuit's original opinion, but the court modified the original opinion on petition for rehearing to delete all such language.  *See Cavalier v. Sch. Bd. of Caddo Parish*, No. 03-30395 (5th Cir. March 29, 2005) (order modifying original opinion).  Indeed, numerous decisions by the Fifth Circuit authorize such desegregation orders. *See, e.g., Davis v. E. Baton*

*Rouge Parish Sch. Bd.,* 721 F.2d 1425, 1440 (5th Cir. 1983); *see also, N.C. State Bd. of Educ. v. Swann,* 402 U.S. 43, 46 (1971) (noting that consideration of race was "one tool absolutely essential" to remedying segregation).

### D. The Equities Favor Hearne

At trial, Mumford suggested that it would be inequitable to enjoin TEA's funding of, or Mumford's continued acceptance of, transfers that reduce desegregation, since the transfers have helped Mumford to become more racially diverse.  Mumford is in error. First, Mumford has not established that, without transfers, it would be less diverse.  Indeed, Mumford's expert Say testified that Mumford's currently diverse enrollment reflects Mumford's resident population, indicating that even without transfers Mumford would remain diverse. More importantly, as Say testified, there is nothing wrong with a school district's enrollment reflecting the racial makeup of the students who live there.  Finally, if enjoining the transfers would make Mumford less racially diverse but would restore Hearne's racial diversity, the Court finds the equities would favor restoring Hearne's racial diversity, since the transfer students actually reside in Hearne.

Mumford also suggested at trial that enjoining it from accepting transfer students would deprive it of funds necessary to offer a full array of educational benefits. The fact that Mumford existed for so long with very few students before accepting such a huge number of transfers from Hearne belies this assertion.[129] Even so, the equities still favor Hearne. The transfers negatively impact Hearne financially, academically, socially and with respect to desegregation.  Most significantly, Mumford's persistent fraudulent and recalcitrant conduct in securing the transfers and reporting them to TEA has left Mumford with "unclean hands," and it is in no position now

---

[129] Mumford had 57 total students in 1990.  Tr. Exh. 212, at 1201.  Mumford has existed for years before that; Bienski has been its superintendent since at least 1976. Stip. No. 36.

to argue that equitable considerations favor allowing otherwise unlawful transfers to remain in Mumford. *See Reg'l Props., Inc. v. Fin & Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir. 1985) ("Under the doctrine of unclean hands, he who commits inequity is not entitled to equitable relief.") (holding that equitable defenses were foreclosed to defendant that had fraudulently misrepresented itself as one authorized to handle securities offerings even though it had not registered itself with the SEC and knew of its duty to do so).

## PART THREE: CONCLUSION

The purpose of the student transfer provision of No. 5281 is to prohibit student movement across school district lines which avoids the effects of desegregation, hinders desegregation efforts, or retrenches segregation. The trial evidence proves that TEA is violating No. 5281 by providing Mumford with funding for transfers that reduce desegregation in Hearne; that Mumford is in active concert and participation with TEA by accepting funding for the transfers that it knows violate No. 5281; and that Mumford, through its fraudulent conduct and defiance of TEA directives, has interfered with No. 5281 and thoroughly undermined its effectiveness.

The Court shall by separate order enjoin Mumford from accepting, and enjoin TEA from providing Mumford with funding for, all of the transfers that are reducing or impeding desegregation in Hearne.

SIGNED this ____ day of August, 2005.

William Wayne Justice
Senior United States District Judge

103