# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 6:71-CV-5281 – WWJ |
| v. | § | (Intervention of Harrold and |
| | § | Samnorwood Independent School |
| | § | Districts) |
| THE STATE OF TEXAS, et. al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On the 12th and 13th of June, 2006, the Court held a bench trial on the issue of whether the Texas Education Agency ("TEA") properly withheld funds from the Harrold and Samnorwood Independent School Districts (Plaintiff-Intervenors in this action) [hereinafter referred to as "the Districts"]. The funds were withheld by reason of the respective failures of the Districts to report transfer students accepted during the 2002-2003 school year to the system created by TEA for monitoring the legality of student transfers under the orders of this Court. Although the Districts make various constitutional arguments, this intervention is largely a challenge to TEA's enforcement of the Court's Order No. 5281, as modified. In many respects, TEA has adopted reasonable practices and policies in its effort to enforce this long-standing decree; but, in important ways, TEA's enforcement efforts are arbitrary and unreasonable. For the reasons

-1-

stated herein, the Court finds that TEA improperly withheld the funds, and that all such funding

should be restored to the Districts.

## II. No. 5281 & TEA ENFORCEMENT BACKGROUND

This civil action concerns a claim arising under the Court's Order No. 5281, entered in

this case on August 9, 1973. Docket No. 39 (Amendments to Modified Order of July 13, 1971

(Aug. 9, 1973)) [hereinafter "Court Order" or "Modified Order"]. Section A(1) of the Court's

Order pertains to student transfers and provides:

> "Defendants shall not permit, make arrangements for or give support of any kind to
> student transfers, between school districts, when the cumulative effect, in either the
> sending or receiving school or school district, will be to reduce or impede desegregation,
> or to reinforce, renew, or encourage the continuation of acts and practices resulting in
> discriminatory treatment of students on the grounds of race, color, or national origin."

Section A(3)(b) further provides that:

> "... [D]efendants shall not approve transfers where the effect of such transfers will change
> the majority or minority percentage of the school population, based on average daily
> attendance in such districts by more than one percent (1%), in either the home or the
> receiving district or the home or receiving school."

For very small school districts (fewer than 300 students), including Harrold and

Samnorwood, the tolerable percentage change in the diversity of the home and receiving districts

due to transfers is now three percent (3%). The Court Order requires TEA to review all student

transfers and to notify districts of transfers that do not appear to comply with the terms of the

Order. *Id.* § A(5). To track interdistrict transfers and their effects, TEA requires each district to

inform TEA of each transfer that the district has accepted. Before TEA switched to an electronic

reporting system in 2002, districts reported transfer data via a TEA form, identifying each

transfer student and type of hardship exception for which the transfer qualified. In the spring of

-2-

2002, TEA implemented a new automated system to track transfers. The new automated Student Transfer System ("STS") still requires districts to report transfers, but now districts must submit the information electronically.

Using the information reported by the districts to STS, TEA generates data on the segregative effect, if any, of student transfers. The districts are notified electronically by TEA, no later than the day after students are entered into STS, whether the transfer caused either district to exceed the one percent, or three percent, limitation of the Modified Order. Such transfers are reported to the schools as "ineligible." STS operates in "real time," and makes no permanent record of eligibility decisions as they are made. Thus, there is no way, within STS, to determine, *ex post facto*, whether a transfer was deemed eligible or ineligible when that student was entered into the system. TEA, in fact, makes no record of STS eligibility decisions.

TEA annually provides school districts in Texas with a certain amount of funding for each enrolled student, whether the student resides in the district in which he is enrolled, or transfers from another district. TEXAS EDUC. CODE §§ 7.055(b)(35), 42.005, 42.101. TEA treats ineligible transfers – that is, those transfers that decrease diversity by more than one or three percent – as nonfunded transfers, and withdraws the appropriate amount of funding from the receiving district in the next fiscal year.[1] TEA also treats student transfers that were not entered into STS as nonfunded, and withholds funding in the subsequent fiscal year.

In order to determine the cumulative enrollments of school districts in a given year, TEA

---

[1]    Defendants refer to this policy as the "settle up" policy. TEA distributes state funds to school districts based upon an estimated student enrollment for each district. At the end of the school year, TEA calculates the actual student enrollment for each district and adjusts payments in the following school year based on the actual enrollment for the previous year.

-3-

requires all districts to report student data to the Public Education Information Management System ("PEIMS") each summer after the end of the school year.[2] PEIMS data are then validated by TEA regional offices, and the cumulative enrollment data are typically finalized by December or January of the following school year. TEA relies upon these data to determine the "average daily attendance" of a school district for funding purposes, as well as compliance with Section A(3)(b) of the Modified Order. TEA ensures compliance with this part of the Modified Order by using the finalized PEIMS data within STS to generate reports on what districts have caused the racial balance in either the sending or receiving district to change by more than one, or three, percent – depending on the size of the district.

Sections A(5), A(6) and A(7) of the Modified Order require TEA to follow a set of escalating sanctions against a district for violating the Order. Section A(5) requires the TEA to "review all student transfers and [to] notify the sending and receiving districts promptly of all transfers which do not appear to comply with the terms of [the Order]."

Section A(6) requires TEA to "refuse to transfer the funds, based on the average daily attendance of the transfer students involved to the account of the receiving district," if the district continues to accept transfers following TEA's notification of its refusal to approve such transfers.

Section A(7) requires that TEA warn any district that its accreditation is in danger if it "continues to refuse to deny transfers which adversely affect desegregation." If, after ten days, the district "has failed to correct its violations, [TEA] shall suspend the district's TEA accreditation." Thus, TEA must first notify a district of noncompliance before imposing a fine,

---

[2]     The PEIMS system has been in place since the 1993-94 school year.

-4-

and suspension of accreditation is the most severe penalty, reserved for cases of willful, and unremitting violations of the Modified Order.

### III. FACTUAL FINDINGS

The school districts at issue in this case, Harrold and Samnorwood, are located in west Texas, in or near the Panhandle. The enrollment of Harrold ISD for the 2002-2003 school year was 112 students, of whom 1% are Black, 35% are Hispanic, and 63% are white. Docket No. 629-2 (Stipulation No. 2). Samnorwood ISD's 2002-2003 enrollment was 101 students, of whom 3% are Black, 20% are Hispanic, and 75% are white. *Id.*

Like all school districts in Texas, Harrold operated a dual school system prior to 1965, whereby all Anglo students attended the same school, but all Black students attended an all-Black school in an adjacent district. Hispanic students attended school with Anglo students. Following the approval of integration by the school boards in 1965, both districts desegregated, and all children attended the same school in Harrold, without regard to race or ethnicity. Samnorwood also operated a dual school system until 1963, when all students began attending the same school without regard to race. Like Harrold, Samnorwood never operated a segregated school system for Hispanics. Both Harrold and Samnorwood make it their policy to accept transfer students regardless of the race or ethnicity of the student. Neither district charges tuition to any transfer student.

In this case, STS reported that Samnorwood ISD exceeded the three percent limitation due to one ineligible transfer student, "Vincent R." By comparing year-end PEIMS data to the students entered by Samnorwood into STS, TEA also discovered that Samnorwood failed to

-5-

enter into STS three additional students that it did report to TEA for funding purposes.[3] TEA informed Samnorwood by letter dated March 24, 2004, that $10,746 in funds would be withheld from the next year's funding allotment for the three unreported transfer students, plus Vincent R. Also by letter dated March 24, 2004, TEA informed Harrold that $100,069 would be withheld because it failed to enter seventeen transfer students into STS. TEA did not discover, nor has there been any allegation, that any of Harrold's transfers exceeded the three percent limitation in the Modified Order. However, TEA maintains that the fiscal sanctions were appropriate in all instances because the Districts' failure to enter transfers into STS effectively prevented TEA from determining those transfers' compliance with the Modified Order.

Both Harrold and Samnorwood requested an informal review of TEA's funding decisions, as provided for by TEA policy. During that review, both districts admitted that they failed to enter into STS the students identified by TEA as unreported, but because they were able to show that some of the students were in fact eligible transfers *for other reasons*,[4] TEA waived the financial penalty for nonreporting.[5] In addition, Samnorwood was able to show that on the

---

[3]     As noted, TEA makes funding decisions based on cumulative enrollment and average daily attendance figures generated by the enrollment data collected by PEIMS. If a district fails to enter the transfer into STS when the student is accepted, TEA notes this failure by comparing STS data to PEIMS data. In this case, both Harrold and Samnorwood reported transfer students to PEIMS, but not to STS.

[4]     TEA makes exceptions to the transfer limitations in the Modified Order for "approved exemptions." In this case, Harrold demonstrated that five of the seventeen transfers it failed to enter into STS fell with the exceptions made for children of school district employees, and siblings of eligible transfer students.

[5]     STS does not factor exempt transfers into its racial balance calculations, so none of the these five students would have triggered the three percent limit in either the sending or receiving district. It is TEA's policy not to withhold funds whenever a district can show the transfer student does not cause the one, or three percent limitation to be exceeded.

day that Vincent R.'s transfer was entered into STS, the system reported to Samnorwood that he was an eligible transfer student who did not cause the three percent limit to be exceeded.[6] TEA also restored funding for this student. As to the students whose eligibility the Districts could not prove, TEA left the financial penalty intact. After the informal review, Harrold was lacking funding for twelve students that were not entered into STS, and Samnorwood lacked funding for three unreported transfer students. Harrold was penalized $68,525, and Samnorwood was penalized $6,111. These amounts are at issue in this action.

Although the Districts have raised questions about TEA's actual basis for withholding funds in this case, they do not seriously challenge TEA's explanation that funds were withheld for failure to enter the transfer students into STS. For example, the Districts questioned a TEA witness: "How could the reason for withholding funds be failure to report when TEA did not withhold funds for the five students for whom Harrold provided documentation showing that they qualified for an exemption?" Tr. 180:11-20. In other words, how could failure to report be the true basis for withholding funds when the exempted students were also not reported to STS?

The question is a rhetorical one designed to expose the impossibilities of predicting when, and on what basis, TEA might withhold funds. It does no such thing, however, since there is a simple answer to the question: TEA withholds funds for failure to report a transfer student, except that it does not withhold funds when a district can show that its transfer student was eligible. Because some students – including siblings of eligible transfers, and children of school

---

[6]     The fact that a student can be an eligible transfer on the day he actually transfers, but can be ineligible because his transfer affected the school's racial balance by more than three percent by the end of the school year is not a fact that is easily absorbed by the Court. The phenomenon of a transfer's eligibility fluctuating between eligible and ineligible throughout the remainder of the school year is referred to by the Plaintiffs as the "Jitters."

employees – are exempted from the racial balance calculations, they are automatically eligible, whether they are entered into STS or not. Harrold made these showings during its informal review, and funding was restored for five of its transfer students.

## IV. LEGAL ANALYSIS

This case concerns the propriety of withholding state funds from the school districts of Harrold and Samnorwood. The Districts contend that no funds should have been withheld, and make two general assertions in support of their claims. First, the Districts argue that Part A of the Modified Order exceeds the scope of federal court jurisdiction as measured by modern school desegregation principles. Alternatively, the Districts claim that the fiscal sanctions imposed by TEA in this case violate the terms of the Modified Order for a variety of reasons.

### A. The Extent of the Court's Jurisdiction

#### 1. The Modified Order is Not an Unlawful "Interdistrict" Remedy

The Districts argue that the Modified Order exceeds the modern limits on the jurisdiction of federal courts in school desegregation matters. First, the Districts argue that the Modified Order is facially invalid under *Milliken v. Bradley*, 481 U.S. 717 (1974), as an unlawful "interdistrict remedy." In *Milliken,* the Supreme Court held that a multi-district school desegregation plan that included Detroit and its suburbs was an improper remedy where the evidence showed that the Detroit school district had engage in past *de jure* segregation, but where there was no evidence that the suburban districts subject to the plan ever had such segregation policies, or committed other such acts that effected segregation. *Id.* The *Milliken* Court made no pronouncement that "interdistrict remedies" are unconstitutional, however. To the extent the *Milliken* Court made any meaningful statements about the relevance of district

lines, it noted that school district lines may not be casually ignored or treated as a mere administrative inconvenience in fashioning a remedy to the equal protection problem posed by *de jure* segregation, because such an approach ignores the "deeply rooted" tradition of "local control over the operation of schools." *Id.* at 741-42.

More importantly, the Court was guided by, and espoused, the constitutional principle that a remedial order seeking to correct a constitutional violation must be tailored to the scope of the constitutional violation itself. *Id.* at 744. Thus, the Detroit area desegregation plan, which included suburban districts that had no history of segregation beyond non-governmental demographic shifts in the population, exceeded the district court's authority because it exceeded the scope of the violation.

In more practical terms, the Court's decision in *Milliken* established that federal courts cannot, by decree, reverse the segregative effects on public schools of demographic shifts, colloquially known as "white flight," not directly caused by government action. *See also United States v. Texas* 158 F. 3d 299, 310 (5th Cir. 1998) (noting that "[r]esidential mobility is a virtue of a free and dynamic society," and that "residential choices turn on economic and social considerations or even, at times, on private discrimination, but as long as they remain attributable to individual decisions, born of free choice, they are devoid of constitutional implications"). Federal courts are, therefore, without the power "to counteract demographic changes in school districts that are the product of private choice and not state-sanctioned discrimination." *Id.* at 310.

Contrary to the Districts' argument, *Milliken* does not obviate any authority to fashion an "interdistrict remedy," where the violation both occurs between school districts, and is

-9-

sanctioned by the State. Indeed, the Modified Order is tailored precisely to those situations in which transfers between school districts are both segregative in their effect on the public schools, and are supported by state funds. The Order enjoins TEA from supporting such transfers – which, by definition do not involve a student's family moving its residence from one district to another – with state funds. The Order does not directly impose student assignments in *any* case, and the student transfer provisions of the Modified Order simply do not seek to reverse the segregative effects on public schools that result from private residential decisions. Consequently, *Milliken* is inapposite to the present action, save for the guiding principle that a Court's injunctive powers must be exercised as broadly as necessary to cure the constitutional injury, but no more so.

*Milliken II*, 433 U.S. 267 (1977), reiterates this proposition. Following a remand, and the adoption of a more limited school desegregation plan that required, among other things, teacher training, the Supreme Court affirmed that school desegregation "cases call for the exercise of [the] traditional attributes of equity power." *Id.* at 288 (citations omitted). The Court further characterized that power as encompassing a "practical flexibility ... and [ ] a facility for adjusting and reconciling public and private needs," *id.*, and described the outer limits of a court's equitable powers in this arena as being shaped by the requirement that the remedy must directly address, and relate to, the constitutional violation itself. *Id.* at 282. This limitation means that a court exceeds its jurisdiction when it issues a remedy aimed at eliminating a condition that does not violate the Constitution (or does not flow from a constitutional violation), or if it applies the remedy against governmental units not involved in, nor affected by, the violation. *Id.* (citing *Freeman v. Pitts*, 503 U.S. 467 (1992); *Milliken v. Bradley*, 418 U.S. 717 (1974) (*Milliken I*);

-10-

*Pasadena City Bd. Of Education v. Spangler,* 427 U.S. 424 (1976)). Thus, the *Milliken* cases, taken together, stand for the proposition that federal courts, guided by established principles, are to exercise their broad and flexible powers of equity to remedy constitutional violations within school systems where those violations are properly found. *Id.* at 288.

> 2.  TEA Properly Enforces the Student Transfer Provisions of the Modified Order on a State-Wide Basis

Setting aside the deceptive argument that "interdistrict" remedies are patently unconstitutional, the Districts argue that because they were not original parties to Civil Action No. 5281, and because there is no "vestige of a former Constitutional violation" in those districts, they are not properly subject to the Court's continuing jurisdiction, under the limited-jurisdiction principle articulated in *Milliken.* It is not clear, however, that the principle espoused by the *Milliken* Court means, or even implies in this case, that the Districts should not be subject to TEA's policies that are designed to effectuate the desegregation requirements of the Modified Order.[7] Both school districts were, after all, part of a state-wide dual school system prior to desegregation in the 1960s. This argument also necessarily raises the issue of how broadly TEA should enforce the Court's Order; specifically whether TEA – which was a party defendant to the original action – is to enforce the Modified Order against only school districts that were parties to that action, or also against all districts that unquestionably practiced *de jure* segregation?

---

[7]     It is significant that the Districts are the Plaintiffs in this Intervention. This is not a case in which a school district that was not an original party to Civil Action No. 5281 is sued in Intervention, and faces the prospect of being enjoined, or otherwise punished by the Court for simply violating the Modified Order, without any additional finding of intentionally discriminatory conduct on the district's part. *See United States v. Gregory-Portland Indep. School Dist.,* 654 F. 2d 989, 996-99 (5th Cir. 1981).

-11-

The Court's decree properly enjoined TEA to cease its practices that led to, and supported unconstitutional segregation in all Texas public schools, as Texas operated a state-wide dual school system. That TEA, which operates on a state-wide basis, adopted a uniform policy of enforcement for all Texas school districts is not surprising, nor has that result ever been seriously challenged. In the Court's view, it is quite doubtful that the principle articulated by the Districts by reference to *Milliken*, and echoed by the Fifth Circuit in this case, that federal jurisdiction in this area "goes only so far as the correction of the constitutional infirmity," *United States v. State of Texas*, 158 F.3d at 311, threatens the Court's continuing jurisdiction over TEA, or its enforcement of the student transfer provisions of the Modified Order. However, the Court need not undertake further analysis in order to make a definitive statement on this issue in this case, because this action can de disposed of on other, narrower grounds.

3.  The Districts Have Not Established That the Modified Order Unlawfully Subjects Hispanic Students to Its Terms.

The Districts further invoke the principle of limited federal jurisdiction in support of their contention that the transfer provisions of the Modified Order should not be construed to apply to students of Hispanic descent, because Hispanics were never segregated from Anglo schools as Black students were. This argument again raises issues related to TEA's enforcement of the Modified Order. TEA notifies a district that a transfer student is ineligible when the transfer both moves either the sending or receiving district away from desegregation by making it less diverse, and affects the racial balance by more than one, or three percent. TEA assesses the effect on diversity by lumping students into two categories: "white," and "non-white."

The Districts now contend that lumping students into "white," and "non-white" categories

-12-

for purposes of enforcing the transfer limitations of the Order necessarily subjects Hispanics to the Court's Order, despite the fact that Hispanic students were never segregated into separate schools. *United States v. Gregory-Portland Indep. Sch. Dist.*, 654 F. 2d 989 (5th Cir. 1981). Contrary to the Districts' argument, the fact that Hispanics were never segregated into separate schools does not necessarily mean that the Court has exceeded the proper scope of its jurisdiction in issuing its decree. Nor does it necessarily mean that TEA has erred in considering whether student transfers decrease diversity in its enforcement of the student transfer provisions of the Order.

The *Gregory-Portland* case involved two distinct communities of differing ethnic composition that combined school districts to form one, unified district with two schools. As a result of the different ethnic makeup of the two sides of the consolidated district, the Gregory school was majority Mexican-American, while the Portland school was majority Anglo. The Fifth Circuit held that the facts of that case – specifically, historically race "neutral" population and demographic shifts – permitted no presumption that Mexican-American students were the victims of discriminatory intent such that it would be proper for the Court to impose student busing plans designed to increase diversity between the two schools within the newly consolidated district. 654 F.2d 989, 997-98. Because the facts that led to a disparity in the percentages of Mexican American students between the district's two schools were not evidence of any governmental action, much less intentional discrimination, the Court could not properly enjoin the school district to remedy the disparity. *Id.* at 1006. The *Gregory-Portland* court made no pronouncement that Hispanic students cannot, in any way, be considered by TEA in enforcing the Court's desegregation orders. Thus, *Gregory-Portland*, properly construed, stands as

-13-

additional instruction that the Court's remedial powers extend only so far as the constitutional offense requires. *Id.*

Here, TEA policies "subject" Hispanic students to the Modified Order only insofar as all other students are subjected to the Order: by undertaking both quantitative and qualitative analyses aimed at determining whether student transfers increase or decrease diversity. It is TEA's policy that an increase in diversity renders the student eligible to transfer, even if a strict application of the one, or three percent limitation would not. Tr. 192-94. The Districts do not appear to challenge this policy in any meaningful way, and have failed to illustrate to the Court how TEA's policy offends the principle articulated by the *Gregory-Portland* court, either with regard to Hispanic students, or in any other way.

Furthermore, it is quite doubtful that including Hispanic students in the consideration of the ethnic makeup of a district's students, which is done to determine whether a district or school is becoming a "one race" entity, is a constitutional violation in this context. *See, e.g.; Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 226 (5th Cir. 1983) ("[I]n seeking reduction in the number of one-race schools, the district court could not ignore diminished white enrollment in [the Houston Independent School District] and substantial immigration of Hispanic students ... . Even if some method were devised to spread white students equally among all schools in the system, 74% of the students in each school would be black and Hispanic."). However, the Court is, again, relieved of the task of deciding, for purposes of disposing of this action, whether TEA's enforcement policies improperly subject Hispanic students to a constitutionally infirm court-ordered remedy, as the Districts' requested relief can be granted on narrower grounds.

4.    Constitutional Avoidance

-14-

The Districts have raised three arguments that contain constitutional dimensions: 1) That the Modified Order operates between districts, rather than between schools, rendering it unconstitutional under the Court's holding in *Milliken I*; 2) That enforcing the transfer provisions of the Order against all Texas school districts exceeds the Court's constitutional jurisdiction because no constitutional violations have been found in districts other than those that were original parties to the No. 5281 litigation; and, 3) That by including Hispanic students in its diversity assessment, TEA (and the Court, by virtue of its injunctive authority over TEA's actions) "subjects" Hispanic students to the transfer provisions of the Order, despite the fact that no school district in Texas ever segregated Hispanic students into separate schools. The Court has addressed these arguments insofar as necessary to satisfy any concerns that the Court is acting within the bounds of its jurisdictional constraints. As noted, further analysis of the constitutional issues raised is unnecessary, because other, narrower grounds exist for disposing of this matter. The Court will not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288 (U.S. 1936) (Brandeis, J., concurring); *see also, Burton v. United States*, 196 U.S. 283 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to the decision of a case."). Here, TEA has run afoul of the requirements of the Modified Order in two distinct ways, either of which serves as a complete ground for disposing of this matter, as discussed below.

### B. *Enforcement of the Modified Order*

The Districts argue, as an alternative to their constitutional arguments, that TEA has violated the terms of the Order by withholding funds for nonreporting of transfer students. These

-15-

claims take various forms, and many remain unsubstantiated by the record. Nevertheless, the Court addresses all of the Districts' claims.

Though the Modified Order is a detailed decree, the Court has always, and will continue, to grant TEA certain necessary flexibility in crafting the precise details of administering the terms of the Order. The Court, of course, retains oversight authority to determine whether TEA's policies are arbitrary, or unreasonable, for purposes of enforcing the Order. Therefore, the Court reviews TEA's practices for reasonableness.[8]

      1.    "Cumulative Effect" and Qualitative Analysis

The Districts assert, correctly, that the transfer provisions of the Modified Order require TEA to limit its enforcement of the Order to those situations in which the "cumulative effect" of the transfers is segregative, or in the words of the Order itself, where the effect of the transfer is to "reduce or impede desegregation." *Modified Order* § A(1). The Districts further contend, again correctly, that TEA should only sanction a district for accepting transfer students that affect the racial balance by more than one or three percent in either the home or receiving district when

---

      [8]    This standard of review is a familiar one in administrative law, though the TEA is obviously not subject to the statutes governing the rulemaking and adjudication powers of federal agencies. The Administrative Procedure Act ("APA") generally requires agencies to make decisions "on the record," and requires federal courts to hold unlawful and set aside agency action that is found to be arbitrary, capricious, or an abuse of discretion. APA § 706(2)(A). Additionally, where an authorizing statute is ambiguous, the reviewing court is to defer to the agency's permissible construction of the statute. *Chevron v Natural Resources Defense Council*, 467 U.S. 837, 842-843 (1984). Such agency regulations are to be given controlling weight "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-844.

    The Court finds these familiar standards informative, but certainly not binding, in a case such as this, where a state agency is charged, by force of an injunction, with enforcing a federal court's order.

"student transfers between school districts involve ethnic consideration concerning race, color, or national origin." *Modified Order* §A(3)(a) and (b). The Districts are wrong, however, that TEA fails either to assess the cumulative effect of transfers, or to undertake any qualitative analysis, before sanctioning a district. The record shows that TEA's STS system does account for the segregative effect of student transfers by "flagging" only those transfers that affect the racial makeup of either district by more than one or three percent in such a way that moves the district away from diversity. Tr. 193:13-21. Contrary to the Districts' assertion, STS does not simply employ a numbers-only analysis before imposing sanctions. The Court finds that TEA undertakes adequate qualitative analysis, as well as assesses the cumulative effect of student transfers, as the Modified Order requires.

2.    Notice Provisions of the Modified Order and Retroactive Withholding of Funds.

As noted, *supra*, the Modified Order requires TEA, first, before withholding any funds, to notify any district that appears to be in noncompliance with the Order. *Modified Order* §A(5). The Order requires TEA to withhold funds from the offending district, but only if the district refuses to comply after being notified by TEA of its noncompliance. *Id.* § A(6). The Modified Order, finally, requires TEA to suspend the district's accreditation should it not comply with the terms of the Order. *Id.* §A(7). The Districts contend that STS fails to offer advance notice that funds are to be withheld because the STS system notifies school districts that TEA has disapproved a transfer only after the child has attended school for the year. The evidence is to the contrary.

The Superintendents of both Samnorwood and Harrold acknowledge that STS provides

-17-

prompt notice of an ineligible transfer, as soon as the transfer is entered into the system by listing the district as "noncompliant." Docket No. 629-2 (Stipulations Nos. 8, 9); Tr. 41-43, 88:7-25. And, both witnesses testified that they fully understand that being "noncompliant" means that TEA will not fund that transfer student. *Id.*

The Districts next make a somewhat confusing argument about TEA's policy of withholding funding for ineligible transfers from the following year's allotment of state funds. The evidence shows that TEA does, in fact, withhold funds based on ineligible transfers in the next fiscal year, as part of its "settle up" process. Docket No. 629-2 (Stipulation No. 37). This does not violate the advanced notice requirement, or any other provision, of the Modified Order, however, as TEA is merely required to notify an offending district of its noncompliance before withholding funds. *Modified Order* §§A(5) and (6). Because STS notifies districts of the eligibility of transfers as they are entered into the system, notice occurs well in advance of the actual withholding of funds, which occurs after that school year.

The Court further rejects the Districts' claim that the feature of the STS system known as the "Jitters" causes the advance notice provision to be violated. The Districts claim that because the STS system allows for a particular transfer student's eligibility to "jitter," or fluctuate, between eligible and ineligible over the course of the school year, there is a chance that a student who is initially eligible at the time of the transfer, may appear to be ineligible when TEA finalizes its year-end attendance data. Dock. No. 646 at 27. Thus, the Districts contend, they run the risk of losing funding well after the transfer has been approved, and occurred, which would be a violation of the Modified Order's advance notice requirement.

This is a spurious argument – even under the current STS system in which the district

bears the burden of proving transfer eligibility – because any loss of funding would be due to the district's failure to properly record, and document their compliance regarding student transfers. The Districts' concern is further alleviated, however, by the Court's finding, *infra*, that TEA must record, and document, its own eligibility decisions, *as they are made*.

> 3.   Sparsity Adjustment

The Districts have argued throughout this litigation that they are very small, single school districts that rely heavily on state funding for their survival.[9] They also rely heavily on transfer students, and the state funding that follows such transfers. However, for small districts, such as Harrold and Samnorwood, funding does not necessarily fluctuate with each individual transfer student. A section of the Texas Education Code known as the "Sparsity Adjustment," provides that districts whose student populations fall within certain ranges of enrollment are to receive a certain minimum level of funding. TEXAS ED. CODE § 42.105. Both Harrold and Samnorwood fall within the ninety to 130 student range.[10] Under state law, this guarantees each District the level of state funding set by state law for 130 students. *Id.* Thus, as long as no transfer student would have pushed the enrollment for each respective district above 130 students, no additional state funds would have flowed to the District. The parties have stipulated, and the Court finds, that no transfers at issue in this action would have affected state funding for either District, because each District remained within the ninety to 130 student range, after accounting for the

---

9    The parties have stipulated, and the Court finds, that the total student enrollment for Harrold ISD varied between 112 and 123 between the 2000-2001 and 2005-2006 school years. Harrold's enrollment for the 2002-2003 school year was 112. Samnorwood's enrollment varied between 101 and 134 between the 2000-2001 and 2005-2006 school years. Its enrollment was 101 for the 2002-2003 school year. Docket No. 629-2 (Stipulations Nos. 2 and 4).

10    Docket No. 629 -2 (Stipulations Nos. 2 and 4)

transfers. Tr. 54:17-22; Docket No. 629-2 (Stipulations Nos. 38 and 39).

TEA nevertheless withheld funding from these school districts, based on its interpretation of section A(6) of the Modified Order, which commands TEA to "refuse to transfer the funds, based on average daily attendance of the transfer students involved to the account of the receiving district ... ." TEA misreads, and has misapplied, the Modified Order in this case. The plain language of the Order requires TEA to not transfer state funds for a transfer student to the account of the receiving district,[11] if that transfer appears not to comply with the terms of the Order, and the district fails to comply after receiving warning. *Modified Order* §§ A(5) and (6). In this case, no state funds were to be transferred to either Harrold or Samnorwood as a result of the transfers, since both districts received the sparsity adjustment. Yet, TEA nonetheless reduced both Districts' state funding for the students who were not entered into STS. The Court concludes that there is no basis in the Modified Order for the sanctions imposed by TEA in this case.[12] TEA is not authorized to reduce state funding for any district based on any transfer that

---

[11]     The Districts make another argument that is related to the language of the Modified Order that directs TEA to refuse to transfer state funds to the account of the receiving districts. The argument is that the language of the Order requires the state funds at issue to remain in the account of the sending district. Docket No. 646 at 27. This argument is easily rejected, as the Court finds that TEA's policy of simply withholding funds for the ineligible student is a reasonable effectuation of section A(6) of the Modified Order. It is, in fact, much more reasonable than the Districts' suggested policy of leaving the funds designated for a particular student with a school district that is no longer educating that student.

[12]     The Court notes, and appreciates, the uncertainty of the effect of the transfer students involved here on the sending districts due to the failure to enter the transfers into STS. However, what is at issue in this litigation is the propriety of TEA's fiscal sanctions against two receiving Districts. Those sanctions simply fall outside the scope the duties that TEA is admonished to perform under the Modified Order.

could not generate additional state funds for that district.[13]

    4.    TEA's Improper Burden Shifting Under the Modified Order, and Effective Denial of Appeal of Its Funding Decisions

Though the Court finds that TEA's basis for withholding funds from the Districts in this case was caused by the Districts' failure to report their transfer students, the Districts' contention that their inability to document the eligibility of transfer students is not without basis in the evidence presented at trial. As noted, one Samnorwood transfer student, Vincent R., was funded after Samnorwood submitted evidence at the informal review that he was an eligible transfer. It was the Districts' inability to show proof of eligibility for the other transfer students that required TEA to keep the penalty for failure to report intact. In other words, the Court's finding that the Districts' failure to report transfer students is the basis for the penalty levied by TEA does not preclude a judgment for the Districts on the ground that the Districts were improperly notified of their responsibilities within the STS system, and were thus effectively denied a meaningful opportunity to appeal that decision during the informal review.

Indeed, the shortcomings of TEA's STS system have been placed on full display during this litigation. The Districts have shown that STS does not provide any means of assessing the eligibility of a transfer student if, for some reason such as a clerical error, a student is not entered on the day he or she transfers. Tr. 182:8-22. Furthermore, the Districts have shown that unless

---

13    The Court notes that TEA has, by separate Motion, proposed to modify its enforcement of the Modified Order in various ways, some of which raise serious questions about TEA's commitment to preserving the intent of Modified Order to prevent resegregation within the public school system. The Court does not address TEA's Motion now, and awaits an appropriate time to consider the proposals contained therein, including the so-called "all comers" proposal. However, the effect of the Court's decision in this action should be unmistakably clear to TEA: that it is not to reduce state funding when the receiving school district is within the Sparsity Adjustment, since there is no transfer of funds involved in such cases.

they print the "compliance screen" that STS produces immediately after the transfer student is entered, there will be no record of that student's eligibility, since TEA itself keeps no record of its own eligibility decisions. Tr. 183-84. In fact, the evidence shows TEA's only method for assessing the eligibility of student transfers is to compare the year-end PEIMS data with the students whose names were submitted into STS. Document No. 629-2 (Stipulations Nos. 13, 14 and 18). There is an obvious incongruence in TEA's operations, since the eligibility of student transfers is assessed at the time of the transfer – not at the end of the school-year; yet, it is the end of the year data upon which TEA relies in making its funding decisions.

What is most troubling to the Court, however, is that the entire burden of recording, and preserving the eligibility of transfers must be borne by the school districts. While it is not unreasonable for TEA to require that districts report transfer students,[14] the burden of preserving all records of transfer eligibility is an unreasonable burden to place on the districts, in light of the Modified Order's requirement that TEA "review all student transfers." *Modified Order* §A(5). The Modified Order places the greater weight of the burden of determining the eligibility of transfers on TEA, which, in the Court's judgment, reasonably includes documenting the basis for such decisions. TEA's attempt to shift the entire burden of proving the eligibility of transfers onto the districts is an impermissible, and unreasonable enforcement mechanism. The Court finds that it is TEA's obligation under the Modified Order to: 1) Provide to all districts a clear, and detailed statement of their obligations regarding compliance with the Modified Order; and, 2) Record and preserve any decision which forms the basis of any funding decision made

---

[14]    It is not unusual, or improper, for agencies to compel reporting from the entities they regulate. *See generally*, Richard J. Pierce, 4 ADMINISTRATIVE LAW TREATISE 194.

pursuant to TEA's enforcement of the Modified Order.

The Court further finds that in the case of both Harrold and Samnorwood, TEA had not provided a clear statement of the districts' obligation to record, by printing the STS compliance screen, the eligibility of their transfer students. The former TEA official in charge of the STS system, Mr. Ronald Rowell, testified that TEA sent a letter to the districts in 2002 notifying them of the new STS system. Yet, that letter said nothing about the specific requirement that the districts must print the compliance screen in order to make a record of transfer eligibility. Exh. D-14. No other form of guidance made this requirement clear, either.[15] Tr. 184:7-25. Therefore, TEA effectively denied the Districts adequate notice regarding their full responsibilities under the automated STS system. The improper and incomplete notice, in this case, deprived the Districts of a meaningful opportunity to appeal their funding decisions. Without such meaningful process, TEA cannot withhold funds under the Modified Order.

## V. CONCLUSION

For the reasons stated herein, particularly that, 1) TEA reduced state funding for both Districts despite the fact that no transfer student would have generated any state funds for either District; and, 2) that TEA effectively denied the Districts the right to a meaningful appeal of its funding decisions by unreasonably placing the burden of documenting the basis for TEA's

---

[15] The Court notes that the letter indicated that "Failure to report will result in noncompliance with the federal court order." Exh. D-14. Additionally, Mr. Rowell testified that TEA "placed the responsibility on the school districts and superintendent to keep documentation. And that's stated several times in the manuals." Tr. 184:17-21. None of this, however, indicates to the Districts the severity of the consequences for failing to document transfer compliance in the only way in which that is possible within STS: by printing the compliance screen.

decision on the Districts, the Court finds that the fiscal sanctions imposed against Samnorwood,

and Harrold Independent School Districts for the 2002-2003 school year were unreasonable

under the terms of the Modified Order.


Signed, this 2 ${}^{th}$ day of July, 2006.

William Wayne Justice

Senior United States District Judge