

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

AUG 11 2006

DAVID J. MALAND, CLERK
BY
DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, et al. § | |
| § | |
| Plaintiff, § | |
| and § | |
| § | |
| GI FORUM and LULAC, § | Civil Action No. |
| § | 6:71-CV-5281-WWJ |
| § | |
| Plaintiff-Intervenors § | |
| § | |
| v. § | |
| § | |
| THE STATE OF TEXAS, et. al., § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING MOTION FOR RECONSIDERATION AND STAYING DISTRICT COURT PROCEEDINGS AGAINST STATE DEFENDANTS

Before the Court for consideration is the Defendants' Consolidated Motion for Reconsideration of Memorandum Opinion and Order Rejecting Defendants' Eleventh Amendment Immunity Defense and Retaining Jurisdiction, and Conditional Motion to Stay Proceedings [hereinafter "Motion for Reconsideration"].  Docket No. 640.  For the reasons stated herein, Defendants' Motion for Reconsideration must be denied.

### DISCUSSION

On February 9, 2006, Plaintiff-Intervenors GI Forum and LULAC filed a Motion for Further Relief seeking to have the Court require the State of Texas, the Texas Education Agency ("TEA"), and the Commissioner of Education, Shirley J. Neeley (collectively

"Defendants") monitor, enforce, and supervise programs for limited-English proficient ("LEP") students in Texas public schools to ensure that such students receive equal educational opportunities. Docket No. 588. Defendants opposed the motion on several grounds, including: Rule 7(a) of the Federal Rules of Civil Procedure; Eleventh Amendment Immunity; and, unspecified substantive defenses amounting to a contention that Plaintiff-Intervenors have not submitted sufficient evidence to warrant the relief requested by their motion. On April 14, 2006, the Court set Plaintiff-Intervenors GI Forum and LULAC's Motion for Further Relief for a hearing on July 24, 2006, and ordered the parties to complete discovery by June 23, 2006. The Court did not address Defendants' assertion of Eleventh Amendment immunity before setting the motion for a hearing. Defendants then filed a motion to stay district court proceedings, in which they argued that the Court "effectively denied the State's immunity defense" by setting the Motion for Further Relief for a hearing. Docket No. 602. The Court issued a Memorandum Opinion and Order denying Defendants' Motion to Stay Proceedings, and rejecting Defendants' claim of Eleventh Amendment immunity. Docket No. 628. Because the immunity argument, as presented, was frivolous, the Court retained jurisdiction to hear the Motion for Further Relief, even though district court proceedings are normally stayed pending collateral appeal of the immunity issue. *Id.*

Defendants now urge the Court to reconsider its rejection of the immunity defense, and have, for the first time, made cognizable legal arguments regarding the merits of the defense in this case. Plaintiff-Intervenors have responded in opposition (Docket No. 653), as has the United States (Docket No. 652), the original plaintiff in the No. 5281 litigation.

### *Background of English Language Proficiency Litigation*

The Court will not recite the history of the No. 5281 litigation, even in abbreviated form, having done so in its recent Memorandum Opinion rejecting Defendants' claim of immunity and retaining jurisdiction. *See* Docket No. 628. However, a brief history of the litigation of the EEOA, and related, claims is in order. Approximately a decade after this Court held that the State of Texas and the TEA violated both the Constitution and federal law by creating and maintaining all-Black school districts throughout the State, 321 F. Supp 1043 (E.D. Tex. 1970), the Court heard the first challenge to the State's method of addressing the significant language barriers faced by Mexican-American students in the form of both statutory – including EEOA – complaints, and a motion to enforce the existing school desegregation decree. *United States v. Texas*, 506 F. Supp 405 (E.D. Tex. 1981). This Court held, *inter alia*, that Defendants violated the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 *et seq.* ("EEOA"), through a wholly inadequate "bilingual education" program, but that injunctive relief concerning language proficiency was not an appropriate enforcement of 1971 desegregation decree. 506 F. Supp at 409-10. The Court enjoined TEA to take "appropriate action" to remove the language barriers faced by Mexican-American students in Texas, as required by the EEOA. The Court of Appeals for the Fifth Circuit reversed the Court's Order on the ground that the then-newly enacted State law, S.B. 477,[1] *was an* adequate response by the State to the requirements of the EEOA, because the law compelled "TEA to take certain specific measures, including on-site monitoring, to insure compliance." *United States v. Texas*, 680 F.2d 356, 372 (5th Cir. 1982). Thus, any injunctive relief that

---

[1]     The law was entitled the 1981 Bilingual and Special Language Programs Act.

may have been, prior to S.B. 477's enactment in 1981, necessary to ensure the State's compliance with the EEOA's mandates, became moot in light of the new law.[2]

The crux of Plaintiff-Intervenors' Motion for Further Relief is that in the years since S.B. 477 was enacted, there has been an abandonment by TEA of on-site monitoring, enforcement, and supervision of school districts to ensure compliance with the State's bilingual education program. Docket No. 588. Plaintiff-Intervenors assert that this failure violates the EEOA, 20 U.S.C. § 1703(f), when read against the backdrop of the Fifth Circuit's reason for denying injunctive relief in its 1982 opinion reversing this Court's Order.

### The Court's Continuing Jurisdiction

Plaintiff-Intervenors properly invoke the continuing jurisdiction of this Court by seeking further relief via Section J(1) of the Court's 1971 Modified Order, in which the Court retained jurisdiction to enter orders modifying or enforcing the provisions of that Order. The Motion for Further Relief invoked the Court's Order of July 13, 1971 as the basis of this Court's jurisdiction, and as a source of law being violated by Defendants' alleged failure to conduct on-site monitoring of bilingual education programs. Docket No. 588 . Section J(1) of the Court's July 13, 1971 Order (modifying the Court's Order of April 20, 1971) [herein after "Modified Order"] provides that "[t]his Court retains jurisdiction for all purposes, and especially for the purpose of entering any and all further orders which may become necessary

---

2        The Court of Appeals held that "[u]ndoubtedly there was adequate evidentiary support for a conclusion that in some areas local programs for remedying the educational handicaps of limited English-speaking students were deficient . . . . Where the court erred, however, was in its denial of the state's post-trial motion to vacate the injunctive remedy on the ground of mootness. The TEA argued, in our opinion persuasively, that the Texas Legislature's enactment of the 1981 Bilingual and Special Language Programs Act made the court's injunctive relief unnecessary." 680 F.2d at 372.

to enforce or modify this decree." It is this provision which Plaintiff-Intervenors contend

authorizes this Court to consider its Motion for Further Relief. Docket No. 653 at 24

("Certainly plaintiff-intervenors rely upon Section J of the Court's Order . . .").[3] Plaintiff-

Intervenors contend that Section G (1) of the Modified Order requires Defendants to "insure

that school districts are providing equal educational opportunities in all schools," and now

seek to enforce that section against TEA. *See* Modified Order § G(1).

Defendants, however, dispute that the Court's 1971 decree provides jurisdiction for

the Court to consider the Motion for Further Relief. Defendants admit that Section J(1)

permits the Court to entertain motions to enforce, or further modify other provisions of the

Court's Modified Order, but deny that any of its provisions, including Section G(1), are

implicated by Defendants' alleged violation of the EEOA, or the purported failure to conduct

on-site monitoring of bilingual education programs. Docket No. 590 at 5-6. Defendants

correctly assert that Plaintiff-Intervenors, in the 1981 action before this Court, requested that

TEA be required to create and institute a comprehensive, statewide bilingual education

program as a means of enforcing Section G of the Modified Order. The Court denied the

motion for enforcement because Section G was not the appropriate vehicle for enjoining TEA

in the manner requested. In so holding, the Court noted that the evidence at trial contained no

expert testimony regarding ethnic-based language barriers. "Thus, while it was determined

that equal educational opportunity should be afforded to Spanish-speaking students, no record

---

[3] Though Defendants claim in their Motion for Reconsideration that Plaintiff-Intervenors have abandoned this as a ground for relief (Docket No. 640 at 6), Plaintiff-Intervenors maintain that "the evidence which will be produced in support of the current allegations [ ]certainly will justify further relief under Section G(1) of the Court's order . . . ." Docket No. 653 at 26.

existed on which to base specific findings as to the extent of the language problem in the state's public schools or how that problem could best be remedied . . . . Given the paucity of evidence which had been received on the language problem at the time, such specificity would have been unwarranted." *United States v. Texas*, 506 F. Supp. 405, 410 (E.D. Tex 1981).

That finding does not, however, preclude consideration of Plaintiff-Intervenors's Motion for Further Relief. Plaintiff-Intervenors now seek, through Section J(1), to enforce Section G(1) of the Modified Order in a manner warranted by new evidence which they believe demonstrates not only that Defendants have violated the EEOA, 20 U.S.C. § 1703(f), but also Section G(1)'s requirement that TEA ensure that school districts in Texas provide equal educational opportunities for all students.[4] Therefore, the Court finds that Plaintiff-Intervenors have properly invoked this Court's continuing jurisdiction to modify and enforce the existing decree. Modified Order § J(1).[5]

---

[4]     Defendants contend that Section G of the Modified Order imposes no continuing obligations on TEA. "The only order of the Court in this cause that concerns programs for limited-English proficient students is Section G, which 'required the TEA to carry out a study of the educational needs of minority children throughout the state and to report [its] findings to the court by August 15, 1971.'" Docket No. 640 at 5 (quoting *United States v. Texas*, 506 F. Supp. at 409). Though the Court noted that "[i]n submitting these reports, the agency did all that it had been required to do under Section G," it is abundantly clear that the Court was referring to Section G(2), and therefore did not hold that Section G(1), including Sections G(1), which has nothing to do with the reporting requirement, was complied with by virtue of filing the report of the study's findings.

[5]     Defendants do not contend that Eleventh Amendment immunity bars Plaintiff-Intervenors' attempt to modify, and, or enforce the Court's existing decree. Defendants' only argument regarding the Court's existing orders is that Plaintiff-Intervenors have not properly invoked any of them, and that the Motion for Further Relief is entirely grounded in the EEOA claim. *See* Docket No. 640.

### Plaintiff-Intervenors' State-Wide Claim
### and the Absence of School Districts as Parties

Plaintiff-Intervenors note in their Motion for Further Relief that they do not seek any relief against particular school districts, nor that any particular form of educational program for LEP students be ordered. *See* Docket No. 588 at 1 n.1. Plaintiffs seek a review of Defendants' current administration of the State's bilingual education program, a determination that Defendants are not complying with the EEOA's mandate that the State's education agency – in this case, TEA – take "appropriate action" to overcome the language barriers faced by LEP students, and a determination that Defendants are in violation of Section G(1) of the Modified Order. The claims asserted are, therefore, claims against State-level agencies and officials, rather than local school districts.

Defendants argue that the Motion for Further Relief is precluded because "far-reaching statewide injunctive relief [is] inappropriate in the absence of individual school districts whose bilingual education programs would be effected [sic]." Docket No. 590 at 4. Indeed, the Fifth Circuit, in reversing this Court's injunctive relief granted in 1981, expressed its skepticism of EEOA claims that are directed toward State-level entities, since "Congress [in enacting section 1703(f) of the EEOA] left the state and local authorities substantial latitude to select programs and techniques of language remediation suitable to meet their individual problems," which will certainly vary from one school district to another. *United States v. Texas*, 680 F.2d at 373-74. Thus, the court concluded "that there exist[ed] little if any practical or logical justification for attempting to deal on a statewide basis with the problems presented by this case." *Id.* The court described section 1703(f) claims, and the necessity of making particular school districts parties to the litigation thereof, as follows:

-7-

> Either the actual, local program as it operates on actual, local students is an
> appropriate response to their language problems or it is not. If it is, then section
> 1703(f) has been complied with as to these students; if not it has not been . . . . We
> fail to see how such questions as these can be properly resolved in the absence of the
> school district concerned or how they can effectively be dealt with on a statewide
> basis. In the exercise of our supervisory powers, we therefore direct the district court
> to determine, in light of the foregoing, what questions – if any – presented by the case
> are subject to resolution on a statewide basis before proceeding further on the remand
> that we mandate.

*Id.* The Court finds that the claims presented by Plaintiff-Intervenors' Motion for Further

Relief are directed toward the proper defendants in this instance, and that individual school

districts should not, as part of the consideration of this Motion, be made party to this action.

Section 1703(f) deems "the failure by an educational agency to take appropriate action

to overcome language barriers that impede equal participation by its students in its

instructional programs." While the Fifth Circuit has interpreted this section to be directed to

local education agencies, such as schools and school districts, *United States v. Texas, supra*, it

is just as clear that section 1703(f) can also be directed at the TEA, as the State's only

*education agency*, because Texas has devised a statewide system to ensure compliance with

federal law.

As an initial matter, Texas law declares it to be "State Policy" that "public schools are

responsible for providing a full opportunity for all students to become competent in speaking,

reading, writing and comprehending the English language." TEXAS EDUC. CODE § 29.051.

The Texas Education Code further provides, as a statewide mandate, "for the establishment of

bilingual education and special language programs in the public schools," and TEA "provides

supplemental financial assistance to help school districts meet the extra costs of the

programs." *Id.*

-8-

TEA also carries many crucial responsibilities under State law in ensuring the success of the State's bilingual education and special language programs. These responsibilities include, *inter alia*, establishing a procedure for identifying school districts that are required to offer bilingual education and special language programs, *id.* § 29.053(a), and establishing statewide standardized criteria for identifying LEP students eligible for special language programs. *Id.* § 29.056. State law also mandates the basic content of these language programs, as well as the methods of instruction. *Id.* § 29.055. TEA is also required to certify teachers competent to teach in the bilingual education program. *Id.* § 29.061. Finally, TEA is charged with monitoring and evaluating the effectiveness of school districts' language programs according to certain, statewide criteria provided for in the Texas Education Code. *Id.* § 29.062.

It is this final requirement – that TEA perform monitoring and evaluation of bilingual education and special language programs throughout the State – that Plaintiff-Intervenors claim is necessary to ensure compliance with federal law, but which is not being fulfilled by Defendants. Docket No. 588 at 10. Plaintiff-Intervenors cite a 1996 Texas State Auditor's Office Report that found that TEA had not performed the required "on-site monitoring visits at all districts at least once every three years," and "[a]s a result, the Agency is not in compliance with the Texas Education Code or federal court order requirements for cyclical visits. Nonperformance of these monitoring visits the Agency's ability to ensure that . . . districts are providing equal educational opportunities for bilingual students." *Id.*

This Court does not, of course, presume to enforce the State's education code in this case, as the Eleventh Amendment bars State law claims in federal court. *See Pennhurst State*

*Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). The question, as presented by Plaintiff-Intervenors, is one of federal law: Does TEA's failure to monitor and enforce the statewide language programs, if proved, amount to a violation of the EEOA, 20 U.S.C. §1703(f), or Section G(1) of the Court's Modified Order?  The Court's reference to the Texas Education Code illustrates that the TEA, along with local school districts, is responsible for ensuring the effectiveness of English language programs, and can therefore be responsible for the ineffectiveness of those programs, which may violate section 1703(f).  *See Castaneda v. Pickard*, 648 U.S. F. 2d 989, 1010 (5th Cir. 1981)  (holding that a court reviewing a section 1703(f) claim seeks, in part, to determine whether an education agency has persisted in using a program which has proven ineffective at overcoming language barriers, such that it can no longer be considered "appropriate action as far as that school is concerned").

Because Texas' means of complying with the mandate of section 1703(f), and this Court's orders, includes a central role for the TEA, the Court finds that the State of Texas, TEA, and the Commission of Education are proper defendants in this action.  The State of Texas has chosen a system of shared responsibilities between State-actors and local officials, to ensure the equal educational opportunities of LEP students.  It is therefore quite "logical" that the State's failure to perform its duties in the administration of English language programs can result in inequality in access to educational opportunities.  *See United States v. Texas*, 680 F.2d at 373-74.  Plaintiff-Intervenors' contention that these relevant State actors are shirking their responsibilities under State law is, therefore, a cognizable section 1703(f) claim.  Finally, whether TEA has effectively abandoned its monitoring and evaluation responsibilities is a question that is necessarily "subject to resolution on a statewide basis,"

-10-

since TEA operates on a statewide basis. *See id.*

## EEOA Background

Plaintiff-Intervenors filed the Motion for Further Relief in this action pursuant to the EEOA, 20 U.S.C. §§ 1703(f) and 1706. Congress passed, and President Nixon signed the EEOA into law in 1974. President Nixon proposed the EEOA in 1972, law, stating that the bill's purpose was to move the parts of the nation that had been struggling to dismantle segregated school systems forward to achieve true racial equality in terms of educational opportunities. *See Martin Luther King Jr. Elem. Sch. Children v. Michigan Bd. of Educ.*, 451 F. Supp. 1324, 1330 (E.D. MI 1978) (citing 118 Cong. Rec. 8929 (1972)). To move the nation in this new direction, the proposed legislation was designed "to give the courts a new and broader base on which to decide future cases and to place the emphasis where it belongs: on better education for all our children." *Id.* at 1330 (citing Cong. Rec. 8931 (1972)). The President described this "broader base on which to decide future cases," as new "standards for all school districts throughout the Nation, as the basic requirements for carrying out, in the field of public education, the Constitutional guarantee that each person shall have equal protection of the laws." *Id.* at 1331 (citing 118 Cong. Rec. 8931 (1972)).

Though the EEOA failed to pass both houses of Congress in 1972, these remarks illustrate that the EEOA was intended to provide statutory definitions of equal education opportunities that could be vindicated by students seeking redress from the courts. *Id.* This view is supported by the legislative history. The House Education and Labor Committee, which reported the 1972 bill to the House of Representatives, with the recommendation that it pass, stated that the bill "for the first time in Federal Law contains an illustrative definition of

-11-

denial of equal educational opportunity. It is the purpose of that definition ... to provide school and governmental authorities with a clear delineation of their responsibilities to their students and employees and to provide the students the students and employees with the means to achieve enforcement of their rights." *Id.* (quoting H.R. Rep. No. 1335, 92d Cong., 2d Sess. 3 (1972)). The bill became law two years later when it was adopted as a floor amendment to the 1974 Education Amendments legislation in both houses of Congress, and then signed by the President. One of the ways in which the Act defines the substantive rights of the students is to have language barriers overcome:

> No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by ... (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703(f). The enforcement prong of the EEOA provides the means to enforce those rights:

> An individual denied an equal educational opportunity, as defined by this subchapter may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate. The Attorney General of the United States (hereinafter in this chapter referred to as the "Attorney General"), for or in the name of the United States, may also institute such a civil action on behalf of such an individual.

20 U.S.C. § 1706. It is against this legal and policy background which the Court evaluates Defendants' claims of Eleventh Amendment immunity from this action.

### Eleventh Amendment Immunity Analysis

As a general rule, the Eleventh Amendment prevents federal jurisdiction over suits against nonconsenting States. *Nevada Dept of Human Resources v. Hibbs*, 538 U.S. 721, 726

(2003). Congress, however, can abrogate this immunity when it both "unequivocally expresses its intent to abrogate [the State's] immunity," and when it acts "pursuant to a valid grant of constitutional authority." *Tennessee v. Lane,* 541 U.S. 509, 518 (2004). Here, there is no question, and Defendants concede, that Congress clearly intended to abrogate sovereign immunity in enacting the EEOA. See *Castaneda,* 648 U.S. F. 2d at 1009 ("[I]t is undisputed ... and indeed undisputable, that in enacting the EEOA, Congress acted pursuant to the powers given it in s. 5 of the Fourteenth Amendment."); Docket No. 640.

Whether Congress acted pursuant to valid grant of constitutional authority, in this case, section 5 of the Fourteenth Amendment, is the question at issue here. Section 1 of the Fourteenth Amendment provides, in pertinent part, that

> No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of laws.

Section 5 of the Amendment provides that "Congress shall have the power to enforce" the substantive guarantees provided by section 1, by enacting "appropriate legislation." This enforcement provision permits Congress a certain latitude, such that it can do more than proscribe unconstitutional conduct. It is, the Supreme Court has repeatedly held, broad enough to allow Congress to enact so-called "prophylactic legislation" that proscribes facially constitutional conduct in order to prevent and deter other unconstitutional conduct. *See Hibbs,* 538 U.S. at 727-28 (citations omitted). The Court has also said that this power has its limits, and that deciding whether Congress has enacted "appropriate legislation," requires courts to determine whether the legislation at issue is a 'congruent and proportional' response to the injury "to be prevented or remedied." *City of Boerne v. Flores,* 521 U.S. 507, 520

-13-

(1997).

In various cases since *Boerne*, the Supreme Court has provided lower courts guidance in applying the "congruence and proportionality" test, such that it now requires a three-part inquiry. *See Lane*, 541 U.S. at 520-22; *see also*, *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 277 (5th Cir. 2005). The first step of the *Boerne* inquiry requires the court to identify the "constitutional right or rights that Congress sought to enforce when it enacted" the EEOA. *Id.* at 522 (citations omitted). Second, the court examines whether there is a history and pattern of unconstitutional action by the States against the class of citizens protected by the legislation. Finally, the Court seeks to determine whether the legislation is a proportional response to the constitutional wrong identified. The Court's primary concern in formulating this analysis is that the legislation at issue does not work a substantive change in what rights the constitution protects, since it is within the Supreme Court's province – not Congress' – to define the substance of constitutional guarantees. *Boerne*, 521 U.S. at 519-24; *see also*, *Hibbs*, 538 U.S. at 728; *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000).

A.    **The Constitutional Right at Issue**

The rights at issue are the rights of national origin minorities to equal educational opportunities. Congress specifically directed the EEOA to public school students who have been denied the equal participation in instructional programs because of the State's failure to take "appropriate action to overcome" those "language barriers," that, "on account of ... national origin," impede students' participation in educational instruction. 20 U.S.C. § 1703(f). National origin classifications are "inherently suspect," and, as such, are subject to strict scrutiny. *Apache Bend Apartments, Ltd v. United States*, 964 F.2d 1556, 1562 (5th Cir.

1992). This is important for two reasons. First, although the State of Texas has not explicitly made such a classification, Congress describes the failure to remove national original language barriers as an affirmative denial of equal protection rights. 20 U.S.C. § 1703(f). Second, when addressing legislation passed pursuant to section 5 of the Fourteenth Amendment to members of a protected class, Congress is granted broad authority to deter and prevent the constitutional wrong. *See Hibbs*, 721 U.S. at 737-38. This is especially true when that protected class of citizens has experienced a long, and difficult history of state-sponsored discrimination. *Id.*

**B.** **History of States' Discrimination Based on National Origin**

1. Courts may look to a record of discrimination documented in case law, and other sources, as well as relevant legislative history.

As an initial matter, Defendants argue in their Motion for Reconsideration that Congress itself must document in the legislative history of the EEOA an extensive history of state, or state-sponsored discrimination in order to justify the remedy the Act provides.[6] This is not so. The Supreme Court stated in *Lane*, in upholding Title II of the Americans With Disabilities Act ("ADA"), that the "historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings . . . ." 541 U.S. a 524-25. The *Lane*

---

[6] Defendants write that the "EEOA itself contains no congressional findings regarding a history or pattern of the States denying equal protection rights by failing to address language barriers in public schools – the provision invoked by GI Forum and LULAC here. Rather, the findings are mostly confined to the collateral harms of busing students to achieve desegregation. The legislative history of the EEOA does not cure this deficiency because, as the Fifth Circuit has recognized, 'the legislative history of this statute is very sparse, indeed almost non-existent.' For this reason, the provisions of the EEOA purporting to subject States to private suits for failing to overcome language barriers fail the second requirement for a valid abrogation of immunity under Section 5." Docket No. 640 (internal citations omitted).

Court also discussed "the decisions of other courts [that] document the unequal treatment in the administration of a wide range of public services, programs, and activities," noting "that these decisions also demonstrate a pattern of unconstitutional treatment in the administration of justice." *Id.* at 525. The Court further cited various law review articles, and state laws and regulations that were not noted by Congress, but that documented the history of discrimination against the disabled. *Id.*

Whether or not the Supreme Court has ever required Congress itself to provide a documented history of discrimination in order for section 5 legislation to be deemed 'congruent a proportional,'[7] it appears that the Fifth Circuit has taken note that the Supreme Court does not now impose such a requirement. *See McCarthy v. Hawkins,* 381 F. 3d 407, 423 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in part) ("The Supreme Court, in *Tennessee v. Lane,* appears to have resolved this question. Relying almost exclusively on case law, the Court concluded that 'Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs . . .'").[8]

The Court further notes that the EEOA was extensively debated in 1972, and enacted in 1974, long before the Supreme Court put Congress on notice that courts would closely

---

[7]     The Court noted in *Boerne* that a "comparison between RFRA and the Voting Rights Act is instructive. In contrast to the record confronting Congress and the Judiciary in the voting rights cases, RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." 521 U.S. at 530.

[8] Judge Garza further explained in a footnote to this quote that "The Supreme Court has in the past required that Congress *itself* identify a history and pattern of discrimination by states . . . . In *Lane,* the Supreme Court appears to have abandoned this requirement." *McCarthy,* 381 F.3d at 423 n.2 (Garcia, J., concurring in part and dissenting in part).

examine the historical basis for Congress's actions. *See Boerne*, 521 U.S. at 530. In this light, the Court refuses to hold that there was not a sufficient history of discrimination upon which Congress acted simply because Congress itself did not document the vast record of unconstitutional discrimination on which it undoubtedly acted in passing the EEOA. To do otherwise, as Defendants suggest, would be a rather obtuse application of Supreme Court precedent.

In addition, courts are to look not only at a pattern of discrimination originating with State governments, but also with nonstate governmental units, such as local school boards or districts. *See Pace v. Bogalusa City Sch. Bd.*, 403 F. 3d 272, 277 n.14 (5th Cir. 2005) ("[A]fter Lane, we do not look solely at the state level for a history and pattern of unconstitutional action, we also examine discrimination by nonstate government entities."). The Court now examines the history of national origin discrimination against which Congress enacted the EEOA.

    2.    In passing the EEOA, Congress acted against a backdrop of well-documented discrimination against national origin minorities in the nation's public schools.

The Supreme Court has long recognized that many States have a long history of school segregation, and an unequal distribution of educational opportunities based on the race of school children. *See, e.g., Swann v. Charlotte Mecklenberg Bd. of Educ.*, 402 U.S. 1, 6 (1971). As this Court has observed, "[i]n the field of public education, discrimination against Mexican-Americans has been particularly acute." *United States v. Texas*, 506 F. Supp. 405, 411 (E.D. Tex. 1981). Thus, although segregation of Mexican-American students was not required by the Texas Constitution, as was the segregation of Black students, "the segregation

-17-

of Mexican-American is a historical fact in Texas public schools." *Id.* (citing Texas Const., art 7, sec. 7 (1876)).

The relevant case law documents quite salient illustrations of this discrimination, which was often attributable to the language difficulties suffered by Mexican-American students. For example, the Supreme Court noted in *Hernandez v. Texas*, 347 U.S. 475, 479 n.10 (1954), that the Jackson County, Texas school district segregated young students of Mexican descent into separate schools, on the ground that the students lacked proficiency in English. The Court found, however, that these Mexican-American schools were provided with approximately half the resources of their Anglo counterparts, and that "[m]ost of the children of Mexican descent left school by the fifth or sixth grade." *Id.*

The Fifth Circuit found in *Morales v. Shannon*, 516 F.2d 411, 413 (5th Cir. 1972) that Uvalde, Texas operated a separate school for Mexican-American students, "apparently as a result of the language problem," as early as 1907. The *Morales* court further found that in the 1950s, Uvalde perpetuated the segregated school system by building a school specifically for Mexican-American students, and requiring them to attend because it was the school in closest proximity to the Mexican-American neighborhood. *Id.* ("The imposition of the neighborhood assignment system froze the Mexican-American students into the [traditionally Mexican schools].").  The court concluded that "this is strong evidence of segregatory intent." *Id.*

In *United States v. Texas Educ. Agency*, 467 F.2d 848, 865-66 (5th Cir. 1972), the Fifth Circuit held that the Austin Independent School District "has, in its choice of school site locations, construction and renovation of schools, drawing of attendance zones, student assignment and transfer policies, and faculty and staff assignments, caused and perpetuated

the segregation of Mexican-American students within the school system." The court found that the policies that segregated Mexican-American students continued even after the AISD "nominally undertook to abolish the dual school system based on separate schools for blacks and whites," following the Supreme Court's decision in *Brown*. *Id.* at 867.

The Texas Court of Civil Appeals found in *Indep. Sch. Dist. v. Salvaterria* that the Del Rio school authorities segregated Mexican-American students into separate schools, at least for lower grades, in order to "instruct that group according to their own particular needs." 33 S.W. 2d 790, 791-92 (Tex. Civ. App. 1930). School officials instituted the policy of segregation after noticing that students of Mexican descent frequently started school well after the school year began, and after assisting their families in the cotton fields. *Id.* Asked whether he required Anglo students who were working in the fields when the school year began to attend the alternative school, the Del Rio Superintendent testified, "No, I did not send any of those English speaking children who came in late over to the school where I sent the Mexican or Spanish speaking, because there were so few there was nothing to worry about with them. I only sent the Spanish speaking children over there, those who came in late." *Id.* at 793. The Superintendent also noted the language barrier as a reason for the segregation: "[T]here is a difference in ages in the same grades between children of Spanish or Mexican descent and those of Anglo-Saxon parentage. Partly for that reason and the language difficulty with which the overwhelming majority of children are hampered I directed that all the first three grades [of Mexican American students] be set aside into the new two-room building and into the vocational agricultural building." *Id.* at 792.

Thus, the judicial record of discrimination against Mexican-American students is not

-19-

only extensive, but it also reveals that the unconstitutional segregation has been historically attributable to, and justified by, the language barriers faced by those students. Congressional records, discussed below, illustrate that Congress was well aware of this discrimination, and its unfortunate cause, in enacting the 1974 Education Amendments.

The United States, original plaintiffs in the No. 5281 litigation, have filed a brief opposing Defendants' claim of immunity, which describes a robust record of Congressional testimony relating to discrimination against national origin minorities in public schools across the country in the years leading up to the enactment of the EEOA. Docket No. 652 at 7-12. As noted by the United States, Congress heard a great deal of testimony specifically relating to bilingual education during the late 1960s and early 1970s. The Bilingual Education Act was first introduced by Senator Ralph Yarborough from Texas as S. 468 in 1967, and was signed into law in 1968. Congress conducted extensive hearings on amendments to the Act between 1969 and 1974.

Just months before passing the EEOA in 1974, Congress heard testimony from the acting director of the Office of Civil Rights for the Department of Health, Education and Welfare, Martin Gerry, who described a nationwide pattern of exclusion of national origin minority students from meaningful participation in educational programs. Bilingual Education Act: Hearings on H.R. 1085, H.R. 2490, and H.R. 11464 Before the Gen. Subcomm. on Educ. of the Comm. on Educ. and Labor, 93rd Cong. 20 (1974) (testimony of Martin Gerry, Acting Director, Office of Civil Rights for Dept. Health, Educ. and Welfare). Mr. Gerry singled out Texas as an example of desegregation plans that "failed to affect significantly the discriminatory treatment of the national origin minority students. Therefore,

'desegregation' of Blacks and Mexican-Americans – rather than desegregation among blacks, Anglos and Mexican-Americans – often resulted." *Id.* at 21. Mr. Gerry went on to explain that the Office of Civil Rights ("OCR") had concluded, after a review of "civil rights and educational literature," that "national origin minority children were, as a group, in many school districts being excluded from full and effective participation in, and the full benefits offered by, the educational programs operated by such districts." *Id.*

Based upon this review, the OCR prepared a memorandum to school districts that "reflected the operational philosophy that school districts create an educational approach which would ensure the equal access of all children to its full benefits. The burden, according to this philosophy, should be on the school to adapt its educational approach in order to create such equal access." *Id.* The memorandum,[9] published in the Federal Registrar, directed school districts to focus their efforts in four specific ways, in order to ensure that the rights of national origin minorities: (1) school districts must take affirmative steps to rectify language deficiencies suffered by national origin minority students in order to open their instructional programs to these students; (2) school districts must not assign national origin minority students who cannot speak and understand the English language to classes for the mentally retarded, nor may school districts deny minority students access to college-preparatory classes for any reason related to the district's failure to teach English language skills; (3) any ability-grouping or tracking system designed to address the language needs of national origin

---

[9]     Mr. Gerry noted that the 1970 memorandum "formed the central element in the Supreme Court's recent decision in *Lau v. Nichols* (Slip Op. 72-6520, January 21, 1974)," in which the Supreme Court held that the San Francisco school system's failure to overcome language barriers faced by students of Chinese ancestry denied the students meaningful opportunity to participate in educational programs in violation of Title VI of the 1964 Civil Rights Act. *See Lau,* 441 U.S. 563 (1974).

minorities must be designed to meet those needs as soon as possible, and must not operate as an educational dead-end or permanent track; and, (4) school districts have the responsibility of notifying national origin minority parents of activities that other parents are notified of. *Id.* at 21-22.

Following the issuance of the memorandum in 1970, the OCR also conducted reviews of school districts' performance in meeting these obligations, which "showed conclusively that the educational performance of national origin minority students as compared against their prior performance was declining rapidly and, when compared to the performance profile of their Anglo peers, decidedly unequally. The exclusion of national origin minority students from the full benefits of the educational program appeared to be continuing each year." *Id.* at 23.

Further Congressional testimony underscored this point. Professor L. Ling-Chi Wang, Lecturer in Asian Studies at the University of California at Berkeley testified that in San Francisco alone, several thousand students of Asian-ancestry needed, but did not receive, any English language assistance between the years of 1969 and 1973. Bilingual Education Act: Hearings on H.R. 1085, H.R. 2490, and H.R. 11464 Before the Gen. Subcomm. on Educ. of the Comm. on Educ. and Labor, 93rd Cong. 53 (1974).

Herman LaFontaine, Executive Administrator, Office of Bilingual Education, New York City Board of Education, testified that

> In New York City, we have some 260,000 Peurto Rican students in the public schools. Out of these some 95,000 are classified as having limited ability in English; that is to say, either moderate difficulty or severe difficulty with the English language. In addition to that there are approximately another 30,000 students of other Hispanic backgrounds – that is, Cuban, Dominican, and so on – who are in the same category. Interestingly enough, in recent years we are getting other groups who are not of

Hispanic background but have the same problems; that is to say, Italians, Haitians, Chinese and Greek .... The total number of students then in this category comes to approximately 150,000, and unfortunately we still must confess that when we look at the present status of the academic achievement of most of our students it is still lacking. In other words, we still find tremendous reading retardation, tremendous retardation in mathematics, the drop out rate is incredible, particularly in the high schools, and of course we have this large number of students who do not speak the language and are thereby prevented to a certain extent from actually developing and taking advantage of the learning process in the schools and thereby becoming part of the rationale for establishment of bilingual education programs.

*Id.* at 187. Then-Representative William S. Cohen, Republican of Maine, also testified before

the General Subcommittee on Education regarding the difficulties of many Franco-American

students because of English language deficiencies. *Id.* at 69-72. Rep. Cohen noted that

One of the most striking findings I have seen involves the results of IQ tests administered in one of Maine's Franco-American communities. The tests showed a marked decrease in IQ scores from the fourth to the twelfth grades. It is common knowledge that IQ tests are designed to measure one's ability to cope with the dominant society, and the lack of a bilingual education program in this instance does not mean the children's mental capabilities have been diminished. However, these results do indicate that we have failed to bring these Franco-American children into our society.

*Id.* at 72. This testimony serves as evidence that Congress, in passing the EEOA,[10] operated

with a full awareness of both the unconstitutional discrimination faced by national original

students in the nation's public school systems, the causes of that discrimination, and the

varied perspectives on the ultimate harms done by that discrimination. This awareness is

evident not only in the statutory language, but also in the Congressional Record. For

example, Senator Edward M. Kennedy noted in the Record that "Mexican American

---

[10]     In looking at the legislative history of the 1993 Family Medical Leave Act ("FMLA"), the Supreme Court not only reviewed the hearings directly related to that legislation, but also took note of testimony that pertained to earlier, related legislation, such as the Parental and Medical Leave Act of 1986, and 1987, and the Family and Medical Leave Act of 1987. *Hibbs*, 538 U.S. at 730-31, n.3 and n.5.

youngsters are not only shunted out of college bound courses, but all too frequently are placed in classes for the mentally retarded – not because of any intelligence deficiency, but because of an English language deficiency." 93 Cong. Rec. 15431 (May 20, 1974).

In light of the voluminous record of Congressional testimony, as well as the scores of contemporaneous court decisions finding national origin-based discrimination in public schools, Defendants' contention that there is no history and pattern of unconstitutional discrimination underlying the EEOA must be deemed, at the least, to lack merit. Defendants, of course, hitch this contention to the improperly narrow view that Congress must lay out, in its findings, and in the legislative history of the final passage of the EEOA itself in August of 1974. According to Defendants, the decades of case law that formed the judicial backdrop against which Congress operated, as well as the years of testimony and debate Congress heard regarding the need for meaningful language programs in the nation's public schools, is irrelevant, because, "as the Fifth Circuit has recognized, 'the legislative history of the statute is very sparse, indeed almost non-existent." Docket No. 640 at 12 (quoting *Castaneda v. Pickard*, 648 F.2d 989, 1001 (5th Cir. 1981).

The *Castaneda* Court made these remarks in the context of determining whether the EEOA, 20 U.S.C. § 1703(d) – which related to employment decisions – should be construed more broadly than a strict reading of the statutory language would permit. *Casnaneda*, 648 F.2d at 1001. Certainly, in that context, the lack of legislative history illuminating the precise meaning of the language, leaves a court little choice but to "adhere closely to the ordinary meaning of the amendment's language." *Id.* (citations omitted). That, of course, is a much different proposition than the claim, which Defendants have made here, that the *Castaneda*

court has declared the EEOA to be lacking any basis in the form of a history or pattern of unconstitutional discrimination.

### C. The EEOA is congruent and proportional remedial legislation.

The Court must determine whether the remedies created by the EEOA, namely, those provided for in sections 1703(f) and 1706, are a "congruent and proportional" response to the constitutional violation Congress sought to remedy or prevent. *Pace*, 403 F.3d at 277. "The appropriateness of the remedy depends on the gravity of the harm it seeks to prevent." *Lane*, 541 U.S. at 523-24. Thus, the more profound the history of unconstitutional discrimination, the more latitude Congress has in enacting prophylactic legislation that proscribes what may be facially constitutional conduct, in order to combat and deter unconstitutional conduct. *Hibbs*, 538 U.S. at 737.

### 1. The EEOA is appropriate prophylactic legislation.

In *Hibbs*, the Supreme Court deemed the 1993 Family Medical Leave Act ("FMLA") to be a congruent and proportional remedy to the problem of persistent gender discrimination in the workplace. 538 U.S. 721. The Court noted, as an initial matter, that gender-based classifications demand "heightened scrutiny." *Id.* at 728-29. The Court then described the "history of the many state laws limiting women's employment opportunities" as being "chronicled in – and until recently, [ ] sanctioned by – this Court's own opinions." *Id.* Congress responded to this invidious discrimination by enacting Title VII of the 1964 Civil Rights Act. But that legislation fell short of deterring gender discrimination, especially in the employment context. The "long and extensive history of sex discrimination," and the "persistence of such unconstitutional discrimination by the States, justifies Congress' passage

of prophylactic legislation." *Id.* at 730. Thus, the Court upheld the FMLA's "across the board, routine, employment benefit for all eligible employees," in the form of a minimum twelve weeks of unpaid family leave for both sexes. *Id.* at 737. This remedy, though a tangible benefit, was not a substantive redefinition of the rights protected by the Fourteenth Amendment, because it was the least intrusive means of requiring the equal treatment of men and women employees in the administration of family leave benefits. Simply proscribing the type of discrimination at issue, as the dissent preferred, would have allowed "States to provide for no family leave at all, [and] such a policy would exclude far more women than men from the workplace." *Id.* at 737-38 (quoting *Kimel*, 528 U.S. at 81) ("The dissent characterizes the FMLA as a 'substantive entitlement program' rather than a remedial statute because it establishes a floor of 12 weeks' leave. In the dissent's view, in the face of gender-based discrimination by the States in the provision of leave benefits, Congress could do no more in exercising its § 5 power than simply proscribe such discrimination. But this position cannot be squared with our recognition that Congress 'is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment,' but may prohibit 'a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.'").

The EEOA is similar legislation to the FMLA in this respect. Both Acts are limited, but appropriate prophylactic legislation. In passing the FMLA, Congress was within its section 5 authority to set a floor of twelve weeks' leave, since simply prohibiting discrimination in family leave policies would not have negated the gender-based discrimination that has been so pervasive. *Id.* at 737-38. In the EEOA, Congress required

that States take "appropriate action," to ensure that LEP students receive some form of assistance. A provision that simply prevented discrimination against national-origin minority students would allow States to simply provide all students with the same instruction in English, thereby effectively denying educational opportunities to those students in much the same way that they had been excluded for decades. As the record of judicial and congressional findings of discrimination against Mexican-American students in Texas illustrates, stereotypes about these students led to unlawful discrimination, and the failure to render any assistance in helping students overcome language barriers ensured their failure, thereby creating "a self-fulfilling cycle of discrimination." See *id.* at 737. The *Hibbs* Court found that a similarly harmful pattern of "mutually reinforcing stereotypes" about women's and men's "proper" roles – both at home and in the workplace – led to permanently disadvantageous hiring and leave policies for women, which only served to reinforce the harmful stereotypes. This entrenched discrimination was Congress's target in passing the FMLA, and its remedy was designed to eliminate its practice. The EEOA, with its "appropriate action" requirement, is, like the FMLA, congruent and proportional prophylactic legislation designed to break the cycle of stereotype-driven discrimination against LEP students.

Also like the FMLA, the EEOA is aimed at a protected class – national origin minorities – whose classification is subject to the strict scrutiny of the courts. The *Hibbs* court noted that "because the standard for demonstrating the constitutionality of a gender-based classification is more difficult to meet than the rational-basis test, it was easier to for Congress to show a pattern of constitutional violations." *Id.* at 722. In the case of the EEOA,

-27-

national origin classifications are subject to strict scrutiny, which is more exacting than the heightened scrutiny applied to gender classifications. Therefore, it is at least as "easy," if not more so, for Congress to show a pattern of violations against national minority students as compared to women in the workforce. *See id.*

In sum, there is, as noted in the previous section, a substantial history of judicial findings, as well as Congressional testimony, relating to discrimination against Mexican American students in Texas. More troubling, yet acutely pertinent to the issue now before the Court, is that much of the discrimination, and segregation, appears to have been a result of, or at least correlated with, the limited English–speaking ability of Mexican American students. That Congress enacted legislation aimed at requiring state education agencies to take action to ensure that LEP students overcome their language barriers seems a quite well-targeted response to a history of segregation on account of those barriers, and therefore an excellent example of remedial legislation that is both congruent and proportional to a well-documented constitutional wrong.

2. The EEOA is limited in scope, and does not redefine substantive constitutional rights.

As noted, the Supreme Court's chief structural concern in advancing the "congruence and proportionality" requirement in *Boerne* is that the Court, and not Congress, define the substantive scope of constitutional rights. Legislation that is not a congruent and proportional response to some salient constitutional injury is likely to overreach, and thereby redefine the scope of protection afforded by the Fourteenth Amendment. *Boerne*, 521 U.S. at 519-24; *see also, Hibbs*, 538 U.S. at 728. Defendants do not argue that EEOA offends this principle, but instead tie their argument that the EEOA is not congruent and proportional legislation to a

-28-

misplaced structural concern. Defendants assert that the relevant provisions of the EEOA "*per se* fail the congruence and proportionality test because they are limited only by what a particular judge deems to be 'appropriate' both in terms of the right and remedy." Docket No. 640 at 13. Defendants then quote from the Fifth Circuit's opinion in *Castaneda v. Pickard*, in which the court noted that:

> Congress has provided us with almost no guidance, in the form of text or legislative history, to assist us in determining whether a school district's language remediation efforts are 'appropriate.' Thus we find ourselves confronted with a type of task which federal courts are ill-equipped to perform and which we are often criticized for undertaking: prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (*i.e.*, state and local educational agencies) which are better able to assess the knowledge of professionals in the field.

*Id.* (quoting *Castaneda*, 648 F.2d 989, 1009 (5th Cir. 1981)). However, Defendants are quite mistaken that, in this passage, the *Castaneda* Court identified the "precise" reason why the EEOA is not congruent and proportional legislation. Docket No. 640 at 13. Legislation that is not congruent and proportional is likely to create new substantive constitutional rights in the legislation itself; here, Defendants complain that the EEOA does too little to define the ways in which constitutional rights are protected, and therefore misplaces that authority in the hands of federal judges. Whether or not this is a defect with the EEOA is discussed *infra*,[11] but it is not

---

[11]    After voicing reluctance its reluctance to determine whether a school's actions are appropriate under 20 U.S.C. § 1703(f), the *Castaneda* court proceeded to "devise a mode of analysis which will permit ourselves and the lower courts to fulfill the responsibility Congress has assigned to us without unduly substituting our educational values and theories for the educational and political decisions reserved to state or local school authorities or the expert knowledge of educators." *Id.* at 1009. The court then detailed a three-part inquiry to determine appropriateness under section 1703(f). *Id.* at 1009 – 10. The Court considers the Fifth Circuit's ability to construe, and apply section 1703(f) to be evidence that the EEOA is rather typical section 5 legislation that does not expand the scope of equal protection rights in this area. *See infra.*

the "precise" structural concern of which courts applying the *Boerne* test should be mindful.

Limitations on the remedy provided are, of course, features that the Supreme Court has identified as relevant in determining whether Congress has enacted legislation that is proportionate to the wrong it seeks to combat. *Boerne*, at 532-33 (Where a "congressional enactment pervasively prohibits constitutional state action in an effort to remedy or to prevent unconstitutional state action, limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under § 5."). To the extent that prophylactic legislation should be "narrowly targeted" at eliminating discrimination where it occurs, the EEOA certainly meets that standard. *See Hibbs*, 538 U.S. at 738 (noting that "the FMLA is narrowly targeted at the faultline between work and family – precisely where sex-based overgeneralization has been and remains strongest – and affects only one aspect of the employment relationship."). The EEOA requires States only to take "appropriate action" in one discrete aspect of education policy – English language proficiency – that the vast record of discrimination illustrates leads to a lasting, and unequal denial of educational opportunity.

The Supreme Court upheld a quite similar mandate when it deemed the "reasonable modification" requirement of the Americans With Disabilities Act ("ADA") to be congruent and proportional. *Lane*, 541 U.S. at 532. The Court acknowledged Congress' recognition that "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion," as a sound basis for imposing the modest requirement that States "reasonable measures to remove architectural and other barriers to accessability." *Lane*, 541 U.S. at 531 (citing 42 U.S.C. § 12131(2)). As noted, the EEOA requires "appropriate action" by States, because a failure to take any, or inappropriate action effectively denies LEP students

the same right to educational instruction enjoyed by English-proficient students.

Also supporting the validity of the "reasonable modification" requirement was the flexibility it afforded the States in complying. The Court noted that "Title II [of the ADA] does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs. It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service." *Id.* at 532. Furthermore, this "reasonable modification requirement can be satisfied in a number of ways," which may vary between newer and older structures, and may require no structural modification at all. *Id.*

The EEOA provides similar flexibility. The United States notes in its brief that "'[a]ppropriate action' could entail, for example, providing bilingual instruction, English as a second language instruction, an immersion program, or some combination thereof." Docket No. 652 at 16. The Fifth Circuit, in *Castaneda*, has also construed section 1703(f) to allow States significant leeway in constructing remedial language programs, holding that "[w]e do not believe that Congress, at the time it adopted the EEOA, intended to require local educational authorities to adopt any specific language remediation program." *Castaneda*, 648 F.2d at 1008. The *Castaneda* Court pointed to the fact that Congress passed the Bilingual Education Act of 1974, 20 U.S.C. § 880(b) *et seq*, which tied federal funding to bilingual education programs, at the same time it passed the EEOA. . The Court noted that Congress acknowledged that many bilingual education programs were still in "experimental stages," and therefore did not impose any one program on local educational authorities, but allowed them to

-31-

develop their own such programs in order to qualify for federal funding . *Id.* at 1009. The Court applied the same reasoning to its interpretation of section 1703(f):

> We think Congress' use of the less specific term, "appropriate action," rather than "bilingual education," indicates that Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA. However, by including an obligation to address the problem of language barriers in the EEOA and granting limited English speaking students a private right of action to enforce that obligation in s 1706, Congress also must have intended to insure that schools made a genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students and deliberately placed on federal courts the difficult responsibility of determining whether that obligation had been met.

After lodging its complaint that Congress provided too little guidance to Courts applying section 1703(f), 648 F.2d at 1009, noted *supra*, the *Castaneda* Court developed a three-part analysis to determine whether a state education agency has taken appropriate action. Under this analysis, the reviewing court first asks whether the educational theory underpinning the challenged program is "recognized as sound by some experts in the field, or, at least, deemed a legitimate experimental strategy." *Id.* at 1010. Second, the court asks whether the program adopted is "reasonably adopted to implement effectively the educational theory adopted by the school." *Id.* This inquiry is designed to ensure that the school "follow[s] through with practices, resources and personnel necessary to transform the theory into reality." *Id.* Finally, the court seeks to determine whether the school has persisted in using a program which has proven ineffective at overcoming language barriers, such that it can no longer be considered "appropriate action as far as that school is concerned." *Id.* The court noted that Congress did not intend for schools to continue the use of programs which, though promising in theory, "have proved a failure" in practice. *Id.*

Thus, as construed by the Fifth Circuit, the EEOA is moderate legislation aimed at

pushing State education agencies and school officials to overcome the long-lived problem of English language deficiency; a problem that is often the nucleus of unconstitutional discrimination against many national origin minority schoolchildren. That courts have devised a measured analysis for a case-by-case review of its requirements illustrates that the EEOA is not so far reaching that it redefines substantive rights. Rather, the EEOA is, like the ADA, and the FMLA, rather typical prophylactic legislation that imposes nothing extraordinary, or even unnecessary, on States, but seeks only to redress long-standing, and well-documented constitutional wrongs.

By defining the failure to take such appropriate action to overcome language barriers as an affirmative denial of an equal educational opportunity, Congress sought to prevent a form of discrimination – failure to overcome language barriers – that may be passive in form, but has invidious consequences for its victims. Such legislation is well within Congress's section 5 enforcement power, which "is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment, but may prohibit a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Hibbs*, 538 U.S. at 737 (quoting *Kimel*, 528 U.S. at 81). Therefore, the Court finds that the EEOA, 20 U.S.C. § 1703(f), is congruent and proportional legislation, and validly abrogates the State's sovereign immunity in this case.

### *Waiver*

In the Court's May 30, 2006 Order rejecting Defendants' immunity claim, the Court noted that Defendants may have waived their right to immunity in this action based on their previous conduct in the No. 5281 litigation. Docket No. 628. However, because the EEOA is

a valid abrogation of Eleventh Amendment immunity, the Court will not further address the waiver issue.

### Stay of Proceedings Pending Collateral Appeal

The Court's May 30, 2006 Order also deemed the Defendants' claim of immunity to be frivolous because it was unsupported by any legal argument concerning the proper basis for its immunity. For example, Defendants claimed, simply, that there was no Fifth Circuit authority holding that the EEOA abrogates sovereign immunity, which must mean that the Act does not have that effect. *See* Docket No. 590 at 8.[12] The Court also noted that Defendants ignored their own, past acquiescence to EEOA claims in this litigation. Based on its finding that Defendants' claim of immunity was frivolous, the Court retained jurisdiction to proceed with a hearing on the Motion for Further Relief. Docket No. 628 at 10. The Court now finds that Defendants have, on their third attempt, asserted at least one cognizable ground for their purported immunity – that the EEOA is not congruent and proportional section 5 legislation – which has enabled the Court to undertake the preceding analysis. Though Defendants' claim of immunity fails in this case, it can no longer be considered frivolous. However, the Court

---

[12]    The entirety of Defendants' Eleventh Immunity argument their Response to Motion for Further Relief is as follows:

"'The Eleventh Amendment jurisdictionally bars a suit in federal court by a private individual against an unconsenting state – absent waiver or congressional abrogation of sovereign immunity pursuant to section five of the Fourteenth Amendment – regardless of the relief sought by the plaintiff.' *State of Texas By and Through Bd. of Regents of University of Texas System v. Walker*, 142 F.3d 813, 820 (5th Cir. 1998). Both the State and TEA (as its agency) enjoy Eleventh Amendment Immunity. *Cozzo v. Tangipahoa Parish Council-President*, 279 F.3d 273, 280-81 (5th Cir. 2002) ("[w]hen a state agency is the named defendant, the Eleventh Amendment bars suits for both money damages and injunctive relief unless the state has waived its immunity"). The Motion does not cite any Fifth Circuit authority for the proposition that the EEOA abrogates this immunity." Docket No. 590 at 7-8.

expresses its deep reservations about Defendants' conduct in advancing the immunity

argument. Specifically, Defendants filed two briefs with the Court before finally advancing, in

their third brief, an argument that the EEOA is unconstitutional, thereby forcing the Court to

pass on a motion for reconsideration in order to address a preliminary sovereign immunity

claim. Despite the disingenuousness exhibited by Defendants' responses, the Court must stay

proceedings as to the State Defendants, specifically the State of Texas, and the Texas

Education Agency, pending appeal of this Order and Opinion under the collateral order

doctrine. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-

45 (1993); *Sherwinski v. Peterson*, 98 F.3d 849, 851 (5th Cir. 1996) ('States and state entities

may take advantage of the collateral order doctrine to appeal a district court order denying a

claim of Eleventh Amendment immunity.").

The Eleventh Amendment does not, however, prevent the Court from retaining

jurisdiction over the proceedings against the Texas Commissioner of Education, Ms. Shirley J.

Neeley, the third named Defendant in this action. Docket 588 at 2. *Ex Parte Young*, 209 U.S.

123 (1908), provides an exception to Eleventh Amendment immunity for lawsuits seeking

prospective, but not compensatory or injunctive relief, challenging the constitutionality of State

officials' enforcement of state law. The *Ex Parte Young* doctrine is designed to ensure that

State officials do not employ that immunity as a means of avoiding compliance with federal

law. *See Puerto Rico Aqueduct*, 506 U.S. at 146. In a case such as this, which involves claims

against both a State and a State official, the district court is to proceed with the action against

the State official, even where Eleventh Amendment immunity prevents jurisdiction over the

State agency. *See Brennan v. Stewart*, 834 F.2d 1248, 1253 (5th Cir. 1988). Thus, there is no

basis for staying the proceedings against Commissioner Neeley in this action, and the Court will not undertake to do so, even if Defendants appeal the denial of Eleventh Amendment immunity as to the State Defendants.

## CONCLUSION

For the reasons stated herein, Defendants' claim of Eleventh Amendment immunity must be rejected, and the Motion for Reconsideration, denied. The Court shall stay district court proceedings against Defendants the State of Texas and the Texas Education Agency, pending collateral appeal of the Court's denial of the Motion for Reconsideration. District Court proceedings against Defendant Shirley J. Neeley, Texas Commissioner of Education, shall proceed as announced by the Court.

SIGNED this 11th day of August, 2006.

William Wayne Justice
Senior United States District Judge