IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | § | |
| *Plaintiff,* | § | |
| | § | |
| **and** | § | |
| | § | Civil Action No. |
| **LULAC-GI FORUM** | § | 6:71-CV-5281 WWJ |
| *Plaintiff-Intervenors,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| THE STATE OF TEXAS, et al., | § | |
| *Defendants.* | § | |

### MEMORANDUM OPINION

This civil action relates to whether the Texas Education Agency's ("TEA") administration of the State of Texas's chosen program for educating non-English speaking students violates the Equal Educational Opportunity Act of 1974 ("EEOA"), 20 U.S.C. § 1703(f), or this Court's Modified Order in Civil Action 6:71-cv-5281.[1]

At issue, specifically, is whether TEA has abandoned its duty to monitor, enforce, and supervise school districts' administration of bilingual education programs to ensure compliance with Texas's bilingual education program. After considering the evidence and arguments at the hearing, as well as the post-trial briefs in this matter, the Court finds that the Plaintiff-Intervenors' Motion for Further Relief, as well as the United States of America's requested relief, should be **DENIED**, in all respects.

---

[1] The State of Texas and the Commissioner of Education, Shirley J. Neeley, are also defendants in this action.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The complex factual and procedural background of this case begins thirty-seven years ago, with a suit filed in the United States District Court for the Eastern District of Texas.  That action involved nine all-black school districts located in or around the northeastern part of Texas, and resulted in a comprehensive order directed to TEA, concerning its responsibilities with regard to all Texas school districts. The Court entered a permanent injunctive order, and retained jurisdiction over TEA, and thus, indirectly, over the Texas public education system. *See United States v. Texas*, 321  F. Supp 1043 (E.D. Tex. 1970), *aff'd as modified*, 447 F.2d 441 (5th Cir. 1971).[2]

The Court crafted the comprehensive injunctive order to ensure that "no child will be effectively denied equal opportunity to educational opportunities on account of race, color or national origin."[3] The original injunctive order was modified by this Court, *United States v. Texas*, 330 F. Supp. 235 (E.D. Tex. 1971), and later by the United States Court of Appeals for the Fifth Circuit, *United States v. Texas*, 447 F.2d 441 (5th Cir. 1971).  It will be referred to herein as the "Modified Order."

Section G of the Modified Order, entitled "Curriculum and Compensatory Education" provides, that the State of Texas, the TEA, its officers, agents, and employees:

> (1) . . . shall [ensure] that school districts are providing equal education opportunities in all schools. The [TEA] through its consulting facilities and personnel, shall assist school districts in achieving a comprehensive balance[d] curriculum on all school campuses . . . .
> * * *
> (2)  The [TEA] shall institute a study of the educational needs of

---

[2]  Section J(1) of the Modified Order provides that "[t]his Court retains jurisdiction for all purposes, and especially for the purpose of entering any and all further orders which may become necessary to enforce or modify this decree."

[3]  Modified Order (Docket No. 8); *see also, United States v. Texas (Goodrich)*, 158 F.3d 299 (5th Cir. 1998).

minority children in order to [ensure] equal educational opportunities of all students. The [TEA] shall request the assistance of the United States Office of Education and any other educational experts whom they choose to consult in making this study.... [A] report on this study shall be filed by the [TEA] with the Court including:

> (A) Recommendations of specific curricular offerings and programs which will [ensure] equal educational opportunities for all students regardless of race, color, or national origin. These curricular offerings and programs shall include specific educational programs designed to compensate minority group children for unequal educational opportunities resulting from past or present racial and ethnic isolation, as well as programs and curriculum designed to meet the special educational needs of students whose primary language is other than English;[4]
> * * *

## A.   1981 INTERVENTION

In 1975, Plaintiff-Intervenors GI Forum and the League of United Latin American Citizens ("LULAC") filed a Motion to Enforce Decree and for Supplemental Relief under the Modified Order, seeking to address denials of equal education opportunity to Mexican-American students in Texas public schools. That Motion asserted the following bases for relief: Section G of the Modified Order, Title VI of the 1964 Civil Rights Act, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the EEOA, 20 U.S.C. § 1703(f). In their demand for relief, the Intervenors called for TEA to implement a plan which would provide all limited English proficiency ("LEP") students with bilingual instruction and compensatory programs, to overcome the effects of past discrimination.[5]

---

[4] (Docket No. 8).

[5] The United States also moved for enforcement of section G and for similar, but not identical, supplemental relief.

Following a lengthy hearing, this Court held that the Defendants had violated the Equal Protection Clause and section 1703(f) of the EEOA, by failing to take appropriate action to address the language barriers of LEP students, and by failing to remove the disabling vestiges of past *de jure* discrimination against Mexican-American students. *United States v. Texas (LULAC)*, 506 F. Supp. 405, 428-34 (E.D. Tex. 1981). This Court issued a remedial decree compelling Texas to take affirmative steps to remedy the EEOA and equal protection violations. *Id.*

However, this Court found that because no evidence of purposeful discrimination was present, Defendants had not violated Title VI. *Id.* at 431. This Court also found no violation of Section G of the Modified Order, explaining that the comprehensive bilingual program sought by Intervenors was not inherent in Section G. Therefore, the Defendants were not bound, *res judicata*, to implement such a program under that section. *Id.*

Soon thereafter, Defendants moved to vacate the remedial decree. Defendants argued that a recently enacted state law, the Texas 1981 Bilingual and Special Language Programs Act (S.B. 477), created a new program for addressing the learning difficulties of LEP students, and "must be given a chance to work before it can be evaluated for success or failure." *See United States v. Texas*, 523 F. Supp. 703, at 736 (E.D. Tex. 1981). This Court denied Defendants' motion, and Defendants appealed.

In 1982, the United States Court of Appeals for the Fifth Circuit reversed this Court's decision. *United States v. Texas, (LULAC)*, 680 F.2d 356 (5th Cir. 1982). First, the Fifth Circuit held that there was insufficient factual support in the record for this Court's Equal Protection findings. *Id.* at 370-71. Regarding the EEOA findings, the court explained that the case below was tried and decided prior to the Fifth Circuit's decision in *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981), which laid down a three-step test for compliance with section 1703(f) of the EEOA. *Id.* at 371. Relying upon this new

-4-

standard, the court concluded that this Court's EEOA findings were moot. *Id.* The court explained that

> where the court erred . . . was in its denial of the state's post-trial motion
> to vacate the injunctive order on the ground of mootness. . . . The court's
> refusal to reconsider its injunctive order in light of the 1981 Act imposed
> a judicial gloss on the new legislative scheme without testing that
> scheme against the requirements of section 1703(f) as elaborated by
> *Castaneda*. In these circumstances, the court's judgment may not
> legitimately be sustained upon the section 1703(f) ground.

*Id.* The Fifth Circuit remanded.[6]

## B.   2006 INTERVENTION

Twenty-four years later, on February 9, 2006, LULAC and GI-Forum filed a Motion for Further Relief under the Modified Order.[7] This Motion is now before this Court. The crux of Intervenors' Motion is that in the years since Texas enacted S.B. 477, TEA has abandoned monitoring, enforcing, and supervising school districts to ensure compliance with Texas's bilingual education program. Intervenors assert that TEA's actions deny LEP students equal educational opportunity, and therefore violate section 1703(f) of the EEOA, and the Modified Order.[8] It was, and apparently remains, the Intervenors' position that the instant action is merely a successive motion in their original 1981 intervention, lineally descending from the Fifth Circuit's remand in *United States v. Texas, (LULAC)*, 680 F.2d 356.

---

[6] The appeals court also directed this Court to "determine . . . what questions–if any–presented by the case are subject to resolution on a statewide basis before proceeding further on the remand . . . ." *LULAC*, 680 F.2d at 374.

[7] Intervenors' Motion for Further Relief (Docket No. 588).

[8] On February 28, 2006, the United States intervened in a limited capacity. The United States reserved its position on the Intervenors' allegations, awaiting the Defendants' response as well as future factual developments. (Docket No. 589).

Defendants immediately moved to dismiss the Intervenors' Motion, asserting Eleventh Amendment immunity. They also argued that the Intervenors had improperly invoked the forum of this Court by filing this action as a Motion for Further Relief under the Modified Order—directly challenging Intervenors' "successive motion" theory.

It is important, at this juncture, to clarify that although Defendants' motion to dismiss framed the issue as one of "jurisdiction," it is more accurately termed an objection to an allegedly factitious forum. It is undisputed that this Court has subject matter jurisdiction over Intervenors' EEOA claim.[9] The gravamen of Defendants' objection was that the Intervenors improperly filed their Motion for Further Relief under the Modified Order in an attempt to select this Court, and this judge, when Intervenors' claim is exclusively an EEOA claim.

On August 11, 2006, the Court issued a lengthy written opinion denying Defendants' motion to dismiss.[10]  Therein, the Court rejected Defendants' Eleventh Amendment Claim.  Regarding Defendants' forum objection, the Court explained that Intervenors had pled not only a violation of the EEOA, section 1703(f), but a separate violation of Section G(1) of the Modified Order, which requires Defendants to ensure "that school districts are providing equal educational opportunities in all schools." That is, Intervenors had invoked the Modified Order "as a source of law" being violated by Defendants' actions.[11] The Court applied notice pleading principles and concluded that the litigation could proceed

---

[9] Section 1708 of the EEOA expressly grants jurisdiction for claims under the statute to United States District Courts.  20 U.S.C. § 1708.

[10] (Docket No. 663).

[11] *Id.* In addition, Intervenors invoked the enforcement provision of the Modified Order— Section J(1), which provides "[t]his Court retains jurisdiction for all purposes, and especially for the purpose of entering any and all further orders which may become necessary to enforce or modify this decree."

under the Modified Order at that stage in the case.[12]

In a subsequent motion to dismiss, the Defendants argued that the Intervenors lacked associational standing because no LEP students are members of their organizations, and no member would have standing to bring this action in their own right. The Intervenors requested, and this Court granted, leave to amend their Motion for Further Relief, in order to identify Texas LEP students who are members of their organizations. That same afternoon, the Intervenors amended their complaint, identifying fourteen parents of LEP students enrolled in Texas schools, who are members of Texas LULAC or whose children are members of Texas LULAC. The Court considered Intervenors' amended submissions and arguments and rejected Defendants' standing challenge by written order.[13]

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

On October 24, 2006, the Court commenced a five day bench trial.[14] The Court has considered the evidence and arguments at the hearing, as well as the post-trial briefs in this matter, and makes the

---

[12] In allowing the litigation to proceed at this juncture, the Court did not comment upon the legal standard required to establish a novel and previously untested violation of section G(1) of the Modified Order. (*See* Docket No. 633). Instead, the Court applied notice pleading principles to the issue and concluded that the facts and allegations in the Intervenors' Motion for Further Relief, if proven, could establish a violation of the Modified Order. Therefore, dismissal was inappropriate at this juncture.

[13] *See* "Memorandum Opinion and Order Denying Defendants' Motion to Dismiss" October 23, 2006 (Docket No. 699). Therein, the Court found that Intervenors, GI-Forum and LULAC, are two Mexican-American organizations with broad membership and chapters across Texas. Both organizations have, as two of their primary functions and purposes, the improvement and advancement of educational opportunities for persons of Mexican-American descent or nationality, and the protection and defense of the civil rights of this major ethnic and nationality group.

[14] At the opening of trial, the United States stated its intention to reserve its position on the merits until the close of trial.

following findings of fact and conclusions of law.[15] The Court will begin by summarizing the structure of Texas's programs for educating non-English speaking students relevant to the issues in this case. Then the Court will turn to Intervenors' claims, addressing first the adequacy of Texas's program under the Modified Order, and lastly, its adequacy under the EEOA.

## A.  INTRODUCTION

The State of Texas seeks to educate one of the largest populations of LEP students in the country, and the population steadily grows.  LEP students are present in nearly every school in Texas—57 percent of the State's 1,227 school districts serve 20 or more LEP students.  At least one LEP student is enrolled in 1,070 district and charter schools statewide, resulting in the presence of at least one LEP student in approximately 87 percent of schools.  According to TEA statistics for the 2004-2005 school year, approximately 36 percent of Texas's 1,969,097 Hispanic students were LEP students.[16]

### 1.    State Administration of LEP Education

To educate Texas students, including LEP students, Texas has legislated a system of shared responsibilities between state and local educational entities.  Under the Texas Education Code, the

---

[15]  At the October 24, 2006 hearing, Intervenors called parents of Texas LEP students to testify regarding standing, and the Defendants cross-examined these witnesses. Upon hearing the testimony, the Court is convinced that Intervenors have established associational standing to proceed on behalf of their respective organizational memberships. In support thereof, the Court hereby incorporates the findings in its written "Memorandum Opinion and Order . . . ." October 23, 2006 (Docket No. 699).

[16]  Texas schools enrolled 1,969,097 Hispanic students, and 637,239 were LEP students.

school districts shoulder "the primary responsibility for implementing the state's system of public education and ensuring student performance in accordance with this code." TEX. EDUC. CODE § 11.002. In contrast to this broad statement of responsibility, Texas law precisely tailors TEA's role, tasking the agency with fourteen enumerated "educational functions." *Id.* at § 7.021. Directly relevant here, the agency is tasked with administering and monitoring "compliance with education programs required by federal or state law . . . ." *Id.* Texas law explicitly limits TEA's realm of authority, by providing that "[a]n educational function not specifically delegated to the agency or the board under this code is reserved to and shall be performed by school districts . . . ." *Id.* at § 7.003.

In 1995, Texas enacted Chapter 29 of the Texas Education Code, which mandates bilingual education and English as a second language (ESL) programs in all Texas schools. *Id.* at § 29.051, *et seq.* The state policy controlling these programs is unequivocal, stating:

> English is the basic language of this state. Public schools are responsible for providing a full opportunity for all students to become competent in speaking, reading, writing, and comprehending the English language. Large numbers of students in the state come from environments in which the primary language is other than English. Experience has shown that public school classes in which instruction is given only in English are often inadequate for the education of those students. The mastery of basic English language skills is a prerequisite for effective participation in the state's educational program. Bilingual education and special language programs can meet the needs of those students and facilitate their integration into the regular school curriculum. Therefore, in accordance with the policy of the state to ensure equal educational opportunity to every student, and in recognition of the educational needs of students of limited English proficiency, this subchapter provides for the establishment of bilingual education and special language programs in the public schools and provides supplemental financial assistance to help school districts meet the extra costs of the programs.

*Id.* at § 29.051.

This legislative scheme makes plain Texas's decision regarding how best to distribute

responsibility within state government, in a stated effort to effectively ensure equal educational opportunities for LEP students. In service of that end, it is TEA's responsibility to establish a procedure for identifying school districts that are required to offer a bilingual education or ESL program. *Id.* at § 29.053(a). By law, every Texas school district with twenty or more LEP students in the same grade level in the district must offer a bilingual education or ESL program. *Id.* at § 29.053(c).

Bilingual programs are distinct from ESL programs. In layman's terms, bilingual education programs use "both the students' native language and English to teach content material while students are mastering English, with the ultimate goal of transition to all-English instruction." Erica Higgs, *Specialized High Schools for Immigrant Students: A Promising New Idea*, 34 J.L. & EDUC. 331, 335 (2005). In contrast, "ESL instruction teaches all courses in modified English that is easier for [LEP students] to comprehend." *Id.*

Bilingual programs are also implemented differently from ESL programs under state law. In school districts with twenty or more LEP students in the same grade level, the statute mandates bilingual education in kindergarten through sixth grade, and ESL in secondary school. *Id.* at § 29.053(d). In elementary schools with fewer than twenty LEP students in the same grade level, state law requires school districts to provide ESL instruction.[17]

In addition, Texas law mandates standards relating to bilingual/ESL program content and instructional methods, *id.* at § 29.055; identification and classification of LEP students, *id.* at § 29.056; facilities and class sizes, *id.* at § 29.057; and bilingual/ESL teacher certification, *id.* at § 29.061.

---

[17] Specifically, the statute mandates: "(1) bilingual education in kindergarten through the elementary grades; (2) bilingual education, instruction in English as a second language, or other transitional language instruction . . . in post-elementary grades through grade 8; and (3) instruction in English as a second language in grades 9 through 12."

## 2.     PBMAS:  Compliance Monitoring

Texas law requires that TEA evaluate the effectiveness of school districts' compliance with requirements of Chapter 29, Texas's bilingual/ESL statute. *Id.* at § 29.062. However, TEA may only monitor Chapter 29 compliance to the extent necessary to ensure "compliance with federal law and regulations . . ." and "accountability under Chapter 39." *Id.* at § 7.023. Chapter 29 instructs TEA to monitor compliance "based on the academic excellence indicators adopted under Section 39.051(a) including the results of assessment instruments." *Id.* at § 29.062. Because the actual means by which Defendants monitor Chapter 29 compliance and effectiveness is directly at issue in this case, it will be thoroughly introduced.

From 1995 to 2003, TEA monitored Chapter 29 compliance via the District Effectiveness and Compliance ("DEC") system. Under DEC, TEA was tasked with conducting on-site monitoring of special programs, such as bilingual/ESL, in every school district within a five-year cycle.[18] Once on-site to monitor a bilingual/ESL program, TEA officials were required to evaluate several substantive components (*e.g.*, design, materials, in-class implementation) of the district's bilingual/ESL program. The DEC program was ultimately unsuccessful. It is undisputed that TEA failed repeatedly from 1996 to 2002 to conduct bilingual reviews in numerous Texas school districts.[19]

In 2003, TEA replaced the DEC with the Performance Based Monitoring Analysis System ("PBMAS"). The 2003-2004 school year was a transition year from old to new monitoring systems, and 2004-2005 marked the first year of PBMAS in Texas schools. The 2006-2007 school year was the third year of full implementation of PBMAS.

---

[18] The plan was later amended to a six-year cycle.

[19] *See* Def. Ex. 28.

In a significant departure from DEC practices, PBMAS does not use on-site visits as the primary monitoring tool to evaluate Chapter 29 compliance. Nor does PBMAS, as an initial strategy, review the substantive components of school districts' programs. Instead, PBMAS is essentially an automated, data-driven system. TEA's first tool under PBMAS is a "desk audit" of student performance data. That means that TEA compiles and analyzes data at its offices in Austin, Texas. By reviewing this data, TEA seeks to gain insight into educational programs by reviewing student performance "indicators" intended to measure the students' performance and, correspondingly, program effectiveness.[20] Most, but not all, of the indicators are derived from student performance on one standardized test—the Texas Assessment of Knowledge and Skills ("TAKS").

TEA employs nine bilingual education/ESL "indicators" that it uses to assess LEP student achievement in a school district.[21] "Indicator" is a general term, referring to statistical information regarding LEP student achievement in a given area subject area (e.g., mathematics or reading). One example of an indicator used by TEA is the percentage of students enrolled in a bilingual education program who pass the TAKS test in English. Each indicator is then measured against an "accountability standard," which is a target passage rate for a given subject area. A "performance level" is then assigned to a school district for that subject area, based upon the percentage deviation of the indicator from the accountability standard.[22]

---

[20] PBMAS monitors indicators in four key program areas: bilingual/ESL (most relevant here), career and technology education, No Child Left Behind ("NCLB"), and special education.

[21] For a full description of the nine indicators, see Def. Ex. 3, p. 23-38.

[22] TEA assigns performance levels as follows: (1) if a school district meets or exceeds the accountability standard for a given subject, their performance level is 0; (2) the performance level is 1 for results that are between 0.1 to 5 percentage points below the accountability standard; (3) 2 for results that are between 5.1 - 10 percentage points below the accountability standard; and (4) 3

A school district's failure to meet TEA's expectations, by failing to meet an "accountability standard," triggers the PBMAS intervention process.  Under TEA's intervention procedures, school districts are subject to progressively more extensive levels of TEA intervention, depending upon the severity of a given district's under-performance.  The lowest level of intervention requires the district to submit a thorough "continuous improvement plan" to TEA, subject to random review.  Under the highest level of intervention, TEA initiates a "targeted on-site review" of the school district, the parameters of which TEA tailors to the precise problems identified in the school district.  During this stage of intervention, a team of TEA officials actually goes on-site to monitor and evaluate the school district.  A school district's chronic failure to meet TEA's standards can result in a series of sanctions, the most severe of which is the dissolution of that district, accompanied by its annexation to an adjoining district.[23]

In the 2006-2007 school year, TEA staged 328 school districts for intervention based on under-performance in their bilingual/ESL programs.  Of those 328 school districts, 21 districts were staged for on-site inspection.  At the close of this Court's hearing, TEA had yet to go on-site to these 21 school districts.  However, a TEA official testified that she was certain that these on-site reviews would occur in the 2006-2007 school year.  Intervenors have presented, and the Court has no independent reason, to doubt the credibility of this witness and evidence.

Although PBMAS is the primary means, it is not the sole means by which TEA monitors LEP students in Texas schools.  TEA also monitors LEP students served in bilingual/ESL programs under Title I of the federal No Child Left Behind Act of 2001 ("NCLB"), 20 U.S.C. § 6301, *et seq.*  In

---

for results that are greater than 10 percentage points below the standard.

[23] *See* TEX. EDUC. CODE §§ 29.062(e), 39.131(a), 39.132.

addition, TEA monitors LEP student performance under the Texas accountability rating system, as mandated by Chapter 39 of the Texas Education Code. These monitoring devices will be discussed as necessary in analyzing Intervenors' claims under the relevant law.

**3.    Intervenors' Claims**

Citing "miserable" LEP student academic achievement as proof, Intervenors contend that over the last 25 years, TEA has abandoned monitoring, enforcing, and supervising school districts to ensure compliance with the Texas's bilingual/ESL program.[24] This, they argue, has resulted in a denial of equal educational opportunities to the Texas LEP student population. Intervenors also claim that TEA has failed to implement properly its bilingual/ESL program. Intervenors name no schools or school districts as parties in this action.

Intervenors contend that TEA's alleged abdication of its duties violates section 1703(f) of the EEOA, which provides:

> No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin by—
> * * *
>
> (f) the failure by an educational agency to take appropriate action to overcome language barriers that impeded equal participation by its students in its instructional programs.

20 U.S.C. § 1703(f). As discussed above, Intervenors also allege that Defendants' actions violate Section G(1) of the Modified Order, which requires Defendants to ensure "that school districts are providing equal educational opportunities in all schools."

---

[24] Transcript, vol. I, pg. 17, ln. 16.

-14-

## B. MODIFIED ORDER

The Court first turns to Intervenors' contention that Defendants' actions violate the terms of the Modified Order.  As discussed above, GI Forum and LULAC first intervened to challenge TEA's administration of Texas's bilingual education program in 1975.  They now seek further relief under Section G(1) of the Modified Order, arguing that Defendants' actions have violated the Modified Order's mandate that Defendants ensure "that school districts are providing equal educational opportunities in all schools." Intervenors argue that this language of Section G(1) obligates Defendants to specific action in the realm of monitoring and enforcing Texas's bilingual education programs.[25]

The Modified Order directs Defendants to take affirmative steps to eliminate all remaining vestiges of the former *de jure* segregated school system in Texas, to prevent the recurrence of a segregated system, and to achieve fully integrated schools. *United States v. Texas (Intervention of LULAC, GI-Forum, and the NAACP)*, 793 F.2d 636, 642 (5th Cir. 1986).  Under the Modified Order, Defendants' duties are twofold: first, Defendants are required to "act at once to eliminate by positive means all vestiges of the dual school structure throughout the state; and second, to compensate for the abiding scars of past discrimination."[26]  The Modified Order goes on to prescribe, in specific terms, what Defendants must do to achieve these ends.

In the realm of "Curriculum and Compensatory Education," Section G(1) instructs Defendants to ensure "that school districts are providing equal educational opportunities in all schools."  To accomplish this, the Modified Order requires TEA, "through its consulting facilities and personnel" to "assist school districts in achieving a comprehensive balance[d] curriculum on all school campuses .

---

[25] Int. Post-Hrg. Brief (Docket No. 720, at 3).

[26] (Docket No. 8).

. . ." Although the Court has never articulated the standard necessary to establish a violation of Section G(1) of the Modified Order, it is clear that Intervenors' attempt to do so falls short in this instance.

Intervenors have not carried their burden of proof to establish that Defendants' monitoring and enforcement of Texas's bilingual education program violates the Modified Order. First, Defendants' actions do not plainly violate any specific provision of the Modified Order, which articulates no prescriptive means by which Defendants must monitor and enforce the state's bilingual education programs. Beyond invoking the broad language of Section G(1) as a talisman, Intervenors have presented no evidence that Defendants have abdicated their responsibility to ensure equal opportunities statewide, by failing to assist districts in "achieving a comprehensive balance[d] curriculum on school campuses." Except in the most attenuated sense, Intervenors presented no evidence linking Defendants' monitoring and enforcement actions to inadequate curriculum on a single Texas campus.

Although this Court retains broad remedial jurisdiction over those facets of school operations which represent or flow from the earlier *de jure* discriminatory system in Texas, its remedial jurisdiction goes only so far as the correction of the constitutional infirmity. *United States v. Texas (Goodrich)*, 158 F.3d at 312 (citing, *e.g., Missouri v. Jenkins,* 515 U.S. 70, 97-98 (1995)*; Freeman v. Pitts,* 503 U.S. 467, 496-97 (1992)*; Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 434-37 (1976)*; Milliken v. Bradley,* 433 U.S. 267, 282 (1977)*; Milliken v. Bradley,* 418 U.S. 717, 750-53 (1974)). Intervenors present no evidence or argument that Defendants' current monitoring and enforcement schema flows from, or is a vestige of, the earlier *de jure* system of segregation in Texas. Nor do Intervenors establish that Defendants' actions evince a failure to compensate for the scars of past discrimination.

The Modified Order remains valid and enforceable, at hand to enforce its express provisions and eliminate the remnants of Texas's earlier *de jure* discriminatory system. It has accomplished much,

ensuring that Texas's development of an education bureaucracy be done with an eye to the rights guaranteed in the Constitution. However, the integrity of the Modified Order, and the aims it remains intact to achieve, demand that it be invoked for its given purpose, and no other.

In conclusion, Intervenors have failed to establish that Defendants' actions violate any express provision of the Modified Order. Also, they have failed to link Defendants' challenged action to the wrong which lends the Modified Order its remedial authority—Texas's earlier *de jure* discriminatory system. Accordingly, Intervenors' Motion for Further Relief under the Modified Order shall be **DENIED**.

## C.   EQUAL EDUCATION OPPORTUNITY ACT OF 1974,
## 20 U.S.C. § 1703(f)

The remaining issue is whether Defendants' administration of the state's chosen program for educating LEP students violates the EEOA, which requires an educational agency to "take *appropriate action* to overcome language barriers that impede equal participation" by students in instructional programs. 20 U.S.C. § 1703(f) (emphasis added).

As discussed above, Intervenors allege that Defendants have abdicated their responsibility to monitor and enforce implementation of Texas schools' bilingual/ESL programs. Intervenors' first argument is that the data-driven PBMAS is structurally flawed, in that it does not, and cannot, fulfill Defendants' monitoring obligations as currently designed. Intervenors' second argument is results-based. Citing poor student performance results at the secondary-level, Intervenors argue that Defendants have failed to monitor the implementation and evaluate the effectiveness of bilingual/ESL programs as to these students.

The United States also asserts that Defendants have violated section 1703(f) of the EEOA. The United States contends that Defendants' monitoring efforts are deficient in two respects. First, Defendants do not intervene in low-performing individual campuses that are located within otherwise satisfactory school districts. Second, the United States asserts that because Defendants have abandoned DEC's cyclical on-site visits, Defendants have no mechanism to ensure compliance with state bilingual/ESL program standards in a meaningful way.

The leading case on section 1703(f) is *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981). The plaintiffs in *Castaneda*, Mexican-American schoolchildren and their parents, argued that the bilingual education and ESL program in their Raymondville, Texas, school district violated the EEOA by failing to take "appropriate action to overcome language barriers." *Id.* at 1006. In addressing the plaintiffs' claims, the *Castaneda* court noted Congress provided little guidance, in the language of the EEOA or its legislative history, to assist it in determining whether a school district had taken "appropriate action" to overcome student language barriers. *Id.* at 1009. Nevertheless, Congress had placed the difficult responsibility of determining whether this obligation had been met upon the federal courts, and thus

> we find ourselves confronted with the type of task which federal courts are ill-equipped to perform and which we are often criticized for undertaking, prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (*i.e.*, state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field. Confronted, reluctantly, with this type of task in this case, we have attempted to devise a mode of analysis which will permit ourselves and the lower courts to fulfill the responsibility Congress has assigned to us without unduly substituting our educational values and theories for the educational and political decisions reserved to state or local authorities or the expert knowledge of educators.

*Id.*

By requiring educational agencies to take "appropriate action to overcome language barriers,"

rather than "bilingual education" or some other prescriptive measure, the court reasoned that Congress intended to leave state and local educational authorities "a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA." *Id.* That being the case, Congress still intended to ensure that educational authorities make a substantial and good faith effort to remedy students' language deficiencies. *Id.* Schools are not free to ignore LEP students' need for language assistance. *Id.* at 1008.

The *Castaneda* court articulated a three-prong test to assess the appropriateness of a particular school system's language program. In order for a particular language program to constitute "appropriate action," the court must first assess whether a school "is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy." *Id.* at 1009-10. The second inquiry is whether the programs and practices actually used by a school are "reasonably calculated to implement effectively the educational theory adopted by the school," *i.e.*, whether "the system follows through with practices, resources, and personnel necessary to transform the theory into reality." *Id.* The third and final prong of the *Castaneda* test requires a court to determine whether the program, after "being employed for a period of time sufficient to give the [program] a legitimate trial," fails to "produce results indicating that the language barriers confronting students are actually being overcome." *Id.*

The instant case differs from *Castaneda* in an important respect. Whereas the *Castaneda* court was asked to evaluate the language program of a specific school district, the issue in this case is whether the actions of a state administrative agency, TEA, violate the EEOA.[27] Faced with a similar question

---

[27] Although the Fifth Circuit has yet to expressly apply the *Castaneda* test in this context, the Court finds, as did the Seventh Circuit in *Gomez*, that it is the appropriate standard for assessing a state administrative agency's compliance with section 1703(f) of the EEOA. *See*

in *Gomez v. Illinois State Bd. of Educ.*, the Seventh Circuit applied the *Castaneda* test to assess the responsibilities of a state educational agency under section 1703(f). 811 F.2d 1030, 1042-43 (7th Cir. 1987). The *Gomez* court noted that the *Castaneda* test will necessarily apply differently, depending on whether a state or local education program is at issue. The court reasoned that "the question is primarily one of the intensity of judicial review. For example, the [state agency and its director] are obviously not directly involved in the classroom education process." *Id.* at 1042; *see also Lulac*, 680 F.2d at 373-74 (stating that Texas, "*qua* state, directly educates no one; this is the work of the school districts"). As such, state educational agencies can generally set only "general guidelines in establishing and assuring the implementation of the state's programs." *Id.*

Nevertheless, the EEOA's obligation to take "appropriate action" extends to both state and local educational agencies. *Id.* at 1042; *Idaho Migrant Council v. Bd. of Educ.*, 647 F.2d 69 (9th Cir. 1981). It is the duty of both state and local entities to ensure that the educational needs of LEP students are met. *Id.* at 1043. The state agency, in its role as administrator, "cannot, in the guise of deferring to local conditions, completely delegate in practice [its] obligation under the EEOA." *Id.*

Indeed, the general guidelines promulgated, and actions taken, by a state education agency must constitute "appropriate action" under the EEOA. *Id.* at 1042. The *Gomez* court stopped short of defining exactly what state educational agencies must do in that regard, beyond establishing the minimums for the implementation of language remediation programs and enforcing those minimums. *Id.* at 1043. Nor did they address how *Castaneda* should apply in this context. These issues are now before the Court.

---

*LULAC*, 680 F.2d at 373-74.

### 1.   Monitoring and Implementation

The first prong of the *Castaneda* test, *i.e.*, whether the bilingual/ESL program is based on sound educational theory, is not at issue.  Neither the United States nor Intervenors challenge the soundness of the bilingual/ESL programs that the state of Texas has legislated for LEP students.  Instead, the United States and Intervenors argue that Defendants have failed to adequately monitor, implement, and enforce Texas's bilingual/ESL programs, invoking prong two of *Castaneda*.

Intervenors maintain that TEA's implementation of statewide bilingual/ESL programs is deficient in several respects, amounting collectively to a failure to take "appropriate action" under the statute.  The first argument is that the data-driven PBMAS is structurally flawed, in that does not, and cannot, fulfill Defendants' monitoring obligations as currently structured.  Intervenors bemoan TEA's abandonment of cyclical, on-site monitoring, which they assert is the only meaningful way to ensure that school districts are complying with substantive components of Chapter 29 of the Texas Education Code.  Intervenors go a step farther, asserting that TEA has completely abdicated its responsibilities under the EEOA, and has improperly delegated its responsibilities to local education agencies.

The bureaucratic structure of a state's education system is the province of that state.  Neither section 1703(f), nor the *Castaneda* test require a specific apportionment of responsibilities between state and local educational agencies.  Absent a violation of federal law, the Court will not seek to redistribute a state-legislated system of responsibilities under the guise of the EEOA.  *See Bd. of Educ. of Peoria v. Illinois State Bd. of Educ.*, 810 F.2d 707, 712 (stating that when state education law legislates a system of responsibilities, a party seeking redistribution of those responsibilities must address the state legislature and not the federal courts).  Texas law vests the primary responsibility of educating LEP students in local school districts and charges TEA with monitoring district compliance with state and

federal laws.  In considering the issues in this case, the Court is mindful of the distinct spheres of responsibility given state and local education agencies under Texas law.

The issue properly before the Court is whether Defendants' monitoring system "follows through with practices, resources, and personnel necessary" to transform its chosen educational theory into reality.  *See Castaneda,* 648 F.2d at 1009-10.  The Court is concerned with the question of whether the state has made a *bona fide* effort to make the system work.  *Id.* at 1010.  In other words, the Court's task is determining whether TEA's practices, resources, and personnel are sufficient to implement the state's bilingual/ESL program.  *See id.*

As an initial matter, the applicable law does not prescribe the means by which a state educational agency must monitor school district compliance with language programs.  The Court will not arbitrate a pedagogical dispute over the efficacy and wisdom of data-driven monitoring systems.  For purposes of present inquiry, Texas is free to monitor compliance with its language programs as it sees fit, as long as this choice does not violate the EEOA.

TEA uses PBMAS as a primary device to monitor Chapter 29 compliance in Texas schools.  At the hearing, TEA presented extensive evidence and testimony regarding the theory, design, implementation, and function of the PBMAS system.  As a practice, the Court finds the system to be comprehensive and technologically sound.  Furthermore, the system is dynamic in several respects.  TEA ensures that the system is responsive and evolving by structuring the system to reflect public input.  For example, TEA reviews the PBMAS indicators and standards annually, and selects particular indicators and standards based upon public feedback, agency expert recommendations, and state and federal statutory requirements.[28]

---

[28] Transcript, vol. III, pg. 133-34, 142-43.

Intervenors argue that TEA's monitoring practices are inadequate because TEA has abandoned on-site monitoring of school districts. As an initial matter, the Court notes that the EEOA does not, *per se*, mandate that a state's monitoring efforts incorporate on-site monitoring. Even if that were the case, the evidence simply does not support Intervenors' contention that TEA has abandoned on-site monitoring of school districts. To the contrary, the record shows that on-site intervention remains a vital component of TEA's monitoring and intervention scheme. TEA identified twenty-one Texas school districts for on-site monitoring in the fall of 2006, due to those schools' chronic under-performance in bilingual/ESL programs. While on-site monitoring is not the sole or primary component of the system, it remains a key tool in TEA's intervention scheme.

As further evidence that TEA's implementation efforts are inadequate, Intervenors point to alleged statewide inadequacies in identifying and placing LEP students in bilingual/ESL programs. Texas law requires that every school district must establish and operate a "language proficiency assessment committee" (LPAC). 19 TEX. ADMIN. CODE § 89.1220 (2000).[29] Abundant trial testimony and evidence demonstrates that TEA, in conjunction with its regional service centers, provides ample resources and materials to assist individual school district's LPACs. Intervenors' argument is merely theoretical—they assert that because LPACs, under their current design and operation, could *potentially* malfunction, then LPACs must actually be malfunctioning, statewide. However, Intervenors present no concrete, credible proof of systemic LPAC malfunctions in Texas school districts. Nor have they established that TEA has failed to provide support and resources in a *bona fide* effort to make the LPAC

---

[29] The members of the LPAC are responsible for identifying a student as LEP, placing the student in a bilingual or ESL program, and eventually exiting the student as he or she makes the transition into the mainstream, all-English program. 19 TEX. ADMIN. CODE § 89.1220. Texas law prescribes specific rules regarding LPAC composition, responsibilities, and evaluation criteria. *Id.*

structure work. Accordingly, Intervenors' theoretical objection regarding LPACs cannot, and will not, be sustained.

Finally, Intervenors and the United States (collectively, "Plaintiffs") point to alleged structural "gaps" in the PBMAS and Defendants' intervention system as evidence that Defendants have failed to implement and monitor bilingual/ESL programs. It is undisputed that TEA, *through PBMAS,* analyzes data only on the school district level. Therefore, individual school campuses within a district are not analyzed and targeted for interventions under PBMAS, irrespective of their performance.[30] According to Plaintiffs, the result of this practice is that poor performance at a given campus may be "masked" by the higher performance of other campuses in the same district. At trial, Intervenors' expert witness, Roy Johnson, testified that additional Texas campuses would be identified for interventions, if Texas analyzed PBMAS data on the campus level.[31]

Defendants respond that "TEA receives and analyzes data, for monitoring and intervention purposes, from every school district, concerning every student in every class on every campus, every year, and sometimes more frequently."[32] While TEA concedes that the PBMAS aggregates student data on a district level, they demonstrate that PBMAS is only one component of the monitoring system. In addition to PBMAS, TEA monitors LEP student performance as mandated by the federal NCLB, 20 U.S.C. § 6301, *et seq.* To do so, TEA analyzes every school campus in Texas for "Adequate Yearly Progress" ("AYP"). If a school fails to meet AYP performance standards, these schools must participate in an intervention/sanction process. Like the PBMAS intervention/sanction process, the

---

[30] United States Post Hrg. Brief (Docket No. 718, at 13-14).

[31] The Court notes that Johnson's study was largely based on outdated data.

[32] Def.'s Post Hrg. Brief (Docket No. 716, at 10).

NCLB intervention process becomes more severe each year a school fails to meet standards.

TEA accumulates and analyzes LEP student performance data on the campus level through the federal NCLB process.[33]  However, it analyzes LEP student performance data on only a district level through the state PBMAS.  The difference appears to be that while a school campus with a under-performing LEP student population may be targeted for intervention and sanctions under the NCLB, that same school may evade review, intervention, and sanctions under PBMAS.

PBMAS triggers the multi-stage intervention which results in on-site monitoring, as described above; NCLB triggers a different intervention process.  In this manner, TEA has chosen to more actively intervene under PBMAS when a school district appears to be under-serving LEP students.  TEA generally leaves intra-district, individual campus under-performance to be addressed by the district and the NCLB's provisions, as appropriate.

Plaintiffs argue that TEA's reliance on PBMAS district-wide data amounts to a failure "to take appropriate action to overcome language barriers" as required by the EEOA.  *See* 20 U.S.C. § 1703(f).  The Court disagrees.  In analyzing whether TEA's monitoring scheme violates the EEOA, the Court is mindful that TEA does not *directly* educate a single Texas child.  *See Lulac*,  680 F.2d at 373-74. (stating that Texas, "*qua* state, directly educates no one; this is the work of the school districts").  Thus, the issue is what level of oversight TEA must have over the education of each Texas child to constitute "appropriate action."

First, the problem of "masking" identified by the Plaintiffs is inevitable, to some degree, in any

---

[33] TEA also monitors student performance, including LEP students, under the State Accountability Rating System, Chapter 39 of the Texas Education Code.  TEX. EDUC. CODE § 39, *et seq.*  Separate and apart from PBMAS, under the "academic excellence indicator system" (AEIS), each school campus is assigned an accountability rating.  This data is current and publicly available on TEA's website.

system which aggregates and analyzes student performance data. To illustrate: even if TEA monitored through PBMAS on the campus level, the failure of one classroom of fourth graders may be "masked" by the high performance of the other classroom of fourth graders at the same campus. TEA has elected to risk potential masking at the campus level, placing the responsibility to address and remedy the problem of the under-performing campus with the school district. This policy choice is consistent with Texas's shared system of responsibilities between state and local education agencies.

Assuming, *arguendo*, the fact of "masking" and its concomitant result,[34] Plaintiffs present no evidence of actual harm to these campuses. The Plaintiffs fail to present *any* evidence that Texas districts have systemically failed to fulfill their end of the bargain. That is, Plaintiffs have not established that student under-performance in these campuses is being systematically ignored by the school districts charged, under Texas law, with addressing and remedying it.[35]

In conclusion, the Court finds no compelling reason to supplant TEA's judgment with its own. First, the Plaintiffs have not established that TEA's monitoring and enforcement scheme fails to follow through with the practices, resources, and personnel necessary to effectuate the state's bilingual/ESL program. Second, TEA's decision to focus PBMAS monitoring and intervention at the district level does not amount to a failure to take "appropriate action to overcome language barriers." *See id.* Because the Plaintiffs have not established that TEA's monitoring and enforcement efforts are less than

---

[34] The concomitant result is that TEA would have staged many more campuses for intervention if PBMAS monitored on the campus level.

[35] The Court additionally notes that a private right of action exists under the EEOA for a student to challenge his or her school district's bilingual/ESL program. *See* 20 U.S.C. § 1706. Thus, a LEP student in the hypothetical school district described above may file suit directly against that school district and campus, challenging its failure to properly ensure an equal educational opportunity. In this way, the statute can be effectively utilized to bring a problem district into compliance with federal law. But that is not this case.

*bona fide*, the Court finds that Defendants' actions do not violate the EEOA.

## 2.    Satisfactory Results

The inquiry does not end with the parties' agreement that the Texas bilingual/ESL program is sound and this Court's finding that Defendants are monitoring and implementing the program through the use of adequate techniques.  The third and final prong of the *Castaneda* test asks whether the education program, after a period of time sufficient to give the plan a legitimate trial, fails to obtain results that would indicate that the language barriers confronting LEP students are actually being overcome.  *Castaneda*, 648 F.2d at 1010.  A program which fails to bear fruit after a legitimate test *may*, at that point, no longer constitute appropriate action.[36]  *Id.* (emphasis added).  Deference to the decisions of the education agency is unwarranted if, over sufficient time, the agency's chosen system "has failed to make substantial progress in correcting the language deficiencies of its students."  *Gomez*, 811 F.2d at 1042.

Intervenors argue that the state's program for LEP students at the secondary level has failed to produce satisfactory results, and therefore Defendants are in violation of the EEOA.[37]  Intervenors assert that TEA's pedagogical theory, ESL instruction, has proven ineffective in addressing the needs of LEP students since its inception twenty-five years ago.  As evidence, Intervenors point to the large performance gaps between LEP students and other students, especially at the secondary level.  In light

---

[36] In formulating this standard, the *Castaneda* court reasoned, "We do not believe Congress intended that under § 1703(f) [an education agency] would be free to persist in a policy which, although it may have been appropriate when adopted. . . has, in practice, proved a failure." *Castaneda*, 648 F.2d at 1010.

[37] The United States does not join Intervenors in this allegation.

of LEP student under-performance, Intervenors fault TEA with failing to evaluate and alter the program at the secondary level. The Court understands the Intervenors' argument to be that although the pedagogical theory, *qua* theory, is acceptable, it can no longer be deemed "appropriate action" because of how poorly LEP students are performing at the secondary level. Thus, Intervenors ask this Court to enjoin TEA to propose comprehensive changes in the state program for LEP students at the secondary level.

Defendants respond that bilingual/ESL programs enjoy significant success, statewide, especially in the elementary school grades. The evidence shows that approximately eighty percent of the LEP student enrollment in Texas public schools is concentrated in elementary school, with the highest concentration of LEP students in pre-kindergarten through second grade. Thus, the overwhelming majority of LEP students are served in the very grades where Texas public schools are achieving the most dramatic success. LEP student progress at the secondary level is less dramatic. Nevertheless, there are some bright spots in LEP student achievement at this level, which the Court will discuss below.

At issue is whether Texas's bilingual/ESL program has not proven successful over a sufficient period of time, and therefore is not "appropriate action" under the EEOA. *See Castaneda*, 648 F.2d at 1010. Of course, this inquiry is necessarily different when it is TEA's, as opposed to a local district's, educational program under review. *See Gomez*, 811 F.2d at 1042. TEA administers a comprehensive, state-wide bilingual/ESL program which applies to all Texas schools. The only evidence before the Court pertaining to LEP student success is statistical data regarding the aggregate performance of LEP

-28-

students in Texas.[38]

In assessing whether the state-wide bilingual/ESL program constitutes "appropriate action," Intervenors urge the Court to bisect the data for secondary students from the data for elementary students and analyze, in isolation, whether the secondary student data demonstrates sufficient results. The Court rejects this approach. The program for secondary students is not separate and distinct from the elementary school program. Rather, the secondary program is but the latter stage in TEA's comprehensive bilingual/ESL program.

The goal of the program, at all levels, is to exit LEP students successfully from the program when they have sufficiently mastered basic English skills. As discussed above, the overwhelming majority of LEP students are in elementary school, with the highest concentration of LEP students in pre-kindergarten through second grade. The record clearly shows that LEP students in secondary school (i.e., grades seven through twelve) comprise a clear minority of the overall LEP population.[39] This is largely because the majority of LEP students exit bilingual/ESL programs before they reach the seventh grade. In fact, the number of LEP students becomes progressively smaller at each grade level. In light of these realities, the Court will not gauge the success of TEA's bilingual/ESL program solely on the performance data of a small minority of the overall LEP population in Texas schools. Proper disposition of this case requires that the Court consider the program's panoptic results.

The record clearly shows that language barriers confronting LEP students are being overcome at the elementary school level. First, the performance of elementary LEP students is improving. For

---

[38] Were a local district's program under review, the Court would expect to have before it discrete facts regarding administrative and teaching practices, as well as information regarding individual student performance and individual student, teacher, and administrator testimony.

[39] Four out of five LEP students are in pre-kindergarten through sixth grade.

example, in the past three years, the TAKS passing rate for LEP third graders taking the TAKS test in English increased by eighteen percentage points in reading, and thirteen percentage points in mathematics. Despite this progress, the "all-students" category of elementary students still performs better overall than the LEP student category on the TAKS test in English. However, the dramatic improvement in LEP student performance is narrowing the achievement gap, because LEP student performance on the TAKS in English is improving at a greater rate than the "all-students" performance.

Finally, and perhaps most evident of "appropriate action," the majority of LEP students exit bilingual/ESL programs before they leave elementary school. This is evidence that the program succeeds, statewide, in assisting elementary students in mastering basic English skills. Encouragingly, these students continue to succeed. Two years after exiting the program, former LEP students taking the TAKS test outperform students overall.[40] The record is clear that TEA has not failed to take "appropriate action to overcome language barriers" as to LEP elementary students. *See* 20 U.S.C. § 1703.

It is undisputed that LEP student performance data at the secondary level is less impressive. LEP students are doing far worse than their non-LEP counterparts on TAKS. Intervenors present evidence that over eighty percent of LEP students in the seventh through ninth grade failed to perform satisfactorily on the TAKS test in English. Even so, there are signs of LEP student improvement. For example, from 2003 to 2006, TAKS passing rates improved for seventh and eighth grade students in all three subjects tested (*i.e.*, reading, mathematics, and writing). However, progress towards closing the achievement gaps between LEP students and students overall is less rapid at the secondary level than

---

[40] For example 95% of former LEP students in the third grade passed the TAKS reading test, and 90% passed the mathematics test.

the elementary level.

As Defendants explain, it is foreseeable that secondary LEP students will perform worse on the TAKS in English than their non-LEP counterparts. The test is in English, and once a student has mastered basic English skills, he or she is no longer classified as "LEP." Therefore, the students classified as LEP are taking a standardized test in English, without a basic mastery of English language skills.

Intervenors' argument plainly rests on the precept that "where there's smoke there's fire." That is, because the aggregate data shows LEP student under-performance at the secondary level, TEA must have failed to take "appropriate action to overcome language barriers." From this proposition, Intervenors conclude that TEA has failed to evaluate its program as to these students, and its approach must change. The Court disagrees.

TEA is bound to administer to school districts the legislative mandate that ESL is the method of instruction in secondary schools. *See* TEX. EDUC. CODE § 29.053. Perhaps recognizing this, Intervenors do not challenge the soundness of ESL instruction as a pedagogical theory. Instead, they argue that TEA has failed to "evalute" the program. It is entirely unclear from Intervenors' argument exactly what they seek regarding "evaluation." This being the case, Intervenors have not established that TEA has abdicated any responsibility with regards to its administration of the program. To the contrary, the record shows that TEA "evaluates" the success of bilingual/ESL programs annually, including consideration of means to improve its administration of these programs.

When a state education agency is the defendant in a section 1703(f) case, evidence of statistical under-performance among a minority of the overall LEP population does not, without more, establish a failure to take appropriate action. As discussed above, the Court will not bisect LEP student data at

the secondary level from elementary school data and analyze that data in isolation. The Court's goal is to assess whether TEA's bilingual/ESL program, considered *in toto*, amounts to a failure "to take appropriate action to overcome language barriers." 20 U.S.C. § 1703(f). While no one considers LEP student under-performance at the secondary level satisfactory, the Court will not ignore the encouraging results of the bilingual/ESL program at the elementary school level. It would be inappropriate to gauge the success of TEA's bilingual/ESL program solely on the performance data of a small minority of the overall LEP population in Texas schools.

Further, Intervenors challenge TEA's administration of the statewide ESL program, as opposed to that of any local school district. The sole evidence Intervenors rely on is aggregate student performance data pertaining to the entire State of Texas. In the unique context of this case, this evidence alone cannot present a clear explanation of the causal factors for LEP secondary student under-performance. There are simply too many other potentially contributing variables.[41] Intervenors have failed to establish that it is the program that bears responsibility, as opposed to a confluence of countless other potential factors. The Court will not enjoin TEA to alter its practices on such a slender reed.

On the facts before it, the Court concludes that TEA's education theory is sound, and its implementation and enforcement of the bilingual/ESL program is adequate under federal law. TEA's implementation of the program at the elementary levels is yielding promising preliminary results. Under these circumstances, the Court will not simply assume, without more, that a flaw in the bilingual/ESL program is responsible for the under-performance of LEP secondary students statewide.

In conclusion, the Court holds that Intervenors have failed to establish that Texas's

---

[41] For example, an unspecified number of LEP students in secondary school are recent immigrants.

bilingual/ESL program has not obtained results which indicate that the language barriers confronting LEP students are actually being overcome. *See Castaneda*, 648 F.2d at 1010. The panoptic results of the program indicate that language barriers *are* actually being overcome as to the clear majority of LEP students. Although Intervenors have pointed to consistent under-performance by LEP students at the secondary level, Intervenors have failed to link this data with any flaw in Texas's bilingual/ESL program.

The obligation to ensure equal educational opportunity to every student does not cease. The Court's holding is not an endorsement of those elements of the current bilingual/ESL program which may fail to meet the needs of LEP students. While imperfections are a reality in any administrative system, they must amount to a failure to take "appropriate action to overcome language barriers" to be remedied under the EEOA. *See* 20 U.S.C. § 1703(f). Intervenors have pointed to no systemic flaw which meets that standard in this case. Accordingly, the Intervenors' request for relief under § 1703(f) of the EEOA shall be **DENIED**.

### D. CONCLUSION

Much has changed in the decades since this Court was first tasked with deciding whether TEA's actions in the realm of LEP student education violated the EEOA and the Modified Order. At that time, TEA's administration of a statewide bilingual/ESL program was in its fledgling infancy, and the necessity of federal judicial oversight was evident. Since then, Texas demographics have shifted considerably, and with them the immensity of TEA's responsibility in educating LEP children. The present case demonstrates that TEA is attempting to respond, in all good faith, to the complex demands of this age. Intervenors have failed to support their proposition that Defendants

-33-

are in violation of the EEOA and the Modified Order.

SIGNED this _27th_ day of July, 2007.

William Wayne Justice
Senior United States District Judge